JS 44 (Rev 06/17)

# CIVIL COVER SHEET

18 CV 2689

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

18   2689

## I. (a) PLAINTIFFS

JAMES DENNIS

**(b)** County of Residence of First Listed Plaintiff   PHILADELPHIA
*(EXCEPT IN U S  PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name  Address  and Telephone Number)*

Kairys Rudovsky Messing Feinberg & Lin   (215) 925-4400
718 Arch St , Suite 501S, Phila, PA 19106

## DEFENDANTS

City of Philadelphia, Det. Frank Jastrzembski, Det  Manuel Santiago and Officers John Doe(s)

County of Residence of First Listed Defendant   PHILADELPHIA
*(IN U S  PLAINTIFF CASES ONLY)*

NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an  X  in One Box Only)*

- ☐ 1  U S Government Plaintiff
- ☒ 3  Federal Question
  *(U S  Government Not a Party)*
- ☐ 2  U S Government Defendant
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an  X  in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an  X  in One Box Only)*

Click here for  Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus** | | ☐ 870 Taxes (U S  Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☒ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS  Third Party 26 USC 7609 | |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☒ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer w/Disabilities - Other | **Other** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an  X  in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U S  Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
42 U.S.C. § 1983

Brief description of cause
POLICE MISCONDUCT LITIGATION

## VII. REQUESTED IN COMPLAINT:

☐  CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F R Cv P

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE

DOCKET NUMBER

JUN 27 2018

DATE   6-26-18

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**18    2689**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: c/o Paul Messing, 718 Arch St., Ste. 501S, Phila. PA 19106

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions

1. Is this case related to property included in an earlier numbered suit pending or within one year   Yes ☐   No ☑
   previously terminated action in this court?

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit   Yes ☐   No ☑
   pending or within one year previously terminated action in this court?

3. Does this case involve the validity or infringement of a patent already in suit or any earlier   Yes ☐   No ☑
   numbered case pending or within one year previously terminated action of this court?

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights   Yes ☐   No ☑
   case filed by the same individual?

I certify that, to my knowledge, the within case ☐ is / ☑ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE  6-27-18                          17749
                    *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.   Federal Question Cases:**

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8 Habeas Corpus
☐ 9 Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
        *(Please specify)* _____

**B.   Diversity Jurisdiction Cases:**

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3 Assault, Defamation
☐ 4 Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6 Other Personal Injury *(Please specify)* _____
☐ 7 Products Liability
☐ 8 Products Liability - Asbestos
☐ 9. All other Diversity Cases
        *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, PAUL MESSING _____, counsel of record or pro se plaintiff, do hereby certify

☑ Pursuant to Local Civil Rule 53 2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.

☐ Relief other than monetary damages is sought.

**JUN 27 2018**

DATE  6-27-18                          17749
                    *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE  A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

James Dennis

                v.

City of Philadelphia, et al

**CIVIL ACTION**

## 18    2689

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.        ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.        ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)        ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| | | |
|---|---|---|
| 6-26-18 | Paul Messing, Esq. | |
| **Date** | **Attorney-at-law** | **Attorney for** James Dennis |
| 215 925 4400 | 215 925 5365 | pmessing@krlawphila.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JUN 27 2018

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES DENNIS, | : Civil Action No. 18- |
| Plaintiff | JURY TRIAL DEMANDED |
| v. | : |
| CITY OF PHILADELPHIA, | |
| DETECTIVE FRANK JASTRZEMBSKI, | : |
| DETECTIVE MANUEL SANTIAGO, and | |
| OFFICERS JOHN DOE(S), | : |
| Individually and as police officers for the | |
| City of Philadelphia, | : |
| Defendants | |

**COMPLAINT**
**I. PRELIMINARY STATEMENT**

1. In 1992, Plaintiff James Dennis was wrongfully convicted and sentenced to death for a crime he did not commit. Nearly twenty-five years later, the United States Court of Appeals for the Third Circuit, sitting *en banc*, vacated the conviction, finding that constitutional violations by police detectives had undermined the fairness of the plaintiff's trial and the validity of the jury's verdict. Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants Jastrzembski, Santiago, and Doe(s), who coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and/or suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers, denied the plaintiff due process of law and a fair trial. The actions and conduct of the defendant officers were the results of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to properly train and supervise officers assigned to investigate homicides, and the failure to take disciplinary and remedial action against the defendant detectives and other police officers who commit serious misconduct and abuses of authority.

## II.  JURISDICTION

2.  This action is brought pursuant to 42 U.S.C. §1983.  Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision.  Plaintiff further invoke the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to adjudicate state law claims.

## III.  PARTIES

3.  Plaintiff James Dennis is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

4.  Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department which at all times relevant to this action employed Defendants Jastrzembski, Santiago and Doe(s).

5.  Defendants Jastrzembski, Santiago, and Doe(s) ("the defendant officers") were at all times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law.  The defendant officers are being sued in their individual capacities, and defendant Jastrzembski is also being sued in his supervisory capacity.

6.  At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

7.  At all times relevant to this Complaint, all defendants acted under color of state law.

2

## IV.  FACTUAL ALLEGATIONS

**The Murder**

8.  On October 22, 1991, Chedell Williams left Olney High School in Philadelphia with her classmate Zahra Howard.  Both women were wearing gold earrings.  They took a bus from school to the Fern Rock SEPTA station, near where Howard lived and where Williams could purchase a transpass to continue her journey home.  The station, located at Nedro and Tenth Streets, bustled with commuters and vendors.

9.  As Howard and Williams ascended the steps to the elevated station, two men descended the steps and confronted them, yelling "[g]ive me your fucking earrings!"  Howard and Williams turned and ran down the steps.  Howard left Williams and hid behind a nearby fruit vendor's stand.  Williams ran alone into the middle of the intersection.  The two men followed closely behind Williams, ignoring Howard.  One of the men stood off to the side, while the other followed and grabbed Williams.  Williams and her assailant struggled until the assailant pulled out a gun and shot her at close range in the neck.  The shooter and his accomplice fled from the scene and made their way up Tenth Street towards a getaway car, where a third man, the driver, was waiting.  They entered the vehicle and sped away.

