1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF PENNSYLVANIA

3    JAMES DENNIS,
                                        Case No. 2:18-cv-02689-JS
4              Plaintiff,

5    v.                                 Philadelphia, Pennsylvania
                                        April 23, 2024
6    CITY OF PHILADELPHIA, et al,       9:00 a.m.

7              Defendants.

8

                    TRANSCRIPT OF JURY TRIAL - DAY 7
9              BEFORE THE HONORABLE JUAN SANCHEZ
                 UNITED STATES DISTRICT COURT JUDGE
10
     APPEARANCES:
11   For the Plaintiff:              Paul M. Messing, Esq.
                                     Kairys Rudovsky Messing Feinberg
12                                   & Lin, LLLP
                                     The Cast Iron Bldg Ste 501 South
13                                   718 Arch Street
                                     Philadelphia, PA 19106
14
     For the Defendant:              Andrew Pomager, Esq.
15   (City Of Philadelphia)          Daniel Cerone, Esq.
                                     Bailey Axe, Esq.
16                                   City Of Philadelphia Law
                                     Department
17                                   1515 Arch Street, 14th Floor
                                     Philadelphia, PA 19102
18
     For the Defendant:              Joseph J. Santarone, Jr., Esq.
19   (Frank Jastrzembski)            Joshua W. Brownlie, Esq.
                                     Marshall Dennehey, P.C.
20                                   2000 Market Street
                                     Ste 2300
21                                   Philadelphia, PA 19103

22   Court Recorder:                 Nancy DeLisle/Stacy Wertz

23

24

25

1    Transcription Service:          Chris Hwang
                                     Abba Reporting
2                                    PO Box 223282
                                     Chantilly, Virginia  20153
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1                              **<u>INDEX</u>**

2

3                                                      <u>Page</u>

    Court's Ruling                          164

4

5   <u>WITNESSES FOR PLAINTIFF</u>   <u>Direct</u>    <u>Cross</u>      <u>Redirect</u>   <u>Recross</u>

6   Manuel Santiago                          6          46         78

7

8   <u>WITNESSES FOR DEFENDANT</u>

    David Webb                   97        108        121       121
9
    James Cameron               132        138        146

10  Albert Maahs                148        151

11

12

13  <u>EXHIBITS</u>                                   <u>OFFERED</u>   <u>RECD</u>

        Defendant's 35                              80        80
14

15

16

17

18

19

20

21

22

23

24

25

1  (Call to order at 9:00 a.m.)

2  THE CLERK:  All rise.  This Court is now in session,

3 the Honorable Juan Sanchez presiding.

4  THE COURT:  Good morning, everyone.

5  ATTORNEYS (IN UNISON):  Good morning, Your Honor.

6  THE COURT:  You may be seated.  So let me report on

7 the status of Juror Number 8.  As he was instructed, he called

8 us yesterday afternoon to advise us that he is still in a lot

9 of pain.  He was not able to secure an appointment to see his

10 primary care physician until 2:30 p.m. today.

11  As you know, he reported on Monday that he was in a

12 lot of pain following the car accident where he was rear ended.

13 And he reported suffering from whiplash and a lot back pain.

14  So I'm going to excuse him from further

15 responsibilities with this case and we will continue with seven

16 jurors.  That's the status.

17  And we regarded two issues that were raised yesterday

18 on the issue of Zahra Howard testimony that she have given

19 under oath at the trial, and at the PCR, and proceeding.

20  I'm going to instruct the Government to try one more

21 time for the third time to try to instruct her to be here

22 tomorrow.  I think we're going to begin the Defense case

23 tomorrow and so --

24  MR. POMAGER:  I expect we'll begin today, Your Honor.

25  THE COURT:  Okay, but is it going to be concluded

1   tomorrow?

2           MR. SANTARONE:  It theoretically might be concluded

3   today.

4           THE COURT:  Well, instruct her to get her here today.

5   And then, I will --

6           MR. SANTARONE:  Well, Your Honor, I mean, we bring

7   her in, I think it would go into tomorrow, but if she's not

8   coming today, I think tomorrow morning, but I don't know how

9   long Ms. -- I don't know how long Detective Santiago's going to

10  be.  So it's hard for me to say right now.

11          THE COURT:  All right, we're going to finish today at

12  4:15.

13          MR. SANTARONE:  I know.

14          THE COURT:  We're going to finish 4:15.  So I

15  instruct you to tell her to be here today maybe at 3 or

16  tomorrow.  And you have to do that.  I'm not going to -- so

17  those are my instructions to you, you understand?

18          MR. POMAGER:  I understand, Your Honor.

19          THE COURT:  Three times, you try one more time to get

20  her here.  Are you ready for the jury?

21          MR. POMAGER:  Sure.

22          THE COURT:  Right.

23      (Jury enters courtroom)

24          THE COURT:  Okay, you may be seated.  Members of the

25  jury, unfortunately, Juror Number 8 will not be able to join us

1    for the balance of the trial.  So we will continue with the

2    seven jurors that we have.

3              And my question to you is are you ready to proceed?

4    We're going to do our very best to get the case to you probably

5    sometime -- all the testimony by tomorrow if that's possible.

6    But at this point in time, I'm going to call Attorney Messing -

7    -

8              MR. MESSING:  Yes, sir.

9              THE COURT:  -- to call his next witness.

10             MR. MESSING:  My next witness is Manuel Santiago.

11             THE COURT:  Okay.

12             THE CLERK:  State your name for the record?

13             THE WITNESS:  Manuel Santiago.  That's M-A-N-U-E-L S-

14   A-N-T-I-A-G-O.

15             THE CLERK:  Please raise your right hand.

16                          MANUAL SANTIAGO

17    called as a witness for the Plaintiff, having been duly sworn

18                        testified as follows:

19             MR. MESSING:  May I proceed?

20             THE COURT:  You may.

21             MR. MESSING:  Thank you.

22                        **CROSS-EXAMINATION**

23   BY MR. MESSING:

24        Q    Good morning, sir.

25        A    Good morning, sir.

1      Q      Back in 1991, how were you employed?

2      A      I was employed by the City of Philadelphia as a

3   detective.

4      Q      Homicide unit?

5      A      I was assigned to the Homicide Unit at the time, yes.

6      Q      And how long have you been in the Homicide Unit?

7      A      I started in the Homicide Unit in 1986 and until my

8   retirement in 1996.

9      Q      And during a large part of that time, your partner

10   was Frank Jastrzembski; is that correct?

11      A      For about five years, six years, thereabouts, yes.

12      Q      Okay.  And that included the period 1991 to 1992; did

13   it not?

14      A      Yes, it did.

15      Q      Okay, so you heard your former partner testify about

16   your involvement in the investigation of the murder of Chedell

17   Williams that took place on October 22nd, 1991; is that

18   correct?

19      A      Yes, sir.

20      Q      You are aware that after the murder, nine

21   eyewitnesses were interviewed by the police on the day of the

22   murder, correct?

23      A      Yes.

24      Q      And among other things, or actually principally,

25   those nine eyewitnesses were asked to describe descriptions of

1    the perpetrators of this crime to assist the police in

2    apprehending them, correct?

3        A    Yes.

4        Q    Okay, and I know you have heard -- read into the

5    record parts of that testimony -- those statements taken from

6    Zahra Howard, which was Exhibit 3 who made it -- who described

7    the shooter as 5'9" about 20 years old, baseball cap, red

8    sweatsuit with white stripes on sleeves, black hood under

9    sweatshirt, white sneaks.  Is that correct, sir?

10       A    Yes, sir.

11       Q    And she also made it clear that she had ever seen

12   these men before.  And you also saw the description in Exhibit

13   4 from James Cameron of the shooter 15 to 18, dark skin, red

14   sweatsuit, black jacket, no height or weight description,

15   correct, sir?

16       A    Yes, sir.

17       Q    And then David Leroy (phonetic), 16 to 19, 5'10"

18   tall, dark complected, red hat, red and white waist length

19   jacket.  That was Exhibit 5, correct, sir?

20       A    Yes.

21       Q    Clarence Verdell (phonetic) in Exhibit 6, two black

22   males one taller than the other, one dark complected, wearing

23   shiny black jacket and baseball cap, no height or weight

24   description, correct again?

25       A    Yes.

1      Q    And then Anthony Overstreet (phonetic), Exhibit 7,

2  dark complected, red hooded sweater.

3           MR. POMAGER:  Your Honor, I would object.  I'd just

4  like -- at the very least like to know what page we're working

5  from if?

6           MR. MESSING:  This is Exhibit 7.

7           THE COURT:  All right, you're summarizing --

8           MR. MESSING:  Yeah.

9           THE COURT:  -- this witness testimony again --

10           MR. MESSING:  Yes.

11           THE COURT:  -- based on what is on the record.

12           MR. MESSING:  Yes.

13           THE COURT:  Okay, how is that proper?

14           MR. MESSING:  Well, I'm trying to get to a point,

15  which I haven't got to --

16           THE COURT:  Well, make the point, make the point.

17  Don't summarize the evidence that the jury already heard

18  through multiple witness time again and again.  So your

19  objection is sustained.  Get to your point.

20  BY MR. MESSING:

21      Q    You were the individual, the detective, who later

22  interviewed Thomas Bertha, is that correct or correct me if I'm

23  mistaken?

24      A    Exhibit, let's see.

25      Q    Yes, turn to Exhibit 18.  It's right in front of you,

1    I'm sorry.

2        A    Yes, I have it in front of me.

3        Q    Okay, and that was when you showed him this photo

4    array booklet here that's previously been introduced into

5    evidence, that's the photo array that you showed him; is that

6    correct, sir?

7        A    Yes, sir.

8        Q    Okay.  And Mr. Bertha told you that, number one,

9    quote, looks like the guy that he saw running with the gun.

10   You can take a look at the Exhibit to be sure.

11       A    Yes.

12       Q    That obviously would not be considered by you as a

13   detective to be a positive identification; is that correct?

14       A    No, sir.

15       Q    What's that?

16       A    No, sir.

17       Q    So when someone says somebody, well, it looks like

18   the guy, you consider that the same as somebody saying that's

19   the guy, I'm sure of it?

20       A    Maybe I misunderstood the question.

21       Q    Maybe you are.  Let me re-phrase.

22       A    Okay.

23       Q    When a witness looks at a photo array --

24       A    Yes.

25       Q    -- and says number 5, that's the guy, I'll never

1    forget that face, would you consider that a positive

2    identification?

3         A    Yes, sir.

4         Q    When a witness looks at a photo array and says number

5    5 looks like the person I saw that day, would you consider that

6    a positive identification?

7         A    No, sir.

8         Q    Okay.  So Thomas Bertha did not make a positive

9    identification of Mr. Dennis' photo; is that correct?

10        A    Yes.

11        Q    You're also aware that Mr. Bertha went to a line-up a

12   couple of weeks later and picked somebody else out of the line-

13   up, not Mr. Dennis, who was --

14             MR. SANTARONE:  Objection, Your Honor.

15             THE COURT:  State your ground.

16             MR. SANTARONE:  That's not that witness.  It's

17   another witness, Overstreet.

18             THE COURT:  Okay, sustained.  Re-phrase your

19   question.

20   BY MR. MESSING:

21        Q    Yeah, you were one of the assigned investigators on

22   this case, were you not?

23        A    I was.

24        Q    And you were familiar with the investigation as it

25   unfolded in particular with regard to identification witnesses;

1    isn't that right?

2        A    Yes.

3        Q    And you're aware that a couple of weeks after you

4    showed the photos to Mr. Bertha, he attended a line-up, are you

5    not?

6        A    I don't know specifically who attended the line-up.

7    I wasn't there.  I know that a court order line-up was held and

8    there were some identifications and possibly a

9    nonidentification, but I wasn't there.

10       Q    When you --

11       A    But I wasn't there so I'm not aware of exactly what

12   happened at the line-up.

13       Q    Okay, when you say a nonidentification, by that you

14   mean Mr. Dennis was in the line-up, but I witness picked

15   somebody other than Mr. Dennis; is that correct?

16       A    It's my understanding I'm -- I would have to see the

17   documents.  I don't have -- I don't have a specific

18   recollection of the events of that line-up.

19       Q    Okay.

20       A    I wasn't there.

21       Q    Well, but you were told at some point I assume that

22   Mr. Bertha attended the line-up, Mr. Dennis was in the line-up,

23   but Mr. Bertha picked somebody else out as the shooter.  You

24   were told that some point I assume?

25            MR. SANTARONE:  Objection, Your Honor.

1          THE COURT:  State your ground.

2          MR. SANTARONE:  Can we see a document that says that?

3          THE COURT:  All right, sustained.  (Indiscernible.)

4     Make an objection, but give me the grounds.

5          MR. SANTARONE:  Well, the problem, the problem --

6          THE COURT:  The objection is sustained.

7          MR. SANTARONE:  All right.

8          THE COURT:  Re-phrase your question.

9     BY MR. MESSING:

10    Q    All right, I -- I'll get back to that.  You were also

11    aware that a George Ritchie (phonetic) was interviewed in

12    connection with the murder and that he was an eyewitness; is

13    that correct?

14    A    Yes, sir.

15    Q    Are you -- you're also aware and it's in Exhibit 9

16    that Mr. Ritchie said that he had a very good view of the

17    shooter and that he was positive that he could identify him if

18    he saw him again.  Are you aware of that?  It's in the

19    statement.

20    A    Yes, I am.

21    Q    Now Mr. Ritchie said -- by the way, you conducted

22    these photo identification procedures in this case using this

23    folder; is that correct?

24    A    Yes, sir.  Well, that folder and two others.

25    Q    And the two others related to other possible suspects

1    in the crime, correct?

2         A    In this crime, yes.

3         Q    But this is the folder that was used that had Mr.

4    Dennis' photograph in the number one position, correct?

5         A    Yes, sir.

6         Q    Okay.  And it was you that conducted the photo

7    identification sometimes alone, sometimes with your partner

8    Frank Jastrzembski; is that correct?

9         A    I don't have a specific recollection of being alone

10   for the photo displays, but it's possible.

11        Q    All right, you did them?

12        A    I did them.

13        Q    That was your assignment in this case?

14        A    Yes.

15        Q    When you went to show the photos to George Ritchie,

16   he told you that he could not make an identification, correct?

17        A    I don't believe that I showed Mr. Ritchie photos,

18   sir.

19        Q    Well, you were the one who had possession of this

20   folder showing it to the various eyewitnesses in this case; is

21   that correct?

22        A    That is correct.

23        Q    And you showed, according to all of the Exhibits that

24   I've referred to earlier, you were the one that showed the

25   photographs to all the eyewitnesses, were you not?

1        A        No, that is not correct.  There were other

2    eyewitnesses that were shown photos (indiscernible) by other

3    detectives.

4        Q        Okay, let's see.  If you could turn to, let's see,

5    Exhibit 16.  Tell me when you're there?

6        A        It just came up on the screen, yes, I'm here.

7        Q        Okay, do you recognize Exhibit 16?

8        A        Yes, sir.

9        Q        That is a record of when Zahra Howard was shown the

10   photo array; is that correct?

11       A        Yes, sir.

12       Q        And could you tell us who showed her that photo

13   array?

14       A        I did, sir.

15       Q        That's your name on the upper right hand corner?

16       A        Yes, sir.

17       Q        Could you turn to Exhibit 17?  Is that in fact the

18   record of when James Cameron was shown this photo array?

19       A        Yes, sir.

20       Q        Who showed him the photo array?

21       A        I did.

22       Q        That's your neighbor in the upper right-hand corner,

23   correct?

24       A        Yes, sir.

25       Q        Could you look at Exhibit Number 18?  Is that in fact

1   the record of when Thomas Bertha was shown the photo array?

2        A    Yes, sir.

3        Q    And who showed him the photo array?

4        A    I did, sir.

5        Q    Okay.  You're aware that Mr. Ritchie has testified

6   that when he was shown the photo array, that he told the two

7   detectives that he not only could not make an identification,

8   but that none of the people in the photographs were the robber

9   because he got a really good look?  Is --

10           MR. CERONE:  Your Honor, objection.

11           MR. MESSING:  That was his testimony.

12           MR. CERONE:  Your Honor, this is not in evidence.

13   This is not in evidence.

14           THE COURT:  Okay, your response?

15           MR. MESSING:  My response is that's what Mr. Ritchie

16   testified to.

17           THE COURT:  Very well.  The jury ought to remember

18   what Mr. Ritchie testified to.  I'm going to sustain the

19   objection.

20   BY MR. MESSING:

21        Q    Okay, but it's -- is there anything -- let me back up

22   for a second.  In preparation for your testimony here today, I

23   assume you reviewed the homicide file?

24        A    I did, sir.

25        Q    Is there anything in the homicide file or in the

1    activity sheets that refers to Mr. Ritchie being shown a photo

2    display?

3        A    I don't recall seeing it, no, sir.

4        Q    Because it's not there, is it?

5        A    I did not see it.

6        Q    Okay, do you have an explanation of why Mr. Ritchie

7    would say the two detectives came and showed him a photo array,

8    that he said that the killer wasn't there and that that fact

9    did not appear in any homicide file or activity sheet.  Do you

10   have an explanation for that?

11           MR. SANTARONE:  Objection, Your Honor.

12           THE COURT:  State your grounds.

13           MR. SANTARONE:  It's argumentative.  He's --

14           THE COURT:  Sustained, re-phrase.  You can say that

15   for argument.

16           MR. MESSING:  All right, I'll move on.

17   BY MR. MESSING:

18       Q    These photos that you showed, by the way, and I just

19   want this to be clear when you look at them, is there anything

20   on the photos which shows the height of these eight people

21   that's in the photo?

22       A    No, sir.

23       Q    Is there anything in these photos that shows the

24   weight of these people?

25       A    No, sir.

1    Q    So there's no way for an eyewitness to look at these

2   photos and make a decision as to whether or not a suspect is

3   too tall, too short, too thin, too heavy; is that correct?

4    A    Correct.

5    Q    One of the most important things that you look at in

6   identification testimony and in getting descriptions from

7   eyewitnesses is the height and weight; is that correct?

8    A    Yes, sir.

9    Q    And of the nine eyewitnesses who were interviewed,

10   four of them could not describe height or weight; is that

11   correct?

12   A    Um --

13   Q    Do you want to look at their statements?

14   A    I don't.  I would take your word that that

15   representation is correct.  I just don't have specific

16   recollection of everyone's description or nondescription.

17   Q    Okay, you're aware that the young girl who was

18   murdered was unusually tall; are you not?

19   A    I am not, sir.

20   Q    Well, could you look at Exhibit 2, please?  Well, let

21   me, before you do that, part of your job as a homicide

22   detective is to consult the medical examiner's office; is that

23   right?

24   A    Well, it's part of the -- one of the duties in

25   homicide it wasn't -- I wasn't specific -- the -- I'm sorry,

1     the specific detective, you know, assigned to do that.  It's

2     just a general rule that the detective would consult with the

3     medical examiner, yes.

4          Q    That's all I asked?

5          A    Yes.

6          Q    It's routine; is that correct?

7          A    Yes.

8          Q    You want to know the cause and manner of death; is

9     that correct?

10         A    That is correct.

11         Q    Because the medical examiner does precise

12    measurements to determine everything related to the autopsy; is

13    that correct?

14         A    That is correct.

15         Q    Turn to Exhibit 2, please.

16         A    Yes.

17         Q    First page.  Are you there?

18         A    I am, sir.

19         Q    Okay.  Do you see halfway down the page, the medical

20    examiner's measurement of the decedent's height and weight?

21         A    I do, sir.

22         Q    And what are they?

23         A    Her -- woops.  It is 5'10", 151 pounds.

24         Q    So Ms. Williams was unusually tall?  She was 5'10"

25    tall; is that correct?

1      A      She was tall.  I don't know if it's unusual, but she

2    was tall.

3      Q      Okay.  Is it also correct that three days after the

4    murder, well, actually more than -- about a week after the

5    murder, you learned that the same pair of earrings that had

6    been stolen, robbed from Ms. Williams on October 22nd, had been

7    taken from Ms. Williams at gunpoint about a week before that?

8    Do you remember that?

9      A      I do remember that, yes.

10     Q      And it was taken at a SEPTA station about a week

11   before that, correct?

12     A      I don't have recollection of where it occurred, but I

13   do know that the incident did occur, yes.

14     Q      And you also learned from Walter Gilliard (phonetic),

15   who was Chedell Williams' boyfriend, that someone by the name

16   of Pep (phonetic) had stolen the earrings.  Do you remember

17   that?

18     A      I don't remember the name.  I do know that they knew

19   the person that stole the earrings and yes.

20     Q      And that Chedell's boyfriend managed to get the

21   earrings back; is that correct, just shortly before she was

22   murdered?

23     A      My understanding was that he bought -- had bought

24   them back, yes.

25     Q      Okay, and you never interviewed Pep, did you?

1           A     I personally did not.

2           Q     Well, is there anything in the homicide file or

3     activity sheets that you reviewed that indicates that anybody

4     interviewed Pep?

5           A     I don't know sir.  I did review the file.  I don't

6     recall seeing it.

7           Q     That's right.  There was nothing about Pep recorded

8     in the activity sheets, are you aware of that?

9           A     I am not aware of that, no.

10          Q     You looked at the activity sheets.  Have you ever

11    seen any reference to Pep in there?

12          A     Well, I -- in preparing for the trial, I looked over

13    hundreds of papers.  I just don't, you know, it's an overload.

14          Q     Yes.

15          A     I don't remember all the names or all the events.

16          Q     Nothing about this incident involving the same

17    earrings stolen at gunpoint days before this murder was ever

18    turned over to the Defense or the District Attorney's Office

19    because it doesn't appear in the homicide file or activity

20    sheets?

21                MR. CERONE:  I would object.

22                MR. MESSING:  Is that correct?

23                THE COURT:  State your grounds.

24                MR. CERONE:  It's argumentative, Your Honor.

25                THE COURT:  Sustained.

1          MR. MESSING:  This is cross-examination.

2          THE COURT:  I'm sorry, save it for closing.  That's

3    an argument.

4    BY MR. MESSING:

5       Q    Okay.  I want you to turn to Exhibit 28, please.

6    That is the interview on November 8, 1991 with Charles

7    Thompson; is that correct?

8       A    Yes, sir.

9       Q    And who took that interview?

10      A    I did.

11      Q    And Jastrzembski was with you?

12      A    He may have been.

13      Q    Uh-huh.

14      A    I don't see his name noted on the interview though,

15   so I don't know specifically.

16      Q    Where did you interview him?

17      A    In our office in the homicide division at 8th and

18   Race.

19      Q    How did you get him there?

20      A    My understanding is that he was either brought up

21   by -- from the cell room where the Homicide Unit's on the first

22   floor of the police administration building or was at 8th and

23   Race.  It's no longer there.

24          We were located on the first floor and in the basement

25   would have been the cell room.  And this is where the prisoners

1    are processed.  And he would have been brought up to the

2    homicide division.

3         Q    Now this was November 8th about two weeks after the

4    robbery.  You were focused on James Dennis before you

5    interviewed Mr. Thompson; is that correct?

6         A    I believe that Mr. James Dennis at -- by November

7    8th, Mr. James Dennis had already been identified as the male

8    with the gun and the shooter of Ms. Chedell Williams, yes.

9         Q    So, to be clear, by then, you were focused on James

10   Dennis, correct?

11        A    That is correct.

12        Q    And in fact you knew that he was associated with

13   people in the vicinity, including Charles Thompson, did you

14   not?

15        A    I don't recall the name Charles Thompson.

16        Q    I think --

17        A    I don't recall being aware of that name.

18        Q    Following up, why would you had called him up from

19   the detention area at the Manor House to interview him if you

20   did not know that he might have information about James Dennis?

21        A    I never said that I called him up.  I don't think

22   that anybody called him up.

23        Q    He just wandered in?

24        A    No, I think he requested to come up.

25        Q    I see.  And why would somebody request to come up to

1    see an officer?

2        A    The only reason that I -- well, there could be many

3    reasons, but one of the reasons could be because they have

4    information on a homicide.

5        Q    And when somebody's in custody and asks to see

6    somebody who has open serious criminal charges, asks to see,

7    they want to come and deal, don't they?

8        A    They may, yes.

9        Q    They may?

10        A    Or they may just want to do the right thing.  They

11    may want to come in and indicate that they were a witness and

12    they want to tell, you know, the investigator what they saw.

13        Q    So somebody who's been arrested let's say charged

14    with a felony (indiscernible) and is sitting in the detention

15    area in the basement of the Manor House, it occurs to them, oh,

16    I just want to get this off my chest, so I'll ask to speak with

17    homicide, is that what you're telling us?

18        A    I'm telling you that I don't know what's in his head.

19        Q    Uh-huh.  When you interview witnesses or suspects as

20    part of a homicide investigation, do you ever lie to them to

21    get them to give you information?

22        A    No, who are we talking about?  Are we talking about a

23    suspect or are we talking about a witness?

24        Q    I don't know.

25        A    Well, no, it would be different.  You would never lie

1    to a witness to give you information.  You would want the

2    witness to of course be as forthright and as honest with their

3    information as possible.

4        Q    I see.  So this would just be a sincere conversation

5    trying to get whatever information they are voluntarily willing

6    to offer; is that your testimony?

7        A    A witness?

8        Q    A witness or a suspect?

9        A    Well, for the purposes of Mr. Charles Thompson, he

10   was a witness.  So certainly we would want to get whatever

11   information if he had information on the homicide.

12       Q    Well, he was also a Defendant in a pending felony

13   aggravated charge.  You had to know that.  He was in custody.

14       A    Yes.

15       Q    Didn't you?

16       A    Yes.

17       Q    So he wasn't just a witness.  He was also a

18   Defendant, correct?

19       A    Well, he wasn't someone that I was focused on as a

20   Defendant on one of the homicide cases.  For the purposes of

21   the Chedell Williams case, he was a witness.

22       Q    So you didn't tell him anything to the effect that

23   you don't want to be implicated in this murder.  You've got to

24   cooperate with us.  You never did that?

25       A    No, sir.

1      Q    Do you ever cut deals with suspects or witnesses to

2  get them to give you information?

3      A    No, sir.

4      Q    Just to be clear, you're testifying before this jury

5  that as a detective for many, many years, a homicide detective

6  for many of those years, you've never cut a deal with a witness

7  for information?

8      A    I don't have the authority to cut deals.

9      Q    All right, you may not have the final authority, but

10  in the course of interrogating a witness or a suspect, you

11  never said you cooperate, you give me this information, I'll

12  see what I can do on your open case, or on some other problem

13  you're having?  You're telling the jury you've never done

14  anything like that?

15      A    I don't recall doing that, no, sir.

16      Q    You ever see another detective do that?

17      A    No, sir.

18      Q    You ever hear of a homicide detective doing that?

19      A    I've heard of deals being cut, but I don't know what

20  the circumstances were.  I would always -- I've always thought

21  that the deals were cut through the D.A.'s Office, District

22  Attorney's Office.

23      Q    And what made you think that?

24      A    Well, because they're the ones that would have the

25  authority to do that.

1      Q      The final call?

2      A      Well.

3      Q      Sir --

4      A      I don't know how you dice up the authority.  You

5  either have authority or you don't have authority.

6      Q      So you're telling us that cutting some kind of a deal

7  with a witness or a suspect in exchange for information is just

8  improper and you never do that?

9             MR. SANTARONE:  Objection, Your Honor.  This is

10  argument.

11             THE COURT:  Sustained.

12  BY MR. MESSING:

13      Q      Is it improper to cut a deal or?

14             MR. SANTARONE:  Objection.

15             THE COURT:  Sustained, sustained.

16  BY MR. MESSING:

17      Q      Have you ever reported another police officer for

18  improperly cutting a deal with a witness or defense or a

19  suspect?

20      A      No, sir.

21      Q      Did you not just say that you knew of other officers

22  that did that?

23      A      No, I said I've heard that that's that, but I've

24  never seen that happen, no, sir.

25      Q      Okay.  Well, tell us where you last heard that

1   happening?

2        A    I hear it on TV all the time.

3        Q    I'm not talking about television now.  This is real

4   life.

5        A    Well, in real life, I haven't --

6             MR. SANTARONE:  Objection, Your Honor.

7             THE COURT:  Sustained.

8   BY MR. MESSING:

9        Q    I'm sorry, did you just say that --

10            THE COURT:  Please make no comments in your

11  questions.

12  BY MR. MESSING:

13       Q    When you said you heard about deals being cut by

14  detectives earlier in your testimony, are you saying you were

15  referring to television?

16            MR. SANTARONE:  Objection.  This is not what he said,

17  Your Honor.

18            THE COURT:  Sustained.  Move on.  Let's move on.

19  BY MR. MESSING:

20       Q    Were you present when the search warrants were

21  executed in this case?

22       A    I believe I was present for one or two of them.  I

23  I'm not --

24       Q    Okay.

25       A    -- you know, 100 percent positive.

1      Q    Well, the first one was executed on November 23rd at

2  the apartment of Helen Everett (phonetic) at 1221 N. 31st

3  Street.  Were you present at that?

4      A    I am not sure, sir.  I would have to look at the

5  document and see.

6      Q    Okay, all right, let me get that for you.  So that

7  would be Exhibit 32, okay?

8      A    I have it in front of me, sir.

9      Q    Okay.  Were you present during the execution of that

10 search warrant?

11     A    Yes, I was.

12     Q    Okay.  And how long were you at the premises

13 conducting that search?

14     A    I don't know, sir.

15     Q    Well, was it more or less than an hour?

16     A    I have no recollection of the time.

17     Q    Well, if you look, you'll see that that was conducted

18 at 8:30 in the morning.

19     A    Yes, sir, I do see that.

20     Q    All right, and you have no idea how long you were

21 there?

22     A    No, sir.

23     Q    Do you have a recollection of going through every

24 drawer, every nook and cranny in that apartment?

25     A    I do not.

1       Q    Well, how thorough did you search that apartment?

2       A    Again, I have no specific recollection of this

3  search.

4       Q    Okay, was anything recovered?

5       A    No, sir.

6       Q    And then if you turn to Exhibit 33, that is the

7  search of the School House Lane Apartments, which is the mother

8  of Mr. Dennis, do you see that?

9       A    Yes, I do.

10      Q    Were you present for that?

11      A    I was, yes.

12      Q    Okay, and that search took place at 5:50 in the

13  evening; is that right?

14      A    Yes, sir.

15      Q    How long were you there?

16      A    I don't know, sir.

17      Q    Could you describe how you searched that apartment?

18      A    I have no specific recollection of searching the

19  apartment.

20      Q    Exhibit 34 is the search of Mr. Dennis' father's

21  house at 6301 Old York Road.  You were there for that?

22      A    Yes, sir.

23      Q    Now that took place at 7:10 p.m., so the search of

24  the preceding apartment, which is in another part of the city,

25  it's in East Falls, took place at 5:50 p.m.  Would you agree

1   that you couldn't have been at the School House Lane Apartments

2   5:50 for very long because you were back up on Old York Road at

3   7:10?  Would you agree with that?