10.  The first 911 call came in at 1:52 p.m.  By 1:54 p.m. and 1:57 p.m., respectively, police and medical personnel had arrived on the scene.  Williams was missing the gold earrings she had been wearing before the assault.  Her necklace and ring were untouched, and Howard still had her jewelry.  EMTs rushed Williams to a nearby hospital.  At 2:30 p.m., doctors pronounced her dead.

3

**The Eyewitnesses**

11.  In addition to Howard, numerous bystanders witnessed the events.  Of the dozens of witnesses, only nine provided descriptions of the assailants to police.  Defendants Jastrzemski, Santiago and Doe(s) ("the defendant officers") and other detectives interviewed and took statements from those witnesses at the police station.  Although the witnesses' descriptions differed in minor details, they were consistent in certain critical aspects.  Virtually all of the eyewitnesses who provided weight and height estimates of the shooter described him as about 170 to 180 pounds and 5'9" to 5'10," about the same height as the victim, who was 5'10."  Eyewitnesses also described the shooter as being in his late teens to early twenties, with a dark complexion, and wearing a red sweat suit.

12.  At the time of the incident, James Dennis was 5'4" tall, about 125 pounds, with a medium complexion.

13.  The witnesses to the shooting provided varying levels of detail in their descriptions.  Howard described the shooter as a twenty year-old black man wearing a baseball hat, a red sweat suit with white stripes on the arms, a black hood, and white sneakers.  She estimated the shooter's height as at least 5'9" or 5'10" tall.  Howard also stated repeatedly that she had never before seen either the men or the getaway car.  James Cameron, a SEPTA worker who had been standing near the bus stop in front of the station, saw both the shooting and a portion of the struggle leading up to the shooting.  Cameron described the shooter as between fifteen and eighteen years old, darker than himself, and wearing a red sweat suit with a black jacket.  Unlike Howard, Cameron did not mention a baseball cap and provided no height or weight estimates.

14.  David Leroy, a hot dog vendor, described the shooter as sixteen to nineteen years old,

4

5' 10" tall with a dark complexion, wearing a red hat, and red and white waist-length jacket.

15.  Dr. Clarence Verdell, who had been headed up the subway steps, described both men as black, one as dark-complected, with one man wearing a shiny black jacket and baseball cap, and one slightly taller than the other.

16.  As the assailants made their way to the getaway car at the top of the hill, they passed three more eyewitnesses.  On the left side of the street were Anthony Overstreet and Thomas Bertha, two men working together to install stone facing on the front of a garage.  On the right side of the street was George Ritchie, who was working on two cars.  None of these men on the hill saw the shooting, but all three witnessed the assailants running to the getaway car.  Like the bystanders from the Fern Rock station, all three gave statements to police on the day of the crime. Overstreet described the man with the gun as dark-complected, wearing a red hooded sweat suit, a black leather jacket, and white high top sneaks.  Unlike any of the other witnesses, Overstreet told police that he had recognized the shooter from the neighborhood.

17.  Bertha described the man with the gun as eighteen to nineteen years old, wearing red sweatpants, a red hooded sweatshirt, a black leather jacket, black cap, and white high top sneakers.  Bertha also described the man with the gun as having the darkest complexion of the three individuals.  Although his statement did not provide a height or weight estimate, Bertha later testified that he told police the man with the gun was 5' 9" tall and 180 lbs.  Ritchie described the man with the gun as seventeen to twenty years old, wearing a red hooded jumpsuit, blue jacket, "silk or smooth" with white stripes on the arms, a blue ball cap, white high top sneakers, sunglasses, thin build, weighing about 170 pounds, and standing 5' 9" tall.

18. Of the nine eyewitnesses who gave descriptions, only three would ever testify.  Of

the three men described as participating in the crime, only one man – Mr. Dennis, who at 5'4"

tall, 125 pounds, with a medium-complexion did not match *any* of the descriptions – would ever

be arrested.

**The Police Investigation**

19.  A squad of detectives was assigned to the Williams case, led by defendant Frank

Jastrzembski.  In the days after the crime, detectives focused their efforts on locating the getaway

car and determining whether any other robberies in the area involved similar facts.  An array of

leads led to no arrests.

20.  Extensive media coverage intensified pressure to solve the murder.  On the day of the

crime, at least three local television stations led their newscasts with the story.  The following day,

the Philadelphia Inquirer ran a front-page story about the crime under the headline: *Promising*

*Teenager Slain for Pair of Gold Earrings*.  The murder immediately became the centerpiece of

growing community panic over a series of teen robberies for expensive jewelry or clothes.

21.  Police began to follow up on attenuated street rumors and anonymous tips – among

them, a suggestion that someone named "Jimmy" from the projects may have been involved.

Detectives soon learned that the none of the men spreading the rumors had any firsthand

knowledge of the murder or those responsible for the crime.  One of them – the so-called source

of the rumors – described "Jimmy" as about 5' 5" and told the detectives that as far as he knew,

Jimmy had no involvement with guns and the rumors of his involvement were mere "hearsay."

22.  Despite the obvious inconsistencies between "Jimmy" from the projects and the

eyewitness descriptions of the shooter, and despite the apparent unreliability of the street rumors,

the defendant officers zeroed in on Mr. Dennis as their suspect.  They immediately began

6

showing his picture in a photo array to the eyewitnesses, suggestively and improperly placing Mr. Dennis's photo in the first position of the six photos.

23.   Defendants' disregard of generally accepted police practices, including the use of such highly suggestive identification procedures, improperly influenced the witnesses to identify Mr. Dennis as the man who murdered Chedell Williams.

24.   Defendant Santiago directly participated in the activities at the crime scene on the day of the murder and, in concert with Jastrzembski and Doe(s), compiled the suggestive photo arrays shown to Howard, Bertha, and Cameron, which included six photographs with Mr. Dennis's photo in the *first* position.