4       A    Yes, I would.

5       Q    Okay, so you would have been at the School House Lane

6   Apartments executing the search warrant for well under an hour?

7       A    I -- again, I don't --

8       Q    Well, do the math.  You were there at 5:50.

9       A    Yes.

10      Q    You were up in Old York Road at 7:10.

11      A    Yes.

12      Q    You had to have been in School House for less than an

13  hour.

14      A    For less an hour, yes, probably.

15      Q    Could you explain how you could search an entire

16  apartment, every nook and cranny, for gold hoop earrings and do

17  that in under an hour?

18      A    Again, there would be many factors that you would

19  have to take into account, but I couldn't explain to you, you

20  know, why -- you know, how much time any specific search took.

21      Q    Okay, you're aware that the clothing that was seized

22  in Exhibit 34 from Mr. Dennis' father's house included two

23  black wink -- waist length jackets, one pair of red pants, one

24  pair of white Nike Air sneaks; is that right?

25      A    Yes, sir.

1    Q    Those were not high top sneaks.  They were Nike Air,

2  correct?

3    A    My knowledge of sneaks or sneakers are -- is very

4  limited, so I don't know --

5    Q    Uh-huh.

6    A    -- I don't know, you know, which are

7  described -- unless they're described as high tops or lows, I

8  wouldn't know.

9    Q    You were there?

10   A    Yes, I was.

11   Q    Did you seize regular Nike Air sneaks or did you

12 seize white high top sneaks?

13   A    The pair that was seized were a pair of white Nike

14 Air sneaks.

15   Q    High tops?  Did you seize high tops?

16   A    I don't know, sir.  I don't if they're -- at this

17 today, I don't recall if there were high tops.

18   Q    Also says pair of red pants; is that correct?

19   A    Yes, sir.

20   Q    Doesn't say sweatpants, does it?

21   A    No, it says red pants.

22   Q    At trial, did you or your partner Jastrzembski

23 testify that there was red sweatpants?  You were there.

24   A    Well, I was there when I testified.  I wasn't in the

25 courtroom when he testified, sir.

1      Q    Okay, you see anything here about a red sweatshirt?

2      A    No, sir.

3      Q    Okay, these things that are seized in a search

4  warrant are considered evidence; are they not?

5      A    Yes, sir.

6      Q    And they're put in a bag, an evidence bag; are they

7  not?

8      A    Yes.

9      Q    And they're brought to the police station immediately

10  after the search is completed; are they not, sir?

11      A    Yes, sir.

12      Q    And in a homicide case where the victim was shot at

13  very close range by the murderer, clothing evidence might

14  contain important forensic evidence as well; isn't that

15  correct?

16      A    Yes, it could.

17      Q    If somebody fires a gun, short range, there's likely

18  to be a lot of blood and blood spatter; isn't that right, if

19  the person is literally right next to them?

20      A    I imagine it's possible, yes.

21      Q    Right, but your experience as a homicide detective,

22  blood evidence and blood spatter evidence has been very

23  critical, hasn't it?

24      A    Yes.

25      Q    And so, when you seize clothing, pants or a sweater

1    or shoes that you believe were worn by the murderer at the time

2    the shot was fired within inches of the victim, you're the one

3    to have that evidence forensically examined, correct?

4        A    Yes.

5        Q    And in fact, the crime lab is in the same building as

6    the Homicide Unit, your offices?

7        A    That is correct, yes.

8        Q    And they are open 24 hours a day, 7 days a week every

9    day of the week; are they not?

10        A    Yes.

11        Q    And so, the practice that you had and it's like this

12   is to bring it immediately for analysis to the crime lab; isn't

13   that correct?

14        A    Yes, sir.

15        Q    That wasn't done in this case?

16        A    No, sir.

17        Q    And according to your former partner, it was either

18   thrown out by custodial staff having been left on the top of

19   the filing cabinet or thrown out at the direction of Lieutenant

20   Quinn; is that right?

21        A    That's what I heard, yes, sir.

22        Q    Where did you hear that?

23        A    I heard it here during testimony.

24        Q    You never heard it before?

25        A    I may have heard it before.  I don't recall

1    specifically.  I mean, the trial, this trial was 30-some years

2    ago.

3        Q    This was.

4        A    I don't recall today.

5        Q    But you --

6        A    But I do, I did hear it here.

7        Q    But you testified in other proceedings in this case

8    well after the trial, the post-conviction hearing?

9        A    I did not.

10       Q    Oh, so do you know Lieutenant Quinn?

11       A    I'm sorry?

12       Q    Lieutenant Quinn, I know he's now deceased, but you

13   knew him well; did you not?

14       A    Well, I knew him.

15       Q    Was he competent?

16       A    He was the administrative lieutenant in homicide

17   while I was there.

18       Q    He was your boss?

19       A    He was one of my bosses, one of many bosses that I

20   had there.

21       Q    And he helped direct homicide investigations?

22       A    He was the administrative lieutenant, so --

23       Q    What does that mean?

24       A    He worked in administration for the captain.  He was

25   not a line supervisor.  You know, we were in in the line squad

1    handling or investigating cases on a daily basis.

2         He would be part of the administration, you know, setting

3    up the squads, making sure that the -- that the Homicide Unit

4    ran efficiently I would think, you know, with paperwork and

5    reports.

6         Q    And evidence.

7         A    And evidence, yes.

8         Q    A very important part of your job and the

9    lieutenant's job; isn't that right?

10        A    Yes.

11        Q    And he was stickler about that stuff, wasn't he?

12        A    Oh, I don't know what his philosophy -- what

13   evidence.

14        Q    Lieutenant Quinn was your administrative supervisor

15   for quite a few years, was he not?

16        A    Yes, he was.

17        Q    And you don't remember him as a real stickler for

18   detail?

19        A    Again, I didn't work for Lieutenant Quinn.  He was in

20   the office.  Again, I had very little contact with Lieutenant

21   Quinn.

22        Q    Have you ever known him to throw out --

23             MR. SANTARONE:  Objection, Your Honor.

24             THE COURT:  Sustained.  He doesn't know him.  He was

25   not a line supervisor.

1    BY MR. MESSING:

2        Q    Let me bring you then to January 11th of 1992.

3    Please turn to Exhibit 36.  That is the interview that was

4    conducted of Latanya (phonetic) Caison on January 11th, 1992

5    about three months after the -- almost three months after the

6    murder; is that correct?

7        A    Yes, sir.

8        Q    And that interview was conducted by, according to

9    this, you and Jastrzembski, correct?

10       A    Yes, sir.

11       Q    Now you had been told long before this that Latanya

12   Caison was listed or noted by Mr. Dennis as an alibi witness,

13   correct?

14       A    It was noted on his statement that --

15       Q    Yes.

16       A    Yes.

17       Q    He told you that at the time the murder was

18   committed, which was shortly before 2:00 p.m. on October 22nd,

19   he was on a bus heading down towards East Falls and he saw

20   Latanya Caison on that bus; is that correct?

21       A    Yes.

22       Q    So that would be an alibi?

23       A    Yes.

24       Q    If it was true --

25       A    If it was true, yes.

1    Q   -- it would provide him a very good alibi; is that

2  right?

3          MR. SANTARONE:  Objection, Your Honor.

4          THE COURT:  Sustained.  Re-phrase.

5  BY MR. MESSING:

6    Q   So when you went to see her, do you remember telling

7  her that you wanted to talk to her about October 22nd, the day

8  that this young woman was murdered at Fern Rock Station?

9    A   I'm sure that's what we told her, yes.

10   Q   And she told you that on that day, she had seen Jimmy

11 Dennis on the bus headed down to the East Falls (indiscernible)

12 Avenue and (indiscernible), correct?

13   A   Well, not quite correct, sir.  She told us that she

14 saw him on the street on that day after she got off the bus.

15   Q   I see.  And that was according to her testimony about

16 an hour after she had picked up her welfare check up in

17 Germantown, correct?

18   A   I would have to --

19   Q   Go ahead.

20   A   -- review the --

21   Q   Look at it.

22   A   -- I don't know exactly what she said.

23          THE COURT:  36, are you using 36?

24          MR. MESSING:  I said take a look at the statement.

25          THE WITNESS:  Yes.

```
 1                    THE COURT:  36.

 2                    MR. MESSING:  What's that?

 3                    THE COURT:  Exhibit 36?

 4                    MR. MESSING:  Yes, he has it in front of him.

 5                    THE COURT:  All right.

 6                    THE WITNESS:  Do you want me to go through her

 7     timeline?

 8     BY MR. MESSING:

 9          Q    Sure.  Well, actually, let me ask you this before

10     that.

11          A    Yes.

12          Q    She didn't remember the precise times when you first

13     went to talk to her of what she did that day, correct?

14                    MR. SANTARONE:  Objection, Your Honor.  The statement

15     speaks for itself.

16                    THE COURT:  Sustained.

17                    MR. SANTARONE:  Refer to the statement if he's going

18     to ask.

19                    THE COURT:  Sustained.  Re-phrase your statement, but

20     the statement is there.  Take a look at it.

21                    MR. MESSING:  The statement is there.  I'm asking

22     about something else, Your Honor.

23                    THE COURT:  All right.

24     BY MR. MESSING:

25          Q    When you first spoke to her and asked her what she
```

1    did that day and what time she did it, she told you that was

2    three months ago I don't remember the precise times.  Do you

3    remember her saying that?  It's not in the statement. .  I'm

4    asking you.

5         A    Oh, I don't remember that, no, sir.

6         Q    Correct.  Do you remember her saying, you know, I

7    want to try to figure out what time I saw him, so she got a

8    welfare receipt?

9              MR. SANTARONE:  Objection.

10             THE COURT:  Sustained.

11             MR. MESSING:  This is cross-examination.

12             THE COURT:  I know.  May I see you at sidebar?

13             MR. MESSING:  Sure.

14         (Sidebar conference)

15             THE COURT:  Attorney Messing, he -- you're showing

16    him the statement where -- that he took.  You are now asking

17    questions about things that are not in the statement --

18             MR. MESSING:  That's right.

19             THE COURT:  -- as to whether or not he remembers --

20             MR. MESSING:  That's right.

21             THE COURT:  -- whether she told him that she was not

22    sure about the timeline, whether she talked to him something

23    else, whether she gave him a receipt or two receipts and all

24    that, which is not in the statement.

25             MR. MESSING:  That's right.

1       THE COURT:  All right.  And how is that portion of

2   the statement not hearsay?

3       MR. MESSING:  I'm not sure that I -- anything I ask?

4   I'm asking him about his --

5       THE COURT:  No, you're asking about things that are

6   not in the statement from 37 years ago.

7       MR. MESSING:  Yeah, well, if he doesn't remember, he

8   doesn't remember.  I'm asking questions to test his memory and

9   to test is credibility.  That's what cross-examination is.

10      THE COURT:  All right, what is your point, Attorney

11  Cerone?

12      MR. CERONE:  Your Honor, he's making statements

13  instead of asking questions.  I mean --

14      THE COURT:  Right.

15      MR. CERONE:  -- if he makes a statement based on the

16  statement, that's fine.  But he's just -- he's testifying

17  himself of things that happened and he's mischaracterizing both

18  that statement and her testimony that she gave later.

19      THE COURT:  Then the objection is sustained.  Please

20  just ask simple questions based on the record.

21      MR. MESSING:  Well, I'll try.

22      (End sidebar conference)

23  BY MR. MESSING:

24      Q    So put aside the statement for now.

25      A    Okay.

1      Q      When you spoke to Ms. Caison, did she tell you she

2  needs to look at a document to refresh her memory of what time

3  all of this happened.  Do you remember that?

4      A      I don't recall that she said that at all, no.

5      Q      Well, let me show you and this is Exhibit 247.  If

6  you could bring that up.  It's already been published to the

7  jury.

8              THE COURT:  Okay.

9  BY MR. MESSING:

10     Q      So this --

11             MR. MESSING:  May I approach the witness?

12             THE COURT:  You may.

13 BY MR. MESSING:

14     Q      Is this the document that you and Jastrzembski

15 claimed to have taken from Ms. Caison that day?

16     A      Well, this is a document that she in fact gave us as

17 we were leave -- after the interview was completed and we were

18 leaving.

19     Q      And she gave that to you because she had used it to

20 refresh her memory of the date and time?

21     A      I don't remember her referring to this document at

22 all while we were interviewing her.

23     Q      Why did she in your words give you this document?

24     A      I think to verify the dates, you know, to indicate

25 that she received a check on October 22nd, which would have

1    been the date of the murder.

2         Q    I want you to look at that document carefully and

3    tell us whether or not there is a time or time stamp on either

4    side of that document?

5         A    I have looked at the document and I can see that

6    there is no time stamp on it.

7         Q    Okay, I'm now showing you --

8              MR. MESSING:  And if you could bring up Exhibit 38.

9    It's already in evidence, so it could be -- please publish to

10   the jury with the Court's permission?

11             THE COURT:  You may.

12   BY MR. MESSING:

13        Q    I'm showing you this document, Exhibit 38, which is a

14   receipt from DPW.  Do you see a time stamp, the date stamp on

15   that?

16        A    I do, sir.

17        Q    And what's the date?

18        A    10/22/91.

19        Q    Okay, and that is the date of the murder; is that

20   correct?

21        A    Yes, sir.

22        Q    And do you see a time stamp on that?

23        A    Yes, I do.  It says 1303.

24        Q    What time is 1303 in fact?

25        A    1:03 p.m.

1          Q     Okay.  So if Ms. Caison had told you that she picked

2     up her DPW check at about 3 o'clock, and then said in the

3     statement that she saw James Dennis on or outside of a bus at

4     4:00 or 4:30, that would be consistent with a 3 o'clock time

5     for picking up the DPW check, correct?

6               MR. SANTARONE:  Object, Your Honor.

7               THE COURT:  State your ground?

8               MR. SANTARONE:  One, it's a compound question.  Two,

9     it assumes facts not in evidence.  And three, he's going back

10    to what was previously said that isn't -- he's testifying

11    again.

12              THE COURT:  All right, sustained.  Re-phrase the

13    question.

14    BY MR. MESSING:

15         Q     Sure.  Ms. Caison told you at some point putting

16    aside the statement that you have there, but she told you at

17    some point that she saw Mr. Dennis sometime after she had

18    picked up her DPW check; is that right?

19         A     Yes.

20         Q     Did Ms. Caison tell you that she saw Mr. Dennis three

21    hours later after she picked up her DPW check?

22         A     She did not -- the only time that she told us about

23    is that she gets off work at about 2:00 p.m.  And that's the

24    only time that she referred to in the entire statement that she

25    gave us.

1      Q    Well, doesn't she say at the end of the statement

2    that she saw Mr. Dennis at or outside the bus at 4:00 or 4:30?

3      A    Yes, that is correct.

4      Q    So that's another time?

5      A    That's another time, yes, I'm sorry.

6      Q    Okay.  So if she got off work at 2 o'clock, how much

7    time went by before she picked up her DPW check according to

8    you?

9      A    I don't know what time she picked up the DPW check

10   other than from the information from this receipt, which says

11   1301.

12     Q    Well, she told you that you that, according to you,

13   she left work at 2 o'clock and she was working in Center City

14   at 8th and Arch Street, correct?

15     A    Yes, sir.

16     Q    And then, she had to take mass transportation in two

17   busses to get up to where the DPW check is up north in

18   Germantown; is that right?

19     A    Yes.

20     Q    Okay.  So you know that some considerable time went

21   by before she got to the DPW office, isn't that right?

22     A    Yes, sir.

23     Q    And you also know that she told you that she had

24   ordered some fish, that she then went to the pharmacy and

25   either picked up or dropped off a prescription, went back to

1    the fish store to get her fish after being cleaned, correct?

2        A    Yes.

3        Q    So some considerable time went by; is that right?

4        A    Yes.

5        Q    Until she got on the bus near the DPW office,

6    correct?

7        A    Yes.

8        Q    So if she picked up the DPW check at 3 o'clock, then

9    by the time she got on the bus and saw Mr. Dennis, it would

10   have been after 4 o'clock, correct?

11       A    But she didn't pick up the DPW check at 3 o'clock.

12   She picked it up at according to this document at 1303 hours.

13       Q    And what time is that?

14       A    1:03 p.m.

15           MR. MESSING:  I have no further questions.

16           THE COURT:  Okay.

17           MR. SANTARONE:  Your Honor, if I may, so I don't need

18   to call Detective Santiago back in my case in chief, I will go

19   beyond the scope of direct?

20           THE COURT:  All right, so members of the jury, since

21   he's also going to testify as part of the Defense case, I'm

22   going to permit him to do every -- a full direct examination of

23   the witness.

24                        **REDIRECT EXAMINATION**

25   BY MR. SANTARONE:

1      Q     Detective Santiago, you were asked about height and

2   weight.  You testified that you were aware there was a line-up

3   in this case?

4      A     Yes.

5      Q     Would the person's height be visible to the witnesses

6   at a line-up?

7      A     Yes, at the line-up the height and weight would be

8   part of the line-up process or the identification process.

9      Q     And were you or Detective Jastrzembski involved in

10   the line-up that occurred at the prison?

11      A     No, sir.

12      Q     And at that point, what was the status of Mr. Dennis

13   as far as his -- whether he'd been arrested or not?

14      A     He had been arrested.  The line-up was court-ordered

15   after his arrest.

16      Q     Okay, and of the -- you were shown the folder which

17   has eight photographs, three folders each with eight

18   photographs?

19      A     That is correct, sir.

20      Q     Is eight the required number that the department had

21   a policy on?

22      A     The policy, the department policy, is six or more

23   photos of -- with the suspect in the photo array.  And then,

24   the fillers would be -- you try to match the color, the hair,

25   you know, the age, so that the photos are somewhat similar, but

1    the policy would be six photos, including the suspect or more.

2         Q    And you used eight?

3         A    We used eight on this one, yes.

4         Q    And the -- were any of the same people in any of the

5    other photo arrays?

6         A    No, each photo array had a suspect.  So, for each

7    suspect, you would try to match up fillers that would match

8    that suspect.  So, in essence, the witnesses all saw 24 photos

9    of suspects.

10        Q    And of those witnesses, that we've talked about here

11   made some identification, either line-up or trial, did the

12   witnesses either identify or focus on only one person in any of

13   those photographs?

14        A    Well, they view all eight photos in each array.  And

15   the ones that did make an identification identified Mr. James

16   Dennis.

17        Q    Detective Santiago, where are you from originally?

18        A    Well, I was born in Puerto Rico, but I was raised

19   here in Philadelphia.

20        Q    And how old were you when you moved to Philadelphia?

21        A    About five years old I think is when my parents

22   brought me here.

23        Q    And did you go to school in this area?

24        A    I did.  I went to -- well, I graduated from Ben

25   Franklin High School, which is a inner city public high school

1   here in the city.

2       A    And did you have any education past high school?

3       A    I went to Cornell University for a year and a half

4   and then I dropped out.

5       Q    And when you dropped out, what did you do?

6       A    I joined the police department, Philadelphia Police

7   Department.

8       Q    And what year was that?

9       A    Well, I joined -- I became a member of the

10  Philadelphia Police Department in January of 1970.

11      Q    And when did you retire?

12      A    My retirement was I believe August of 1996.

13      Q    And could you just briefly tell the jury what your

14  assignments were and your progression through the Philadelphia

15  Police Department?

16      A    Certainly.  I was -- when I came out of the police

17  academy, I was a uniformed police officer and I was assigned to

18  work in the 25th Police District, which is North Philadelphia

19  basically in Kensington in Philadelphia.

20      In 1974, I was promoted to the detective.  And I worked at

21  West Detectives, which is at 55th and Pine, the west side of

22  the city.

23      I worked there until 1978.  And then, I was transferred to

24  East Detectives, again, East Detectives would have encompassed

25  the 25th District, again, North Philly, Kensington all the way

1    up to the Boulevard from Lehigh -- oh, I'm sorry, from Gerard

2    Avenue to the Boulevard.

3         I went to West Detectives.  I worked in -- I'm sorry, in

4    East Detectives.  And I worked there until 1986, where I was

5    transferred to the Homicide Unit.

6         Q    And in the years that are relevant to this '90, '91,

7    about how many homicides were there in Philadelphia a year?

8         A    We -- in the mid '80s, all the way through the '90s,

9    we were averaging 450 up to 500 some years every year homicides

10   in Philadelphia.  It was lot of homicides during that time

11   period.

12        Q    And we went through with Detective Jastrzembski and I

13   won't go through the -- how the Homicide Unit was set up, but

14   roughly how many you described line detectives?

15        A    Yes, the -- we had line detectives.  We have -- you

16   have to man the Homicide Unit 24 hours a day, 7 days a week.

17   And so, we were divided into different squads and groups, you

18   know, within that so that, you know, there was coverage all the

19   time.

20        And you know, I was in 2 Squad.  And I believe I was in F

21   Group I believe.

22        Q    And in the '90s, early '90s, do you know

23   approximately how many line detectives there were?

24        A    There were -- around the clock, I would think that

25   there was somewhere in the area of about 80 detectives that

1    covered the line squad.

2         We had other units within the homicide division that were

3    also manned by other detectives.  We had a fugitive squad and

4    then we had a special investigation squad or a -- they call it

5    a cold case squad today, but we also had groups of detectives

6    that man those units.

7         Q    And it'd also be vacations, days off for the

8    detectives over the line detectives?

9         A    Yes, yes.  You would have to make sure that when

10   people were on vacations or holidays, that Homicide would still

11   man 24 hours a day every day of the week.

12        Q    Were you working on October 22nd, 1991?

13             THE COURT:  We need a break.

14             MR. SANTARONE:  Okay.

15             THE COURT:  Five minutes?  Okay, we need a five

16   minute break.  Remember my instructions, members of the jury.

17             THE CLERK:  All rise.

18             THE COURT:  Five minutes.  Come back and be on the

19   witness stand in five minutes, all right?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Thank you.

22        (Recess taken at 10:04 a.m., recommencing at 10:17 a.m.)

23             THE COURT:  Okay, Nancy, can you put on the record

24   the conversations that you had with the Juror Number 1?

25             THE CLERK:  I spoke with Juror Number 1, who advised

1   me he was having a panic attack.  It hasn't happened in eight

2   years.  And he needs to take meds, heavy duty medication, and

3   then go home and sleep it off.  He's uncertain if he will

4   be -- need to take that medication again tomorrow.

5              THE COURT:  Okay.  Attorney Messing?

6              MR. MESSING:  Plaintiff's position is it sounds like

7   he needs to take medication.  Hopefully, that will solve the

8   problem.

9              My request would be for us to suspend proceedings for

10  the rest of the day, come back tomorrow.  We've already lost

11  one juror.  I would hate to lose a second juror.  If he's okay,

12  he can come and serve tomorrow.

13             THE COURT:  All right.

14             MR. MESSING:  If not, then the Court will do what the

15  Court wants to do.

16             THE COURT:  Very well.  Let me hear from the City?

17             MR. POMAGER:  Your Honor, I think the City at this

18  point is prepared to move forward.  We have a number of

19  witnesses lined up for today.  And it would complicate and both

20  delay the rest of this trial to have another day lost at this

21  point.

22             THE COURT:  Attorney Cerone for the Defendants.

23             MR. CERONE:  We continue with six and complete the

24  trial today or early tomorrow.

25             THE COURT:  Very well.  Attorney Messing, I

```
 1     appreciate your recommendation.  Yesterday, I suspended a day

 2     contemplating that.  We anticipated that the Juror Number 8 was

 3     not promising to be able to be with us given what happened to

 4     him.

 5            I think the situation with this juror about the panic

 6     attack is pretty serious.  He's on heavy medication.  And we

 7     are very uncertain as to whether or not he will be able to join

 8     us or return to continue with the trial.

 9            This trial is about a day, day and a half to conclude

10     all the evidence, and then, we're going to proceed to the

11     closing, so I will excuse Juror Number 1 and we will continue

12     with the trial at this point in time.

13            So what I intend to do is ask that a marshal escort

14     him.  And he's requested to take a Lyft or Uber, but I'm

15     concerned.  I'm going to recommend to him that he go directly

16     to the emergency room in the nearest hospital in this case.  So

17     my deputy's going to instruct him to do that.

18            And we'll have a marshal escort him and make sure he

19     is safe.  Nancy will talk to him, okay.

20            And is Stacy going to continue?  Okay.

21            MR. MESSING:  Do we want to give the jury --

22            (The Judge confers with the Clerk)

23            MR. MESSING:  Judge, may I make a suggestion?

24            THE COURT:  Yes.  Take the 15-minute break now so

25     that the rest of the jury can just calm down from what just
```

1     happened.

2              THE COURT:  Yeah, that's not a suggestion.  I will

3     take another 10 minutes.  We'll start at 10:30.

4              You may step down.

5              MR. CERONE:  Your Honor, I will have an update on the

6     witness when the Court's ready to hear it.

7              THE COURT:  Okay, thanks.

8          (Recess taken at 10:21 a.m., recommencing at 10:34 a.m.)

9              THE COURT:  Okay, members of the jury, you may be

10    seated.  Members of the jury, unfortunately, Juror Number 1

11    cannot continue in the case due to a medical emergency.

12             So, with that, are you ready to continue?  I think we

13    have close to a day, day and a half, maybe a little less of

14    testimony.

15             And then, we'll proceed to the final stage of the

16    case, which is for you to listen to the closing arguments and

17    my charge.

18             I'm hopeful that you'll have the case sometime

19    Thursday.  Okay, thank you.  Attorney Santarone?

20             MR. SANTARONE:  Thank you, Your Honor.

21    BY MR. SANTARONE:

22        Q    I think the last question was were you working on

23    October 22nd, 1991?

24        A    I was, sir.

25        Q    And did you go to the scene of a murder?

1          A     Yes, I did.

2          Q     And where was that?

3          A     At 10th and Nedro in Philadelphia.

4          Q     And I pull (indiscernible) for Exhibit 151.

5                THE COURT:  Volume, please?

6                MR. SANTARONE:  3, Your Honor.

7                THE COURT:  Okay.

8                MR. SANTARONE:  Can you put it on the screen?  Your

9    Honor may --

10               THE COURT:  Go ahead.  You have it?

11               UNIDENTIFIED SPEAKER:  I have it.

12               THE COURT:  Okay.

13          (Counsel confer)

14               THE COURT:  Could you --

15          (Counsel confer)

16               THE COURT:  Do you need the monitor?  Oh, we -- he

17   sees it.

18               MR. SANTARONE:  Okay.

19               THE COURT:  And I think the jury will be able to see

20   it, too.

21               MR. SANTARONE:  Okay, when I get to some question, it

22   might be I could just sit at -- sit at my table because

23               THE COURT:  That's fine.

24   BY MR. SANTARONE:

25          Q     Detective, looking at Exhibit 151, the front page,

1    could you tell me what that is?

2        A    Yes, sir.  It -- this is a general radio message that

3    the Homicide Unit would request Philadelphia Police radio to

4    announce over the police radio descriptions.  In this case, it

5    would be a description of a vehicle.  And the request was for

6    this general radio message to be read three times per hour for

7    the next 72 hours.

8        Q    And that goes citywide?

9        A    This goes citywide, yes.  It would be on one of the

10   police radio bands that would transmit to every uniform officer

11   that was working.

12       Q    And the date of that is what?

13       A    November 9th, 1991.  Well, I'm sorry, it was sent on

14   October 22nd 1991.

15       Q    And how long would they be sent out, how many?

16       A    Well, it would vary depending, but on this one, it

17   was requested that this GRM be read three times per hour for

18   the next 72 hours and one time per hour thereafter.

19       Q    The first page of 1, page 2 we're doing or page 1.

20   Going back and looking at this, the state exhibit, the flash

21   information, is that a description of the (indiscernible)?

22       A    Yes, it is.

23       Q    And what did the description say?

24       A    The description reads wanted Ferrari and homicide by

25   shooting on the highway at 10th and Nedro, three black males,

1  number 1, 18 years, 5'7", 150 pounds, red sweat jacket with

2  hood, matching pants, white high top sneaks.

3      Number 2, 18 years old, 5'9", 160 pounds, blue top, with

4  white stripes and a black jacket.

5      Q    And is there a description of the vehicle?

6      A    Yes, the -- underneath, there is a description of a

7  1978 or 1979 Chevy Malibu or Nova, four door, gold body with a

8  light gold vinyl top.  Vehicle has a PA license plates, I'm

9  sorry, PA license plates with a yellow background and a -- and

10 blue lettering.  Vehicle is described as a clean car.

11     Q    And that -- does that appear to be a pretty thorough

12 description of the vehicle?

13     A    It -- yes, it does.

14     Q    Was that vehicle ever found?

15     A    That vehicle was never found, no, sir.

16     Q    And these alerts were going out citywide?

17     A    They were going out citywide, yes, through police

18 radio.

19     Q    At the crime scene, when you arrived, was anyone

20 there to collect evidence?

21     A    We -- on -- at the scene of every homicide

22 investigation, we always have the mobile crime unit, their

23 expert technicians, who have been trained in collecting and

24 preserving evidence.  So we have them at every crime scene.

25 And they were in fact at this crime scene.

1      Q     And if you look at Exhibit 255, page 620.

2            MR. SANTARONE:  May I show that to the jury, Your

3   Honor?

4            THE COURT:  You may.  That's (indiscernible).

5            MR. SANTARONE:  That's in the last binder, sir.

6   BY MR. SANTARONE:

7      Q     And is that the mobile crime scene detective service

8   report that deals with this homicide that we're talking about

9   October 22nd, 1991?

10     A     Yes, sir.

11     Q     And if a witness had said I saw one of the suspect's

12  throw something, would an effort be made to try and find that?

13     A     Certainly.  We had the mobile crime unit.  We also

14  had uniform officers on the scene.  And we were searching the

15  area for any evidence.

16        If we were directed by anyone to search a specific area

17  for evidence in this crime, I would have had the crime lab plus

18  the uniform officers assist us in searching that area for any

19  potential evidence.

20     Q     Once it is determined that there are witnesses, who

21  were willing to talk, what happened to those witnesses?

22     A     Well, once we determined that there are witnesses, we

23  try to send them down to our office, where they can be

24  interviewed properly.  They wouldn't have the distractions of

25  being on -- at the crime scene and, you know, they could come

1   to the -- be interviewed, you know, for the information that

2   they would have to --

3        Q    And how would they transport them?

4        A    They would be sent down normally by a

5   police -- uniform police officer would normally send -- take

6   them down to the police administration building.  And then, we

7   would provide a ride back home.

8        Q    And were you involved -- were you and Detective

9   Jastrzembski involved in taking these initial statements at the

10  Homicide Unit?

11       A    No, we were not.  We were at the crime scene.

12       Q    Of the statements that you looked at and the

13  descriptions, did anyone ever say that one of the suspects was

14  wearing full length down to his ankles leather coat?

15       A    I do not recall having that as one of the

16  descriptions in this murder case, no.

17       Q    And when a witness does arrive, now you said that you

18  and Detective Jastrzembski were at the scene, who's taking the

19  statements then of these witnesses?

20       A    Well, there would have been detectives.  Again, I say

21  we man the homicide division all the time.  And so, there would

22  have been detectives in homicide that would have assisted in

23  taking witness statements.

24       Q    And if we looked at -- statements were taken from

25  witnesses then, did you as was discussed in your direct or your

1    cross-examination rather, you showed specific photo spreads to

2    the various witnesses?