25.   Upon viewing the array, Howard, the victim's friend, pointing to the first photo, could say only that "[t]his one looks like the guy but I can't be sure. . . .  He looks a little like the guy that shot Chedell."  Asked if she could be sure, Howard responded "No."

26.   Defendants also showed the array to James Cameron, the SEPTA employee. Cameron likewise stated that "[n]umber one looks familiar but I can't be sure."

27.   When first presented with the photos, Thomas Bertha, one of the two men who had been working on a garage, stated only that the first photo "looks like" the man running with the gun.

28.   Despite their failure to make any positive identifications immediately following the crime – they ranged from qualified to plainly uncertain – Howard, Cameron and Bertha would ultimately become the Commonwealth's only testifying eyewitnesses.

29.   The defendant officers, knowing that the identification evidence against Mr. Dennis was weak and susceptible to impeachment, set out to develop other evidence against Mr. Dennis.

7

30. Anthony Overstreet, Bertha's partner, initially stated that number one "looks like" the shooter. But on seeing Mr. Dennis in person, Mr. Overstreet – the only eyewitness who had recognized the shooter from past contacts – did not identify Mr. Dennis in a lineup. In fact, he identified someone else in the lineup. Neither David Leroy, the hot dog vendor, nor the fruit vendors identified Mr. Dennis from the photo array. George Ritchie, the man who was working on cars directly across the street from Bertha and Overstreet, had told detectives that he "[s]ure would" recognize "the guy with the red hooded sweatshirt." However, detectives never reported showing him the photo array. Ritchie later testified at Mr. Dennis's PCRA hearing that detectives did show him photos at about the same time as other eyewitnesses. Ritchie stated that the detectives became agitated when he was unable to identify anyone after repeated instructions to "look . . . again." Ritchie was not invited to the lineup. Only those witnesses who had made qualified and tentative photo identifications of Mr. Dennis were asked to attend the lineup.

31. After suggestively securing the highly qualified "identifications" of Mr. Dennis, the defendant officers conducted subsequent identifications procedures that corrupted the witnesses' memories and improperly secured tainted identification evidence that was used against Mr. Dennis at trial.

32. Two days after the murder, the defendant officers learned that the victim's relatives had information about one of the witnesses – Zahra Howard. Diane and Mannassett Pugh, the victim's aunt and uncle, alerted the detectives that they had just spoken with Howard. According to Mrs. Pugh, Howard stated that a "Kim" and "Quinton" were also at the scene. Mrs. Pugh also stated that Howard recognized the perpetrators from Olney High School (which Mr. Dennis had not attended). Following this conversation, detectives noted in their "activity sheets" that they

8

planned to follow up with Howard concerning the information which, in addition to excluding Mr. Dennis, was contrary to her repeated statements that she had never before seen the assailants.

33.   Defendants received corroboration of the Pughs' information from another of the victim's relatives, an aunt named Elaine Parker.  Parker told the detectives that she too had spoken with Howard, and had asked why the men did not steal her earrings.  Parker also stated that she asked Howard whether she had "set up" Williams.  Howard denied the accusation, but stated for the first time that the getaway car had been following the girls for "one whole week." Like the Pughs, Parker stated that Howard mentioned Kim and Quinton's presence at the scene.

34.   Defendants went to see Howard the day after they spoke with the Pughs, and just six hours after they spoke with Parker.  One of the detectives was present at both the Parker and Howard interviews.  However, and despite their written plans to the contrary, neither detective asked Howard about the inconsistent statements, opting to focus only on the array containing Mr. Dennis's photograph.  The defendant officers concealed the "activity sheets" for ten years.

35.   In the meantime, word spread that police were investigating Mr. Dennis.  Hoping to clear his name, Mr. Dennis hired a lawyer and had him call homicide to check if there was a warrant for his arrest, or if police wanted him to come to the station.  Police responded that there was no warrant, and showed no interest in speaking with Mr. Dennis.  When he later heard that police were still asking about him, Mr. Dennis and his family went to the police station to inquire whether he was wanted for questioning.  Again, the police indicated that he was not.

36.   A few days later, Montgomery County police contacted the Philadelphia Police Department (PPD) Homicide Unit with new information about the assailants in the Williams murder.  According to the Montgomery County authorities, William Frazier, an inmate in the

9

Montgomery County Prison, advised them that he had spoken with the men who may have committed the murder.  In a signed statement, Frazier said that a friend named Tony Brown had been trying to reach him at his aunt's home.  Frazier's aunt relayed the message, and the two called Brown back together.  During that call, Frazier explained, Brown told him that he and two other individuals – a Ricky Walker and someone named "Skeet" –  had "fucked up" and accidentally killed a girl during a botched robbery for her earrings.  Brown explained that the gun had gone off in the struggle.  Frazier told police that the men knew the victim, and had described her as "Kev with the blue Pathfinder . . . his girl."  Frazier indicated that Brown also had a brown-colored car that the three used in the crime, and that Brown "liked to wear sweat suits." According to Frazier, Brown and Walker explained that they hid in Frazier's empty apartment for several days following the crime, venturing out only in the middle of the night.

37.  Frazier provided physical descriptions of the three men, all of whom were taller than Mr. Dennis and closer in height to the descriptions provided by the eyewitnesses.  He also gave the detectives addresses for the men, including their parents' and girlfriends' addresses. Detectives took Frazier on an extended "ride along" to point out each of the houses in question. Frazier also signed a consent to search his apartment.  Detectives spoke with Frazier's landlord, who was unaware of anyone having hidden out in the apartment.  They also spoke with Walker who admitted to knowing the victim from Olney High School, as Frazier had stated.