3        A    I did.

4        Q    And can you describe the -- who was in each of those

5    three photo arrays?

6        A    We had -- at the time, we had developed information

7    about three suspects in this robbery murder.  And what we try

8    to do is to put each suspect in each array.

9        And then, we would try to match up the filler photos to

10   the specific characteristics of that, you know, suspect.  You

11   know, the color of the skin, the hair, the age, that type of

12   thing.

13       Q    The initial interview of Ms. Howard, did you review

14   that before you interviewed her?

15       A    I did.

16       Q    And your interview of her was Exhibit 16?  You can

17   look at your monitor.

18       A    Oh, it is, yes, I'm sorry.

19       Q    We lost that signal, too.

20       A    I have it here.

21       Q    Okay, it's up there.  In that statement of Ms.

22   Howard, it was, scroll down, was she asked whether or not she

23   recognized the suspects or the shooter from any other place?

24       A    Um --

25       Q    She was asked would you be able to recognize him

1    (indiscernible)?

2        A    I specifically asked her if she would be able to

3    recognize the male that did the shooting, the robbery and the

4    shooting.  And she said -- and her answer was I think so.

5        Q    I'm sorry, I want to go back to the statement

6    of -- the first statement, the statement you gave Exhibit 3.

7                THE COURT:  Exhibit what?

8                MR. SANTARONE:  Exhibit 3 the initial interview, I'm

9    sorry.  It should be on your screen, detective.

10               THE WITNESS:  Okay, I see it.

11   BY MR. SANTARONE:

12       Q    If you look at the bottom of page 3 and the top of

13   page 4?

14       A    Yes, I see it.

15       Q    Was she specifically asked if she had seen the

16   suspect anywhere before?

17       A    Yes, she was.  The question to her was have you ever

18   seen him before anywhere, school, a store, a dance in your

19   neighborhood, anywhere?  And her answer is, no, I have never

20   seen him before.

21       Q    If we looked at Exhibit 17, which is the

22   identification that you showed to the identification of James

23   Cameron, look at page 1.

24       A    Yes, I have it.

25       Q    And scroll down a little.  He -- did he identify

1   anyone as looking familiar?

2        A    His answer is number 1 looks familiar, but I can't

3   be -- I can't be sure.

4        Q    Now did you in any way make any suggestion as to what

5   photograph they should look at or who they should identify?

6        A    No, sir, I just handed over the manila folder and

7   they just, you know, reviewed the photos.

8        Q    And did any of the witnesses, were any of them able

9   to identify anyone in photo array number 2 or photo array

10  number 3?

11       A    No, sir.

12       Q    Were you aware that there was a line-up that was

13  conducted?

14       A    Yes, I was aware.

15       Q    And if we look at Exhibit 250, you said these are

16  usually court ordered and signed by a court?

17       A    Yes, sir.

18       Q    Is that the case here?

19       A    Yes.

20       Q    And what's the date that the line-up was held?

21       A    The --

22       Q    The date the order started?

23       A    Yes, the line-up was ordered to be held on December

24  19th, 1991 at approximately 5:15 p.m. at the Philadelphia

25  Detention Center.

1    Q    And at that point, what was Mr. Dennis', had he

2    already been arrested?

3    A    He had already been arrested, yes.

4    Q    And do you know who approved that arrest of Mr.

5    Dennis?

6    A    The District Attorney's Office.

7    Q    Did you or Detective Jastrzembski line up at all?

8    A    No, sir.

9    Q    Did you or Detective Jastrzembski have any

10   involvement or what witnesses would appear at the line-up at

11   the prison?

12   A    No, sir.

13   Q    And who would take care of that?

14   A    The District Attorney's Office.

15   Q    We went over the -- with Detective Jastrzembski

16   whatever the statements and the investigations that led to

17   James Dennis, Rodney Johns, and Derek Stalworth being potential

18   suspects.  And I'm not going to go through that, all their

19   statements again to try to move this along.  If we look at the

20   --

21        MR. SANTARONE:  Your Honor, I'm going to just -- for

22   the purpose for identification and moving into evidence, I

23   think I just will identify the statements if that's okay with

24   you?

25        THE COURT:  You may.

```
 1    BY MR. SANTARONE:

 2         Q     If you look at Exhibit 86?

 3               THE COURT:  Volume 2?  What volume?  You got to give

 4    me the volume.

 5               MR. MESSING:  Objection.  This has all been gone

 6    over.  Sidebar?

 7               THE COURT:  State your ground.  Please stand, state

 8    your ground or the objection.

 9               MR. MESSING:  Yeah, this has all been gone over.

10    It's hearsay on hearsay.

11               THE COURT:  Very well.  Attorney Santarone, your

12    response?

13               MR. SANTARONE:  Your Honor, I'm not -- we've already

14    gone through with Detective Jastrzembski.  They've been shown,

15    but I don't know that they're moved into evidence.  So I would

16    rather just move them into evidence, now we can get through

17    this case.

18               MR. MESSING:  Objection.  They don't belong in

19    evidence.  They're hearsay.

20               MR. POMAGER:  Your Honor, Exhibit 86 is already in

21    evidence.

22               THE COURT:  Right, they are admitted.  They're

23    already in evidence.  You may continue.

24               MR. SANTARONE:  Thank you, Your Honor.

25    BY MR. SANTARONE:
```

1          Q     Now the arrest of James Dennis, do you remember what

2     date that was?

3          A     Not off the top of my head, sir, no, sir.

4          Q     Okay, let's look at Exhibit 74.  This is the activity

5     sheet of October 30th, 1991.  And if we look down at number 4?

6          A     Yes.

7          Q     Does that indicate that an attorney had contacted the

8     homicide department for (indiscernible)?

9          A     Yes, there's a notation that Attorney Lee Mandel had

10    called the Homicide Unit, stating that he represents Jimmy

11    Dennis.  He inquired if homicide had a warrant for Dennis'

12    arrest.  And he was informed that there was no warrant at the

13    time.

14         Q     And if we look at number 6 on that page, it refers to

15    ADA David Webb.  Would it be common to be updating the District

16    Attorney's Office as to what was going on with the

17    investigation?

18         A     Yes, David Webb at the time was the chief of the

19    Homicide Unit in the D.A.'s Office.  And he would be updated on

20    a regular basis as to the investigation.

21         Q     And if we look at Exhibit 30, which is the warrant

22    for the arrest, does that indicate what date the warrant was

23    issued?

24         A     Well, not issued --

25         Q     Or the date --

1      A    -- but the date and time of arrest is November 23rd,

2  1991 at 8:30 a.m. at 6301 Old York Road.

3      Q    So this is 24 days or so after Lee Mandel had called?

4      A    Yes, sir.

5      Q    Did you look through the page -- go to page 2 of

6  that?  What is that?

7      A    This is the actual warrant, the actual arrest warrant

8  that is signed and sealed by the, in this case, a magistrate.

9      Q    And does that warrant anywhere designate any degree

10  of murder?

11      A    No, sir.  It's a warrant that indicates that a

12  warrant was issued for a Mr. James Dennis and that the -- it

13  would be charging him with murder, no degree, possession

14  instrument crime, violation of the Uniform Firearms Act,

15  criminal conspiracy, robbery, theft, and receiving stolen

16  property, none of which have a -- whether, you know, what

17  grading?  There was no grading on any of the crimes that were

18  charged.

19      Q    And once the arrest takes place, which now is

20  November 23rd, 1991, who's in charge of the investigation from

21  that point?

22      A    Once the arrest is made, the District Attorney takes

23  over the case and the investigation.

24      Q    And do you know who was assigned this case at the

25  District Attorney's Office?

1    A    Yes, the attorney was Mr. Roger King.

2    Q    Had you worked with Roger King in other cases?

3    A    Yes, I have.

4    Q    What was his level involvement in the case?

5    A    Roger King needed full involvement in a case.  He

6  wanted to see every police officer that was at the crime scene,

7  every -- he wanted to talk to every witness.  He needed to

8  speak to all the detectives.  He needed to see all the

9  paperwork.

10    And then, he would give different people assignments that

11  he -- on things that he thought needed to be done to complete

12  the investigation, so that he could put on a proper

13  prosecution.

14    Q    Did he meet with witnesses?

15    A    Yes, he did.

16    Q    Did he talk to detectives to give you assignments?

17    A    Yes, he did.

18    Q    Do you remember any specific instructions you

19  received from Roger King in this case in the murder of Chedell

20  Williams?

21    A    Well, I didn't have an independent recollection, but

22  in reviewing the file, I saw where Mr. King had instructed me

23  to go to the scene.

24    And this is -- this was sometime after the preliminary

25  hearing or for the, yeah, sometime after the preliminary

1    hearing and for trial, he instructed me to go the crime scene

2    and make a note and drive from the scene to 6301 Old York Road,

3    give him a -- the route that I took and approximately how long

4    it took me to get there.

5         And the same thing from 10th and Nedro to the Abbottsford

6    Projects.

7         Q    And 10th and Nedro's where?

8         A    The -- that's where the crime scene was for

9    Mr. -- for Ms. Chedell Williams, yes.  That's where she was

10   murdered.

11        Q    And from 10th and Nedro to Abbottsford Project, do

12   you know how long a ride that was?

13        A    It -- well, I had -- I looked it over and it looked

14   like it was a four, five minute ride for me that day.

15        Q    From 10th and Nedro --

16             MR. MESSING:  I'm sorry --

17        Q    -- to Old Your Road or from 10th and Nedro to

18   Abbottsford Projects?

19        A    I'm sorry, 10th and Nedro to 6301 Old York Road.

20        Q    Okay.  How about from 10th and Nedro to Abbottsford

21   Project?

22        A    That was an approximately 13 minute ride.

23        Q    Did Roger King ever send detectives out to talk to

24   alibi witnesses?

25        A    Well, in this case, we spoke to Ms. Caison.  And it

 1    was shortly after the preliminary hearing.  So it -- although I

 2    don't have a specific recollection of it, this would be

 3    something that he could have assigned myself and/or Detective

 4    Jastrzembski to do.

 5         Q    If you look at Exhibit 170, go to the middle of page

 6    3.  That is the preliminary hearing?

 7         A    Yes.

 8         Q    And if we go to the middle of page 3, or I'm sorry,

 9    go to the next page.  Does that indicate you testified?

10         A    Yes, this is the index of witnesses that testified at

11    the preliminary hearing.

12         Q    And the preliminary hearing would be for what

13    purpose?

14         A    To establish that the -- that a prima facie case was

15    made against the suspect that was arrested for the crime of the

16    murder and robbery of Chedell Williams.

17         Q    And did you or Detective Jastrzembski testify at that

18    preliminary hearing?

19         A    No, we did not.

20         Q    Did the interview and statement taken from Ms. Caison

21    have anything to do with the establishment of probable cause

22    for the arrest?

23              MR. MESSING:  Objection.  Calls for a legal

24    conclusion.

25              THE COURT:  Your response?

1          MR. SANTARONE:  I can re-phrase it.

2          THE COURT:  Okay.

3   BY MR. SANTARONE:

4     Q    Prior to you ever going out to see Ms. Caison, have

5   the District Attorney's Office approve the arrest of James

6   Dennis?

7     A    Yes, the arrest had been approved by the District

8   Attorney's Office.  The arrest had been made.  And a

9   preliminary hearing had taken place and he was held over for

10  trial prior to myself and Detective Jastrzembski interviewing

11  Ms. Caison.

12    Q    Would you in your experience with Roger King ever

13  have a statement or a document that you withhold from Roger

14  King?

15    A    No, sir.  Yeah, you could --

16    Q    If you look at after James Dennis is arrested, he did

17  give a -- you did interview him?

18    A    Yes, we did an interview with him.

19    Q    Look at Exhibit 31.  If we go to the -- page 5 at the

20  bottom?

21    A    Page 5?

22    Q    You see at the end of the week?

23    A    No, I think I don't know if this is page 5.

24          MR. SANTARONE:  May I approach the witness?

25          THE COURT:  You may.

1    BY MR. SANTARONE:

2        Q    Page 5?

3        A    Yes, okay.

4        Q    Did Mr. Dennis indicate that he had had any contact

5    with Derek Stalworth or Rodney Johnson?

6        A    Yes, he indicates that then at the end of the week,

7    Derek and Rodney told me that the cops were looking for us for

8    the murder of that girl.

9        Q    And where did they go, where did Rodney and Derek

10   speak with them?

11       A    They spoke at a -- they came over to Helen's house

12   and that would be Helen Everett.

13       Q    And on page 4 of the statement, but I think it's page

14   6 of the document itself, is there a mention there that he saw

15   Latanya Caison on the bus?  If you go to the bottom of that

16   page.

17       A    Yes, it -- he in the statement, he at the bottom of

18   this page, I seen this girl Tammy Caisson on the K bus.

19       Q    And that spelling is C-A-I-S-O-N.  Is that the

20   spelling he gave or spelling you gave?

21       A    No, that's the spelling that I put down.  I -- that's

22   the spelling that I thought -- that's -- I thought that's the

23   way you spelled the name.  I didn't have any other information

24   about that.

25       Q    And on page 8 of the statement, was he asked do you

1    own a red jogging suit?

2         A    Let's see.

3         Q    Page 8 of the document.

4              THE COURT:  Question.

5              THE WITNESS:  Okay.  Okay, yes, he's asked do you own

6    a red jogging suit.  And his answer's no, sir.

7    BY MR. SANTARONE:

8         Q    Looking at the activity sheet, Exhibit 81, do you

9    remember looking at this what efforts were made to locate Tammy

10   Caison, regardless of how anything is spelled?

11        A    Yes, the detective --

12        Q    Next paragraph?

13        A    Detective Jastrzembski and myself, we did a -- it's

14   virtually a cold call or a neighborhood survey in the area of

15   Abbottsford Project.

16        And in an attempt to locate the girl that was listed, you

17   know, we had Tanny or Tammy Caison.  We ended up at -- we ended

18   up finding the mother's house.

19        And then, the mother instructed us, you know, that or told

20   us that who we're looking for was Latanya Caison and she gave

21   us an address to go to.

22        Q    And if we go to Exhibit 36, her statement at the

23   bottom of page 1, was she asked whether or not she saw James

24   Dennis?

25        A    Yes, she was asked and her answer was, yes, I think

1    so.

2        Q    And if you go to page 2, the second question, was she

3    asked about what did you do that day?

4        A    Yes, it was just an open-ended question tell me about

5    that day?  And she provided the answer.

6        Q    And are you able to read that answer?

7        A    Yes, a little bit.  I got off work at 200 p.m.  I

8    work at 8th and Market it says here, Market Street and went to

9    the Broad and Erie, let's see Broad and Erie.

10        From there, I got either the X or H bus.  They both go to

11   the 32 Center.  I waited in line for about 15 or 20 minutes.

12   Got my --

13        Q    Check?

14        A    Oh, yes, got my check, went to the Rite-Aid, dropped

15   off a prescription, then went to the fish market.  I waited to

16   get served, picked my fish out.

17        Then went back to pick up my prescription.  Then came back

18   and picked up my fish.  Then I got the K bus, where -- which

19   took me to Henry and Midvale, where I got off.

20        Q    And if you look at page 3, question, did you see

21   James Dennis on the K bus?

22        A    Yes, I do see that.  And you want me to read the

23   answer?

24        Q    What was your answer?

25        A    The answer is I saw him when I got off the bus.  I

1   was walking up one side of the street.  He was walking up the

2   other.  You talked about earlier that a pink card.  Did you get

3   anything else from her that day while you were at the house?

4        A    No, the pink card was something that she actually

5   gave us.  The statement was over.  There's no mention of

6   the -- of any receipt or pink card or anything at the time the

7   statement was taken, but I think she gave it to us to show us

8   that the 20 -- October 22nd would have been one of the days

9   that she was scheduled to pick up her check.

10       Q    Were you aware that there was an investigation

11  of -- based on some allegations made by a Montgomery County

12  prisoner William Braden (phonetic)?

13       A    Yes, I am aware of that.

14       Q    And was there an -- was an investigation completed of

15  those claims based on your knowledge?

16       A    Yes, yes, there was.

17       Q    And what was the conclusion?

18       A    The conclusion was that Mr. Frazier (phonetic) had

19  allegations that he knew or heard that somebody else had

20  committed the crime.  And we investigated those allegations.

21  We went to the locations.

22       Actually, we took him to or he was taken to the locations

23  that he provided.  And interviews of the people that lived in

24  the house show that the -- his allegations were completely

25  groundless.

1  Q So he got his day out of prison to run around?

2  A He basically, yes, he --

3  Q And Exhibit 96 is a statement that was taken from

4 him.  Do you know who took that statement?

5  A Yes, Detective Maahs and Detective McGuffin

6 (phonetic), two homicide detectives.

7  Q And Exhibits (sic) 98 is an interview of a witness?

8 Was this a witness who -- who was interviewed as part of that

9 investigation?

10  A Yes, and that interview was conducted by Detective

11 McGuffin.

12  Q And Exhibit 99 is an interview of Pamela Bryan

13 (phonetic)?

14  A Yes.  And again, the interview was conducted by

15 Detective McGuffin.

16  Q And in the -- based on these interviews and riding

17 around in pointing out addresses, was any support for his

18 allegations?

19  A No, no support for the allegations, no.

20  Q And were these documents regarding this investigation

21 and the interviews, would they be included in the file that

22 would have been given to Roger King?

23  A Yes.

24  Q And does the District Attorney or does the detective,

25 the Homicide Unit, once the arrest is made, does the Homicide

1    Unit have any role in what -- providing documents directly to

2    the criminal defense attorney?

3        A    No, we provide all our documents directly to the

4    District Attorney.  And the District Attorney would then

5    distribute the documents that's needed.

6        Q    Let's take a look at Exhibit 28.  And this is the

7    interview of Charles Thompson.  Prior to that date of that

8    interview, had any witnesses mentioned the name Charles

9    Thompson?

10       A    I don't recall that name being mentioned in this

11   investigation prior to this.

12       Q    You talked about him being processed for another

13   crime.  How do you believe he ended up at Homicide?

14       A    Well, he would have had to have told someone

15   that -- the other crime that he was convicted or I'm sorry,

16   arrested for happened in an another division.

17       And so, that division, after processing him there, would

18   send him to the round house or the police administration

19   building for processing, where he would be fingerprinted,

20   photographed, and he would have his arraignment.

21       And that process happens in the building where I work,

22   where I was working at the time in the basement.

23       So there's hundreds, maybe thousands of people that are

24   arrested almost every day in Philadelphia for various crimes

25   and they're all, you know, being funneled through the detention

1   unit, as we called it, in the round house.

2        There's no way for me to know, you know, what his charges

3   were, who he was unless he specifically said to someone I have

4   information that homicide may be interested in.

5        And at that point, you know, we would be contacted and he

6   would either be brought up by the detention center personnel or

7   we may send someone down to pick him up and bring him up for an

8   interview.

9        Q    And looking at the bottom of page 6 of that

10  statement, regarding the homicide of Chedell Williams, did he

11  add anything other than he had seen Jimmy Dennis with a silver

12  gun?

13       A    No, I mean, after -- we finished the interview.  And

14  when I go over the interview, I see that the only thing that he

15  can tell me is that the night of the murder when you were at

16  the rehearsal, did you see any guns on Jimmy Dennis?  And he

17  says, yes, I saw him with a silver .38.  He pulled it out while

18  we were outside.

19       Now of course by this time, we already had information

20  with that, you know, our witness has told us that Jimmy Dennis

21  had a silver revolver.

22       Q    And looking at this statement and the other

23  statements you went through with Ms. Caison and those

24  statements, do the individuals whose statement was being taken,

25  do they review and sign the bottom?

1      A      Yes, they do.

2      Q      They sign them of each page?

3      A      Yes, although I don't see a signature on this page

4  here.  I don't see it.

5      Q      Generally, do they sign?

6      A      Generally, they review the statements and they sign,

7  yes.

8      Q      That's all I have, thank you.

9             THE COURT:  Okay.

10            MR. CERONE:  May I Your Honor?

11            THE COURT:  You may.

12                       **RECROSS-EXAMINATION**

13  BY MR. CERONE:

14     Q      Detective?

15     A      Good morning or good afternoon.

16     Q      Is it the morning still?

17     A      Yeah, it's still morning.

18            MR. CERONE:  One moment.

19            MR. SANTARONE:  Thank you.

20  BY MR. CERONE:

21     Q      Now I believe Mr. Messing had either talked about

22  and/or showed you a statement from a Walter Gilliard

23  (phonetic).  Do you remember that?

24     A      We spoke about it.  I don't know if I saw it.

25            MR. CERONE:  May I have the witness shown Exhibit

1    106, Volume 2?

2            THE COURT:  You may.  Thank you for referring to the

3    bottom.

4            MR. CERONE:  Yeah.

5            THE COURT:  Mr. Santarone makes me work I guess.

6            MR. CERONE:  I wanted to make (indiscernible) with

7    that.

8            Can we just take that down from the view of the jury

9    because I don't believe it's in evidence yet?

10   BY MR. CERONE:

11       Q   Can you just identify the document for the jury,

12   please?

13       A   Yes, this is an interview of a Mr. Walter Gilliard.

14   And this interview was conducted on November 5th, 1991 by

15   Detective Perks (phonetic) in -- let's see, yes, inside of

16   homicide.

17       Q   Okay, and this would have been the statement that Mr.

18   Messing had discussed the name of Pep; is that right?

19       A   I believe so, yes.

20       Q   Okay, now this statement would have been submitted

21   and put into the H file?

22       A   Yes.

23       Q   Is that fair to say?

24       A   Yes, sir.

25       Q   And by virtue of that statement being in H file,

1    would it have been passed over to the D.A.'s Office?

2         A    Yes, sir.

3         Q    Okay.  Now what I'll do next, did you happen to take

4    an interview of Mr. James Murray (phonetic), the Plaintiff's

5    father in this case?

6         A    I believe I did, yes.

7              MR. CERONE:  Okay, could I have the witness shown

8    Exhibit 35, which is Volume 1, Your Honor?

9              THE COURT:  Thank you.

10   BY MR. CERONE:

11        Q    And let me know when it's up?

12        A    I have it, sir.  Have it, okay, yes.

13        Q    Could you just identify Exhibit 35 for the jury,

14   please?

15        A    Yes, it's an interview that I took of Mr. James A.

16   Murray on November 23rd of 1991.

17             MR. CERONE:  With the Court's permission, could I

18   have Exhibit -- may I have Exhibit 35 submitted into evidence,

19   please?

20             MR. MESSING:  No objection.

21             THE COURT:  It's admitted.

22        (Defendant's Exhibit 35 admitted into evidence)

23             MR. CERONE:  And may I have it put up on the screen

24   for the jury?

25             THE COURT:  You would publish it.

1          MR. CERONE:  Okay.

2     BY MR. CERONE:

3          Q    Okay, and again, this is a statement that you took

4     yourself from the Plaintiff's father?

5          A    Yes.

6          Q    Okay, I just want to direct your attention to the

7     bottom of that page.  Did Mr. Murray indicate a specific time

8     in which Mr. Dennis and himself left his apartment that day?

9          A    Yes, he told me that I left my house at about 1:53

10    p.m. and Jimmy was coming up out the house.

11         Q    Okay, and I believe that the answer goes over to the

12    next page if you just don't mind reading the top of the

13    following page, please?

14         A    Certainly.  Jimmy was coming out the house right

15    behind me.  He was going to take the K bus at Shelton and Old

16    York Road.

17         Q    Okay, thank you.

18         MR. CERONE:  If I could have the witness shown page 4

19    of that same statement?

20         THE COURT:  You may.

21    BY MR. CERONE:

22         Q    Now I want to go to I believe it's the third question

23    and answer of that page.  Do you have that there for you?

24         A    Yes, I do.

25         Q    Okay.  And is -- could I have that shown to the jury

1    as well, Mr. Patel?  Now could you read that question and

2    answer for the jury, it starts with do you recall?

3        A    Yes, do you recall what time -- what time of the day

4    the murder that Jimmy -- I'm sorry, let me read that again.

5        Q    Sure.

6        A    Do you recall what time the day of the murder that

7    Jimmy got home?  His answer was after practice between 11:00

8    p.m. and 1:00 a.m.

9        Q    Okay, now I don't know if you saw each page of this

10   document, but it's four pages in length.  Is that fair to say?

11       A    Yes.

12       Q    Okay, and did you have Mr. Murray sign the bottom of

13   each page?

14       A    Yes, I had him -- I had him review the statement and

15   I asked him to sign the bottom of each page, you know, after

16   reviewing it --

17       Q    Okay.

18       A    -- and agreeing with the statement.

19       Q    Okay.  And would you have taken down I guess since

20   this is in your handwriting, correct?

21       A    This is my handwriting, yes.

22       Q    Okay, and you would have taken down the words that

23   were given to you by Mr. Murray verbatim?

24            MR. MESSING:  Objection.  Leading.

25            MR. CERONE:  I'll re-phrase.

1              THE COURT:  Sustained.  Re-phrase.

2    BY MR. CERONE:

3         Q    Did you take down the statement verbatim as given to

4    you by Mr. Murray?

5         A    Yes, to the best of my ability, I tried to take it

6    down verbatim.

7              MR. CERONE:  Okay, we can have that taken down.

8              I have a few more questions for you, detective.

9              If I could have the witness shown Exhibit 18.

10   BY MR. CERONE:

11        Q    Do you remember Mr. Messing talking to you about a

12   statement he took from Mr. Bertha?

13        A    Yes.

14        Q    And he had -- I believe he had shown you a portion of

15   that statement.  So what I'll do is I'll have you shown page 2.

16             MR. CERONE:  And if we could publish that to the

17   jury, I believe it's already in evidence?

18             THE COURT:  You may.

19   BY MR. CERONE:

20        Q    Now could I just have you read the second question

21   and answer --

22        A    Certainly.

23        Q    -- for the jury, please?

24        A    Yes, can you be sure that the photo number 1 is the

25   male that you saw get away from the girl and run at you with

1    the gun after the gunshot?  And his answer was, yes, I can.

2         Q    Okay, and to put it into context, is Mr. Bertha

3    talking about James Dennis?

4         A    Yes, she is.

5         Q    Okay, thank you, detective.  Nothing further.

6              THE COURT:  Okay, thank you.  You don't have any

7    questions?

8              MR. MESSING:  No, no.

9              THE COURT:  Okay, thank you for your testimony.  You

10   may come down.

11             Call your next witness.

12        (Witness is excused)

13             MR. MESSING:  Your Honor, there's a stipulation.

14             THE COURT:  Okay.

15             MR. MESSING:  (Indiscernible) get into.

16             THE COURT:  Very well.

17             MR. MESSING:  It's Exhibit Number 256.

18             THE COURT:  256.

19             MR. MESSING:  This is the stipulation between the

20   Plaintiff and the Defendants.  It is copying the order of the

21   mandate issued by the United States Court of Appeals on the

22   date of September 30th, 2016.  And it reads judgment -- the

23   caption of the case is the James Dennis case.  It's the federal

24   habeas corpus case.

25             MR. SANTARONE:  Objection, Your Honor.  The

1    stipulation is we read the order.

2            THE COURT:  All right.  Why don't you read the order?

3            MR. MESSING:  I was identifying the case.

4            MR. SANTARONE:  Read the order.

5            MR. MESSING:  The case has been -- this is a federal

6    between habeas case before the 3rd Circuit.  Judgment, this

7    case came on to be heard on the record before the United States

8    District Court for the Eastern District of Pennsylvania and was

9    argued on October 14th, 2015, on consideration whereof, it is

10   now hereby ordered and adjudged by this Court that the judgment

11   of the District Court entered on August 21st, 2013 is hereby

12   affirmed.

13           Petitioner shall be released unless the Commonwealth

14   commences a new trial against him with 90 days of the issuance

15   of the mandate.  All of the above in accordance with the

16   opinion of this Court.

17           With that stipulation, Defendant rests.

18           THE COURT:  Very well.  Remember, stipulation is in

19   an agreement by and between the parties that you could take

20   this as established fact that is proven.  And with that, the

21   Plaintiff is resting.

22           I'm going to give you a five-minute break.  I have to

23   talk to the lawyers.  And then, we'll see where we are after

24   continuing with the testimony.

25           So remember my instructions not to talk among each

1    other.  And I'll be with you shortly.  Thank you.

2              THE CLERK:  All rise.

3         (Jury exits courtroom)

4              THE COURT:  So I just want to make sure any motions

5    that you need me to argue briefly with the supplement or we

6    could reserve the argument on the motion until later on, but

7    briefly, you have any motions?

8              MR. POMAGER:  Your Honor, the City has a Rule 50

9    motion.

10             THE COURT:  All right.  Go ahead.

11             MR. POMAGER:  Your Honor, the City would move for

12   judgment for the City under Rule 50 on grounds both of the

13   individual liability or I should say not the individual

14   liability as it pertains to the City, but the proof of an

15   underlying constitutionally violation on two grounds.

16             The first at a high level is that it is effectively

17   Heck-barred, which is pretty similar to the argument that was

18   made at summary judgment.

19             The second is that there's been insufficient evidence

20   to prove the underlying violation, both because of its impact

21   on the reasonable likelihood to affect the outcome of that

22   trial, that is, to make it a first degree murder conviction

23   versus a third degree murder conviction and the inability to

24   prove any withholding of evidence.

25             But likely the Court does not need to get that

1    because the other grounds that the City moves on is that there

2    has been no proof of a Monell violation in this case.  There's

3    been no evidence of custom, pattern, or practice.

4         Deputy Commissioner Healy was the only person who

5    spoke even tangentially about policy or procedure at the time.

6    And he said very little, if anything, about what occurred at

7    the time of the -- at the time of this incident or before it.

8         There's been no evidence of policy or custom, no

9    specific evidence regarding the training or disciplinary

10   procedures at issue prior to the sentencing and no evidence of

11   causation, moving force causation under Monell or deliberate

12   indifference by any policymaker.

13        I think that argument is pretty straightforward on

14   this record, Your Honor.  So I would only reserve to respond to

15   Mr. Messing unless the Court wants to hear more on the

16   underlying constitutional violation at this time.

17        THE COURT:  Okay, I think I want to hear more.  You

18   could supplement the record later, but Attorney Brownlie?

19        MR. BROWNLIE:  Yes, Your Honor.  The individual

20   detectives are also moving under Rule 50 at this time on all of

21   the constitutional violations, particularly with respect to the

22   fabricated evidence and the deliberate deception claims.

23        Principally because these claims are Heck-barred

24   because they require that Mr. Dennis prove facts inconsistent

25   with his outstanding convictions for primarily murder and in

1    the third degree and possession of a firearm without a license.

2        To the extent these claims are not Heck-barred, and

3    I'll just say for the record, Your Honor, we'll be filing this

4    afternoon, so we'll have a more substantive response on the

5    record for your review.

6        But the claims are Heck-barred because they require

7    facts inconsistent with the convictions.  And alternatively,

8    they fail on the merits because the way that the 3rd Circuit's

9    decision in Sharif (phonetic) and Nelson in conjunction with

10   Heck have carved out the merits determination.

11       The inquiry here is whether or not there's a

12   reasonable likelihood that Mr. Dennis would not have been

13   convicted of first degree murder.