38.  When asked about the crime, Walker denied any participation, said that at that time of the crime he was sleeping, and that his mother came home during that time.  The defendant officers, despite their knowledge of the above information, never spoke to Walker's mother to verify his alibi, never spoke to Frazier's aunt to confirm the conversation, never spoke to Tony

10

Brown or Skeet, never showed photos of the three men to eyewitnesses, and completely dropped this line of investigation in favor of pursuing Mr. Dennis. The Frazier-related investigation materials and statements were concealed by the defendant officers and were not provided to Mr. Dennis's criminal defense trial counsel. Accordingly, Mr. Dennis would not learn of the Frazier investigation until a decade after his trial, when he received the information as part of PCRA discovery.

39. A few days after Frazier came forward, detectives learned that this was not the first time that the very same pair of earrings were stolen from Williams at a SEPTA station. Walter Gillyard, the victim's former boyfriend, told police that just four months before the murder a man held a gun to Williams's head at the Logan SEPTA station and stole her earrings. Williams reported the incident to police at the 35th District, the same district that would later investigate her murder. Gillyard told detectives that he was able to locate the earrings and buy them back. After Gillyard made some additional inquiries, the victim was eventually able to identify the assailant as a man named "Pep," whom she did not know, but whom Gillyard knew. Despite knowledge of the striking similarities between these robberies, the defendant officers never investigated Pep or any of the other information from Gillyard's statement.

40. A few days after Frazier and Gillyard were interviewed, the police arrested Charles "Pop" Thompson, a member of the same singing group as Mr. Dennis, for an assault that had sent his pregnant girlfriend to the hospital. While questioning Thompson about the assault, the defendant officers used coercion and threats to pressure him for information about the Williams murder. According to Thompson, the defendants said that they already knew Mr. Dennis had committed the crime, but wanted Thompson to admit that he had seen Mr. Dennis with a gun,

and to state that Mr. Dennis had confessed to him.  In return, Thompson understood that he could

expect cooperation on the felony assault charge.  Thompson cooperated and gave a statement that

he had seen Mr. Dennis with a gun on the night of the murder, but he did not state that

Mr. Dennis had confessed to him.  Mr. Dennis was told nothing about this arrangement.

41.  Approximately six months after Thompson provided this statement, and six months

prior to Mr. Dennis's trial, the Commonwealth dropped the felony assault charges against

Thompson.  After trial, Thompson told defense investigators that he regretted the false statement,

and that he had attempted to recant on the eve of trial.  The prosecutor told him it was too late.

**The Arrest And Searches**

42.  About two weeks after obtaining Thompson's statement, detectives obtained an arrest

warrant for Mr. Dennis.  They found Mr. Dennis at his father's apartment, and Mr. Dennis

accompanied them to the station with no resistance.

43.  Although he had previously retained a lawyer to clear his name, Mr. Dennis waived

his right to counsel and voluntarily gave a statement denying any involvement in the murder and

describing his whereabouts on the afternoon of the crime.  Mr. Dennis explained that on October

22, he had been at his father's apartment until the two walked out toward the bus stop, where

Mr. Dennis waited while his father watched from his nearby car.  Mr. Dennis boarded the K bus

just before 2 p.m. and took it across town to a stop just outside the Abbotsford Home Projects,

where he was scheduled to practice with his singing group that evening.  The Projects are nearly

5 miles from the scene of the Williams murder.  He told police that while on the bus, he recalled

seeing an acquaintance from Abbotsford, Latanya Cason.  After the two got off the bus,

Mr. Dennis explained, they saw each other and waved.  Mr. Dennis then spoke with some friends

in Abbotsford, met with several of his fellow singing group members, and eventually ended up at practice that evening.

44.   In his statement, Mr. Dennis also willingly supplied detectives with the information about all three apartments where he stayed and kept clothes.  Detective Jastrzembski used that information to execute search warrants that same day on Mr. Dennis's mother's house, his father's house, and his girlfriend's house.  The warrants sought clothing similar to that described by the eyewitnesses, as well as guns, ammunition, and the stolen earrings.  Following the search at Mr. Dennis's father's house, Jastrzembski filled out an executed warrant form in which he falsely claimed to have seized a pair of red pants (no indication as to whether they were sweatpants), two black waist-length jackets (no indication of the material), and a pair of Nike "Air" low top sneakers (eyewitnesses had described the shooter as wearing high top sneakers). The form provided no information describing the size of the clothing, or to whom it belonged.

45.   Defendant Jastrzemski falsely claimed that the clothes seized from the house matched Mr. Dennis's size and the description of the clothing worn by the man who shot Ms. Williams, testimony he later offered at trial to falsely incriminate Mr. Dennis.

46.   Once Jastrzembski bagged and removed the evidence to take it to police headquarters, this "evidence" disappeared forever.  Neither the defense nor the jury ever had the opportunity to see the seized clothing, but instead had to rely solely on Jastrzembski's description.  No gun, ammunition, or earrings were located at any of the three residences.

47.  Defendants Jastrzembski and Santiago investigated Mr. Dennis's alibi by interviewing Ms. Cason about two months after Mr. Dennis gave his statement.  Cason confirmed that she knew who Mr. Dennis was, and that she had in fact seen him on the afternoon

of October 22, 1991.  She confirmed that she had been on the K bus, and that after exiting the

bus, she and Mr. Dennis waved to each other from across the street, exactly as Mr. Dennis had

told police.  Cason explained that she remembered the day based on the errands she ran after

work, including cashing her welfare check at a local check cashing center.  Cason estimated the

time that she saw Mr. Dennis based on the time she usually left work, and how long it took her to

complete the errands she ran that day.  She guessed that she left work around 2 p.m., and that the

encounter would have been about 4:00 to 4:30 p.m., a full two hours after the time Mr. Dennis

described seeing her.  The time difference meant that even if Mr. Dennis truthfully stated that he

had seen Cason on the bus, her testimony would not have supported his alibi.