14       None of the evidence cited by Mr. Dennis makes out

15   that difference.  To the extent that there's competing factual

16   scenarios, as Your Honor knows from motions in limine practice,

17   one of which supports the conviction and one of which calls it

18   into question, the jury must resolve those factual disputes

19   consistent with the conviction.

20       And it's very clear that Mr. Dennis' theory of the

21   case here is that there's a reasonable likelihood he would not

22   have been convicted because persons other than Mr. Dennis

23   committed the crime or he was not at the crime scene at the

24   time of the murder.

25       Those facts are inconsistent with his conviction.

1   These claims are Heck-barred and alternatively fail on the

2   merits.

3        We also are asserting an argument that Mr. Dennis has

4   failed to prove actual injury in light of the expert testimony

5   that has been proffered to the Court.

6        And because there's no underlying Constitutional

7   violation, the civil conspiracy claim fails as a matter of law.

8   Again, we'll be filing this afternoon, so Your Honor can see

9   more of the substance of our arguments on the papers.

10       THE COURT:  Okay, Attorney Messing?

11       MR. MESSING:  I will be brief.

12       THE COURT:  Yeah, okay, appreciate that.

13       MR. MESSING:  The Heck bar issue has been decided by

14  this Court and the honorable Eduardo Robreno previous to that

15  as well as every federal court that has considered this issue

16  in the last 15 years.

17       The underlying violation, it's fact based if the jury

18  believes that these officers did not disclose the existence of

19  a true alibi witness.

20       An independent witness, if they shielded that

21  information from the prosecution, the defense, and the Court,

22  that in and of itself could easily have resulted in a different

23  outcome.

24       Similarly, the testimony of Charles Thompson, which

25  Thompson claims was a lie and had been coerced by the

1  detectives that he saw Mr. Dennis with a gun on that case,

2  given what I think the jury will find was very flawed

3  identification evidence.

4        The testimony that Mr. Dennis was seen with the same

5  kind of gun the day of the robbery, if disbelieved by the jury,

6  would have led likely to a different outcome.

7        Other evidence as well.  I won't belabor it.  It's a

8  fact question for the jury.

9        On the issue of injury, obviously, there are

10  witnesses for the Plaintiff that have described the damages

11  sustained, the emotional harm, and other harms sustained by Mr.

12  Dennis.

13        There's an expert for the Plaintiff, Dr. Brand

14  (phonetic) who testified at great length.  The jury may choose

15  to believe Dr. Joy (phonetic), but even if they do, she

16  confirms that he suffered some emotional harm.

17        Mr. Bookman's testimony about the nature of death row

18  service and then he -- it does then come to the Monell claim.

19  And on that issue, given the Court's rulings on the pre-trial

20  motions, frankly, even had our police practices expert Mr.

21  Polini (phonetic) not falling ill, the Court's rulings I think

22  would have made it impossible for us to have established the

23  Monell claim.

24        And based on the record before this Court, I am

25  inclined to concede, although I certainly take issue with the

1    Court's rulings on all of this evidence.

2         I mean, I don't feel I'm now in a position to argue

3    that there is sufficient evidence of record at the Rule 50

4    stage to survive the Monell claim.

5         As to the individual liability, obviously, there are

6    factual issues and it's going to be up to the jury when

7    instructed on the law by this court of law.

8         THE COURT:  Very well.  But at least as to the Monell

9    claim, I understand that you disagree with my rulings, but as

10   to the Monell claim, given my rulings, you can see that you

11   have insufficient evidence to have that issue decided by the

12   jury?

13        MR. MESSING:  I'm afraid so.

14        THE COURT:  Very well.  So --

15        MR. MESSING:  If the Court disagrees, that's up to

16   the Court, but --

17        THE COURT:  No, I agree, I agree with you.

18        MR. MESSING:  I appreciate that.

19        THE COURT:  You didn't produce enough evidence to

20   establish the Monell claim in this case.  I understand your

21   disagreement with my rulings, but my rulings did not prevent

22   you from introducing evidence to establish a pattern or

23   practice addressing the lack of or (indiscernible) of the

24   detectives or on disciplinary issues of the detective.

25        So, that motion is granted.  I'm going to reserve

1    ruling on the remainder of the motions, Rule 50 motion, that

2    the Defendant individual detectives have issued as moot in this

3    case.

4          And I'm going to submit it to the jury.  You could

5    supplement the record.  Depending on the verdict, you could

6    file polled verdict motions, okay?  With that, I think that's

7    sufficiently for us to proceed.

8          MR. POMAGER:  Your Honor, before the City's excused

9    from the table, as I assume they would be, may I address the

10   issue with the witness Zahra Howard?  Or I will be available in

11   the courtroom to address it at a time that is convenient to the

12   parties and the Court.

13         THE COURT:  All right, you're going to be available.

14   I don't know how -- who's your first witness?  How long you

15   have now?

16         MR. SANTARONE:  Your Honor, we have -- we're going to

17   read the testimony of Howard, because she's still unavailable.

18   We're going to read the testimony of Bertha.  James Cameron is

19   going to -- is coming in?

20         UNIDENTIFIED SPEAKER:  Yeah.

21         MR. SANTARONE:  He'll be 10 minutes.  And Davie Webb

22   is here.

23         THE COURT:  All right.  So, we've -- I mean, Bertha

24   testimony is already in evidence right?

25         MR. SANTARONE:  No, he testified --

 1          MR. MESSING:  No, not his testimony, just his

 2    statement.

 3          MR. SANTARONE:  -- preliminary he testifies at his

 4    criminal trial.

 5          THE COURT:  Oh.  Okay, the statements, yeah.

 6          MR. MESSING:  As I make clear the Court and through

 7    opposing counsel, if they do read parts of Bertha's testimony

 8    or Zahra Howard's testimony, I will read parts of the

 9    cross-examination.

10          THE COURT:  Right.

11          MR. MESSING:  And as to Zahra Howard, I do object.

12    Can we see you at sidebar?

13          THE COURT:  Yes.

14       (Sidebar conference)

15

16          MR. POMAGER:  Your Honor, may I retrieve an exhibit

17    while (indiscernible)?

18       (End sidebar conference)

19          THE COURT:  So may I in the interest of just moving

20    this thing along, since we had a recess this morning,

21    who -- you want to read the testimony of Howard first?

22          MR. SANTARONE:  I have Davie Webb is here.

23          THE COURT:  I mean, why don't take a listen to the

24    live testimony?  And then, I could deal with this issue and I

25    have a little bit more time to this issue because it might be

1    by -- by that, it may be lunchtime.

2              MR. MESSING:  Is it --

3              MR. SANTARONE:  Your Honor, I'm fine.  And if Mr.

4    Messing's willing to stipulate that these three eyewitnesses

5    identify him in a line-up, identify him at the preliminary

6    hearing, identified in trial, I don't have to call him at all.

7              THE COURT:  All right.

8              MR. MESSING:  I'm not prepared to do that, but

9    I -- it's fine to call Davie Webb now.

10             THE COURT:  Right.  Let's --

11             MR. MESSING:  And then, maybe you know --

12             THE COURT:  The live witnesses, whoever they are.

13             MR. MESSING:  That's fine.

14             THE COURT:  Okay.

15             MR. MESSING:  Just before they try reading Zahra

16   Howard, I want to see the Court at sidebar.

17             THE COURT:  All right.

18             MR. MESSING:  Thank you.

19             MR. POMAGER:  Your Honor, may I retrieve an exhibit

20   on the (indiscernible)?

21             THE COURT:  Yes, give me a second.

22        (The Judge confers with the Clerk)

23             MR. MESSING:  After we're done with Webb, maybe we

24   can talk about stipulations.  I can -- I'm happy to talk.  I

25   mean, this is the first time they proposed that, so I'll talk

1   to them.  I'm a very reasonable guy.

2        (Counsel confer)

3             THE COURT:  Did you want to wait then to place that

4   on the record or you need it now?

5             MR. MESSING:  What's that?

6             THE COURT:  (Indiscernible) sidebar.

7             MR. MESSING:  Well, that was about Zahra Howard.  Do

8   you want to do that now?

9             THE COURT:  Well --

10            MR. MESSING:  It won't take long.

11            THE COURT:  I want to get to the witnesses that I --

12            MR. MESSING:  Yeah, I'll wait as long as they don't

13   put Zahra Howard on before we talk.

14            THE COURT:  No, we never let that happen.

15            MR. MESSING:  Okay.  You're the judge.

16            THE COURT:  So I'm going to call the jury in.  Who's

17   your witness?  Get your witness on the stand Attorney

18   Santarone?

19            MR. SANTARONE:  I'm sorry, Your Honor?

20            THE COURT:  Your witness?

21            MR. SANTARONE:  Oh.

22            THE COURT:  Where is he?

23            MR. SANTARONE:  He's in the witness --

24            THE COURT:  You have a whole bunch of lawyers in the

25   back.  Are you getting the witness, please?

1          THE CLERK:  I'll go get the witness, Your Honor.  My

2     apologies.

3          MR. POMAGER:  Your Honor, we are excused from the --

4          THE COURT:  Yes.

5          MR. MESSING:  I haven't agreed to that, Your Honor.

6     I would object.

7          THE COURT:  To them leaving?

8          MR. MESSING:  Yeah, I would -- he has nothing else to

9     do.  I think he can stay.

10          THE COURT:  Okay, they are dismissed.

11          MR. MESSING:  And the other guy, too.  I don't see

12     why he (indiscernible).

13          THE COURT:  Okay.

14       (Counsel confer)

15          MR. POMAGER:  Thank you, Your Honor.

16       (Pause)

17          THE COURT:  Yeah, line them up, please.

18          MR. MESSING:  If the witness is in the men's room,

19     can I be excused to use the mens room?

20          THE COURT:  You need to?

21          MR. MESSING:  I always, yeah, I'm 76 years old, yeah.

22          THE COURT:  Oh, let's see.  Go ahead, use the

23     restroom.

24          MR. MESSING:  All right, don't start without me.

25       (Pause)

1          THE COURT:  David Webb, how are you?

2          MR. WEBB:  I'm fine, thanks, sir.

3          THE COURT:  Okay, Attorney Messing, as soon as he

4   sits, you can bring the jury in.  All right, bring the jury in.

5       (The Judge confers with the Clerk)

6       (Jury enters courtroom)

7          THE COURT:  The jury may be seated.  Stay standing.

8   She's going to swear you in.

9          THE CLERK:  State and spell your for the record?

10         THE WITNESS:  David Blake Webb, D-A-V-I-D B-L-A-K-E

11   W-E-B-B.

12         THE CLERK:  Please raise your right hand.

13                          DAVID WEBB

14    called as a witness for the Defendant, having been duly sworn

15                       testified as follows:

16         THE CLERK:  You may be seated.

17         THE WITNESS:  Thank you, Your Honor.

18                    **DIRECT EXAMINATION**

19   BY MR. SANTARONE:

20      Q    Mr. Webb, could you tell the jury briefly your

21   educational background?

22      A    Sure.  I grew up in Abington, Pennsylvania.  I went

23   to Abington High School.  I then went to Lycoming College.  I

24   graduated with a B.A. in Anthropology.  I then went to Wake

25   Forest University in North Carolina and I got a Masters degree

1    again in Anthropology.

2        From there, I went to work with the North Carolina

3    Department of Corrections.  I started out as a correctional

4    officer and I ended up as a warden after six years.

5        From there, I decided to go to law school.  I went to the

6    University of North Carolina at Chapel Hill.  I got my law

7    degree.

8        And I'd grown up in Abington and Philly, decided to come

9    back to Philadelphia after 12 years in North Carolina and went

10   to work for the Philadelphia District Attorney's Office.

11       I was in a number of units.  I ended up as chief of the

12   Homicide Unit in the District Attorney's Office.  I left the

13   District Attorney's Office in 19 -- I'm sorry, in 1994 and went

14   to work in the U.S. Attorney's Office.

15       And I stayed in the U.S. Attorney's Office for

16   approximately 17 years.  I was chief of the narcotics section.

17   I was chief of the bank fraud section.  This is separate times

18   obviously.

19       And then I ended up as -- after 9/11, I was appointed to

20   be the chief of the counterterrorism section.  So from 9/11 in

21   the office, I worked counterterrorism cases, which also

22   involved going to Iraq for a year as one of the prosecutors of

23   Saddam Hussein and came back to the U.S. Attorney's Office.

24       And at that point, I was nominated by President Obama to

25   be the United States Marshal for the Eastern District of

1    Pennsylvania, which of course includes this building.  And I

2    retired in 2019.  And I'm retired now.

3         Q    And let's step back to when you were in the

4    Philadelphia District Attorney's Office.  Can you go through

5    what progressions you had, positions you held back

6    (indiscernible)?

7         A    Okay, let's see.  I started out in the lowest rung of

8    the office as a preliminary hearing most of the time, MC court

9    section.  I stayed there I guess a couple years.

10        Then, I went to the major trials and started doing regular

11   trials.  And then, I went to the Homicide Unit in I guess about

12   1987 or so I think I believe.

13        And then, I was in the Homicide Unit until -- let me make

14   sure I get my years right here until 1994 when I went to the

15   U.S. Attorney's Office.

16        Q    And in 1991, what was your position in the Homicide

17   Unit?

18        A    I was the chief of the Homicide Unit.

19        Q    Before you were chief of the Homicide Unit, were you

20   a district attorney who prosecuted homicide cases?

21        A    I did and I also had been the assistant chief of the

22   Homicide Unit before I was the chief.

23        Q    When you were the assistant chief, were you involved

24   in actually prosecuting cases?

25        A    Yes.

1    Q     What was -- in the '90s, what was the professional

2  relationship between the D.A.'s office and homicide detectives?

3    A     Well, we worked hand and glove.  I mean, the -- my

4  responsibility as the chief of the Homicide Unit was that I

5  approved all homicide arrests.

6       So, therefore, I'm constantly meeting with homicide

7  detectives.  They're constantly over at my office and we're

8  going through the open cases, the cases that haven't come in

9  yet, or the cases that are get -- were getting ready to charge.

10    Q     And would you be approve -- did you approve the

11  arrest in every homicide where an arrest was made?

12    A     Just about.  Now if I was out of town, if I was on

13  vacation, then the assistant chief would make the

14  arrest -- would approve the arrest for homicide, but that was

15  the primary part of my job really, that and supervising the

16  trial somewhat once they were all going.

17    Q     And when you were the chief of homicide, did you have

18  prosecutors who worked under you?

19    A     Yes, yeah.

20    Q     And did the prosecutors that worked under you just

21  handle homicides?

22    A     Yes.

23    Q     And was one of those Roger King (phonetic)?

24    A     Yes.

25    Q     If we look at Exhibit 30?

 1                     THE COURT:  Volume?

 2                     MR. BROWNLIE:  1, Your Honor.

 3                     THE WITNESS:  Does this roll up or?

 4                     MR. BROWNLIE:  It's not working, Judge.

 5                     THE COURT:  Back.

 6                     THE WITNESS:  Okay.

 7                     THE COURT:  Can you see it?

 8                     THE WITNESS:  I can't see -- oh, there we go, sure.

 9                     MR. BROWNLIE:  You got it?

10                     THE WITNESS:  Yes.

11                     MR. BROWNLIE:  I'm not getting it.

12                     MR. SANTARONE:  (Indiscernible.)

13                     MR. MESSING:  I know what exhibit it is.  It's fine.

14     I know --

15                     THE COURT:  Monitor?

16                     MR. MESSING:  I don't need to see it on the screen.

17     Oh.  Everybody but me, but that's fine.

18     BY MR. SANTARONE:

19          Q    And if we look at page 2 of that, what is page 2?

20          A    That's the warrant of arrest and the -- in the case.

21          Q    And is that something you would have to approve?

22          A    Yes.

23          Q    And on that warrant of arrest, is there any

24     indication as to what the degree of -- the degree or grading of

25     the individual charges?

1          A    I don't believe so.  I don't -- I think we just

2     charged murder, and then, the degree would be figured out

3     probably at the preliminary hearing.

4          Q    Okay.

5          A    I think.

6          Q    And who makes a decision whether or not the person's

7     charged with first, second, or third degree murder?

8          A    You know, it's probably -- it's probably a

9     combination of myself and the assigned trial lawyer, but the

10    trial lawyers in homicide are all experienced people.

11         Some of them, they try homicide cases longer than I ever

12    did.  So -- but I, you know, I always wanted to know exactly

13    what we were charging obviously.

14         Q    But it was a decision that was made in the District

15    Attorney's Office?

16         A    Correct, correct.

17         Q    And who makes the decision as to whether or not

18    you're going to seek -- whether it's a capital case?

19         A    That would be again the District Attorney's Office.

20    That's going to be me or the -- or it'll be the assigned

21    homicide prosecutor.

22              MR. SANTARONE:  If we look at Exhibit 250, you know,

23    I'm sorry, if we go back.  I think Messing will see the

24    document.  I can represent that James Dennis was arrested on

25    November 23rd, 1991.

1          MR. MESSING:  That's agreed.

2              MR. SANTARONE:  Agreed?

3              MR. MESSING:  Yeah.

4    BY MR. SANTARONE:

5      Q    Then we can go to Exhibit 250.  So, after the arrest,

6    there was a line-up.  And this -- is this court-ordered line-up

7    when you look at the bottom of it?

8      A    If I can get to the bottom -- if I can get

9    to -- my -- no, it's ordered by the Court.

10     Q    That's what I said.  Was it a court-ordered line-up?

11   I'm sorry.

12     A    Yes.

13     Q    Okay, and what's the purpose of the line-up?

14     A    The line-up is to give eyewitnesses -- to have

15   eyewitnesses pick out who they think to be the Defendant, you

16   know, the person who committed the crime out of a line-up of

17   inmates.

18     Q    And if the -- your eyewitness doesn't pick out the

19   person, what happens then?

20     A    Is there only just one eyewitness in the case?

21     Q    Well, would you prosecute a murder case with one

22   eyewitness?

23     A    Not as a rule unless we had other evidence.  I mean,

24   there may be physical evidence, but we -- you know, if you

25   don't have a lot of physical evidence, if you don't have blood,

1    this was sort of really before DNA became a tool, I guess, as a

2    rule, I wanted more than one eyewitness to approve a homicide

3    arrest.

4         Q    And then, it --

5         A    Excuse me, there were always exceptions, but for the

6    most part, I wanted two eyewitnesses.

7         Q    At least two?

8         A    At least two.

9         Q    And if we go to Exhibit 17, this is a preliminary

10   hearing.  Do you see the date that that preliminary hearing

11   took place?

12        A    It looks like December 23rd, 1991.

13        Q    And if we look at page 3 of that, who was

14   representing the Commonwealth?

15        A    Roger King.

16        Q    So Roger King appeared at the preliminary hearing?

17        A    Yes.

18        Q    And was counsel there for Mr. Dennis?

19        A    Yes.

20        Q    And who is that?

21        A    Lee Mandel.

22        Q    If you look at the next page of that, were witnesses

23   called and cross -- questioned and cross examined?

24        A    Yes, it certainly appears that -- appears from

25   this -- it appears so from this document.

1       Q    And what's the purpose of the preliminary hearing?

2       A    To establish a prima facie case that the Defendant

3   did in fact commit the crime that it's alleged that he

4   committed.

5       Q    Is a prima facie case different than probable cause?

6       A    I think this is -- I think it's the same thing.

7       Q    Okay.

8       A    Quite frankly, or close enough.

9       Q    And are cases sometimes dismissed at preliminary

10   hearings if there's not sufficient evidence?

11      A    Yes.

12      Q    And we -- I think we once the arrest is made and this

13   arrest was made November 23rd, 1991, who's in charge of the

14   case going forward (indiscernible)?

15      A    Well, essentially, the trial lawyer that I've

16   assigned the case to.

17      Q    And that would be the trial lawyer from your office?

18      A    Yes, yeah, from D.A.'s Office.

19      Q    In 1991, do you know what the practice was of the

20   district attorney homicide detectives in reviewing the homicide

21   file?

22      A    I'm sorry, could you repeat the question?

23      Q    Sure.  In 1991, 1999, what was the practice as far as

24   the assistant district attorney looking at the homicide file to

25   decide what the next step would be?

1      A     Right, so the assigned assistant district attorney

2    is -- will have the homicide detectives come over, bring their

3    file, go through the file, and see what, and you know, dig into

4    the evidence of what's available.

5      Q     And --

6      A     And he would have done that before the preliminary

7    hearing hopefully.

8      Q     And was that something that Roger King would do?

9      A     Yes.

10     Q     And did Roger King ever give detectives assignments

11   and meet with them during the course of -- before the trial

12   started?

13     A     Constantly, constantly.

14     Q     In 1991, did the police have any role in responding

15   or producing evidence directly to the criminal attorney?

16     A     No, it came through our -- it came through the

17   District Attorney's Office.

18     Q     And do detectives have the authority to have charges

19   dismissed (indiscernible)?

20     A     The detectives?  No.  Charging function strictly is

21   the District Attorney's Office.  And the uncharging, if that

22   happens, that's also the District Attorney's Office.

23     Q     And are you familiar in the period that you were the

24   chief of homicide whether witnesses recanted?

25     A     Yes, often.

1       Q    And you know the reasons they recant?

2          MR. MESSING:  Objection.

3          THE WITNESS:  Yeah.

4          THE COURT:  State your ground?

5          MR. MESSING:  What witness recanted under what

6  circumstances?  How could this witness possibly know?

7          THE COURT:  I agree.  Objection sustained.  Re-phrase

8  the question.

9  BY MR. SANTARONE:

10      Q    Okay, if the initial investigation of this case began

11  when there were rumors in Abbottsford Project of three

12  individuals who were involved, would you expect the detective

13  to follow up on that investigation of those rumors?

14      A    Absolutely.

15      Q    This case, do you know what element of this case may

16  be a first degree murder prosecution as opposed to a second or

17  third degree?

18      A    Well, it's an intentional killing with malice, which

19  is a legal term.  And it was pretty clear to me that this was

20  an intentional killing with malice.

21      If I may, you know, you've got a 15-year old high school

22  girl, who has her jewelry taken.  You know, the perpetrator got

23  the jewelry already, and yet, still he fires a gun that kills

24  her.  You know, it could have just been robbery.

25      Q    Sure.

1          A     That is clear malice.  That's clear first degree

2     murder.

3          Q     How about --

4          A     In my opinion.

5          Q     How about pointing the gun at someone that then

6     fires, is that first degree?

7          A     Yeah, probably.  I mean, probably if it's an innocent

8     victim.  Now if the other person has a gun, then obviously,

9     it's going to be a self-defense case, but if we're talking

10    about, you know, the -- this case, yeah, you point the gun, you

11    pull the trigger, you shoot and kill her.  That's malice.

12         Q     That's first degree?

13         A     And that's first degree murder.  And that's an

14    intentional killing.

15         Q     Thank you.

16         A     In my opinion.

17         Q     Thank you.

18               THE COURT:  Attorney Messing?

19               MR. MESSING:  Thank you.

20                          **CROSS-EXAMINATION**

21    BY MR. MESSING:

22         Q     Good -- still good morning.

23         A     Good morning.

24         Q     My name is Paul Messing.  We haven't seen each in a

25    while.  We both got a little older.

1      A    A couple more gray hairs, I think, yes.

2      Q    Yes.

3      A    For sure.

4      Q    So just a few questions just to kind of pick up where

5   you left off?

6      A    Sure.

7      Q    I mean, this was a horrible murder.

8      A    Yes.

9      Q    And this was robbery of a juvenile shot in a very,

10  very sensitive area that's likely to inflict fatal wounds.

11     A    On her way home from school.

12     Q    On her way home from school.  Under 18 years of age.

13  Everybody in your office and in the Homicide Unit knew this was

14  the first degree murder.  Is that a fair statement?

15     A    Yes.

16     Q    Okay.  On the issue that you discussed probable cause

17  at a preliminary hearing, just so the jury understands, that

18  probable cause prima facie means a crime was committed and

19  there's some chance that this Defendant did the crime.  Is that

20  about it?

21     A    Probably.  I think that there's more than just some

22  chance.

23     Q    Right.

24     A    I think it's more likely than not --

25     Q    Okay.

1          A      -- that that particular Defendant committed the

2      crime.

3          Q      We're not talking about the standard like proof

4      beyond a reasonable doubt or anything?

5          A      No.  Correct, correct.

6          Q      Could you tell the jury because you were being asked

7      about the obligations of district attorneys like you were for

8      many years, what's the Brady rule?

9          A      Brady is that if you have evidence that in some way

10     inures to the benefit of the Defendant or indicates that he's

11     not or he or she are -- is not the murderer if you will.

12         Q      Right.

13         A      That that evidence has to be turned over to Defense

14     counsel.

15         Q      And that rule has been in effect long before 1991; is

16     that correct?

17         A      Yes.

18         Q      Okay.

19         A      Correct, correct.

20         Q      And in 1991, if you or Mr. King were given evidence

21     that a key prosecution witness had been threatened or coerced

22     into incriminating the accused, would you provide that

23     information to the Defense?

24         A      Could you just repeat the fact pattern there again,

25     please?

1  Q Sure.  If there's a pending murder prosecution --

2  A Right.

3  Q -- a District Attorney is assigned whether it's you -

4 -

5  A Right, right.

6  Q -- or Roger.  And you were given information that a

7 key prosecution witness had been threatened or coerced into

8 implicating the accused, the Defendant in the case.  Would you

9 turn that information over to the Defense?

10   MR. SANTARONE:  Objection, Your Honor.

11   THE COURT:  State your ground.

12   MR. SANTARONE:  I'm objecting that, one, it's

13 designation as a key witness.  Who's the key witness?  The

14 second point is this information --

15   THE COURT:  Very well --

16   MR. SANTARONE:  -- didn't come out.

17   THE COURT:  I think it's a fair objection.

18   MR. MESSING:  Okay.

19   THE COURT:  I'm going to sustain it, but --

20   MR. MESSING:  I'll refine.

21   THE COURT:  That's okay.

22 BY MR. MESSING:

23  Q If there was a prosecution witness in the case, who

24 knew the Defendant and was prepared to testify, but he saw that

25 Defendant with a gun of the same type used in the murder, on

1    the day within hours of the murder, would you consider that an

2    important prosecution witness?

3        A    Yes.

4        Q    And if you or Roger King, prosecutor in your office,

5    had been given information that that witness had in fact been

6    threatened or coerced into testifying falsely against the

7    Defendant, would you turn that information over to the defense?

8            MR. SANTARONE:  Objection.

9            THE COURT:  State your ground.

10           MR. SANTARONE:  Your Honor, the claimed coercion is

11   by the district attorney.

12           THE COURT:  The --

13           MR. SANTARONE:  And it doesn't come out until after

14   the trial was over.

15           THE COURT:  No speeches, please.  I understand.  Why

16   don't you put in a hypothetical --

17           MR. MESSING:  Okay.

18           THE COURT:  -- the issue of whether there was

19   supported confession or not?

20           MR. MESSING:  That's a great idea.

21           THE COURT:  Okay.

22   BY MR. MESSING:

23       Q    Hypothetically, there's a witness like the witness I

24   just mentioned, who knows the Defendant on trial or about to go

25   on trial and says he saw the Defendant within hours of the

1   murder with the same type weapon that was used in the murder,

2   but the prosecution has information that detectives had

3   threatened or coerced that witness --

4        (audio gap from 12:01:58 to 12:07:39)

5        (Counsel confer)

6        (The Judge confers with the Clerk about technical issues)

7             THE COURT:  Attorney Messing, how long are you going

8   to be with this witness?

9             MR. MESSING:  10 minutes.

10            THE COURT:  All right.

11            MR. MESSING:  It depends whether they keep objecting.

12            THE COURT:  Well, don't object.  Very well, let's

13  bring them in and continue, see if we could wrap up this

14  witness.  Where's -- oh.  The City's not here.  You can just

15  bring them in.  How many other witnesses you have in the

16  afternoon?

17            MR. SANTARONE:  If we're going to break for lunch

18  after this witness, I might really be able to streamline this.

19            THE COURT:  All right.

20            MR. SANTARONE:  Mr. Messing and I are talking about

21  it.

22            THE COURT:  Okay, good.

23            MR. MESSING:  One of us is being very reasonable.

24            MR. SANTARONE:  Thank you, Your Honor, I am.

25            THE COURT:  All right.

1        (Jury enters courtroom)

2              THE COURT:  Members of the jury, you may be seated.

3    We continue to have issues with the technology.  My microphone

4    is not working, so now I have to use one close to me.  And I

5    think, but we figured it out.  And our IT Department is on it.

6    Hopefully we're going to try to conclude this witness and then

7    break for lunch, okay?

8              MR. MESSING:  Thank you.

9              THE COURT:  Attorney Messing?

10   BY MR. MESSING:

11       Q    So, Mr. Webb, we were discussing some hypotheticals.

12       A    Yes.

13       Q    Let me re-state the first one.  Assuming there was a

14   prosecution witness who knew the Defendant on trial, and who

15   claims that at about the same time as the murder, he saw the

16   Defendant holding what appeared to be the same kind of gun as

17   the murder weapon, would you agree that that is an important

18   prosecution witness in a murder case?

19       A    Yes.

20       Q    Would you also agree that if you or Mr. King had been

21   told that that witness had been coerced or threatened into

22   falsely implicating the Defendant, that that would be

23   information you would be required to turn over to the Defense?

24       A    Correct.

25       Q    And that you or Mr. King, I understand Mr. King is no

1      longer with us, but that you knew him a long time, that's

2      information that you or Mr. King would have turned over to the

3      Defense, correct?

4          A    Correct, but before you turn it over or at the same

5      time you're turning it over, you go up and talk to the District

6      Attorney, make sure she has all these facts, because that's a

7      very serious allegation obviously --

8          Q    Right.

9          A    -- for a high profile case.

10             MR. SANTARONE:  Speak into the microphone.

11             THE COURT:  Can you repeat your answer?

12             THE WITNESS:  If I can remember it, yes.

13             THE COURT:  Yeah.

14             THE WITNESS:  Yes, but I first would go up, talk to

15     the District Attorney or the first assistant --

16     BY MR. MESSING:

17         Q    Right.

18         A    -- explain the situation and go from there, but yes,

19     that's material that should be turned over.

20         Q    Yes, because it's so serious --

21         A    Absolutely.

22         Q    -- when something like that happens.  Another

23     hypothetical if you --

24             MR. SANTARONE:  Your Honor, I make an objection.

25     This isn't an expert.

1        MR. MESSING:  This is the way they wanted me to ask.

2   I can ask --

3        THE COURT:  I'm going to permit it, because he's the

4   prosecutor who approves the prosecution and turns over the

5   evidence to the Defense.  Go ahead.

6   BY MR. MESSING:

7        Q    If you or Mr. King were provided with a document that

8   for purposes of this hypothetical confirmed an alibi that had

9   been offered by the accused in the case, would you, Mr. King,

10  be required and would you in fact have turned that document

11  over to the Defense?

12       A    I apologize.  Could you just repeat that for me?

13       Q    Sure.  If the homicide detectives involved in a

14  murder case gave you a document --

15       A    Right.

16       Q    -- that corroborated the alibi witness that had been

17  provided by the Defendant on trial, would you be obligated to

18  turn that over to the Defense?