48.  In an interview after trial, Cason revealed that when Jastrzembski and Santiago took

her statement, they also took her only copy of the time-stamped welfare check receipt from the

day of the shooting.  According to Cason, detectives brought one copy with them, and then asked

Cason for her copy.  Cason explained that she had used the time stamp on the receipt to estimate

when she had cashed the check, when she would have completed her other errands, and thus

when she would have seen Mr. Dennis.  Direct appeal counsel investigated the discrepancy

between Mr. Dennis's statement and Cason's testimony.  He obtained a copy of the receipt from

the Department of Public Welfare, and upon viewing it, Cason confirmed that she had thought

the time stamp showed that she cashed the check at 3:03 p.m.

49.  In reality, the receipt showed a "military" style time stamp of 13:03, or 1:03 p.m.  As

Cason later stated in a notarized affidavit, this mistake accounted for the two hour difference in

her time estimate and Mr. Dennis's testimony.  According to Cason, she had told the defendants

that she had based her time estimates on the time-stamp of 13:03 on the welfare receipt.

14

Jastrzembski, who had served four years in the military, had to know that 13:03 was 1:03 p.m. Jastrzembski and Santiago concealed and/or withheld this evidence to undermine defense evidence that would have supported Mr. Dennis's alibi.  This receipt was never turned over to trial counsel, and was not admitted as an exhibit at trial.  Accordingly, Cason's faulty recollection went uncorrected, and her "alibi" testimony at trial was undermined.

**The Lineup**

50.  About a month after Mr. Dennis gave his statement, he participated in a lineup. Despite his counsel's request to have all eyewitnesses present, the Commonwealth provided only four of the nine eyewitnesses at the lineup – the four who had made qualified and highly tentative identifications of Mr. Dennis from the photo array.  Trial counsel, who had not yet received written discovery, was not made aware of the identity of the five eyewitnesses who did not pick Mr. Dennis out of the photo array.  At the preliminary hearing, trial counsel would ask again that any other eyewitnesses attend a lineup, but no other lineup was conducted.

51.  Three of the four eyewitnesses who had only tentatively identified Mr. Dennis from the photo array became more certain upon seeing him again.  Howard, who two months earlier had stated that Mr. Dennis "looks a little like the guy" but she couldn't be sure, now stated at the lineup that "I think it was number – I think it was three..." [indicating Mr. Dennis].  Cameron, who two months earlier had stated that Mr. Dennis "looks familiar but I can't be sure," now identified him in the lineup.  Bertha, who two months earlier stated that Mr. Dennis "looks like" the man with the gun, now simply identified "three" [Mr. Dennis] at the lineup.

52.  Overstreet, however, who at the time of the crime had been standing directly next to Bertha, did not identify Mr. Dennis in the lineup, and instead chose another participant.  Neither

15

the Commonwealth nor trial counsel would call Overstreet at trial.

**The Pretrial Proceedings And Discovery**

53.  Two days after the lineup, a preliminary hearing was conducted.  The Commonwealth called only three of the eyewitnesses – Howard, Bertha and Cameron.  Each witness had previously viewed the photo array prominently featuring Mr. Dennis's picture.  Each witness had seen him again at the lineup two days earlier.  Now, at the hearing, each witness identified Mr. Dennis – sitting at the defense table – as the shooter.

54.  By the time of this hearing, the Commonwealth still had not produced its discovery, and thus Ritchie's existence (as well as the existence of Leroy and Verdell) remained unknown to trial counsel.

55.  In January 1992, the Commonwealth provided the statements of certain witnesses, including Mr. Ritchie, who stated that he was standing in virtually the same position as Bertha and Overstreet, and that he would definitely recognize the man in the red sweat suit again.  The Commonwealth had not called Ritchie at the preliminary hearing, had not provided a photo array statement as was done with other eyewitnesses, and had not presented him at the lineup.  Ritchie, like Overstreet, would never testify at trial.  The defendant officers concealed the critical fact that Ritchie had failed to identify Mr. Dennis from the photo array.

56.  Despite the fact that Jastrzembski and Santiago had interviewed Latanya Cason, Mr. Dennis's alibi witness, less than a week earlier, the Commonwealth's discovery packet did not contain her statement or a copy of the welfare receipt the defendant officers had taken from her.  Nor did the defendant officers advise her of the accurate time stamp on the receipt or of the obvious inconsistency between that time and her statement.  Trial counsel eventually received

16

Cason's statement (but not the receipt) four months later when he requested additional materials. The defendant officers concealed the time-stamped check receipt that provided the basis for the timeline in her testimony and, thus, would have supported Mr. Dennis's alibi.

57. The Commonwealth's discovery packet did not include documents regarding information from inmate William Frazier detailing his conversation with a man – not Mr. Dennis – who had confessed to committing the murder. It also did not contain the activity sheets or any information about statements by the victim's relatives that Howard had recognized the assailants from Olney High School, impeaching her police statement and excluding Mr. Dennis, who attended high school elsewhere. This evidence was deliberately suppressed by the defendant officers, and Mr. Dennis would not receive those items for another ten years.

58. In September 1992, the court held a hearing on trial counsel's motion to suppress. Counsel had filed a boilerplate motion arguing that Mr. Dennis's exculpatory statement should be suppressed as involuntary, and that the lineup, photo arrays and physical evidence should be suppressed. The motion provided no factual or legal support for any of its arguments, and did not list the evidence to which it referred.

59. At the hearing, the ADA stated that the only physical evidence in the case, the clothing seized from Mr. Dennis's father's house, had been "misplaced or mislaid." Defendant Jastrzembski, who had seized the clothing and was responsible for its preservation, testified that he did not know its whereabouts. The court summarily denied trial counsel's motion.

60. Following the hearing, and prior to *voir dire*, the Commonwealth made a plea offer to Mr. Dennis. Because the Commonwealth was prosecuting only Mr. Dennis for a crime committed by three people, the prosecutor offered not to seek the death penalty and to make

17

sentencing recommendations if Mr. Dennis would provide information about the two other individuals.  Mr. Dennis refused to plead guilty, and the case proceeded to trial.