19       A    Yes.

20       Q    What's that?

21       A    Yes.

22       Q    That would be a serious piece of evidence I assume we

23  can agree?

24       A    It should be turned over to Defense.

25       Q    If you, Mr. King, a homicide prosecutor in your

1   office had been provided with evidence that impeached the

2   credibility of an important prosecution witness, would you be

3   required to turn that evidence over to the Defense?

4       A    Yes.

5       Q    When you have evidence like that, you turn it over to

6   the Defense, correct?

7       A    Correct.

8       Q    If you or Mr. King had been given evidence, had been

9   given information that an important piece of evidence had been

10  ordered thrown out by a homicide lieutenant, would you have

11  provided that information to the Defense?

12      A    Yes.

13      Q    If you or Mr. King had been told by the detectives in

14  a homicide case that they had information that other people had

15  committed the murder and not the Defendant on trial, would you

16  have turned that information over to the Defense?

17      A    Yes.

18      Q    When a case is remanded back, back in we're now 1991,

19  well, later for as long as you've been involved with homicide,

20  if the case is remanded back from an appellate court, whether

21  it's the Supreme Court of Pennsylvania --

22           MR. SANTARONE:  Objection, Your Honor.

23           MR. MESSING:  Or I'm not done.

24           THE COURT:  Don't answer the question, but let me

25  hear the question, okay, and then, you could object.

1    BY MR. MESSING:

2         Q    If a case is remanded back from a higher court, like

3    the court -- federal Court of Appeals, they grant federal

4    habeas relief, they send it back.  It's a first degree capital

5    murder case with an order, you know, try the -- try this case

6    within 90 days, are first degree murder cases ever re-tried

7    within 90 days after remand after years -- after appeals?

8         A    You know, I don't know the answer, but I would --

9              MR. SANTARONE:  Objection, Your Honor.

10             THE COURT:  State your ground?

11             MR. SANTARONE:  This is so speculative.  And it's way

12   beyond the scope of direct.

13             THE COURT:  Very well.  The objection's sustained.

14   Let's move on.

15   BY MR. MESSING:

16        Q    Have you in your experience after a first degree

17   murder case from years before had been remanded back for a new

18   trial, in your experience, does that happen quickly?

19             MR. SANTARONE:  Objection, Your Honor.

20             THE COURT:  The same -- that's the same question.

21   The objection is sustained.

22   BY MR. MESSING:

23        Q    It takes a long time for a first degree murder case

24   to go to trial?

25             MR. SANTARONE:  Objection, Your Honor.

1          THE COURT:  You don't have to answer the question.

2     The objection is sustained to the question.

3     BY MR. MESSING:

4          Q    When a case is -- let me see if I could put this as

5     simply as possible.  When a first degree capital murder case is

6     sent back for re-trial, how long, generally speaking, does it

7     take before a case like that goes to a new jury trial?

8          MR. SANTARONE:  Objection, Your Honor.

9          THE COURT:  State your ground?

10          MR. SANTARONE:  Your Honor, this isn't a

11     hypothetical.  There's -- there's an order to when it had to be

12     retracted.

13          THE COURT:  Well, if he knows, I'll permit it, if he

14     knows.

15          THE WITNESS:  I don't know.

16     BY MR. MESSING:

17          Q    Mr. Webb, can we agree that it takes a long time

18     before a first degree murder case is brought to trial?

19          MR. SANTARONE:  Objection, Your Honor.

20          THE COURT:  Sustained.  He told you he doesn't know.

21     BY MR. MESSING:

22          Q    In your experience, prosecuting and supervising the

23     prosecution of first degree murder cases involving the death

24     penalty, could you give the jury an idea of how long it takes

25     before a case like that is brought to trial?

1          A     You mean from the time of arrest till the time we go

2     to trial?

3          Q     Yes.

4          A     It's probably going to be 8, 9, 10 months, close to a

5     year.

6          Q     Sometimes longer?

7          A     Sometime a little longer.  Yes, sir.

8          Q     And cases that have been through appeals from a trial

9     20 or 30 years earlier that get sent back for re-trial, how

10    long --

11               MR. SANTARONE:  Objection, Your Honor.

12               THE COURT:  Let him finish the question.  Don't

13    answer it until I rule.

14    BY MR. MESSING:

15         Q     Have you ever had a situation as a homicide

16    prosecutor where a 20-year old conviction is sent back for a

17    re-trial on a first degree capital murder case how long it took

18    to get that case back in front of a jury for trial?

19         A     Well, the answer is, no, I don't remember a case that

20    came back.  I was only chief of homicide for about three and a

21    half four years.

22         Q     Right.

23         A     I do not remember a case coming back into the unit

24    when I was running the unit that had been, you know,

25    conviction, appellate, remanded for a new trial.  I can't

1     remember a case like that.

2          Q    Could you imagine the 20-plus year old case being

3     brought to trial --

4               MR. SANTARONE:  Objection.

5               THE COURT:  Sustained, sustained.

6               MR. MESSING:  I think the point's made.

7               THE COURT:  Okay.

8               MR. MESSING:  I have nothing further, thank you, Mr.

9     Webb.

10              THE WITNESS:  Thank you.

11              THE COURT:  All right.

12              MR. SANTARONE:  Your Honor, if I just may quickly?

13              THE COURT:  Yeah, quickly, you may.

14                         **RECROSS-EXAMINATION**

15    BY MR. SANTARONE:

16         Q    The determination as to what documents that are in

17    the homicide file should be turned over to the criminal defense

18    attorney, who makes that decision?

19         A    District Attorney's Office.

20         Q    And if in this hypothetical the claim was that the

21    witness wanted to recant, but that the prosecutor threatened

22    him, would that be wrong?

23         A    Yes, that would be wrong.

24         Q    Did you ever know that to happen?

25         A    I do -- no, I do not.

1    Q    Thank you.

2                        **RECROSS-EXAMINATION**

3    BY MR. MESSING:

4    Q    Just a follow up on that.  The decision to turn over

5    this kind of evidence that we've discussed is the prosecutor's

6    decision, correct?

7    A    Correct.

8    Q    But the prosecutor has to have been given that

9    information before they could possibly make that decision

10   because they don't know about it, correct?

11                  MR. SANTARONE:  Objection.

12                  THE COURT:  Sustained.  We already went over that,

13   okay?

14                  MR. MESSING:  All right.

15                  THE COURT:  No other questions?  You're excused.

16   Thank you for your testimony.

17                  THE WITNESS:  Thank you, Your Honor.

18        (Witness is excused)

19                  THE COURT:  Members of the jury, it's a little past

20   12:30.  You could come down, Mr. Webb.

21                  THE WITNESS:  Sure.

22                  THE COURT:  And we're having a lot of problems with

23   the technology.  We're going to have the IT Department come up,

24   see if they could fix it in the one hour that you're going to

25   have for lunch.  And then, we'll see whether we continue.

1          It may be the case that we might to change courtrooms

2    tomorrow.  If I could get a courtroom that the technology is

3    better than the technology in this courtroom.

4          So please bear with me.  Again, have a good lunch.

5    Remember my instructions.  Do I need to repeat them?  Okay,

6    thank you very much.

7          THE CLERK:  All rise.

8       (Jury exits courtroom)

9          MR. MESSING:  So until 1:40, okay or?

10         THE COURT:  1:30.  1:30 or thereabouts.

11         MR. MESSING:  1:45?

12         THE COURT:  1:30, 1:30, we're going to start 1:30.

13         MR. MESSING:  Okay.

14         THE COURT:  But I want to know --

15         THE CLERK:  Judge.

16         THE COURT:  Yes?

17         THE CLERK:  The jury's asking specifically what time

18   you'd like them back?

19         THE COURT:  1:30.

20         THE CLERK:  1:30.

21         THE COURT:  Yes, it's 45 minutes is long enough for

22   lunch.

23         MR. MESSING:  Okay.

24         THE COURT:  So what do you have else?  Do you want to

25   try to work out and bring the case, what do you have?

1          MR. SANTARONE:  Your Honor?

2          THE COURT:  Other than the ruling on these issues?

3          MR. SANTARONE:  We have Detective Maahs, who's

4   outside.  James Cameron is on his way in.

5          THE COURT:  Okay.

6          MR. SANTARONE:  I was going to read the testimony

7   from the trial of Zahra Howard, which is about an hour.  And I

8   was going to read the testimony of Thomas Bertha, which is

9   about a half hour.

10          I discussed with Mr. Messing as to whether or not we

11   would stipulate -- we could stipulate that the witnesses

12   identified James Dennis as the person who shot Chedell

13   Williams, they testified at a preliminary hearing and

14   identified him, they testified at trial and identified.

15          I'm torn because I do have a live witness, James

16   Cameron.  And I don't know if I want to agree without being a

17   stipulation of all three witnesses or to two of them and call

18   Mr. Cameron?

19          MR. MESSING:  No, I made this offer.  I think it's

20   reasonable that I would stipulate to the three witnesses.  It's

21   an all or nothing offer.  It's up to the Defense.

22          THE COURT:  All right, let me know what you plan to

23   do, but it looks like you could probably put all the testimony

24   today, right?

25          MR. MESSING:  Well, remember, the -- if they're

1   reading parts of the direct of all those witnesses, I'll be

2   reading cross.

3           THE COURT:  Okay.

4           MR. MESSING:  So it's going to be longer than that.

5           THE COURT:  Only put on till 4:15.

6           MR. MESSING:  Or they can stipulate.  Ball's in their

7   court.

8           THE COURT:  All right, but assume that we don't

9   finish today, you're going to be finished tomorrow morning,

10  right?

11          MR. SANTARONE:  Oh, I think either way, we're going

12  to finish today.

13          THE COURT:  All right, fine.  So, okay, do you want

14  her to put her initial before my ruling on Howard?

15          MR. MESSING:  Well, it depends on whether they're

16  going to try to put on evidence involving Zahra Howard, other

17  than -- when you do the stipulation anything more than that,

18  then I do need to see the Court at sidebar.

19          THE COURT:  All right.

20          MR. MESSING:  So why don't they think about it over

21  lunch and we can talk about it if we have to?

22          THE COURT:  All right.  Okay, let me know whether you

23  need my ruling on Howard, Zahra Howard.

24          MR. SANTARONE:  Okay, thank you.

25          THE CLERK:  All rise.

1          (Recess taken at 12:39 p.m., recommencing at 1:33 p.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Okay, she's going to see if the jury's

4     in, but I understand you have a couple of issues to raise with

5     me, Attorney Messing?

6               MR. MESSING:  Yes, could we do sidebar, please?

7               THE COURT:  All right, does it have to be a sidebar?

8     We don't have anybody here.

9               MR. MESSING:  Yes.

10              THE COURT:  Okay.

11         (Sidebar conference)

12              THE COURT:  Attorney Messing?

13              MR. MESSING:  So as you may recall, they want to read

14    the prior recorded testimony --

15              THE COURT:  Right.

16              MR. MESSING:  -- of Zahra Howard.

17              THE COURT:  Right.

18              MR. MESSING:  And the principle stated reason was,

19    not that she had been threatened in any way, but that she

20    didn't want her current appearance and information about her to

21    be known to the public.

22              So I did what anyone does these days, I'm doing this

23    at sidebar because I haven't shown it to anybody.

24              THE COURT:  Okay.

25              MR. MESSING:  And I want it under seal.  This is -- I

1    found it in two seconds if I found it, anybody can find it.

2    It's her Facebook page.  It has her picture.  It has where she

3    works.  It has photos of her, her friends and family.

4         You know, I'm sorry, Judge, but she didn't want to

5    come to Court.  They don't want to seek a bench warrant with

6    the Marshals.  That's up to them, but she is not unavailable.

7    That's poppycock.

8         She is quite available.  She chooses not to testify.

9    And it's wrong and in violation of 804 to find her unavailable

10   when she was clearly lying to Mr. Pomager about why she didn't

11   want to come to Court.

12        I mean, she's all over social media, so testing -- if

13   they want to bring her in, let her bring her in.  If I don't,

14   that's up to them, but.

15        THE COURT:  Very well.

16        Attorney Santarone?

17        MR. SANTARONE:  Your Honor, this is the declaration

18   from the paralegal.  The City's been trying to contact her.

19   And she states the reasons why she does -- she is not willing

20   to come in.

21        She fears that she's -- she doesn't want to re-live

22   the trauma, this from 33 years ago.  She's concerned, her

23   family's concerned that Mr. Dennis may have hatred towards her

24   for helping put her (sic) in prison.  She thought she could be

25   tracked down.

1              This Facebook page, she's -- everybody's Facebook

2     page.  There's nothing in here.

3              THE COURT:  Lower.

4              MR. SANTARONE:  There's nothing in there about this

5     murder.

6              THE COURT:  Uh-huh.

7              MR. SANTARONE:  I think this is, you know, they've

8     made multiple, multiple attempts.  And the rule is she's -- she

9     won't come in under a court order, which means subpoena, she's

10    not coming in.  She's unavailable as per the rules.

11             MR. MESSING:  That is not what the rule says.

12             THE COURT:  Okay, very well.  I think I understand

13    the rule.  Can -- you -- can -- you're going to file this under

14    seal?

15             MR. MESSING:  I would ask the Court --

16             THE COURT:  Yeah.

17             MR. MESSING:  -- to keep it under seal.

18             THE COURT:  You don't have a problem that I file this

19    under seal?

20             MR. SANTARONE:  No.

21             THE COURT:  Okay, I will instruct -- I will prepare

22    an order filing it under seal.  And at what point in time are

23    you going to call -- are you -- who's your next witness is what

24    I should ask?

25             MR. SANTARONE:  The next witness is going to be

1    either Detective Maahs or James Cameron, both of whom I

2    anticipate to be very, very quick.  And then, I can read the

3    testimony of Thomas Bertha, who's obviously unavailable, who's

4    passed away.  And I think that is a half hour.

5              THE COURT:  Okay.

6              MR. SANTARONE:  And then, this would be the next

7    (indiscernible).

8              THE COURT:  All right, so do those three witnesses

9    and I'll take this under advisement and I'll give you my ruling

10   before you call that witness, okay?

11             MR. SANTARONE:  Thank you.

12             THE COURT:  We still have time if I decide she needs

13   to be subpoenaed, all right.

14        (End sidebar conference)

15             THE COURT:  Are you breaking my technology here, the

16   little bit I have left?

17             UNIDENTIFIED SPEAKER:  Yeah.

18             THE COURT:  Oh.  Hold on a minute.  Yeah.

19        (The Judge confers with the Clerk)

20             THE COURT:  Okay, bring the jury in, yes.

21             THE CLERK:  Should he come first before the jury

22   comes in?

23             THE COURT:  Yes, come -- bring him in.

24             THE CLERK:  Yeah, he's going to take a little bit

25   to -- he has a -- he walks with a cane.  He's legally blind.

1                THE COURT:  All right, but --

2                THE CLERK:  So he just might take a couple seconds to

3    come up.

4                THE COURT:  That's fine.  You need help?  Does he

5    need help?

6         (Pause)

7                Yes, bring him in.  Oh, no, I'm sorry.  We're

8    bringing a witness in, it's going to take a little while.

9                Counsel, you want the mask off, right?  Ask him to

10   take it off.  This distance and --

11               Ms. Axe, you help him, you help him, nobody else

12   comes.  I --

13               MS. AXE:  Stay there.  And Mr. Cameron, just watch

14   my --

15               THE COURT:  Thank you.

16        (The Marshal guides the witness to the stand)

17               THE COURT:  Yeah, remain standing for a bit.

18               Ms. Axe, stay by just to make sure you give him

19   instruction that he doesn't trip over the chair.

20               MS. AXE:  Absolutely, I will.

21               THE COURT:  You can go back.

22               MS. AXE:  Okay.  Yes.

23               THE COURT:  Bring the jury in.

24               THE CLERK:  All rise.

25               THE COURT:  You may be seated.

1           You remain standing.  My deputy's going to swear you

2      in.

3           THE CLERK:  Please raise your right hand.

4                          JAMES CAMERON

5       called as a witness for the Plaintiff, having been duly sworn

6                       testified as follows:

7           THE CLERK:  Please state and spell your full name for

8      the record?

9           THE WITNESS:  Cameron, James D., C-A-M-E-R-O-N.

10     Common spelling for James.

11          THE COURT:  Okay, you could sit after you make sure

12     he's --

13          MS. AXE:  Yes.

14          THE COURT:  You see the chair?

15          THE WITNESS:  I'm blind.

16          THE COURT:  I'm sorry, you feel the chair?

17          THE WITNESS:  Yeah.

18          THE COURT:  All right.

19          THE WITNESS:  Okey-doke.

20          THE COURT:  Let me know when you're ready, okay?

21          THE WITNESS:  Yes, okay, I'm ready.

22          THE COURT:  Okay, could you stand the microphone to

23     him?  Yes, great.  Okay, thank you very much.

24          MS. AXE:  Mr. Cameron, the microphone is right here.

25          THE WITNESS:  Okay.

1          THE COURT:  Okay, you may begin.

2          MR. SANTARONE:  Thank you.

3                    **DIRECT EXAMINATION**

4   BY MR. SANTARONE:

5      Q    Mr. Cameron, thank you for coming in.  Just to start

6   off initially, you currently have difficulty with your

7   eyesight?

8      A    Yes, I'm legally blind.

9      Q    And --

10          MR. MESSING:  I'm sorry, I --could you lean toward --

11          THE WITNESS:  Legally blind.  I can't see anything

12  out of my left eye and only a small portion out of my right.

13  BY MR. SANTARONE:

14     Q    And how was your eyesight in 1991?

15     A    I guess like a 20-year old.  I don't -- yeah, I could

16  reside in '91.  I didn't have any issues.

17     Q    And do you remember your deposition was taken in this

18  case on October 29th, 2019?

19     A    I don't remember the date, but I had a deposition

20  somewhere around there.

21     Q    Okay, and at that time, was your eyesight fairly

22  good?

23     A    No, it was kind of gone then.

24     Q    Okay, and has it gotten progressively worse over the

25  years?

1    A    No, once it went, it went.

2    Q    Okay.

3    A    Because I went black in this eye.  I can only see

4  things out of -- if I get in the right spot.

5    Q    Okay, is there any document in your mind that you

6  have good eyesight in 1991?

7    A    Perfect.

8    Q    And Mr. Cameron, in October 22nd, 1991, I'm sorry,

9  2019, did you --

10         THE COURT:  1991?

11  BY MR. SANTARONE:

12    Q    1991, did you witness the murder of a young girl at

13  the Fern Rock Station?

14    A    Yes.

15    Q    And why were you at the Fern Rock Station?

16    A    I was working.

17    Q    And could you tell the jury what kind of work you

18  did, what you were doing there?

19    A    I worked for SEPTA.  And I was on light duty because

20  I had just gotten over shoulder reconstruction, so I was what

21  they call runner, running mail from depot to wherever.

22    Q    And on the day of that murder, were you interviewed

23  by Philadelphia Police detectives?

24    A    Yes.

25    Q    And at some point after that, were you shown a photo

1  spread of some suspects?

2      A    Somebody came to the house, yes.

3      Q    And were you able to identify anyone in those

4  photographs?

5      A    Yes.

6      Q    And do you remember who you identified?

7      A    No.

8      Q    Did you identify the person you saw --

9      A    I --

10     Q    -- shoot Chedell Williams?

11     A    That's the person I pointed to.

12     Q    And do you remember at some point after that, you

13 went to a line-up at the prison?

14     A    Yeah.

15     Q    And were there also other witnesses at the prison?

16     A    Yes.

17     Q    Were you -- at -- did you make a selection at the

18 prison as to who you saw shoot Chedell Williams?

19     A    Soon as they turned around the faces.

20     Q    And when they were turned around and face you, were

21 they standing that you could see their heights?

22     A    They were standing.  Number 3, they was right there.

23     Q    That was number 3 at the line-up?

24     A    Yes.

25     Q    Okay.

1   A    I got right up and went back and did this to the guy,

2   whoever the people was in the back.

3   Q    And when they asked the witnesses if they were able

4   to identify anyone, do you remember if they spoke to you

5   privately or they took each witness out one at a time and talk

6   to you?

7   A    No, they had us in a room, but we was all spreaded

8   (sic) out.

9   Q    Okay.

10  A    We weren't with each other.  And they just said

11  when -- if you see anybody you recognize, just you know, come

12  to the back of the room because they were in the back.  And I

13  remember getting up going to the back and doing this.

14  Q    Okay, and did you testify at a preliminary hearing?

15  A    Yes.

16  Q    And at that preliminary hearing did you identify the

17  person who you saw shoot and kill Chedell Williams?

18  A    Yes.

19  Q    And then, did you testify on December 23rd, 1991 at a

20  trial, a criminal trial with a jury?

21  A    Yes.

22  Q    And at that jury trial, did you identify the person

23  who you saw shoot and kill Chedell Williams?

24  A    Yes.

25  Q    At the time of the shooting, how far away were you

1    from Chedell Williams?

2         A    Oh, boy.  See now, you're going to get me in trouble.

3         Q    Okay.

4         A    Maybe 30 feet, if it was 30, I don't know they were

5    in the intersection.  I was on the sidewalk, so.

6              MR. SANTARONE:  Your Honor?

7              THE WITNESS:  I'm not sure measurements like that.

8              MR. SANTARONE:  May I refresh the witness'

9    recollection regarding a deposition he gave?

10             THE COURT:  He said he's not sure, you may.

11   BY MR. SANTARONE:

12        Q    Do you remember testifying under oath at a deposition

13   that you were about 8 to 10 feet away from her?

14        A    8 to 10?

15        Q    Yes.

16        A    That might be right.  I don't know.  I was on the

17   sidewalk.  They were in the street, so might have been 10 feet,

18   might have been 8 feet.

19        Q    Do you remember --

20        A    I'm not sure.

21        Q    -- do you remember that you were close enough to get

22   to work when -- after she was shot?

23        A    Exactly.

24        Q    So where were you?  How fast did you get to her after

25   she was shot?

1    A    Before she went down, she was staggering.  I remember

2    I used my left hand and grabbed hers, because I couldn't use my

3    right.  And I got her down on the ground.  And then, I put my

4    jacket under her because the ground was hot.

5    Q    And at that time when you witnessed the shooting, did

6    you get a good look at the face of the man who shot Chedell

7    Williams?

8    A    Definitely.

9    Q    And is that the same man you identified multiple

10   times?

11   A    Yes.

12   Q    Did you notice whether or not at the time of the

13   shooting the victim Chedell Williams was bent over or she was

14   stand up straight?

15   A    Well, she was bent forward, you know, kind of forward

16   and bent up, pushing off type motion.  She was leaning forward.

17   Q    Do you know -- did you ever testify as to whether she

18   was taller than the person who shot her?

19   A    Then I told him I didn't know and I still couldn't

20   tell you because if you know 10th and Nedro, it kind of starts

21   to go up.  She was leaning bent over from the waist, not

22   extremely forward, but just over from the waist and her arm was

23   like that.

24   Q    Okay, do you remember at your deposition saying I

25   recall telling the police the way they were situated with him

1     on an incline --

2          A    Yes.

3          Q    -- it looked liked the girl was taller than him, but

4     she was bent over?

5          A    She -- right.

6          Q    Mr. Cameron, it's 33 years later.  And do you have

7     any doubt in your mind that you correctly identified at the

8     line-up, at preliminary hearing, or at the trial, the person

9     that you saw shoot and kill Chedell Williams?

10         A    No doubt whatsoever.

11         Q    Thank you.  That's all I have.

12                         **CROSS-EXAMINATION**

13    BY MR. MESSING:

14         Q    Good afternoon, Mr. --

15         A    Hello.

16         Q    -- Cameron.  You have no doubt, right?

17         A    No doubt.

18         Q    So this poor young woman who was killed, had you ever

19    seen her before that day?

20         A    No.

21         Q    And how many men approached -- well, how many men

22    were with her at the time she was shot?

23         A    How many men were with her?

24         Q    Were there men around her?  I mean, there was?

25         A    In her immediate vicinity --

1    Q    Yeah, in her intermediate vicinity?

2    A    There was two.

3    Q    Two guys?

4    A    Yeah.

5    Q    And --

6    A    But he wasn't -- one was over by the parked cars.

7    Q    Oh, one was by the parked cars?

8    A    Yeah, and he was standing in front of a parked car.

9    Q    So get a little closer to you -- so I'm sorry, I

10   think I asked this already, had you ever seen this young woman

11   before?

12   A    Not that that I can say, no.

13   Q    Had you ever seen either of these men before?

14   A    No.

15   Q    These were total strangers?

16   A    Yeah.

17   Q    Okay.

18   A    Yes.

19   Q    And the first thing I assume that drew your attention

20   was the sound of gunfire; is that a fair statement?

21   A    Actually, no.  The first thing, it was -- school

22   broke early.

23   Q    Uh-huh.

24   A    Okay, and when school breaks early, all you hear is

25   kids screaming, hollering, get away, leave me alone, whatever.

```
1    That would -- yeah, at any bus station or whatever.  Because
2    once they all get together, it's all play.
3         Q    Right.
4         A    But that's the first thing I noticed.
5         Q    Okay.
6         A    And I didn't pay it any mind, just kids playing.
7         Q    There was nothing that was going on that was unusual
8    before a shot rang out, correct?
9         A    No.
10        Q    So after the shot rang out, I know you're not quite
11   sure how far away you were.  You ran immediately to this girl
12   quick enough so that you caught her as she was falling; is that
13   correct?
14        A    Not completely accurate.
15        Q    Okay, tell me what --
16        A    I remember when the shot went off.
17        Q    Right.
18        A    I remember telling Bevco (phonetic), because I was
19   standing talking to a bus driver Bevco
20        Q    Right.
21        A    And when the shot went off, he stopped --
22        Q    Right.
23        A    -- and was looking towards us.  So then, I see the
24   girl staggering.
25        Q    Right.
```

1    A    That's when -- and after the guy that was in front

2    the car --

3    Q    Right.

4    A    -- turned to the right, ran up the sidewalk.

5    Q    Right.

6    A    The guy that did the shooting he turned -- he stood

7    there for a second like he was in shock.  And then, he turned

8    to his left and ran up the center of the street.

9    Q    So --

10   A    And the girl was staggering.  And that's when I went

11   out into the street, grabbed her, and got her down on the

12   ground.

13   Q    So this guy, the guy that would kill her, did he run

14   towards you or?

15   A    No, no, no, he turned to his left and ran up 10th

16   Street.

17   Q    Okay.

18   A    And he was more like in the center of the street.

19   Q    Right, so as he was running, I assume his back was to

20   you?

21   A    Yeah.

22   Q    Okay.  When the police came, and I know this happened

23   quickly, but when the police came, didn't -- did they ask you

24   for a description of this shooter or the two people involved in

25   this crime?

 1       A     I'm sure, I'm not -- I'm sure they did, but I don't

 2    remember.

 3       Q     Do you remember telling the police that the shooter

 4    was wearing a red hoodie?

 5       A     Yes.

 6       Q     Okay.

 7       A     But that was at the police station.  That was

 8    downtown.

 9       Q     Right.

10       A     They took us from up there to down to the round

11    house.

12       Q     And they asked you how tall the shooter was, but you

13    told them you couldn't tell --

14       A     I couldn't.

15       Q     -- because it was on an incline?

16       A     Yes.

17       Q     Okay, did they ask you or you were able to tell

18    whether or not the shooter, the guy that shot this girl, had

19    any facial hair?  Do you know if they asked you that or if you

20    remember whether the shooter had facial hair?

21       A     I don't remember.

22       Q     Do you remember telling the police that this -- the

23    guy who shot the girl was dark complected, darker than you?  Do

24    you remember saying that?

25       A     I might have said it.  Sir, 30 some years ago.

1      Q     I know.

2      A     I can be exact but --

3      Q     I understand.

4      A     And we were down at the round house when they did all

5   this.

6      Q     Right?

7      A     So it might have been some facial hair.  It might

8   have been dark skin.  I'm not sure.

9      Q     Okay.

10      A     But I remember the person.

11      Q     So when you went to the police station on October

12   22nd, this was already in evidence.  It's Exhibit 4.  Do you

13   remember telling the police that you, and I'm quoting what they

14   have in your statement, okay?

15      A     Okay.

16      Q     I saw that a male between 15 and 18 years of age, a

17   little darker than myself, wearing a red sweatsuit with a black

18   jacket.  Do you remember giving that description?

19      A     I think it was a sweatshirt.

20      Q     Okay.

21      A     It wasn't a sweatsuit.

22      Q     Was not a red sweatsuit, okay.  And you weren't able

23   to give any height or weight description, is that correct

24   because of the angle?

25      A     Yes.

1      Q      Okay.  And then, when you went later and met with a

2  Detective Santiago, and this was three days later, he showed

3  you some photographs.  Do you remember that?

4      A      That's when they came to my house?

5      Q      Yeah.

6      A      Yeah.

7      Q      They came to your house.

8      A      Yeah, I told him this one's familiar, yeah.

9      Q      And they showed you a bunch of photos.  Do you

10 remember being shown those photos?

11     A      Yes.

12     Q      Okay.  And do you remember being shown the photos and

13 then saying number 1 looks familiar, but I can't be sure.  Do

14 you remember saying that?

15     A      Yes.

16     Q      Okay.  And then, you said -- were asked, what does

17 number 1 look familiar to?  And you said to the guy that did

18 the shooting especially from the side.

19     A      Yeah.

20     Q      Did you see the other male that was with the shooter

21 that day?  I saw him he was a little taller than the guy that

22 did the shooting.  Do you remember being asked those questions

23 --

24     A      Yeah.

25     Q      -- and giving those answers?

1        A    Yes.

2        Q    Now obviously that was within days --

3        A    Yes.

4        Q    -- of the incident.  So it was very fresh in your

5    mind, right?

6        A    Yes.

7        Q    So you're shown -- do you remember how many photos

8    Detective Santiago showed you?

9        A    It was one of them things like you see on TV.  A

10   little folder with maybe six or eight8 holes, I don't remember.

11       Q    Exactly, exactly.

12       A    It was pictures of people.

13       Q    And you said that you said that the photograph, the

14   number one photograph looked familiar, but you can't be sure?

15       A    Uh-huh.

16       Q    Where is that photograph, do you remember?

17       A    Where was it?

18       Q    Yeah, if you're looking at the photos that they

19   showed you, you said they showed you six or eight photos.  It's

20   actually 8.  Where was that photo?  Was it in the middle, was

21   at the bottom, was it in the upper left-hand corner?

22       Q    Sir, I don't know remember.  I honestly don't

23   remember.

24       Q    I understand.  I understand.  So shots ring out.

25       A    One shot.

1    Q    Just one, sorry, one shot.  See this guy, looks in

2    your direction, turns, runs up 10th.  You go over and catch

3    this girl as she's falling to the ground?  Do I basically have

4    the sequence of events correct?

5    A    Yes.

6    Q    And did you hold her until the medics came?

7    A    I was standing right, but there was -- this going to

8    sound funny, but there was an older guy that he knelt down at

9    her head.  I'm old now.

10   Q    Yeah.

11   A    He knelt down at her head about where her head was.

12   Q    Yeah.

13   A    And he was like stroking her.  And I was -- I kept

14   telling him keep talking to her.  And I had told Bevco to hit

15   his radio.