**The Trial**

61.  The prosecution called only three eyewitnesses to the stand – Howard, Bertha, and Cameron.  Howard, on this her fourth identification attempt, identified Mr. Dennis. Howard reiterated on cross-examination that she had never before seen the perpetrators.

62.  Bertha and Cameron also made identifications on their fourth opportunity to view Mr. Dennis.

63.  David Leroy, George Ritchie, and Anthony Overstreet did not testify at trial.  Thus, the jury never heard that Leroy and Ritchie did not pick Mr. Dennis from the photo array, or that Overstreet had picked someone other than Mr. Dennis in the lineup.

64.  The Commonwealth called Thompson to testify that he saw Mr. Dennis with a gun on the evening of the murder.  Neither trial counsel nor, presumably, the prosecutor had been told that the defendant officers had used coercion and threats to force Thompson to implicate Mr. Dennis, leaving no means to challenge the testimony.

65.  Latanya Cason, the alibi witness Mr. Dennis named in his police statement, testified *for the Commonwealth* and said that she saw Mr. Dennis two hours later than indicated by Mr. Dennis's statement to police.  Cason stated that, based on her estimate of when she had completed her errands that day, she could not have seen Mr. Dennis between 2 and 2:30 p.m., as he had stated.  With no knowledge of the time-stamped check receipt that contradicted Cason's testimony and supported Mr. Dennis's story, trial counsel had no basis to challenge or impeach Cason.  Mr. Dennis was thus denied critical alibi evidence by the defendants officers.

66. Defendant Jastrzembski testified about the seized clothing that allegedly matched what was worn by the perpetrator. Jastrzembski testified not only to what he had planted and falsely documented in the executed warrant, but also provided an expanded description of the clothing well beyond the scope of the document. Jastrzembski falsely testified, unchallenged by the evidence itself, that the seized clothing "fit the description" of the clothing worn by the perpetrator even though the recorded descriptions of those items were more generic than the eyewitnesses' descriptions.

67. For example, Jastrzembski testified that the black waist-length jackets matched the witnesses' descriptions, even though there was no indication that the seized jackets were leather as described by Bertha and Overstreet. Previously undescribed sizes now, falsely, became items that "were the size of the defendant" and "belonged to" him. Defendant Jastrzembski added similar corroborating, yet unsupported details to his unsupported pretrial testimony, describing the pants as "sweat pants" and the jackets as "leather" despite no reference to these clothing materials in his written descriptions. Since the clothing as described by Jastrzembski did not belong to Mr. Dennis and was not his size, and since the defendants "lost" the actual evidence that would have exculpated Mr. Dennis, the defendant officers deliberately deceived counsel, the court, and the jury.

68. The case for the defense was limited. Trial counsel called Mr. Dennis's father to testify to the time he saw his son get on the K bus. Mr. Dennis took the stand in his own defense and testified to his whereabouts on the day of the murder. Not surprisingly, the prosecutor confronted Mr. Dennis with Cason's testimony. With no knowledge of the time-stamped receipt showing Cason's mistaken time estimate, Mr. Dennis was forced to concede that he may have

19

been mistaken about seeing her on the K bus at that time.  No other witness testified to

Mr. Dennis's whereabouts at the time of the crime.

### The Verdict And Sentencing

69.  The jury returned a verdict of guilty on first degree murder, robbery, conspiracy,

carrying a weapon without a license, and possessing the instruments of a crime.  The penalty

phase took place immediately thereafter, and the jury returned a sentence of death.

### Post-Trial Proceedings

70.  Plaintiff sought appellate review in state court.  The Supreme Court of Pennsylvania

affirmed his conviction and death sentence. *Commonwealth v. Dennis*, 715 A.2d 404 (Pa. 1998).

The plaintiff later pursued relief under the Post Conviction Relief Act (PCRA) and, after nearly

eight years of litigation, the Supreme Court of Pennsylvania denied relief. *Commonwealth v.

Dennis*, 17 A.3d 297 (Pa. 2011).

71.  Plaintiff then filed a Petition for a Writ of Habeas Corpus in this Court.  On August

21, 2013, the district court granted a new trial. *Dennis v. Wetzel*, 966 F.Supp. 2d 489 (E.D.Pa.

2013).  The relief was stayed pending review by the Third Circuit.  On August 23, 2016, in a

lengthy opinion that catalogued the egregious misconduct of the defendants, the Third Circuit,

sitting *en banc*, granted habeas relief and remanded the matter to state court for a new trial.

*Dennis v. Sec'y Pa. Dept. of Corr.*, 834 F.3d 263 (3d Cir. 2016).

72.  After remand to the Court of Common Pleas of Philadelphia County, the plaintiff

was confronted with two options: remain in custody for up to three more years pending a new

trial, or enter a *nolo contendere* plea to a reduced charge for a prison sentence of less time than

he had already served.  Plaintiff chose the latter.

73.  On December 23, 2016, Plaintiff entered a "no contest" plea to Third Degree Murder and was sentenced to 12 ½ to 25 years.  Mr. Dennis served 25 years for a crime he did not commit.

74.  The actions and conduct of the individual defendants as described above violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

75.  The fabrication of and tampering with evidence by the defendant officers – including a) the clothing defendant Jastrzembski claimed to have seized, b) the false coerced testimony of Charles Thompson, and c) the undermining of the sole alibi witness by mishandling the Cason receipt – violated the plaintiff's right to due process of law and a fair trial.

76.  The defendant officers were deliberately deceptive by concealing and/or suppressing critical evidence – including a) activity sheets that showed inconsistencies in Howard's testimony and contained evidence linking suspects other than Mr. Dennis to a robbery of Chedell Williams' earrings that took place weeks before the murder; b) the existence of a witness (Frazier) who stated that someone other than the plaintiff had confessed to the murder; c) the receipt that supported the alibi testimony of Ms. Cason; and d) information and documents showing that eyewitness George Ritchie had failed to identify Mr. Dennis from the photo array – and thus violated the plaintiff's right to due process of law and a fair trial.