16   Q    Right.

17   A     And for to get the police.  But he was the only one

18   that I remember that was close --

19   Q    Right.

20   A    -- in proximity of me and the girl.

21   Q    I understand.  Nothing further.  Thank you, sir.

22        THE COURT:  You have any redirect?

23        MR. SANTARONE:  One follow up.

24                        **REDIRECT EXAMINATION**

25   BY MR. SANTARONE:

1        Q     Mr. Cameron?

2        A     Yes.

3        Q     The statement that was referred to that you gave at

4   the police station if that says he was wearing a red sweatsuit,

5   would your memory be better 33 years ago than it is now?

6        A     Yeah.

7        Q     That's all I have, thank you.

8              THE COURT:  All right.

9              MR. MESSING:  Thank you, sir.

10             THE COURT:  Attorney Axe, would you make sure that he

11  could safely get out of the chair?  So you are excused now.

12  Thank you very much for your testimony.

13             THE WITNESS:  Yeah.  You putting me out, huh?

14             THE COURT:  Yes.

15             MR. BROWNLIE:  Your Honor, may I step out for two

16  minutes, please?

17             THE COURT:  You may.

18             THE WITNESS:  Thank you.

19             THE COURT:  Be careful coming down.

20        (Witness is excused)

21             THE COURT:  Please come forward.

22             THE CLERK:  Please raise your right hand.

23                         ALBERT MAAHS

24   called as a witness for the Defendant, having been duly sworn

25                      testified as follows:

1          THE CLERK:  Please state and spell your full name for

2     the record.

3          THE WITNESS:  Albert J. Maahs, M-A-A-H-S.

4          THE COURT:  Okay, you may be seated.

5          THE WITNESS:  Thank you.

6          THE COURT:  Adjust the microphone, so that we can

7     hear you.

8          Attorney Santarone?

9                         **DIRECT EXAMINATION**

10    BY MR. SANTARONE:

11        Q    Detective Maahs, in 1991, how were you employed?

12        A    I was a detective in Philadelphia Homicide Division.

13        Q    And how long had you been in Homicide?

14        A    I arrived there early in 1991.

15        Q    All right, and when did you first join the police

16    force?

17        A    1971.

18        Q    Were you involved in any part of the investigation of

19    the murder of Chedell Williams?

20        A    Yes.

21        Q    And do you remember what your involvement was?

22        A    Yes, I took an interview from an inmate at Montgomery

23    County Prison on November the 1st, 1991.

24        MR. SANTARONE:  Okay.  And if we could pull up

25    Exhibit 24, just for the witness and the Court.

1    BY MR. SANTARONE:

2         Q     Is this the interview statement that you took?

3         A     Yes.

4         Q     And who was McGuffin?

5         A     Lawrence McGuffin, he was another detective from

6    Homicide and 2 Squad.

7         Q     And where did this interview take place, can you

8    tell?

9         A     This interview took place in Montgomery County

10   Detective Bureau in Norristown, PA.

11        Q     And who is Rich Peffle (phonetic)?

12        A     Rich Peffle was a detective with Montgomery County

13   Homicide and so was Don Warner (phonetic).

14        Q     And there's a six-page statement here.  And looking

15   at the bottom of that statement, do you have Mr. Frazier sign

16   each page at the bottom?

17        A     Yes.

18        Q     As a result of this interview, were you involved in

19   any follow-up investigation regarding what Mr. Frazier was

20   alleging that he knew about the murder?

21        A     Immediately after this interview, we put him in a car

22   and transported him to the area of West Oak Lane in

23   Philadelphia.  There, he pointed out several houses to us.

24        Q     And were you familiar with that area of Philadelphia?

25        A     Yes, I was.

1      Q     And how was that?

2      A     I worked there as a homicide detective and I grew up

3   there as a young guy.

4      Q     Was there a follow up investigation regarding the

5   houses that he referred to?

6      A     I believe there was.

7      Q     And --

8            MR. MESSING:  Objection as to what he believed.

9            THE COURT:  Oh sustained.  Re-phrase the question.

10  BY MR. SANTARONE:

11     Q     Do you know if there was investigation as to the

12  addresses he pointed out?

13     A     Yes, immediately after taking the statement from him,

14  we put him in a car and we drove him down into that area.  He

15  pointed out several locations.  I made notes of it, identifying

16  the type of structure that he pointed out, any other pertinent

17  facts that might lead into the investigation of who lived

18  there.

19     Q     And if we looked at the activity sheet, dated

20  11/1/91, it's Exhibit 26 in Volume 1.

21     A     Yes, it's a synopsis of my interview and also the

22  actions that were taken after where we drove him to the area of

23  West Oak Lane.  And at several locations, he pointed out

24  residences and also autos.

25     Q     And it's -- the top, it said you proceeded to

1    Norristown Prison.  Did you take him out of prison for this

2    ride around?

3         A    Yes, we took him out of prison and put him in the

4    back seat of a car.

5         Q    And were you involved in any of the investigation of

6    the people that actually lived at the house as he pointed out

7    as being people involved in this homicide?

8         A    No, I do not, excuse me.  Yes, we did -- I did take

9    part with Detective Jastrzembski, McGuffin, and Detective

10   Santiago.  We went to the residence of the -- one of the

11   locations he point out.

12        Q    And did anything match up with what Frazier had told

13   you regarding what you learned at that residence?

14        A    No, not really.

15        Q    That's all I have.  Thank you.

16                         **CROSS-EXAMINATION**

17   BY MR. MESSING:

18        Q    Hi, detective.  Are you still with the force?

19        A    No, no, I retired in '97.

20        Q    Okay, so you said you followed up with one of these

21   houses; is that right?

22        A    From -- I'm reading from a sheet, it's an activity

23   sheet --

24        Q    Right.

25        A    -- dated November the 1st, '91.  And it says that I

1    went to the residence of 7406 Theron (phonetic) Street.  And we

2    identified an individual by the name of William Larry

3    (phonetic), who lived there.

4         Q    Do you know if that particular page of that activity

5    sheet was turned over to the District Attorney's Office?

6         A    I have no idea.

7         Q    Some of the activity sheet, parts were turned over,

8    some were not; is that correct?

9         A    I was in 1 Squad.

10        Q    Right.

11        A    And 1 Squad overlaps with 2 Squad.

12        Q    Right.

13        A    I was in 1A.  So I would be the first portion of 1

14   Squad, 25 percent of it, that would overlap with the other

15   squad.

16        Q    Right.

17        A    And that is the day that I was there.

18        Q    Right.

19        A    I had no further investigations with this incident.

20        Q    Okay, but you don't have any knowledge of

21   whether -- I mean, not all parts of all activity sheets are

22   turned over to the District Attorney's Office at least back in

23   '91; is that correct?

24             MR. SANTARONE:  Objection, Your Honor.

25             THE COURT:  Sustained.

1          MR. MESSING:  If he knows.

2          THE COURT:  Sustained.  Be specific.

3          THE WITNESS:  I have no idea.

4     BY MR. MESSING:

5     Q    You have no idea?

6     A    No, I don't.

7     Q    Okay.  Last question, this guy Walker that had been

8     implicated by this gentleman William Frazier, do you know if

9     anybody made any effort to find out if this guy Walker had an

10    alibi for the date of the murder?

11    A    I wouldn't know.

12    Q    Okay.  Do you know if anybody ever showed any of the

13    eyewitnesses photo arrays that included Walker?  Do you know?

14    A    I would not know.

15    Q    Okay, thank you.  Nothing further.

16         THE COURT:  You don't have redirect, right?

17         MR. SANTARONE:  No, Your Honor.

18         THE COURT:  Thank you for your testimony.  You're

19    excused.

20         THE WITNESS:  Thank you, Your Honor.

21       (Witness is excused)

22         MR. SANTARONE:  Your Honor, at this point I would

23    read the testimony of Thomas Bertha.

24         THE COURT:  Okay.

25         MR. SANTARONE:  Your Honor, this is so I don't read

1    the answers and --

2            THE COURT:  Very well.

3            MR. SANTARONE:  Mr. Brownlie will ask the questions.

4            THE COURT:  Okay, you may.

5            MR. MESSING:  And I'll read whatever section of the

6    cross.

7            THE COURT:  That's fine.

8            MR. MESSING:  Won't be long.

9            THE COURT:  Fine.

10           So, members of the jury, the lawyers are now are

11   going to read to you the deposition testimony of Mr. Bertha,

12   who's not available to testify, but the questions and answers

13   were given under oath.  And you can take that as if it was

14   testifying here live.

15           And, again, apply the same legal standards that I

16   gave you earlier in my preliminary instructions in deciding the

17   extent of the witness' credibility.

18           MR. MESSING:  Your Honor, just for the record, this

19   is not deposition testimony.  This is testimony --

20           THE COURT:  This is trial testimony?

21           MR. MESSING:  -- taken back in 1991.

22           THE COURT:  Okay, I'm sorry.  So it's trial testimony

23   that was given under oath.  Again, you could take that.  It's

24   formal testimony of the witness.  You could take that as if he

25   was testifying here in Court live.

1        MR. SANTARONE:  May I take the stand, Your Honor?

2        THE COURT:  You may.  They are asking the exact

3   questions that were asked at trial and the exact responses that

4   were given at trial.

5        MR. SANTARONE:  Excerpts, actually, but yes, that's

6   correct.

7        May I proceed Your Honor?

8        THE COURT:  You may.

9      (Reading of trial transcript of Thomas Bertha in 1991)

10                    **DIRECT EXAMINATION**

11   Q    Mr. Bertha, directing your attention to Tuesday

12   October 22nd of 1991 at about 4 of 5 minutes to 2, were you in

13   the area of 10th and Nedro Streets?

14   A    Yes.

15   Q    Did you see or hear anything that brings you to Court

16   today?

17   A    Yes.

18   Q    What did you see and what did you hear?

19   A    On that date, working on the garage, we hear a

20   commotion.  We heard a gunshot.  So, okay, so we -- I turn to

21   look down the street and there's a man and a woman in the

22   middle of the street.

23      And I noticed the man stepping away from the woman.  He

24   was hitting her.  He steps away from her and he turned and ran

25   up the street towards me.

1      Q    Okay, and did you hear anything before you saw him

2   turn from the woman?

3      A    I heard a scream.

4      Q    And when you heard a scream and saw him running away,

5   how close was he to you?

6      A    When he ran past me?  He's about as close as this

7   gentleman here.

8      Q    Can we say approximately 3 to 4?

9           THE COURT:   (Then the Court interjects saying) Yes.

10     Q    Between 3 and 5?  Did you get a good look at the

11   face?  Did you get a good look at the face?

12     A    Yes, I did.

13     Q    Do you see that man here in Court today?

14     A    Yes, I do.

15     Q    Where is he seated and what is he wearing?

16     A    Sitting over here, wearing a black suit and tie.

17     Q    For the record, may the record reflect that Mr.

18   Bertha identified the Defendant Jim -- James Dennis.  Did you

19   see anything in his possession when he stepped away?

20     A    Yes.  When he was running up the street, he had a gun

21   in his right hand.

22     Q    And can you describe that gun?

23     A    It was a silver chrome plated revolver like that.

24     Q    Did you attend the line-up?

25     A    Yes, I did.

1      Q      Did you make an identification?

2      A      Yes, I did.

3      Q      And who did you identify?

4      A      The gentleman sitting over at the table over there

5  with a black suit.

6      Q      And you indicated earlier in your response that you

7  were working on a garage.  What kind of work were you doing?

8      A      We was putting stone facing on the front of the

9  garage.

10     Q      And you were in the company of another person?

11     A      Yes, my partner.

12            MR. SANTARONE:  When you're ready.

13            MR. BROWNLIE:  Page 64?

14            MR. SANTARONE:  78.

15            MR. MESSING:  What's that?  I couldn't hear you.

16            MR. SANTARONE:  Page 78.

17            MR. MESSING:  78?

18            MR. SANTARONE:  Of the trial testimony.

19            MR. MESSING:  Oh, the trial.

20            MR. SANTARONE:  Yes, October 5th.

21            MR. BROWNLIE:  One moment.

22            MR. SANTARONE:  Sure.

23            MR. SANTARONE:  Okay.

24     Q      Mr. Bertha, directing your attention to the afternoon

25  hours between 10 minutes of 2 and 5 minutes of 2 on the

1    afternoon of October the 22nd of 1991, did you live in the city

2    and county of Philadelphia?

3         A    Yes.

4         Q    Were you in the vicinity of 10th and Nedro that

5    afternoon?

6         A    Yes.

7         Q    What were you doing, sir?

8         A    We was putting stones on a garage.  We was doing some

9    stone work on a garage.

10        Q    What kind of work or what kind of business are you

11   engaged in?

12        A    Home remodeling.

13        Q    What did you hear and what did you see that brings

14   you to Court here today?

15        A    Well, while I was working, we was -- we heard a

16   commotion at 10th and Nedro right at the Fern Rock train

17   station right there.

18        Q    Okay.

19        A    We started working because we didn't pay any mind to

20   it at first, because it was just a lot of noise.  We turned

21   back around and started working, turned back around, heard a

22   gunshot.

23        Q    And when you turned or after you heard the gunshot,

24   what did you do?

25        A    After I heard the gunshot, we turned around, stepped

1    back on to the sidewalk because we were up on some ladders.  We

2    stepped onto the sidewalk looking down the street.  And we seen

3    or I seen two people on the street, you know, a man and female.

4    I seen the man start running up towards where we were working

5    at.

6         Q    Okay, what was the female doing after you heard the

7    shot and saw the male and the female?

8         A    Well, she was falling down into the street real slow.

9         Q    And then, what happened?

10        A    After she had fell, the gentleman, well, there was

11   two guys.  The first guy ran past me, then the second guy

12   started running past me.

13        Q    What did you do?

14        A    I stepped down on to the street a little more, you

15   know, as the second guy was coming up.

16        Q    The second guy, how was he dressed?

17        A    We had a red -- he had on red sweatpants, red hooded

18   sweatshirt, black cap, and a leather jacket.

19        Q    Okay, and when you stepped out into the street toward

20   him, how close did you get to him?

21        A    As close as this first juror right here, about three

22   or four feet.  It was pretty close.

23        Q    And the person with the red sweatsuit, the cap, and

24   the black jacket, did he have anything in his possession?

25        A    He had a revolver, a gun in his right hand.

1    Q    And did you attempt to stop this individual?

2    A    Well, I stepped out in the street as he was coming

3    up.  He looked at me and I looked at him.  And I stepped a

4    little more.  He started to bring his hand up.  That's when I

5    stopped.

6    Q    When you say he started bringing his hand up, what

7    did he have in his hand?

8    A    A gun.

9    Q    Do you see that man in Court here today?

10   A    Yes.

11   Q    Where is he seated and what is he wearing?

12   A    Right over here.

13       MR. SANTARONE:  And the Court instructs the witness

14   to point to him.

15       THE WITNESS:  Right here.

16       MR. SANTARONE:  The Court instructs very well.  For

17   the record, may the record reflect that Mr. Bertha pointed to

18   the Defendant in this case James Dennis.

19       And the Court indicates very well.

20   Q    Did you notice or take notice of any kind of

21   expression on his face when you attempted to step to him?

22   A    Like he was pissed off, like no, just a real arrogant

23   look like he was just pissed off like.

24   Q    What did you do?

25   A    Well, after he proceeded past me, I started running

1    behind him.

2         Q    You indicated that he passed you.  How close did he

3    come to you in passing?

4         A    Like I said, three to four feet.  He was close.

5         Q    Then what happened?

6         A    As he ran past me, I noticed that he had a gun.  I

7    stopped.  After he got past me, I started running behind him to

8    where the car they got into.

9         Q    What kind of car did they get into?

10        A    Four door Malibu classic, two tone, very clean.

11        Q    Sir, did you ever go into the area where the female

12   fell?

13        A    Afterwards.

14        Q    And what if anything did you observe at that time?

15             MR. SANTARONE:  And the record indicates that there

16   was no response from Mr. Bertha.

17        Q    Did you notice her or any injury to the female?

18        A    Oh, yeah, I noticed the gunshot wound to her.  She

19   was lying on her back.  She didn't appear to be conscious or

20   anything.

21             THE COURT:  (And the Court interjects) Where was the

22   wound?

23             THE WITNESS:  The wound was around here somewhere.

24             THE COURT:  (The Court then interjects) Pointing to

25   right below the neck, the chin?

1          (End of reading)

2               MR. SANTARONE:  And I believe that's all we have,

3     Your Honor.

4               THE COURT:  Okay.  Designations, common designations?

5               MR. MESSING:  Preliminary hearing, if you turn to it,

6     December 23, 1991, I guess exactly two months after this

7     robbery murder.  Turn to page 65, please.  Tell me, are you

8     ready?

9               MR. BROWNLIE:  Yes.

10              MR. MESSING:  Halfway down the page.

11              MR. BROWNLIE:  Okay.

12                         **CROSS-EXAMINATION**

13      Q    When you first saw the man down the street about 100

14     feet away from you, I take it that you weren't able to see his

15     face at that time, were you?

16      A    No.

17      Q    All right, and it was when he got -- and it was as he

18     got closer -- close to you that you were able to see his face

19     for the first time?

20      A    Yeah.

21      Q    My question to you is for how much time, how many

22     seconds were you able to see the man's face, the man with the

23     gun?

24      A    It seemed like it was a long time, but it wasn't.

25      Q    How long did it seem to you?

1      A      It seemed like a long time.  It was like a slow

2   motion.  It couldn't have been no more than about a second.

3      Q      About a second?

4      A      Yeah.

5      Q      And I take it you'd never seen that man before, had

6   you?

7      A      No, that was the first time.

8              MR. MESSING:  Thank you.  Nothing further, Judge.

9              THE COURT:  All right.  Thank you, you may step down.

10             MR. BROWNLIE:  Thank you, Your Honor.

11             THE COURT:  You have another live witness?  No or

12  not?

13             MR. SANTARONE:  The other witness, the other

14  (indiscernible) which is about an hour.

15             THE COURT:  Okay.  Members of the jury, I need five

16  minutes and then we'll resume at 2:30.  And we'll continue.  We

17  could only go to 4:15 today, but I think that you will probably

18  have most of the testimony of the -- most of the witnesses,

19  right?

20             MR. SANTARONE:  All the witnesses, I believe.

21             THE COURT:  Okay.  So I think we are pretty much

22  going to conclude today I think the testimony.  Again, five

23  minute break.  Remember my instructions.  And --

24       (The Judge confers with the Clerk)

25       (Jury exits courtroom)

1           THE COURT:  Okay, so I think I have two pending

2    motions before you call the next witness.  Am I right?

3           MR. SANTARONE:  Yes, Your Honor.

4           THE COURT:  All right.  That is the objection to

5    calling -- allowing the government -- the City, the Defendants

6    to use prior recorded testimony under 804(b)(1) on the basis

7    that you're disputing that she was unavailable.

8           And then, whether the conviction comes in or not,

9    right?  Those are the two issues.

10          MR. MESSING:  That's it.

11          THE COURT:  I'm going to take a five-minute break.

12   And when I come back, I think I should have that issue -- those

13   rulings.  I will place them on the record.

14          MR. SANTARONE:  Thank you, Your Honor.

15          MR. BROWNLIE:  Thank you Your Honor.

16          THE CLERK:  All rise.

17     (Recess taken at 2:23 p.m., recommencing at 2:34 p.m.)

18          THE CLERK:  All rise.

19          THE COURT:  Attorney Messing, and Attorney Santarone,

20   and Brownslie (sic), I'm going to permit the testimony to be

21   read to the jury, the trial testimony to be read to the jury

22   under 804(b)(1).

23          And I have signed an order electronically giving you

24   my two rulings on your objection, Attorney Messing, and also on

25   the second objection with regards to the prior conviction of

1    2005.

2                And with that, I think we're ready.  That testimony's

3    going to take how long, an hour you said?

4                MR. SANTARONE:  An hour, approximately, yes, sir.

5                THE COURT:  All right.  So I'm going to bring the

6    jury in.

7                MR. SANTARONE:  Ms. Bailey's going to read the part.

8                THE COURT:  Okay.  Put her on the witness stand.

9                MS. AXE:  Your Honor, could I just ask you a quick

10   clarifying question before the jury's brought in?  During the

11   transcript, there's a couple of times where she indicates that

12   she's pointing.  Should I not point?  Should I just read

13   pointing?

14               THE COURT:  Just read the transcript.

15               MS. AXE:  Okay, all right.

16               MR. MESSING:  And don't emote.

17               MS. AXE:  What's that?

18               MR. SANTARONE:  Don't emote.

19               MR. MESSING:  Do not emote.

20               MS. AXE:  Okay, well, Dan didn't emote, so.

21               MR. MESSING:  A little.

22               MS. AXE:  Yeah, a little.  You don't want me to

23   emote?

24               MR. MESSING:  No emoting.

25               MS. AXE:  Maybe a little emoting.

1          MR. MESSING:  I never emote ever.

2          THE COURT:  And so, this will be your last witness,

3     right?

4          MR. SANTARONE:  Yes.

5          THE COURT:  Okay.  So we're going to leave earlier.

6          THE CLERK:  (Indiscernible?)

7          THE COURT:  Yes, bring them in.

8       (Jury enters courtroom)

9          THE COURT:  You may be seated.  You're an officer of

10    the Court.  This is a lawyer.  She's an officer of the Court.

11    So she has to read the testimony, trial testimony accurately.

12    Again --

13         MR. SANTARONE:  But she's not a professional actress.

14         THE COURT:  No, and she's not going to be acting.

15    She's going to be reading the trial testimony of the witness

16    who was subjected to direct and cross-examination at trial in

17    this case a criminal trial in this case.

18         And the witness is unavailable, but testimony is

19    going to be presented to you as if she was here testifying

20    live.

21         Subject to same standards evaluated, the credibility

22    of any witness that I reviewed with you during my preliminary

23    instructions.

24         With that, Attorney Brownlie.

25         MR. BROWNLIE:  Thank you, Your Honor.  Ms. Axe, we're

1    going to proceed with the December 23rd, testimony.

2              MR. MESSING:  Does mismatch your exhibit this?

3              MR. BROWNLIE:  I'm sorry?

4              MR. MESSING:  Does the corresponding exhibit to this

5    is 1?

6              THE COURT:  Does it match the trial exhibit?

7              MR. MESSING:  Yeah.

8              MR. BROWNLIE:  That I'm not sure of.  What I'm

9    reading from is what was filed with the Court at ECF 221.  I

10   believe that was part of the City's motion.

11             MS. AXE:  It --

12             MR. BROWNLIE:  It should be -- the preliminary

13   transcript should be designated.  Do we have that exhibit?

14             MR. MESSING:  Before we begin your performance, could

15   you tell us?

16             MR. SANTARONE:  The preliminary hearing is Exhibit

17   170.

18             MR. BROWNLIE:  Line 3, Your Honor.

19             THE COURT:  Okay.

20             MR. MESSING:  Is she just reading the preliminary

21   hearing or is she reading trial as well?

22             THE COURT:  Members of the jury, just try and make

23   sure that the exhibits at trial of the original case are the

24   same exhibits that they're going to be mentioning the -- during

25   the examination here with us.

1          So what exhibits are you making reference?

2          MR. BROWNLIE:  It's Exhibit 170, Your Honor.  And

3    we're going to begin on page 16.

4          THE COURT:  Okay.

5          MR. MESSING:  What page?

6          MR. BROWNLIE:  Exhibit 170, page 16.

7          THE COURT:  And volume?

8          MR. BROWNLIE:  Volume 3.

9          THE COURT:  Okay, got it.

10         MR. SANTARONE:  I got it.

11         THE COURT:  Whenever you're ready.

12         MR. BROWNLIE:  Thank you, Your Honor.

13         (Reading of trial transcript of Zahra Howard in 1991)

14                        **DIRECT EXAMINATION**

15    Q    Ma'am, directing your attention to Tuesday, October

16    22nd of 1991, did you live in Philadelphia?

17    A    Yes.

18    Q    Did you know a person by the name of Cedell Williams?

19    A    Yes.

20    Q    And were you in the company of Cedell Williams at

21    around five minutes of 2 on Tuesday, October the 22nd, 1991?

22    A    Yes.

23    Q    Did anything happen to you and Cedell on Tuesday,

24    October the 22nd, 1991 at 10th and Nedro?

25    A    Yes.

1        Q      What happened?

2        A      We was getting off the 70 bus coming from school.

3   Cedell was going to get a Transpass and we was walking towards

4   Fern Rock Station, walking up the steps.  And two guys

5   approached us and say give me your fucking earrings.

6        Q      And the person that said that, where was he in

7   relation to you?

8        A      He was in front of me.

9        Q      And do you see that person in Court here today?

10        A      Yes.

11        Q      Where is he sitting and what is he wearing?

12        A      (Pointing) Black suit, white shirt.

13              UNIDENTIFIED SPEAKER:  For the record, Your Honor,

14   may the record reflect that the witness identified the

15   Defendant in this case James Dennis?

16        Q      After the man said give me your f'ing earrings, what

17   did you do and what did Cedell do?

18        A      We just stood there for a couple of seconds.  Then we

19   looked each other.  We looked at each other and ran.

20        Q      And what did the man do that said give me your f'ing

21   earrings?

22        A      He chased us.

23        Q      And where did you go and where did Cedell go?

24        A      Cedell ran into the street and I ran where the fruit

25   vendors was on the side of the station.

1      Q    And after Cedell ran in the street, did you see

2   anything happen to her?

3      A    (Pointing) The guy ran behind her and was grabbing

4   her stuff, excuse me, the guy ran behind her and was grabbing

5   her and stuff and he shot her.

6           THE COURT:  (The Court interjects) Ms. Howard, you

7   say that you ran to the vendors and Cedell ran into the street.

8   The guy indicating the Defendant then what did he do?

9           THE WITNESS:  He ran behind Cedell.

10     Q    And then what happened?

11     A    He was grabbing her and then he shot her.

12     Q    And where were you when he shot her?

13     A    Where the fruit vendors on the side.

14          THE COURT:  (The Court interjects) How far away was

15   he from you?  (And the Court interjects again)  That's correct

16   between 15 and 20 feet.

17     Q    Is this the man that said give me our f'ing earrings?

18     A    Yes.

19     Q    Is this the man that you saw shoot Cedell Williams?

20     A    Yes.

21     Q    Did you go to a line-up?

22     A    Yes.

23     Q    Did you make an identification at that line up?

24     A    Yes.

25     Q    Who did you identify?

1      A    (Pointing) James Dennis.

2      Q    Is this the man?

3      A    Yes.

4           MR. BROWNLIE:  We're moving next, Your Honor, to

5    Exhibit 174.

6           MR. MESSING:  Is that the trial?

7           MR. BROWNLIE:  That is the trial.

8           MR. MESSING:  So can I just bring in the rest of this

9    preliminary hearing?  It won't take a minute.

10          THE COURT:  You may.

11          MR. SANTARONE:  No objection.

12          THE COURT:  The counter designations.

13          MR. MESSING:  Yes.

14          Ms. Howard, performer, page 35, about two-thirds of

15   the way down the page.  Tell me when you're ready.  35.

16          MS. AXE:  I'm ready.

17     Q    And he told you if you were able to identify anybody

18   and you said yes and you pointed to the Defendant.  Now when

19   you were up there and you saw the line-up and you were asked if

20   you could identify anybody, do you remember telling the

21   officers that and the people present that you think it was

22   number 3?

23     A    Yes.

24     Q    Okay, and when you said you think it was number 3,

25   was there some doubt in your mind when you said that?

1        A     I think it was him.

2        Q     Now if you knew it was him, well, hold on, there's an

3    objection.  Middle of the page my question is this, Ms. Howard,

4    when you said I think, was there some doubt in your mind?

5        A     Maybe, but it's him.

6        Q     Well, there's no doubt now that you see him sitting

7    over today, right?

8        A     Yes.

9        Q     And that's because -- there's an objection.  After

10   you started to run down the steps and ran to the vendors, and

11   you said you turned around and you saw the man chasing Cedell

12   from the gate into the street?

13       A     Yes.

14       Q     My question to you is for how much time were you able

15   to see the man at that point?  That's when he was going through

16   the gate chasing her in the street and shooting her.  How much

17   time you were able to see the man?  5 seconds, 10 seconds, 15

18   seconds?

19       A     Five.

20       Q     Five seconds?

21       A     (No response.)

22       Q     You have to say yes or no at that time do you know?

23       A     Yes, five.

24       Q     Thank you.

25             MR. MESSING:  That's all we have Judge.

1          MR. BROWNLIE:  And there's some redirect that's

2     designated, Your Honor.

3               THE COURT:  Go ahead.

4               MR. BROWNLIE:  If I may?

5               THE COURT:  You may.

6          (Reading of transcript of Zahra Howard)

7     Q    Ms. Howard, were you wearing your earrings that day?

8     A    One, I had on one.

9     Q    And what kind of earring was it?

10    A    It was a flat plate with a rope around it.

11    Q    Was Cedell wearing earrings that day?

12    A    Yes.

13    Q    And what kind of earrings was she wearing?

14    A    She was a twist.

15    Q    Did you see Cedell after she was shot?

16    A    Yes.

17    Q    Did she have her earrings?

18    A    No.

19    Q    Thank you.

20              MR. MESSING:  Nothing further.

21              THE COURT:  All right, thank you very much.  174 now?

22              MR. BROWNLIE:  174, Your Honor.

23              THE COURT:  Okay.

24              MR. BROWNLIE:  Volume 3.  We'll begin with page 3.

25              MR. MESSING:  Page what?

1          MR. BROWNLIE:  3.  If I may?

2          THE COURT:  You may.

3       (Reading of transcript of Exhibit 174 of Zahra Howard by

4    Mr. Brownslie and Ms. Axe)

5       Q    Ms. Howard, directing your attention to October the

6    22nd of 1991, did you live in Philadelphia on that day?

7       A    Yes.

8       Q    How old were you on October the 22nd of 1991?

9       A    17.

10      Q    Did you know a person by the name of Cedell Williams?

11      A    Yes.

12      Q    How long had you known Cedell Williams?

13      A    About a year and a half.

14      Q    Were you in the company of Cedell Williams when

15   somebody happened to bring you to Court here today?

16      A    Yes.

17      Q    Where were you?

18      A    Fern Rock Station.

19      Q    And where were you coming from?

20      A    School.

21      Q    What, if anything, happened to Cedell Williams in

22   your presence?

23      A    Yes.

24      Q    What happened?

25      A    She got shot.

1      Q      Did you see who shot her?

2      A      Yes.

3      Q      Do you see that person in Court here today?

4      A      Yes.

5      Q      Where is he sitting and what is he wearing?

6      A      Gray suit on the right.

7             UNIDENTIFIED SPEAKER:  For the record, Your Honor,

8      may the record reflect that she picked the Defendant in this

9      case James Dennis.

10            THE COURT:   (The Court interjects) Very well.

11     Q      Ms. Howard, where were you and Cedell coming from?

12     A      School.

13     Q      What school?

14     A      Olney High or excuse me Olney High.

15     Q      And how did you get from Olney High to the Fern Rock

16     Station?

17     A      The 70 bus.

18     Q      And when you got to the Fern Rock Station, tell the

19     ladies and gentlemen of the jury what led up to Cedell Williams

20     being shot and killed?