77.  The defendant officers' use of threats and coercion directed at witnesses, including but not limited to Charles Thompson, for the purpose of eliciting false evidence implicating Mr. Dennis in the murder, violated the plaintiff's right to due process of law and a fair trial.

78.  Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute Mr. Dennis, including the testimony and

21

evidence referenced above, denied the plaintiff a fair trial.

79.  The concealment and/or failure to disclose the relevant and material evidence described above violated the plaintiff's right to due process of law and a fair trial.

80.  Defendants failed to advise the District Attorney's Office and criminal defense counsel of material evidence that negated the existence of probable cause to initiate the prosecution of Mr. Dennis and provided false, misleading and incomplete information to the District Attorney's Office that resulted in the initiation of a murder prosecution of Mr. Dennis.

81.  As a result of the actions and inactions of the defendant officers, James Dennis was compelled to stand trial in a capital murder case, causing him substantial harms.

**The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and threats to secure false statements from witnesses and suspects, failure to conduct proper investigations, and suppression of exculpatory evidence**

82.  For many years dating back at least to the 1970's, and continuing well beyond the time of the investigation of Ms. Williams' murder, the City of Philadelphia, had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

83.  This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly

prolonged interrogations; making false promises, including the promise that a suspect or witness

will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable

treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt,

including without limitation confrontation with false inculpatory evidence; and providing false

assurances—including to juveniles and other vulnerable people—that the suspect or witness will

benefit from making an inculpatory statement that minimizes the suspect's own involvement.

84.   These practices were well known to the City of Philadelphia and its policymakers

with respect to criminal investigations and prosecutions as a result of newspaper investigations

including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental

investigations, complaints from lawyers and civilians, and internal police investigations.

85.   Various cases demonstrate that this misconduct was pervasive within the

Philadelphia Police Department at time of Mr. Dennis's 1992 trial, and, upon information and

belief, the misconduct described below was committed with the knowledge of Homicide Unit

and PPD supervisors or because of their deliberate indifference to this misconduct.

**a.  Anthony Wright** (CP-51-CR-1131582-1991).  Mr. Wright had been convicted of the
rape and murder of an elderly woman based on misconduct by defendants Jastrzembski,
Santiago and other homicide detectives including the tampering with evidence, coercive
witness interrogation, planting evidence and numerous other actions that denied Mr.
Wright a fair trial.  After spending nearly twenty-five years in prison, Mr. Wright was
exonerated by DNA evidence.

**b.  Carlos Hernandez** (CP-51-CR-0302131-1991) & Ed Williams. A woman and her
boyfriend were robbed at gunpoint by two men and her boyfriend was shot. Detective
Devlin interrogated a key witness, Juan Sanchez, and extracted a statement from him
implicating Carlos Hernandez and another man. Mr. Sanchez described the circumstances
of his statement as follows: Det. Devlin held him in custody and interrogated him for
three days, without food or water; he was denied use of the bathroom and had to urinate
on the floor; Det. Devlin hit him several times. After coercing Mr. Sanchez's statement,
Det. Devlin interrogated Mr. Hernandez and obtained a statement from him implicating

Ed Williams. Mr. Hernandez described the circumstances of his statement as follows: Det. Devlin had him handcuffed to a chair and held him without water, food, or use of a bathroom; Det. Devlin punched him in the face and pressed his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

**c. Jackie Combs Jr.** PPD detectives, including Det. Devlin**,** coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives.

**d. Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder that occurred in South Philadelphia while he was working at a popular and busy restaurant. Mr. Veasy was interrogated by Detective Devlin until he provided a "confession." Mr. Veasy has described that Det. Devlin isolated him in an interrogation room where Det. Devlin smacked him around and kicked his testicles several times until Mr. Veasy agreed to sign the "confession."

**e. Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, Detective Santiago obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, Det. Santiago coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by Det. Santiago. After David Glenn testified regarding Det. Santiago's misconduct and disavowed the statement Santiago had coerced him to sign, Santiago notified the Court and the Commonwealth of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case.  Shortly after receiving this letter from Santiago's counsel, the prosecution dismissed all charges against St. George, but Det. Santiago remained with the PPD through September 1996.

**f. Donald Ray Adams** (CP 51-CR-0743812-1991). Mr. Adams was charged and convicted in the 1990 murders of Darryl Patterson and Thomas Winn. The initial investigation of the case did not produce a suspect and in June, 1991 PPD Detectives David Clark and Igor Alfimow were assigned to re-investigate the matter. These detectives secured a statement from an alleged witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr. Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms. Benjamin was coerced and false and some years later she recanted. In 2007, the Court of Common Pleas granted post-conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and

offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20's. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30's. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a retrial, Mr. Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Mr. Adams received compensation for his wrongful conviction.

**g. Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley—an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. Detective Santiago soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, all seven photos that Det. Santiago showed Presley were of Swainson. Presley explained that he only testified against Swainson because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson has a PCRA petition pending and is represented by counsel from Morgan Lewis.

**h. Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low-average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to Detective Devlin. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. According to Det. Devlin, about an hour into the interrogation, Ogrod supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Det. Devlin and a second detective. He finally broke from lack of sleep and began to believe what they detectives fed him—eventually signing the statement written out in longhand by Det. Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan Lewis and the Federal Defender.

86.  At the time of the investigation and prosecution of Mr. Dennis in 1991-1992, the

PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported

witnesses without legal cause and with the intent of coercing statements from these persons,

25

under threat of punishment or other sanctions, and/or for material benefits. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

87.   This practice, as exemplified by the investigations in Mr. Dennis's case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.  Finally, in 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

88.   During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

89.   Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the

39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence,  false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

90.  This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Dennis was charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

91.  In summary, at the time of the investigation and prosecution of James Dennis, the PPD had a practice, policy, and custom of:

a.  Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b.  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

c.  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

27

d.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

e.  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Dennis.