21     A      We got off the 70 bus walking to Fern Rock Station.

22     We was going up the steps and two guys approached us and said

23     give me your f'ing earrings.

24     Q      And to whom were they talking?

25     A      Cedell and I.

1      Q     Did you have on earrings?

2      A     Yes.

3      Q     Now how were you dressed on that day, October the

4   22nd of 1991?

5      A     I don't remember.

6      Q     Were you wearing any jewelry?

7      A     Yes.

8      Q     What were you wearing?

9      A     Earrings.

10     Q     Were you wearing the earrings that you're wearing

11  today?

12     A     No.

13     Q     When the person said give me your f'ing earrings, how

14  close was he to you and Cedell?

15     A     Right in front of me.

16     Q     By right in front of you, could you pick out a point

17  in the room that would estimate the nearness he was to you?

18           THE COURT:  (And the Court interjects) All right, I'm

19  estimating for the record, you guys.  The jury will estimate

20  how close in the area of one or two feet.

21     Q     Did you look in his face?

22     A     Yes.

23     Q     And this -- is this the man you saw?

24     A     Yes.

25     Q     And when he said give me or f'ing earrings, what did

1    you do?

2         A    I paused for a couple of seconds.

3         Q    Were you still looking at him when you paused?

4         A    Yes.

5         Q    What did Cedell do?

6         A    Cedell was just standing there.

7         Q    And after a couple of seconds passed, what did you

8    do?

9         A    We looked at each other and then we ran.

10        Q    When the man said give me your f'ing earrings, did he

11   have anything in his hand?

12        A    I didn't see nothing.

13        Q    Did there come a time when you did see something?

14        A    Yes.

15        Q    What did you see?

16        A    A gun.

17        Q    How did the gun look?

18        A    Silver, it was silver.

19        Q    What did Cedell do after the two of you paused and

20   looked at each other?

21        A    She ran.

22        Q    Which way did she run?

23        A    We ran down the steps.

24        Q    Just tell us what you remember seeing, hearing, and

25   doing, Ms. Howard.  Can you do that?

1      A    Can you repeat it?

2      Q    After the two of you ran, what direction did you run?

3      A    Right to the fruit vendors there.

4      Q    And when you ran to the fruit vendors, what did you

5 do?

6      A    I was screaming and I just stood there.

7      Q    What did Cedell do?

8      A    She ran in the street.

9      Q    And when she ran in the street, did you see anything

10 happen to her?

11     A    James Dennis, he was grabbing her and pulling her and

12 stuff.

13     Q    By grabbing and pulling, in what area of the body was

14 she -- was he grabbing?

15     A    At her shoulders and stuff, her waist.

16     Q    Then what happened?

17     A    Then I heard a gunshot.

18     Q    And when you heard the gunshot, from what direction

19 did it come?

20     A    From in the street.

21     Q    And when you heard the gunshot, did you see what if

22 anything had happened to Cedell?

23     A    She fell.

24     Q    What did you do?

25     A    I just stood on over there with the fruit vendors and

1    then I ran over there and the guys ran up the hill.

2        Q    Okay.  How is Mr. Dennis dressed on that day?

3        A    He had on a black hooded sweatshirt and a red

4    sweatsuit.

5        Q    I show you, Ms. Howard, what has previously been

6    marked for identification as Exhibit 8.  Have you ever seen a

7    gun like this before?

8        A    Yes.

9        Q    Did you see a gun like this the day that Cedell

10   Williams was shot and killed?

11       A    Yes.

12       Q    Who had this, a gun like this, the day that Cedell

13   Williams was shot and killed?

14       A    James Dennis.

15       Q    Now when you ran over to Cedell, did you see her

16   injured in any way?

17       A    Can you repeat?

18       Q    Did you see her injured in any way?  Did you see any

19   injury to her?

20       A    Yes, a gunshot.

21       Q    What part of her body?

22       A    It was like her chest.

23       Q    Was she saying anything?

24       A    No.

25       Q    Were you saying anything?

1      A    I was screaming.

2      Q    Now did there come a time when the police and fire

3   rescue arrived?  Strike that.  D

4      Did there come a time when help came to that area?

5      A    Yes.

6      Q    And who came to that area to help?

7      A    Policeman.

8      Q    Did there come a time, Ms. Howard, when you were

9   taken to Homicide?

10     A    Yes.

11     Q    And interviewed?

12     A    Yes.

13     Q    Did you give a statement?

14     A    Yes.

15     Q    Did you tell the detectives at homicide what you saw

16   and what you knew about this incident?

17     A    Yes.

18     Q    Did there come a time when they brought pictures by

19   your house and you made an identification?

20     A    Yes.

21     Q    Who did you identify?

22     A    James Dennis.

23     Q    Now after they brought the pictures by, did you go to

24   a line up -- at on State Road and did you view this line up?

25     A    Yes.

1    Q    And did you make an identification at that line up?

2    A    Yes.

3    Q    And who did you identify?

4    A    James Dennis.

5    Q    And did there come a time that you arrived at a

6   preliminary hearing on December the 23rd of 1991 here in City

7   Hall?

8    A    Yes.

9    Q    Okay.  Was I, Roger King, there?

10   A    Yes.

11   Q    Was Mr. Dennis there?

12   A    Yes.

13   Q    Was his attorney Mr. Mandel there?

14   A    Yes.

15   Q    Again, Ms. Howard, directing your attention to C-1,

16  is Ms. Williams shown wearing any jewelry?

17   A    Yes.

18   Q    What jewelry is she wearing that you can see?

19   A    Earrings and a chain.

20        THE COURT:  (The Court interjects) What if any

21  jewelry was she wearing?

22        THE WITNESS:  Earrings and chain.

23        THE COURT:  (The Court interjects) All right.

24   Q    When you went over after she was shot, was she

25  wearing earrings?

1    A    No.

2         THE COURT:  (The Court interjects again) The earrings

3    that she was wearing, are they pictured in C-1?

4         THE WITNESS:  Yes.

5    Q    Ms. Howard, I show you what has been marked for

6    identification first as Commonwealth Exhibit 11.  Do you

7    recognize this document?

8    A    Yes.

9    Q    What is it?

10   A    My statement.

11   Q    I show you what has been marked for identification as

12   Exhibit 12.  Do you recognize that document?

13   A    Yes.

14   Q    What is that?

15   A    Statement.

16   Q    Before you testified here today, did you read the two

17   statements?

18   A    Yes.

19   Q    Did you read testimony you gave at the preliminary

20   hearing?

21   A    Yes.

22   Q    Are these the two statements you read?

23   A    Yes.

24   Q    Are these the notes of testimony that you read?

25   A    Yes.

1      Q    Ms. Howard, how often did you travel either to school

2    with Cedell or away from school with Cedell?

3      A    We used to go to school together almost every day,

4    but we didn't used to come home together all the time.

5      Q    On October the 22nd of 1991, what grade were you in?

6      A    9th.

7      Q    And what grade was Chedell in?

8      A    The 9th -- I think 9th.

9      Q    You indicated for the benefit of the ladies and

10   gentlemen of the jury that when the person said give me your

11   f'ing earrings, to whom was he talking?

12         THE COURT:  (And the Court interjects) In what

13   direction was he facing when he said those words?

14         THE WITNESS:  Me.

15     Q    Where was Cedell in relation to you?

16     A    On the right.

17     Q    Were your earrings taken?

18     A    No.

19     Q    Was Cedell's earrings taken?

20         THE COURT:  (The Court interjects) If she knows.  Did

21   you see anybody take Cedell's earrings?

22         THE WITNESS:  No.

23     Q    You indicated that when you went over to where Cedell

24   had fell, was she wearing earrings?

25     A    No.

1    Q    Was she wearing them before all of this took place?

2    A    Yes.

3    Q    Is this the man that you saw shoot Cedell Williams?

4    A    Yes.

5         MR. BROWNLIE:  And then cross designations, Your

6    Honor?

7         MR. MESSING:  I'm sorry?

8         MR. BROWNLIE:  Any cross designations?

9         MR. MESSING:  Briefly.  Next page 23 toward the

10   bottom.

11        (Reading of transcript of Zahra Howard by Mr. Messing and

12   Ms. Axe)

13                    **CROSS-EXAMINATION**

14   Q    You had never seen either one of those men before in

15   your life?

16   A    No.

17   Q    No, you never saw them?

18   A    No, I never saw them.

19        THE COURT:  Yes, it is correct that you never saw

20   them before, is that what your answer is?

21        THE WITNESS:  Yes.

22        MR. MESSING:  Okay, and then, just for a couple of

23   pages, to 29.  Ready?

24        MS. AXE:  Yes.

25   Q    And do you remember telling Detective Dangst

1    (phonetic) that the guy in the red and I assume you meant the

2    man who did the shooting was as tall you or a little taller.

3    And I take you were referring to Detective Dangst's size?

4        A    Yes.

5        Q    The guy in the red was as tall as you or a little

6    taller and then Detective Dangst inserted in there that he was

7    5'9' or 5'10" or that the guy was 5'9" or 5'10"?

8        A    I don't remember.

9        Q    Do you have your statement in front of you that was

10   given on October 22nd, the date of the murder?  I think it's

11   been marked for identification as C-1.  Ms. Howard, do you have

12   C-1 in front of you Ms. Howard?

13       A    Sorry C-11.

14       Q    C-11 in front of you, Ms. Howard?

15       A    Yes.

16       Q    Tell me if you got it in front of you?

17       A    Yes.

18       Q    I want you to take a look if you would at page 4 just

19   about in the middle of the page, the actual question says tell

20   me about the other male, the one that came down the steps on

21   Cedell's side.

22       And the answer says he was the same age, taller than the

23   guy in red.  The guy in read was as tall as you or a little

24   taller, 5'9", 5'10".  Do you see that?

25       A    I see it.

1      Q      There's an objection.  You see it now.  Is that what

2   you told Detective Dangst?

3      A      Yes.

4             MR. MESSING:  Nothing further.

5             THE COURT:  Okay.

6             MR. BROWNLIE:  I do believe there's re-direct, Your

7   Honor.

8             THE COURT:  Go ahead.

9        (Reading of transcript of Zahra Howard by Mr. Brownslie

10  and Ms. Axe)

                     **REDIRECT EXAMINATION**

11

12     Q      Ms. Howard, when you saw the photographs, you

13  indicated that --

14            MR. MESSING:  What page are you on now?

15            MR. BROWNLIE:  38.  And I'll begin again.

16     Q      Ms. Howard, when you saw the photographs, you

17  indicated that -- what did you indicate to the detective?  What

18  did you tell the detective?

19     A      When I saw the pictures of him?

20     Q      Yes.

21     A      Or I'm sorry when I saw the picture of him?

22     Q      Yes.

23     A      I said that's him.

24     Q      Now at the line-up when you saw the person that you

25  saw, was that the person that shot Cedell Williams?

1      A      Yes.

2      Q      Are you identifying Mr. Dennis here today?

3      A      Yes.

4      Q      Are you picking him out because of his height?

5      A      No.

6      Q      Are you picking him out because he's sitting here in

7   the courtroom?

8      A      No.

9      Q      Why are you picking out James Dennis?

10      A      Because that was the one that shot Cedell.

11      Q      Are you sure?

12      A      Yes.

13      Q      You're positive?

14      A      Yes.

15             MR. MESSING:  I have nothing further.

16             MR. BROWNLIE:  Okay.  I think we continue Your Honor,

17   page 43.

18             MR. MESSING:  43, okay.

19      Q      Ms. Howard, getting back to Friday, did you come to

20   the District Attorney's Office on Friday?

21      A      Yes.

22      Q      About how long were you at the District Attorney's

23   Office?

24      A      About a half an hour.

25      Q      Okay.  And during that half an hour, were you ever in

1   my office?

2       A    Yes.

3       Q    And how long of that half an hour were you in my

4   office?

5       A    15 minutes.

6       Q    Okay, and those 15 minutes that you were in my

7   office, did we discuss the particulars of your testimony?

8       A    No.

9       Q    And tell the ladies and gentlemen what we discussed?

10      A    To speak up loud, tell the truth, don't lie.

11      Q    And at the end of that 15 minutes, did I tell you

12  that I wanted you to return?

13      A    Yes.

14      Q    And did I tell you I wanted you to return with

15  anyone?

16      A    If I wanted to bring my mother, I could bring her.

17      Q    And did you bring your mother today?

18      A    Yes.

19      Q    And when you and your mother appeared in my office

20  this morning, tell the ladies and gentlemen how much time I

21  spent with the two of you?

22      A    About 10 minutes.

23      Q    And what was I doing the rest of the time?

24      A    You was out in the hallway sitting down and stuff.

25      Q    At any time did anyone at the District Attorney's

1    Office or the police department tell what you what to say or

2    who to pick out?

3        A    No.

4        Q    Is this the man?

5        A    Yes.

6        Q    Thank you.

7            MR. BROWNLIE:  Turning now Your Honor, to Exhibit

8    213.

9            THE COURT:  Volume?

10           MR. BROWNLIE:  Volume 5.  Beginning page 6 of the

11   exhibit, page 17 of the miniatures.

12           THE COURT:  Go ahead.

13           MR. BROWNLIE:  May I?  Thank you.

14       (Reading of transcript of Exhibit 213 of Zahra Howard by

15   Mr. Brownslie and Ms. Axe)

16       Q    Good morning, Zahra Howard.  Were you with Cedell

17   Williams on the day that she was murdered, correct?

18       A    Yes.

19       Q    And you gave statements.  You testified that you had

20   seen the Defendant before, right?

21       A    No.

22       Q    Is that the Defendant on the screen?

23       A    Yeah.

24       Q    Is that the man that you saw shoot and kill your

25   friend Cedell Williams?

1      A    Yes.

2      Q    Do you ever remember having a conversation with Diane

3   Pugh (phonetic)?

4      A    No.

5      Q    Do you know who Diane Pugh is?

6      A    Yeah, she's related to Cedell.

7      Q    How is she related, do you know?

8      A    Her aunt.

9      Q    Do you remember seeing her aunt any time following

10  the murder of Cedell?

11          THE COURT:  Okay, continue.

12          MR. BROWNLIE:  Thank you, Your Honor.

13     Q    And who was there?

14     A    Her family.  I don't know everybody.  Her family was

15  there.

16     Q    A lot of people were there?

17     A    Yeah.

18     Q    And you were discussing the event that led to

19  Cedell's death?

20     A    Yes.

21     Q    And in that conversation, did you ever say anything

22  about recognizing the Defendant before?

23     A    No.

24     Q    Did you ever see the Defendant at Olney High School?

25     A    No.

1      Q     Did you ever see him around Olney High School?

2      A     No.

3            MR. BROWNLIE:  And I believe we have some cross

4   designations.

5            MR. MESSING:  No, I don't need any.

6            MR. BROWNLIE:  Page 15, page 54 of the miniature,

7   upper right hand corner.

8      Q     Ms. Howard, you testified that you have been visited

9   many, many times by somebody representing the Defendant?

10     A     No.

11     Q     And they find you at every address?

12     A     Yes.

13     Q     And your statement is they talk to your children?

14     A     Right.

15           MR. BROWNLIE:  I believe that's all, Your Honor.

16           THE COURT:  Okay.

17           MR. BROWNLIE:  Thank you.

18           THE COURT:  You don't have anything?

19           MR. MESSING:  No.

20           THE COURT:  Okay, thank you very much for your

21   testimony.

22           MS. AXE:  May I step down?

23           THE COURT:  Yes, you may.

24           You have another witness?

25           MR. SANTARONE:  Your Honor, other than moving

1   exhibits into evidence, I think we rest.

2          THE COURT:  All right, so all your exhibits have been

3   admitted and now we can talk about it later, but.

4          MR. SANTARONE:  Yeah.

5          THE COURT:  So, members of the jury, it's 3 o'clock

6   and all the evidence now is before you.  I think the next step

7   is for tomorrow us to begin the closing arguments.  And then,

8   I'm going to give you the instructions of the Court.

9          So you're going to have the case sometime probably

10  before lunch.  I will order lunch for you.  I will bring it in.

11  I suggest that you set aside a little bit of time to have

12  lunch.  And I will make accommodations to anyone who needs an

13  accommodation.  And then, hopefully, you'll have the case to

14  deliberate in the afternoon.

15         So, with those instructions, I'm going to let you go

16  a little early.  We ended a lot earlier than I anticipated

17  because we could only go to 4:15 and we don't have anything

18  else to present to you.  And I have a lot of matters to discuss

19  with the lawyers before we close tomorrow morning.

20         So it's really important that you continue to heed my

21  instructions not to talk about anything you heard so far not

22  among yourselves with anyone else.  Do not supplement your

23  knowledge from any other source outside of this courtroom.

24         Avoid reading any newspaper accounts of this case,

25  any stories that might be on the Internet, listening to any

1    radio account of the case, conducting any experiment of your

2    own -- if making research or consulting reference works,

3    dictionaries anything of that sort about this case, the nature

4    of the case, the parties in this case, and anything connected

5    with this case.

6            Again, you have to continue to allow each other to

7    keep an open mind and wait until I send you back to the room to

8    begin your deliberations.

9            We are very close to submitting the case to you.  So

10   I'll see you promptly tomorrow at 9.  We're having little bit

11   of technology issues, but we're doing our best.

12           This is a building that was created in 1975.  A lot

13   of the technology, believe it or not, is about 10 years old.

14   And as you well know, as soon as the technology is out, it's

15   already obsolete.

16           And so, we're trying to cope with that.  And it's

17   extraordinarily expensive to wire these courtrooms, but we are

18   managing.

19           If I determine that this is going to be continue

20   perhaps I'll try to get another courtroom with better

21   technology, but I'm not so sure that any other courtroom's any

22   better than my courtroom.

23           So have a nice afternoon and I will see you here

24   promptly tomorrow at 9 to continue with this case.

25           THE CLERK:  All rise.

1          (Jury exits courtroom)

2          (The Judge confers with the Clerk)

3          THE COURT:  So Attorney Messing, I think you have

4    until 4:15 you said.

5          MR. MESSING:  Yeah.

6          THE COURT:  We finished a little early.  I thought

7    we'll probably have a charging conference tomorrow, but it

8    looks like we have a little time.

9          MR. MESSING:  I'm free.

10         THE COURT:  Could we at least get you out of here by

11   no later than 4?

12         MR. MESSING:  Okay.  Let me -- I can just.

13         THE COURT:  But we have a little time.  So I think I

14   submitted -- I think we circulated a proposed instruction, the

15   way I see it going in and what I intend to do.  And I hope you

16   had an opportunity to review that.  I'm going to print -- I

17   think I have my copy here.

18         MR. MESSING:  I have a copy.

19         THE COURT:  Do you have a -- yeah, could you print my

20   copy so that -- I might have it here.

21         MR. SANTARONE:  Yeah, (indiscernible) yes.

22         THE COURT:  Yeah, I don't have a final copy.  So.

23         MR. MESSING:  Do you -- I'm sorry, do you have a

24   copy, Your Honor?

25         THE COURT:  No, I'm getting my law clerk is going to

1  print me my copy.  The other thing is I need to work with you

2  on the verdict slip.  It's the verdict slip.

3          Mr. Messing submitted one that was a lot simpler than

4  the defense.  I think now it's changing because Monell is no

5  longer here, the Monell claim is no longer here.

6          But one of the difficulties I was having to be frank

7  with you is that, Mr. Messing, you brought a whole bunch of

8  claims.  I think it was seven claims initially.  Two were

9  dismissed.

10          And then, two were dismissed, so that's remaining or

11  five.  Now we don't have the Monell claim.  So only three

12  claims remain.

13          But that's the claim of civil conspiracy, civil

14  conspiracy, which is a claim in and of itself.

15          MR. MESSING:  Right, so you're right.  And the way

16  that I -- in cases I've had in the past is the way we deal with

17  that is simply by obviously it's conspiracy to either fabricate

18  --

19          THE COURT:  Right.

20          MR. MESSING:  -- or deliberately conceal evidence.

21          THE COURT:  So you --

22          MR. MESSING:  So the way --

23          THE COURT:  Go ahead.  No, let me -- I think I better

24  listen.  Go ahead.

25          MR. MESSING:  I've dealt with it in the past is for

1    each of the counts of fabrication and then concealment for each

2    individual Defendant, simply say Defendant A acting alone or in

3    conspiracy with Defendant B fabricated evidence.

4         You know, I don't want to confuse -- I think the most

5    important thing with a verdict sheet is not to confuse the

6    jury.

7         THE COURT:  Agreed.

8         MR. MESSING:  The Court has already given them

9    detailed instructions on the law.

10        THE COURT:  You and I are on the same page on that.

11   I think I told them.

12        MR. MESSING:  So, I mean, the -- and I'm not sure

13   that we even need a conspiracy count here, because it's really

14   each of these Defendant detectives did pretty much the same

15   thing with the evidence that we're talking about, whether it's

16   the Caison receipt or the Charles Thompson or the failure to

17   turn over certain information.

18        I mean, we know from Mr. Webb, who I thought was very

19   credible and quite frankly who I know for many years, if any of

20   this stuff had been provided to him or Mr. King, it would have

21   been turned over.  So the obvious inference is that they never

22   had it.

23        You know, whether the jury accepts the, you know, the

24   whole premise as detective I think Maahs just said, sometimes

25   activity sheets are turned over, sometimes they're not.  And

1  but that's not the issue here.  The issue here is how to frame

2  the verdict sheet.

3           THE COURT:  Right.

4           MR. MESSING:  Simple is best.  And I'm not sure it's

5  necessary to have a separate conspiracy verdict simply to say

6  that Detective Jastrzembski acting alone or in conspiracy with

7  Santiago do this, this, or that, period.

8           So that's my position.  On the jury charge itself,

9  I've gone through it.  I can go through with the Court and

10 opposing counsel.  I have some comments.

11          THE COURT:  Okay.

12          MR. MESSING:  Do you want me to do that now?

13          THE COURT:  Right.  Let's take that.  Maybe that will

14 be productive, but --

15          MR. MESSING:  Okay.

16          THE COURT:  -- let me here briefly because my trouble

17 is that the conspiracy claim, it's a claim count for which they

18 could be held liable because they conspired to violate

19 somebody's constitutional right and they could be held liable.

20          And the jury could award damages for that, but it's

21 embedded in the -- in sort of in the claims as, you know, acted

22 alone or in conspiracy with.

23          And you know, I agree with Mr. Messing, the idea is

24 to record the verdict on the claims, so the jury could give us

25 an answer as to each claim.

1          This is not a criminal case which is a lot easier

2   because you do it by count, yes or no, and then you move on.

3   And if there are interrogatories that we need to do because it

4   in fact sentencing we have the jury determine those separately,

5   but so what is your position with regard to the counts?

6   Because when I read the complaint, I see seven counts.  Two are

7   dismissed.

8          The Monell claim is no longer available.  So the only

9   thing we have left is Count 1.  As to each of the detectives

10  and the theory of liability is that they fabricated or

11  deliberately concealed it or engaged in deception.

12         And then, we have the civil rights conspiracy count

13  as to all Defendants, the Monell claim, and then damages, and

14  punitive damages.

15         MR. BROWNLIE:  So I'm not positive I understand 100

16  percent what Mr. Messing's position is, but what I would say

17  with respect to the verdict sheet is that to the extent the

18  civil conspiracy claim is pled as a separate count, it should

19  be inserted in the verdict sheet as a separate question.

20         So to the extent -- and part of my response, Your

21  Honor, and I apologize, is I'm not seeing in my head Mr.

22  Messing's formulation for the verdict sheet.

23         Is he -- is the Court's understanding that it's to be

24  Count 1(a) for fabrication and then within that sub question is

25  did the Defendant otherwise conspire?

1        MR. MESSING:  No, I'm sorry.  I thought --

2        THE COURT:  Yeah.

3        MR. MESSING:  -- filed it and sent it to you.

4        THE COURT:  Yeah.

5        MR. MESSING:  It's simply --

6        THE COURT:  Go ahead.

7        MR. MESSING:  I'm sorry, did Defendant Jastrzembski

8   alone or in concert with Defendant Santiago fabricate evidence?

9   Did Defendant Santiago alone or in conspiracy with Defendant

10  Jastrzembski fabricate evidence?  So that way, it --

11       THE COURT:  Look --

12       MR. MESSING:  -- the jury's been instructed as to

13  what fabrication is.  There's some overlap here.  I mean,

14  fabrication could include tampering with evidence liker you

15  know, taking the DPW receipt from Ms. Caisson or it could be

16  concealment by hiding the DPW receipt from everybody.

17       So I want to try to keep it simple.  The Court is

18  giving detailed instructions as to the law.  So that's my

19  proposed solution.

20       If the Court wants to ask a separate question about

21  conspiracy, that's fine, but I think it's duplicative.  It

22  could be covered in one question.

23       THE COURT:  All right, you don't agree with that?

24       MR. BROWNLIE:  We do not agree with that, Your Honor.

25       THE COURT:  Right, I've been instructing my law clerk

1    to give me some verdicts in these type of cases, supervised

2    cases.  And there are some verdicts, which are pretty simple.

3    They break out the claims.

4         So let's say we have here, as I read it I think we

5    have in terms of Count 1, which is the deprivation of liberty

6    in violation of the due process clause for failing to provide a

7    fair trial as to all Defendants, right?

8         We have two detectives.  And as to each detectives,

9    he has a claim or theory of fabrication or concealment or

10   deception.

11        So can't we just say Count 1, that claim, which is a

12   deprivation of the violation of due process under the 14th

13   Amendment, right to fair trial, with respect to each of the

14   Defendants Santiago and the fabrication.

15        For Plaintiff or Defendant, with respect to Detective

16   Frank Jastrzembski for Plaintiff for Defendant and let's break

17   them out that way.

18        MR. MESSING:  Yeah, that sounds fine.  It's hard to -

19   -

20        THE COURT:  You had a lot of language that is

21   unnecessary.

22        MR. MESSING:  What's that?

23        THE COURT:  You had a lot language that is

24   superfluous and unnecessary because I charged them.  And my

25   case, they're going to have the charge.  It's already written,

1  they all have it.

2          MR. MESSING:  I understand.  I'm not disagreeing.

3          THE COURT:  Okay.

4          MR. MESSING:  It's hard for me to visualize it.  I'd

5  love to see it.  Maybe we could see it tomorrow morning but --

6          THE COURT:  All right.

7          MR. MESSING:  -- that sounds -- anything is simple

8  makes sense to me.

9          THE COURT:  All right.

10          MR. MESSING:  Because they're already getting this

11  complicated charge.  This should be very simple and

12  straightforward, the verdict sheet.

13          THE COURT:  I agree.  Do you understand what I'm

14  talking about?

15          MR. BROWNLIE:  I understand the Court's position

16  completely.  And if I may briefly, Your Honor, just respond

17  with respect to the --

18          THE COURT:  And then, just to add for example Count 2

19  is the civil rights conspiracy as to the Defendants do the same

20  thing.

21          Plaintiff's claim for conspiracy in violation of

22  §1993 conspiracy claim with respect to Detective Jastrzembski

23  for Plaintiff or for Defendant.

24          With respect to the fabrication, with respect to the

25  concealment, and then with respect to Detective Santiago,

1   again, concerning the fabrication concerning the concealment

2   for the Plaintiff or for the Defendant, and eliminates a lot of

3   superfluous language that you've given me.

4         MR. BROWNLIE:  Yes, so with respect to the verdict

5   sheet, Your Honor, this is a very unusual 1983 case.  It's not

6   often that a Plaintiff can come into Court and collaterally

7   attack a criminal conviction.

8         And I think that we discussed previously with Your

9   Honor our reasons for submitting the verdict sheet in the

10  format that we did.

11        We generally follow in Your Honor's wake submitting

12  very general and simple questions to the jury.  However, the

13  jury here is not permitted to find fact inconsistent with Mr.

14  Dennis' conviction.

15        So to the extent they're going to be asked to resolve

16  factual disputes with respect to the fabrication and the

17  deliberate deception, the questions that we've submitted to

18  Your Honor track directly the questions that the jury must

19  answer to arrive at the underlying constitutional violation.

20        And it does so in a way that makes their reference

21  pointed, narrow, and substantive.  The questions are material,

22  they go directly to each claim both with respect to fabrication

23  and both with respect to deliberate deception.

24        THE COURT:  See, the problem I have is that the

25  instructions already tell them to do that.  You know, the

1   instruction.

2          And you -- what you -- the verdict slip that you've

3   given me is almost like an outline of the instructions and you

4   want them to go through the instruction.  And that's what

5   troubles me.

6          I mean, they're going to follow my instructions.

7   They're going to have them in the jury room.  And the, you

8   know, we only given them the broad pictures, the broad claims.

9   And they have to in reaching their judgment, they have to

10  follow the instructions.

11         So, I mean, every case is a dispute of facts.  They

12  have to resolve what happened and then apply the law that I

13  give them.  So that is part of the deliberations, the

14  resolution of the facts, you know, that they have to resolve.

15         And I'm pretty sure you're going to highlight that in

16  your closing argument because if you don't highlight that, then

17  you will not be doing your job.  You understand exactly what

18  you told me that they are not permitted to, for example, enter

19  or decide a fact.

20         Certain facts are going to be given like he's still

21  convicted of third degree murder.  Anything that contradicts

22  that, you know, they cannot do.

23         And you're going to remind them in your closing.  I'm

24  going to remind them in my instructions.  So, you know, I'm

25  with Mr. Messing on the verdict slip.  I always feel it should

1    be simple to record the verdict.

2              The deliberations and the law that I give them is

3    going to resolve the disputes.  I mean, that's their domain.

4              MR. BROWNLIE:  I understand, Your Honor.

5              THE COURT:  So I --

6              MR. BROWNLIE:  We respectfully object and would rest

7    on the papers with respect to that issue.

8              THE COURT:  All right.  I ask that your respectful

9    objection is noted, but I'm going to instruct that you go back

10   and at least make an effort at putting a verdict slip together

11   that is consistent with my instructions.

12             And now Attorney Messing, that your -- the <u>Monell</u>

13   claim is out, it's going to make it a little bit more simpler.

14             MR. MESSING:  Yes.

15             THE COURT:  And now that you know that at least I

16   want the criminal -- civil rights criminal conspiracy because

17   I'm charging them on criminal conspiracy claim in the verdict

18   slip perhaps.

19             MR. MESSING:  Yeah.

20             THE COURT:  It might make it a little easier.

21             MR. MESSING:  Okay.

22             THE COURT:  Can you quickly work on that and submit

23   one overnight?

24             MR. MESSING:  I will try.  I have a commitment that

25   goes --

1          THE COURT:  Right, I forgot.

2          MR. MESSING:  -- long and deep I'm afraid, but I'll

3    see what I can do.

4          THE COURT:  All right.

5          MR. MESSING:  If I get out soon, I can try to do it -

6    -

7          THE COURT:  Do you want -- I try to get you out here

8    in the next five minutes.

9          MR. MESSING:  On the jury charge, I had very few

10   comments.  Could I just tell them -- do you have a printed copy

11   of it?

12         THE COURT:  Yes, I have a copy.  Let me -- did you

13   just give me a copy?