92.  At the time of the investigation and prosecution of James Dennis, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.  excessive and chronic delays in resolving disciplinary complaints;

b.  a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.  a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.  the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.  the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

f.  the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.  a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.  lack of an effective early warning system to identify, track, and monitor "problem" officers;

j.  IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.  IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment**
***Against All Individual Defendants***

93.  Plaintiff incorporates by reference all of the foregoing paragraphs.

94.  The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Dennis of his clearly established constitutional right to due process of law and to a fair trial by:

**Count A – Fabrication:** The defendant officers fabricated, planted, and/or tampered with evidence including but not limited to clothing that defendants' falsely claimed had been seized from Mr. Dennis's house, a witness who was coerced into stating that he had seen Mr. Dennis with a gun (Charles Thompson), and a document that would have corroborated the alibi testimony of an independent witness ("the Cason receipt"); and

**Count B – Deliberate Deception:** The defendant officers deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence, including but not limited to a document that corroborated defense alibi testimony ("the Cason receipt"), documents that showed inconsistencies in the testimony of a key prosecution witness and information that persons other than Mr. Dennis may have murdered Chedell Williams ("the activity sheets"), information and documents showing that a critical eyewitness, George Ritchie, had failed to identify Mr. Dennis from the photo array, and the existence of a witness (William Frazier), who had reported that someone other than Mr. Dennis had confessed to the murder.

95.  The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr.

Dennis's clearly established constitutional rights.  No reasonable officer in 1991-1992 would have believed this conduct was lawful.

96.  Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Dennis's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Dennis's wrongful trial at which he faced the death penalty, and the harms he sustained as a direct result.

### COUNT II:  42 U.S.C. §1983 Civil Rights Conspiracy
### *Against All Individual Defendants*

97.  Plaintiff incorporates by reference all of the foregoing paragraphs.

98.  The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive Mr. Dennis of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

99.  In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

a.  Fabricating evidence, planting evidence, tampering with evidence, and using coercion and/or threats to obtain incriminating witness statements;

b.  Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence, and using coercion and/or threats to obtain inculpatory witness statements; and

c.  Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe Mr. Dennis had committed the murder, and ignoring evidence that exculpated Mr. Dennis.

100.  Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Dennis's injuries.  Defendants knew, or should have known, that their conduct

would result in Mr. Dennis's denial of due process and a fair trial.

## COUNT III: 42 U.S.C. § 1983 Failure to Intervene
### *Against All Individual Defendants*

101.  Plaintiff incorporates by reference all of the foregoing paragraphs.

102.  By their conduct, under color of state law and acting within the scope of their employment with the PPD, the individual defendants had opportunities to intervene on behalf of Mr. Dennis to prevent the deprivation of liberty without due process of law and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

103.  The defendants' failures to intervene violated Mr. Dennis's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1991-1992 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, tampering with evidence, planting evidence, deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Mr. Dennis to be subjected to an unfair trial, were lawful.

104.  Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Dennis's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Dennis's unfair trial.

## COUNT IV: 42 U.S.C. § 1983 Supervisory Liability Claim
### *Against Defendant Jastrzembski*

105.  Plaintiff incorporates by reference all of the foregoing paragraphs.

106.  The individual defendants acted with impunity in an environment in which they

were not adequately trained, supervised, or disciplined by defendant Jastrzembski, both in this

case and as a matter of practice and custom

107.   Defendant Jastrzembski acted recklessly and/or with deliberate indifference to Mr.

Dennis's constitutional rights by failing to adequately train, supervise, and discipline the PPD

homicide detectives assigned to this investigation, including defendants Santiago, Jastrzembski

and Doe(s), thereby allowing and causing these detectives to deprive Mr. Dennis of his clearly

established constitutional rights, including his rights to be free from the deprivation of liberty

without due process of law and to a fair trial under the Fourteenth Amendment.

108.   Defendant Jastrzembski was personally involved in the investigation of Mr. Dennis,

and directly supervised the investigative acts taken by himself and other homicide detectives.

109.   The reckless and deliberately indifferent conduct of defendant Jastrzembski

violated the clearly established duty, in 1991-1992, to supervise the detectives, and no reasonable

police supervisor in 1991-1992 would have believed that reckless and deliberately indifferent

supervision in the face of actual or constructive notice of misconduct by their subordinate

officers was lawful.

110.   Defendant Jastrzembski's acts and omissions, as described in the above paragraphs,

were the direct and proximate cause of Mr. Dennis's injuries.  Defendant Jastrzembski knew, or

should have known, that his conduct would result in Mr. Dennis being subjected to a denial of

due process and an unfair trial.

## COUNT V: 42 U.S.C. § 1983 Municipal Liability Claim
### *Against Defendant City of Philadelphia*

111.  Plaintiff incorporates by reference all of the foregoing paragraphs.

112.  The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Mr. Dennis's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

113.  Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

114.  The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Mr. Dennis's trial for capital murder, and the other injuries and damages set forth in this Complaint.

## COUNT VI: DAMAGES
### *Against All Defendants*

115.  Plaintiff incorporates by reference all of the foregoing paragraphs.

116.  The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused Mr. Dennis to be compelled to stand trial facing the death penalty which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

## COUNT VII: PUNITIVE DAMAGES
### *Against All Individual Defendants*

117.  Plaintiff incorporates by reference all of the foregoing paragraphs.

118.  The defendant officers acted wilfully, deliberately, maliciously or with reckless disregard of the plaintiff's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff James Dennis requests the following relief:

a.  Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.  Punitive damages to Plaintiff and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

c.  Pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 for all 42 U.S.C. §1983 claims;

d.  Any and all other relief to which Plaintiff may be entitled; and

e.  A jury trial as to each defendant and as to each count.


Paul Messing
KAIRYS, RUDOVSKY, MESSING,
    FEINBERG & LIN
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400
Counsel for Plaintiff

Michael C. Schwartz
JAMES, SCHWARTZ & ASSOC., PC
1500 Walnut Street
21st Floor
Philadelphia, PA 19102
(215) 751-9865
Counsel for Plaintiff

36