14         UNIDENTIFIED SPEAKER:  Yeah.

15         THE COURT:  What did I do?  Oh, right here.  I have

16   it, yes.

17         MR. MESSING:  So --

18         THE COURT:  Page?

19         MR. MESSING:  Yeah, I'm looking for --

20         THE COURT:  Listen --

21         MR. MESSING:  So --

22         THE COURT:  -- I'm going to take his comments first.

23   And can we resume tomorrow at 8:30, go over the remainder of

24   the comments?

25         MR. MESSING:  We can try to do it now.  It's --

1            THE COURT:  Okay.

2            MR. MESSING:  We have a little time.

3            THE COURT:  Just --

4            MR. MESSING:  I don't have many.

5            THE COURT:  All right, go ahead.

6            MR. MESSING:  Page 19 --

7            THE COURT:  19.

8            MR. MESSING:  -- is impeachment with character for

9    truthfulness, I think none of that evidence came out in this

10   trial.

11           THE COURT:  I agree.  So that's why I put if

12   applicable.  It's out, agree?  You agree, right?  There was no

13   evidence of impeachment of character.

14           MR. SANTARONE:  Again, we did impeach Mr. Dennis with

15   testimony given that contradicted what he said.

16           MR. MESSING:  No, that's a prior inconsistent

17   statement.

18           THE COURT:  No, that's a prior inconsistent

19   statement.

20           MR. SANTARONE:  Oh, that's right.

21           THE COURT:  This is character for truthfulness.

22           MR. MESSING:  Character.

23           MR. SANTARONE:  Well, okay.

24           MR. MESSING:  Page 20, the trial depositions were of

25   George Ritchie and Bethany Brand.  Polini never came.

1            THE COURT:  All right, you got that, okay.

2            MR. MESSING:  Same thing on page 21.  No Polini and

3    no Gamble (phonetic).

4            THE COURT:  No Polini, no Gamble, you're right.

5            MR. MESSING:  On both the top and the bottom.

6            THE COURT:  No Polini, no Gamble.

7            MR. MESSING:  Page 25 at the bottom of the page.

8            THE COURT:  I repeat the verdict twice if you

9    noticed.

10           MR. BROWNLIE:  I did.

11           MR. SANTARONE:  Yes.

12           THE COURT:  But I think it's a good thing to repeat

13   it in the first part and the second part.

14           MR. MESSING:  The only thing I have at the bottom of

15   page 25 is if a Plaintiff fails to meet this burden, the

16   verdict must be for the Defendants.

17           If you find after considering all the evidence that a

18   claim is in fact more likely than not so, then the claim has in

19   fact been proved by a preponderance of the evidence.  And the

20   verdict must be for the Plaintiff.  I mean, I think we should

21   get the same language as you gave for the Defendant.

22           THE COURT:  I don't have a problem with that.  That's

23   a good recommendation.

24           MR. BROWNLIE:  Objection, Your Honor.  Could we just

25   invert that since it is Mr. Dennis' burden in the first

1    instance, put the Plaintiff language first and the Defense

2    language second?

3              THE COURT:  That's fine.  I don't have a problem with

4    that.

5              MR. MESSING:  That's fine.

6              THE COURT:  Yeah, what's -- Carlos, you heard that?

7              THE LAW CLERK:  Yeah.

8              THE COURT:  Okay, we could do that.  Good suggestion,

9    thank you.

10             MR. MESSING:  Then you have on page 30 the

11   outstanding convictions.

12             THE COURT:  Right.

13             MR. MESSING:  What I don't believe is necessary are

14   all the definitions that you would give in a criminal

15   prosecution of Uniform Firearms Act, third degree murder, first

16   degree murder.

17             I don't think it's necessary nor has the jury been

18   given specific information about all of these things.  I think

19   it's unnecessary for there to be pages 31, 32, 33, and 34.

20             I think that the fabrication definition, the -- oh, I

21   know, the --

22             THE COURT:  All right, so let's think of what -- 30

23   to 34, Attorney Brownlie?

24             MR. BROWNLIE:  With respect to the outstanding

25   convictions, Your Honor, Mr. Messing's statement bolsters our

1     position under Heck.

2            And what he's saying is that there has been no

3     evidence of the distinction between first degree murder and

4     third degree murder.  So I'll just note that for the record.

5            But with respect to the charging instructions under

6     Nelson, we discussed previously the need to instruct the jury

7     on the elements composing Mr. Dennis' outstanding conviction,

8     so that they do not make factual resolutions that are

9     inconsistent with those convictions.

10           They cannot know whether a factual dispute is

11    inconsistent with a criminal conviction unless they know what

12    the elements of a criminal conviction are.

13           And we have not asked Your Honor as would be

14    appropriate to direct the jury to make specific factual

15    findings that James Dennis was at the crime scene and that

16    James Dennis did possess a firearm.  We do believe that Nelson

17    would support that position.

18           Instead, what we've asked Your Honor to do is

19    instruct on the law and allow the jury to make the appropriate

20    resolution itself.  But in order to do that, they need to know

21    what the elements of the criminal offenses are.

22           THE COURT:  Right.

23           Attorney Messing, I'm going to let you make your

24    objections.

25           MR. MESSING:  Okay.

1          THE COURT:  I did think about this.  And I think it's

2     helpful to the jury to sort it out because they have to

3     do -- have a basic understanding of the charges which still

4     remains convicted and the charges that were vacated, the first

5     degree murder and the difference between them.

6          MR. MESSING:  All right.

7          THE COURT:  So they could make appropriate findings

8     of facts.  So your objection is noted.

9          MR. MESSING:  Okay.

10         THE COURT:  It's overruled.  Then you say you have --

11         MR. MESSING:  Then you have nothing until page 44,

12    which begins the municipality liability instruction, which ends

13    at 49.

14         THE COURT:  Right.

15         MR. MESSING:  I think that should be removed because

16    it's not at issue with this case.

17         THE COURT:  You agree, right, Attorney Brownlie?

18         MR. BROWNLIE:  Yes, Your Honor.

19         THE COURT:  So 44 through 49 is deleted.  And we take

20    those out because it is over for the City.

21         MR. MESSING:  On --

22         THE COURT:  Hold on a minute.  You're going ahead of

23    me.

24         MR. MESSING:  Sorry.

25         THE COURT:  Okay, so we're back to compensatory

1   damages now, right?

2          MR. MESSING:  Exactly.  So I understand the Court's

3   instructions on pages 50, 51, 52, I have no objection.  But

4   then your specific -- rather than telling the jury what they

5   can avoid damages for, you are on page 53 telling the jury what

6   they cannot award damages for as if I am making the specific

7   request for damages for a particular period of time.

8          I just don't think that ordinarily a court would

9   charge on what damages the jury cannot award.  Generally,

10  courts charge on what damages the jury can award.

11         THE COURT:  Yeah.

12         MR. MESSING:  So I object to the -- that portion of

13  the first paragraph on page 53 starting from the second

14  sentence on to the end of the paragraph.

15         THE COURT:  Attorney Brownlie?

16         MR. BROWNLIE:  Your Honor, we agreed to this issue.

17  The law is clear he cannot recover these damages.  The jury

18  should be so instructed.

19         THE COURT:  Very well.  I think this is consistent

20  with my prior rulings.  And I'm going to instruct them that

21  they could consider damages in this case, but they cannot award

22  damages for Mr. Dennis for injuries resulting from his valid

23  term of incarceration from the 23rd to 1991 to December 22nd,

24  1996, because as you well know, I think I made the analysis

25  under Sharif and Nelson.

1          And he still stands convicted under <u>Heck</u>.  And I

2     don't want -- to make sure that the conviction is not -- the

3     conviction is not undermined in any way, shape, or form.

4          So your objection is noted, Attorney Messing, but I

5     think this is an appropriate instruction under the

6     circumstances of this case, because I think this case is a

7     little bit unique.

8          MR. BROWNLIE:  My apologies Your Honor.

9          THE COURT:  Go ahead.

10         MR. BROWNLIE:  Before we move on to the compensatory

11    charge, we do -- the Defense does have an objection to the

12    wages charge.

13         THE COURT:  Where is that?

14         MR. BROWNLIE:  Paragraph 4, page 52.  The wages,

15    salary, profits, reasonable value of the working time that Mr.

16    Dennis has lost.

17         Mr. Dennis has not proffered any expert testimony or

18    economic evidence with respect to what his employment was, what

19    it should be, or what it may be.  There's no competent evidence

20    in the record to make that particular award.  So we would

21    object to that particular charge.

22         MR. MESSING:  Your Honor, there's no expert testimony

23    that is required as a matter of law.  Mr. Bookman testified

24    that people in death row can't work for a living.  Mr. Dennis

25    testified he was never employed because he was on death row.

1    It's up to the jury to decide if he's entitled to, you know.

2             THE COURT:  I will overrule the Defendant's

3    objection.  I think it -- the jury should consider based on

4    testimony.  What else?

5             MR. MESSING:  On the jury charge, you know, your

6    instructions on the elements of the offense and of the elements

7    of fabrication and deliberate concealment cover the *mens rea*

8    requirement such as it is in a civil rights case.

9             The Defense has submitted a separate instruction that

10   they want the Court to deliver to the jury that they can't be

11   held liable if they were merely negligent or exercised due

12   care.

13            This is not an instruction in a civil rights case,

14   has nothing to do with it.  Your -- the Court's already

15   instructed them on that issue.

16            And then, the only other issue I had --

17            THE COURT:  Which one is that?  Is that the one you

18   submitted?

19            MR. MESSING:  They filed it probably at midnight one

20   day.

21            THE COURT:  Which one -- is that the one that --

22            MR. BROWNLIE:  It was filed yesterday afternoon

23   probably 4:00 p.m., Your Honor.

24            THE COURT:  All right.

25            MR. BROWNLIE:  And when the Court's prepared, I'm

1    ready to respond.

2              THE COURT:  All right, and your point is that the

3    delivered indifference?

4              MR. MESSING:  I believe that it's covered already in

5    the charge.  So I don't think it's necessary, but -- and you

6    could incorporate it in, you know, to the deliberate

7    indifference.  This is not mere negligence.  This is exactly as

8    you defined them.

9              And the Defense wants that charge.  So it's up to the

10   Court.

11             MR. BROWNLIE:  If I may, Your Honor?

12             THE COURT:  So I think Mr. Messing has a point

13   because you know, it has to be -- look, this is a heavy burden

14   to meet.  It has to be -- create, or tamper with, or make false

15   evidence and it has to be deliberate.

16             And then, I define this does not require that the

17   Defendant acted out of actual malice, spite, or ill will, but

18   only that the Defendant made a knowing misrepresentation.  So

19   that's deliberate.

20             MR. MESSING:  This isn't a car accident with

21   negligence.  This is --

22             THE COURT:  Yeah.

23             MR. MESSING:  This is a deliberate violation of the

24   Constitution.

25             MR. BROWNLIE:  If Your Honor --

1          THE COURT:  I'm not comfortable with what you're

2     giving me.  Has that been applied to a civil rights case?

3          MR. BROWNLIE:  Your Honor, I -- every charge I submit

4     to the Court is aptly supported by case law.

5          THE COURT:  Yeah, but what about case law in the

6     context of civil rights litigation?

7          MR. BROWNLIE:  Yes, Your Honor.  In fact, the

8     instruction is with specific respect to the 14th Amendment's

9     due process clause.  That particular Constitution violation

10     arises from the civil context only under 1983 (indiscernible).

11          So to say that that charge is inappropriate in a

12     civil rights context is to ignore the Supreme Court cases that

13     it's drawn from.

14          THE COURT:  All right.  I --

15          MR. BROWNLIE:  If I may propose an alternative, Your

16     Honor?

17          THE COURT:  Go ahead.

18          MR. BROWNLIE:  With respect, I believe, in paragraph

19     2 of the fabricated evidence charge, that language could fit

20     very neatly there.  The charge need not be given separately to

21     draw the distinction between actionable, cognizable conduct,

22     deliberate conduct and merely negligent.

23          THE COURT:  Does it -- does the definition of

24     deliberate includes -- I think includes might be definition of

25     deliberate might make the distinction.

1          MR. BROWNLIE:  There is no, Your Honor, to my

2     understanding, charge in the Court's instructions that I have

3     on the definition of deliberate.  And that's one of the reasons

4     why we've submitted the supplemental charge.

5          THE COURT:  All right, I will take it under

6     advisement.  I'm not so sure that I'm going to instruct the

7     jury on that.  If I do that, I'll highlight --

8          MR. BROWNLIE:  Okay.

9          THE COURT:  -- that over Mr. Messing's objection.

10          MR. MESSING:  Only other thing I had was I filed a

11     couple of days ago because they were doing this thing about the

12     D.A. made the decision.

13          I think, frankly, Mr. Webb kind of undermined their

14     position on this, but to the extent they're arguing that all

15     this information was turned over to a deceased prosecutor,

16     obviously, that's going to be a fact that the jury's going to

17     have to determine.

18          But you know, there's good federal law on this that I

19     cite to in my proposed instruction about, you know, this

20     independent intervening clause that, you know, if they provide

21     false information or misleading information or withhold

22     material information from the prosecutor, then that breaks the

23     chain of causation.

24          THE COURT:  I read it this morning.

25          Attorney Brownlie, what is your position with regards

1   to the supplemental requests and what would you fit that,

2   Attorney Messing?

3           MR. MESSING:  Huh?

4           THE COURT:  Where would you put it in the

5   instructions as an issue charge, independent charge?

6           MR. MESSING:  Yeah I mean, I probably slip it in --

7           THE COURT:  Slip it where?

8           MR. MESSING:  -- after causation.

9           THE COURT:  Okay.

10          MR. MESSING:  You know, I think that would make

11  sense.

12          THE COURT:  All right, what is your position with

13  regard to supplemental submission by Mr. Messing?

14          MR. BROWNLIE:  The issue with that instruction, Your

15  Honor, we filed specific objections of record I believe it was

16  this morning for Your Honor's review.

17          Our arguments are laid out fully in that particular

18  submission.  But what I'll say is this with respect to the

19  causation issue is that the Court doesn't need to instruct on

20  superseding or intervening causation because the position of

21  the Defendants from the inception of this case has been that

22  they were not a cause at all.

23          So without addressing causation in the first

24  instance, the Court need not address whether or not there was

25  other superseding or intervening causes because those analyses

1  proceed from the premise that the detectives were a cause at

2  the threshold.  So that was the argument.

3        THE COURT:  And you're not going to argue in the

4  alternatives?

5        MR. BROWNLIE:  In the alternative with respect to --

6        THE COURT:  It just meaning, you know, hey, members

7  of the jury, this is my position.  We didn't do anything.  We

8  have no cause.

9        But in the alternative, if you find so, then the

10 lawyers, the prosecutors, and all of that break the change of

11 concession because we were not responsible.

12       MR. SANTARONE:  Your Honor, our position is going to

13 be that everything was turned over to the prosecutor.

14       THE COURT:  But you didn't answer my question.  So

15 that means that you're not going to argue in the alternative,

16 right?

17       MR. SANTARONE:  I'm going to argue that everything

18 was turned over to the prosecutor.

19       THE COURT:  All right.

20       MR. BROWNLIE:  That and --

21       MR. MESSING:  And that's exactly why I'm asking.

22       MR. BROWNLIE:  And that, Your Honor, is causation at

23 the first instance.  It's not a supervening cause.  The factual

24 dispute is whether or not the information was turned over.

25 That's a causation threshold issue.

1          To the extent there's a supervenor intervening cause,

2     there's been no evidence in this case that the particular

3     Defendants were at issue with respect to producing or not

4     producing particular documents.

5          THE COURT:  Right.

6          MR. MESSING:  Actually I think --

7          MR. BROWNLIE:  The jury will resolve it, so I'm not

8     going to argue about that now.

9          THE COURT:  Go ahead, Attorney Messing?

10         MR. MESSING:  Look, it's a bit of a shell game.  I

11    mean, they're going to -- if they're going to claim that

12    these -- that Defendants actually gave over all of their stuff

13    when it's clear from -- well not just Mr. Webb, but from common

14    sense that if they had this, they would have provided it, but

15    they didn't.  Obviously, the prosecution wasn't given it.  I

16    mean, Mr. --

17         THE COURT:  I think their position is that he have

18    it.  And therefore, they didn't give it, because they didn't

19    have it.

20         MR. MESSING:  Yeah, exactly.

21         THE COURT:  So that's what they are saying.

22         MR. MESSING:  So, you know, that's why I think this

23    charge is appropriate --

24         MR. BROWNLIE:  If I may?

25         MR. MESSING:  -- because it lets the jury know that,

1    you know, if they didn't give it, if they withheld material

2    information or provided misrepresentations, here's a witness

3    who said that -- freely said that no deals, no threats, no

4    coercion.  I saw Jimmy Dennis with a gun, same kind of gun on

5    the day of the murder.

6            THE COURT:  But Attorney Messing, the jury has to

7    resolve a conflict here because the detective has said very

8    clearly from the witness stand that these witnesses, what we

9    took the statement way back there and this is what they told

10   us.

11           MR. MESSING:  Right.

12           THE COURT:  We didn't coerce them.  We didn't do

13   anything.

14           MR. MESSING:  That's right.

15           THE COURT:  The statement.  That happened later on.

16   They changed.  They recanted.  And now, we're back here.

17           The receipt, if I understand it correctly, is she

18   never gave us a receipt.  She gave us a pink copy, which is a

19   schedule of payment.

20           So if it's not in the file, they didn't give it to

21   us.  You're saying if it's not in the file, they conceal it or

22   they fabricated it?

23           MR. MESSING:  Yeah.

24           THE COURT:  That's what you're saying?

25           MR. MESSING:  She said she gave it to them.

1          THE COURT:  Right.

2          MR. MESSING:  But it disappeared.

3          THE COURT:  Yeah.

4          MR. MESSING:  That's the main theory of the Plaintiff

5   here.  I mean, I believe we had an independent outline like

6   this.  No skin in the game.  You see --

7          THE COURT:  I know, but you agree that that's the

8   dispute and the jury's --

9          MR. MESSING:  Oh.

10         THE COURT:  -- going to have to resolve that just on

11  credibility.

12         MR. MESSING:  Clearly.

13         THE COURT:  So the dispute is that they didn't -- for

14  example when they took this statement, they didn't coerce or

15  force anybody.  Thompson came because he's looking out for

16  himself.  He was interviewed.  He was asked questions and he

17  gave those answers.

18         MR. BROWNLIE:  These are all --

19         THE COURT:  Tanya Caisson, the receipt appeared years

20  later at the time she was interviewed.  The only thing she gave

21  the detectives was the pink card.  And that was put in the

22  activity file.  It's sent along with the -- after the

23  prosecutor and all that.

24         So why was superseding intervening cause matter?  If

25  that is the -- that is a legal dispute here I think.

1          MR. BROWNLIE:  Right.

2          THE COURT:  And the jury may believe your witnesses.

3   The jury may not.  The jury may believe the detective or do

4   something else.

5          MR. MESSING:  I understand the Court's position.

6          THE COURT:  Right.

7          MR. MESSING:  I get it.

8          THE COURT:  You got it?  So it seems to me that I

9   think they have a point.  I don't think -- I think that now if

10  I hear them argue something different please, please --

11         MR. MESSING:  I will.

12         THE COURT:  -- remind me.  I know that you will

13  remind me because then I'll give it.

14         MR. MESSING:  Okay.

15         THE COURT:  All right?  All right?

16         MR. MESSING:  That's fair, that's fair.  The only

17  other issue before I ask leave to be excused is the Defense has

18  filed a 20-something page motion.

19         The motion, I've looked at it.  I can represent to

20  the Court that all of these issues have previously been briefed

21  and submitted to the Court.

22         I will rest on the previous submissions that I've

23  made on every one of these issues.  If it's available to the

24  Court.  And if the Court has any questions or concerns about me

25  litigating any of these issues perhaps tomorrow morning before

1    we bring the jury in.

2              THE COURT:  Okay.

3              MR. MESSING:  I'm happy to do it, but I --

4              THE COURT:  I have no idea what you're talking about

5    but --

6              MR. SANTARONE:  No, I know, Your Honor.

7              THE COURT:  Oh, the opinion, your opinion of the

8    case?  Okay, the 3rd Circuit opinion?

9              MR. MESSING:  No, no, no I'm sorry.  I'm talking

10   about I was just given a copy of a Rule 50 motion.

11             THE COURT:  Oh, that's supplemental.  You could

12   supplement it later on in the response if you want to.

13             MR. MESSING:  I've already (indiscernible).

14             THE COURT:  Okay, that's fine.  That's fine.

15             MR. MESSING:  The last question I had for the Court

16   is any time limits on closings?

17             THE COURT:  How much do you need?

18             MR. MESSING:  Hour.

19             THE COURT:  That's fine.  I'm not going to rush you.

20   Are you going to reserve?

21             MR. MESSING:  What's that?

22             THE COURT:  Are you going to reserve final hour for

23   rebuttal or you want extra time for rebuttal?

24             MR. MESSING:  Because they told me no, I prefer to

25   ask for separately for a 15-minute rebuttal.

1          THE COURT:  So it's an hour and 15 minutes total?

2          MR. MESSING:  About, yeah.

3          THE COURT:  All right, what do you need, Santarone?

4          MR. SANTARONE:  Your Honor, I would take 45 minutes

5    to an hour.

6          THE COURT:  45 minutes to an hour?  Okay, so we have

7    2 hours and 15 minutes total.  If you need more time, that's

8    fine.  I'm not going to rush you.

9          MR. SANTARONE:  And the only issue, 15 minutes of

10   rebuttal, I mean, rebuttal is unanticipated argument is my

11   understanding of rebuttal.

12         THE COURT:  He doesn't have to take all 15 minutes,

13   but it's rebuttal.  It's not repeating.  Rebuttal does not mean

14   repeating the first part of the closing.  It's to respond to

15   things that were not addressed in your first portion of the

16   argument.

17         I think Attorney Messing has been --

18         MR. MESSING:  Yes, I know --

19         THE COURT:  -- around what it means.  He's not going

20   to waste time, because the jury will punish you, you wasted

21   their time anyway.

22         MR. MESSING:  I understand.

23         THE COURT:  Okay.

24         MR. SANTARONE:  Your Honor, if I may, and I

25   understand Mr. Messing is itching to get out of here, but --

1           THE COURT:  Yeah.

2           MR. SANTARONE:  -- this is not yet gone through.

3    It's (indiscernible) to the instructions.

4           THE COURT:  All right, so how many -- he had briefed.

5    You had how many you have?

6           MR. SANTARONE:  Ours are brief as well, Your Honor.

7    And they overlap.

8           THE COURT:  All right, so I want to get him out of

9    here.  Could we -- could you get here tomorrow at 8:30?

10          MR. MESSING:  It's a little tricky with what the

11   family thing --

12          THE COURT:  Just tell me what the -- yeah.

13          MR. MESSING:  I will be here before 9.  I'm usually

14   here at 8:30.

15          THE COURT:  You -- I know you are.

16          MR. MESSING:  I will do my best to get here 8:30.

17          THE COURT:  So I could listen to his -- and I could

18   get you out of here because then you have some commitments.

19          MR. MESSING:  Well, if he's briefed, but you're going

20   to be brief?  That would be unusual for you, but if you are --

21          THE COURT:  This is not on the record, all right.

22          MR. BROWNLIE:  If I may just begin, Your Honor, my

23   understanding is that Your Honor's policies and procedures

24   reserve specific instructions for anything not charged that was

25   submitted on the record; is that correct?

1            THE COURT:  That's correct.

2            MR. BROWNLIE:  Okay.  With respect to the fabricated

3   evidence claim --

4            THE COURT:  Page?

5            MR. BROWNLIE:  35, Your Honor.  There's been some

6   dispute between the parties with respect to the tampered

7   instruction.  So in the context of this case and I corresponded

8   with Mr. Messing prior to trial about this particular

9   instruction.  And he says that charge is necessary with respect

10  to the Caison receipt.

11           But the issue here is that what Mr. Messing is

12  alleging is tampered is actually concealment.

13           MR. MESSING:  Both.

14           MR. BROWNLIE:  So that's what we're seeking

15  clarification on.  We don't think that tampered is a proper

16  instruction with respect to the fabricated evidence claim in

17  the context of this case.  So we would object to that language

18  in paragraph 1.

19           Also, paragraph 3, Plaintiff would not have been

20  convicted of first degree murder, we would ask the Court to

21  strike and sentence to death since that's not a question of

22  liability.  That's a question of damages.

23           On page 36 at the top, you need not find the

24  Defendant knew Plaintiff was innocent.  We ask the Court to

25  change new to believed.

1          And if I may proceed, Your Honor?

2          THE COURT:  All right, let's take them one at a time.

3          MR. BROWNLIE:  Sure.

4          THE COURT:  So that Mr. Messing could respond.

5          MR. MESSING:  I think the language that you have

6   suffices.  I think these changes are unnecessary, but the Court

7   will decide.

8          THE COURT:  All right, thank you.

9          Go ahead.

10         MR. BROWNLIE:  Page 37, Your Honor, reasonable

11  likelihood standard requires Mr. Dennis to draw a meaningful

12  connection between his particular due process injury.  We would

13  ask the Court to change his particular due process injury to

14  first degree murder conviction.

15         MR. MESSING:  That I object to.  That doesn't make

16  any sense.

17         MR. BROWNLIE:  Because the idea here is that Mr.

18  Dennis must draw a meaningful connection between the cited

19  evidence in the complaint and in this case it's the clothing

20  testimony, the Thompson statement, and the Caison receipt.

21         THE COURT:  Those are -- you're going to argue that.

22  I think this is fine.  I'm not going to change the instruction.

23         MR. BROWNLIE:  Okay.  With respect to the deliberate

24  deception charge of paragraph 3, page 38, the Defendant

25  concealed or suppressed this evidence by failing to provide it

1    to the Prosecutor, we would ask that the Court add.

2              THE COURT:  Objection to that?

3              MR. MESSING:  I don't know that it's necessary.  I

4    mean, then you'd have to say by failing to provide it to the

5    prosecutor or make it known to the Defense or the Court or the

6    jury in 1992, I think it's superfluous language.  I think the

7    way the Court had phrased it is what's legally required.

8              MR. BROWNLIE:  His theory of the case, Your Honor, is

9    that these detectives received evidence and suppressed it and

10   did not turn it over to the prosecutor in the context of this

11   case and the evidence.  We think that instruction is proper.

12             THE COURT:  Mr. Brownlie, the charge is not to argue

13   your theories or your particulars of the case.  That's what

14   closing is for.

15             I think you're getting really -- want to outline your

16   theory of the case through the instruction.  I think this is

17   adequate.  I agree with Mr. Messing.  Overruled, yes.

18             MR. BROWNLIE:  We understand, Your Honor, thank you.

19   And with respect to paragraph 4, again --

20             MR. MESSING:  What page?

21             MR. BROWNLIE:  Page 39, the paper you don't have

22   open.

23             MR. MESSING:  I've got a good memory.

24             THE COURT:  4 is go ahead.

25             MR. BROWNLIE:  Paragraph 4, again, these detectives

1    have no duty to provide information to Mr. Dennis.  Their duty

2    is to provide the information to prosecutors.  So we again

3    would ask to change Plaintiff to prosecutor, paragraph 4.

4              MR. MESSING:  We're getting into the weeds of

5    argument.  I object to any change in those instructions, which

6    follow the law.

7              THE COURT:  The -- I don't know which page you're

8    looking at.  It's only three elements the --

9              MR. SANTARONE:  39.

10             MR. BROWNLIE:  Page 39, Your Honor.

11             THE COURT:  Oh, 39?

12             MR. MESSING:  The top of the page is --

13             THE COURT:  I got it.

14             MR. BROWNLIE:  The concern here, Your Honor --

15             THE COURT:  5 of 4.

16             MR. BROWNLIE:  -- is that for this -- the concern

17   here, Your Honor, is that with respect to these charges on the

18   law, that the jury may be instructed in a way that allows them

19   to impose liability for the conduct of other persons.

20             So by limiting the instruction to the exchange

21   between the detectives and the prosecutor, that is more

22   reflective of what the law requires for liability than it is to

23   say that these detectives are liable for anything that wasn't

24   produced to Mr. Dennis.

25             MR. MESSING:  Well, my position is the Court already

1    makes it clear that the counts are limited to the actions of

2    the two individual defendants.

3         The results of their conduct can be argued by both

4    sides as having deprived the prosecution, the defense, the

5    Court, and the jury of vital information.  So I would keep the

6    language as the Court has it.

7         THE COURT:  All right, I'll -- let me have

8    (indiscernible) that and think about it, but I think this is

9    fine.  You could argue.  You're getting into the arguments and

10   the theories.

11        MR. BROWNLIE:  And obviously, thank you, Your Honor.

12        THE COURT:  Okay, go ahead.

13        MR. MESSING:  Thank you.

14        MR. BROWNLIE:  With the understanding that specific

15   objections have been reserved for anything we filed of record

16   and not provide to the jury, Your Honor, I think that's all

17   that we have.

18        THE COURT:  All right, we'll take those few under

19   advisement and I will give you my ruling on them tomorrow

20   morning.  Work on the verdict slip if you have time.  If Mr.

21   Messing is going to be busy, maybe you could initiate it and

22   send it to him.  He could take a look at it before we come in

23   tomorrow morning.

24        I have a little bit of time, because your closings

25   are going to take at least three hours in the morning.  So I'll

1    work on the verdict slip during that time.

2              MR. MESSING:  Thank you, sir.

3              THE COURT:  Thank you very much.

4              MR. SANTARONE:  Thank you, Your Honor.

5              MR. MESSING:  Good afternoon.

6              MR. BROWNLIE:  Your Honor, may I ask just a point of

7    clarification?

8              THE COURT:  Yeah.

9              MR. BROWNLIE:  Is your practice to charge and then

10   close or close and then charge?

11             THE COURT:  So do you want me to charge first?  I

12   leave it up to you.  It's a civil case.  I leave it up to the

13   lawyers.

14             MR. MESSING:  Usually I thought we closed first and

15   then you charge.  Isn't that --

16             MR. SANTARONE:  That's the way I usually remember --

17             THE COURT:  I leave it up to -- I could charge first.

18   I could give --

19             MR. MESSING:  I think we want you to have the last

20   word.

21             THE COURT:  All right.  I -- in civil cases, I leave

22   it up to the lawyers.  If they want me to charge first, fine,

23   I'll do it.  I'm ready.  The charge is almost ready, but it's

24   up to you.

25             MR. MESSING:  I think the Court should have the last

1    word.

2            THE COURT:  Okay, so then, I'll charge after your

3    closings.

4            MR. BROWNLIE:  Just clarification.  Thank you, Your

5    Honor.

6            THE COURT:  But you don't have my charge.  I mean,

7    you know exactly what I'm going to tell the jury, right?

8            MR. BROWNLIE:  Yes, Your Honor.

9            THE COURT:  All right, bye.

10          (Proceedings concluded at 3:53 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5     that the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9

10

11          /s/ *Chris Hwang*

12     _____          May 7, 2024

13     Chris Hwang                    Date

14     Court Reporter

15

16

17

18

19

20

21

22

23

24

25