1            UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF PENNSYLVANIA

3   JAMES DENNIS,
                                    Case No. 2:18-cv-02689-JS
4              Plaintiff,

5   v.                              Philadelphia, Pennsylvania
                                    April 24, 2024
6   CITY OF PHILADELPHIA, et al,    8:41 a.m.

7              Defendants.

8

9              TRANSCRIPT OF JURY TRIAL - DAY 8
            BEFORE THE HONORABLE JUAN SANCHEZ
10            UNITED STATES DISTRICT COURT JUDGE

    APPEARANCES:
11  For the Plaintiff:           Paul M. Messing, Esq.
                                 Kairys Rudovsky Messing Feinberg
12                               & Lin, LLLP
                                 The Cast Iron Bldg Ste 501 South
13                               718 Arch Street
                                 Philadelphia, PA 19106
14
    For the Defendant:           Andrew Pomager, Esq.
15  (City Of Philadelphia)       City Of Philadelphia Law
                                 Department
16                               1515 Arch Street, 14th Floor
                                 Philadelphia, PA 19102
17
    For the Defendant:           Joseph J. Santarone, Jr., Esq.
18  (Frank Jastrzembski)         Joshua W. Brownlie, Esq.
                                 Marshall Dennehey, P.C.
19                               2000 Market Street
                                 Ste 2300
20                               Philadelphia, PA 19103

21  Court Recorder:              Nancy DeLisle/Stacy Wertz

22  Transcription Service:       Chris Hwang
                                 Abba Reporting
23                               PO Box 223282
                                 Chantilly, Virginia  20153
24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1                                   **INDEX**

2

3                                                               Page

4   Court's Ruling                                   11

5   Closing Argument by Plaintiff's Atty     19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Call to order at 8:41 a.m.)

2     THE CLERK:  All rise.  Court is now in session.  The

3 Honorable Juan R. Sanchez is presiding.

4     THE COURT:  You may seated.

5     MR. MESSING:  Good morning.

6     THE COURT:  Oh, wow, this is a mess.  Wow, okay.  So

7 let me just -- a couple of housekeeping matters here.  Mr.

8 Messing submitted a minor suggestion -- well, not minor, a good

9 suggestion on the verdict slip and he has no objection to the

10 verdict slip.

11     And he had a good suggestion that I accept a good

12 recommendation on page 2, the instructions to the jury,

13 basically indicating that if the answer is yes to one or more

14 of the six questions above as to one or more of the Defendants,

15 then they have to answer damages.  If the answer is no to all

16 six questions, then they skip and they return their verdict.

17     And I submitted this for your consideration regarding

18 the damages and punitive damages, but do you have any objection

19 to his recommendation?

20     MR. BROWNLIE:  Yes, Your Honor, only because the

21 civil conspiracy claim is listed as one of the -- as two of

22 those six questions.

23     So to the extent the answer no in fabrication and no

24 on to deliberate deception, then answered yes on conspiracy,

25 they should not be proceeding to damages.

1          THE COURT:  Okay.

2          MR. BROWNLIE:  It would be inconsistent.

3          MR. MESSING:  I'm not sure I even understand that.  I

4    mean, it --

5          THE COURT:  Yeah, go ahead.

6          MR. BROWNLIE:  You have to find -- you have to find

7    in favor of the underlying constitutional violation in order to

8    find in favor of the conspiracy.

9          The way that this particular instruction reads is if

10   they answer yes to any of the six questions, two with respect

11   to fabrication, two with respect to deliberate deception and

12   two with respect to conspiracy, then they can proceed to

13   damages.

14         THE COURT:  Hold on.

15         MR. MESSING:  Misunderstood.  Your Honor has --

16         THE COURT:  Yeah.

17         MR. MESSING:  -- it's a substantive constitutional

18   claim.

19         THE COURT:  Right.

20         MR. MESSING:  There's a civil rights violation.

21         THE COURT:  Right.

22         MR. MESSING:  It includes --

23         THE COURT:  So you know, the other ones

24   are -- they're each individual detective they are responsible

25   for the misconduct.

```
 1                    MR. MESSING:  Right.

 2                    THE COURT:  So they could be liable.

 3                    MR. MESSING:  Yes.

 4                    THE COURT:  One or both could be liable.

 5                    MR. MESSING:  Correct.

 6                    THE COURT:  In which case we get to the damages,

 7   right?

 8                    MR. MESSING:  Yeah.

 9                    MR. BROWNLIE:  With respect to the constitutional

10   claims --

11                    THE COURT:  Right.

12                    MR. BROWNLIE:  -- for fabrication deliberate

13   deception.

14                    THE COURT:  But he has two theories.  Is that either

15   singly or in agreement?  If the hand -- if the jury finds that

16   there's a conspiracy to violate, they also get to damages.

17                    MR. BROWNLIE:  I want to make sure I understand Mr.

18   Messing's position.  His position is that hypothetically, if

19   they find again Detective Jastrzembski on deliberate deception,

20   but not Detective Santiago, that they then can still proceed to

21   the conspiracy charge on both detectives.

22                    THE COURT:  I think so.  Isn't that your position?

23                    MR. MESSING:  Yes, I mean, it -- obviously, it

24   doesn't matter who the other co-conspirator is.  If there was a

25   conspiracy afoot, it could have been Jastrzembski with Santiago
```

1    or somebody else.  He conspired to violate Mr. Dennis'

2    constitutional rights.

3            MR. BROWNLIE:  The issue with that charge, Your

4    Honor, is that it doesn't take account that 1983 jurisprudence

5    requires personal involvement.

6            That particular theory of liability and underlying

7    constitutional violation caused by one of the detectives

8    thereby imposes liability on two detectives does not take

9    account for the personal involvement requirement.

10           MR. MESSING:  But what the Defense is ignoring is the

11   concept of joint and several tort liability.  So that even if

12   they don't find the first 1, 2, 3, 4, if they find a conspiracy

13   that was engaged in to violate Mr. Dennis' constitutional

14   rights, then they can go on to award damages.  I don't --

15           THE COURT:  Yeah.

16           MR. BROWNLIE:  Your Honor, there is no joint and

17   several liability unless both of the individual --

18           THE COURT:  Uh-huh.  Okay.  So the instruction

19   addresses this issue.  My Law Clerk has pointed out on the

20   fabrication because the instructions basically said -- say, and

21   they're going to have the instructions, that if Mr.

22   Dennis -- for Mr. Dennis to succeed on either his -- if Mr.

23   Dennis, I'm sorry, first, he has to succeed on either as

24   fabricated evidence of the deliberate deception claim.

25           If he does not prove Detective Santiago and Detective

1    Jastrzembski fabricated evidence or engaged in deliberate

2    deception, the instructions say then you must find for them and

3    the criminal conspiracy claim.

4              MR. BROWNLIE:  So the conjunctive and.

5              THE COURT:  That's what --

6              MR. BROWNLIE:  Jastrzembski and Santiago.

7              MR. MESSING:  That's in the instructions, yes

8              THE COURT:  That's in the instructions.

9              MR. BROWNLIE:  That's fine.

10             THE COURT:  So I think the verdict slip reflects his

11   theory and the claims that he brought.

12             MR. BROWNLIE:  If read in conjunction with the

13   instructions, yes, but it does not account for the possibility

14   that the jury may impose civil conspiracy liability on a

15   detective who is not personally involved in a constitutional

16   violation.

17             THE COURT:  Then you could raise that with me and I

18   could deal with it post-verdict or at least -- because the

19   instructions clearly say, and I will emphasize it, you know,

20   there are individual claims against each of the individual

21   detectives.  And there's a conspiracy claim against each of the

22   detective.

23             In order to find under conspiracy claim, they have to

24   prove, you know, that they conspired.  If they cannot prove

25   that they together fabricated evidence or engaged in the

1    deliberate deception, then the jury according to the

2    instructions is directed to return a verdict for them under

3    criminal conspiracy.  I don't know what else you want.

4           MR. BROWNLIE:  No, we understand, Your Honor.  We

5    raise the issue just for the record.

6           THE COURT:  All right.  Okay, do you have anything

7    else, any other issues?  So, anyway, I -- with that, does

8    the -- is the verdict acceptable?

9           MR. BROWNLIE:  Our position is that the jury should

10    be charged with the verdict sheet that we submitted.  We

11    understand that Your Honor has overruled that particular

12    submission and will be providing the jury with this verdict

13    slip.

14           THE COURT:  All right.  So over your objection, I'm

15    going to use the verdict slip that I think simply records and

16    accurately will record the verdict of the jury.

17           Mr. Brownlie, Mr. Messing submitted an additional

18    instruction last evening concerning adding language to the

19    outstanding conviction on page 30.

20           Quite frankly, I think it's fair and imbalanced.  And

21    I'm intending to accept it, but I want to hear if you have an

22    argument against it.

23           MR. BROWNLIE:  We would, yes, object to the

24    supplemental charge that Plaintiff submitted last night.  It's

25    two paragraphs.  For purposes of the record, it reads after the

1     United States Court of Appeals remanded the murder charge to

2     state court for disposition, Mr. Dennis was offered a choice of

3     awaiting a new trial or enter a *nolo contendere* or no contest

4     plea to third degree murder and related charges.

5            Mr. Dennis chose to enter the no contest plea.  A

6     *nolo contendere* or no contest plea is not substantive evidence

7     of guilt.  It cannot be used in this case to impeach Mr.

8     Dennis' credibility.  And it does not prevent Mr. Dennis from

9     asserting his innocence.

10           That first paragraph, Your Honor, is pure argument.

11    Mr. Messing can put that in his closing, but it's not

12    necessarily required because whether or not Mr. Dennis pled

13    *nolo* or guilty is immaterial for purposes of the substantive

14    effect of his convictions.

15           And with respect to the second paragraph, Your Honor,

16    we would have no objection to the first line, a *nolo contendere*

17    or no contest plea is not substantive evidence of guilt.

18           But we would object to it cannot be used in this case

19    to impeach Mr. Dennis' credibility because there was no attempt

20    in this case to impeach Mr. Dennis' credibility with his no

21    contest plea.  And whether or not Mr. Dennis asserts his

22    innocence also is irrelevant for purposes of his 1983 action.

23           THE COURT:  All right.

24           MR. MESSING:  Brief response, Your Honor is --

25           THE COURT:  You may.

1          MR. MESSING:  -- the instruction is as the Court's

2     noted fair and balanced and it directly reflects established

3     3rd Circuit law.  It -- the language is from _Sharif v. Piccone_

4     and from the opinions that this Court has issued in this case.

5          THE COURT:  Yeah, so the opinion that I issued

6     basically -- it basically says that I have to instruct the

7     jury.  The jury must be aware of the legal conviction in this

8     case.  And this paragraph is an attempt to let the jury know

9     that he's still convicted and what the implications of that

10    are.

11         But I think that this language here is balanced.

12    It's balanced.  They already heard that the case was remanded

13    to state court for disposition.  They already heard that the

14    choices he had was either to await a new trial.  I think the

15    testimony is 90 days for Mr. -- so that's what the order said,

16    but if the jury has some evidence that it could take up to nine

17    months or longer according to the testimony of Mr. Webb.

18         And he decided rather than to have a new trial

19    to -- not to contest the third degree murder.  They already

20    know that, what that means.  And he chose not to contest it.

21         But just there's testimony that he maintained his

22    innocence.  This is an accurate statement of the law that a

23    _nolo contendere_ or a no contest plea is not substantive

24    evidence of guilt.

25         And it does not prevent him from asserting his

1    innocence.  I mean, that's the -- that's why we're here,

2    although I don't think he needs to prove that he was innocent.

3          But the only thing I will do is I don't think you

4    need -- it cannot be used in this case to impeach Mr. Dennis'

5    credibility.  I don't think we need that.

6          MR. MESSING:  Well, it is a statement of law from the

7    3rd Circuit and this Court.  And I think it's important for the

8    jury to understand that when you plead no contest under

9    established federal law, it is not substantive evidence of

10   guilt.  It cannot be used to impeach your credibility.  And it

11   does not prevent you from asserting your innocence.

12         THE COURT:  Yeah.

13         MR. MESSING:  Those are the three 3rd Circuit

14   principles.  And I think it's a statement of the law that the

15   jury is entitled to hear.

16         THE COURT:  All right.  So, Mr. Brownlie, I'm

17   inclined to at this paragraph, I think it's very unbalanced.

18   In any event, the third degree murder conviction was not just

19   for impeachment.  It was the previous conviction for the

20   robbery.

21         MR. BROWNLIE:  Yes.

22         MR. SANTARONE:  Correct.

23         THE COURT:  So you already have that.  So I'm going

24   to add the language.  I think it's balanced and fair.  And I

25   don't think -- I think it accomplishes what the concern of the

1    Court was with regards to third degree murder conviction.

2           I wanted to let you know also that I did not -- I

3    rejected or I'm going to deny your request to add a negligence

4    instruction that you submitted a couple of days ago.

5           And I just want to let you know that on top of page

6    41, I added preponderance of the evidence after

7    the -- 42 -- take a look at 42.  Oh, I changed the number on my

8    copy.

9           Take a look at page 42.  I just simply added think

10   following language that to consider the (indiscernible) claim

11   Mr. Dennis must show by a preponderance of the evidence that

12   the detectives reached an understanding.

13          I just added if you have -- the copy that I sent you

14   did not have preponderance of the evidence, so I added that.

15          MR. MESSING:  Understood, Your Honor.

16          THE COURT:  All right.

17          MR. BROWNLIE:  No objection, Your Honor.

18          THE COURT:  Okay, with that, I think unless you have

19   any other concerns about the charge?

20          MR. SANTARONE:  I have one other concern, not about

21   the charge, but about the opening statement of Mr. Messing and

22   the only --

23          THE COURT:  I haven't heard it yet.

24          MR. SANTARONE:  -- evidence to have been introduced

25   about the habeas petition is the order itself.  And I don't

1    think Mr. Messing should be going into what the 3rd Circuit

2    decided or what Judge Brody decided or anybody else decided.

3    The only issue is that order and that's the only evidence

4    that's been before the Court.

5              MR. MESSING:  I have no intention of doing that.

6              THE COURT:  Yeah, okay.  Appreciate it.  I accept Mr.

7    Messing at his word.  He doesn't need to get -- all he needs to

8    do the case was --

9              MR. SANTARONE:  Okay, thank you, Your Honor.

10             THE COURT:  -- remanded from a new trial.

11             MR. MESSING:  Could -- if the Court is finished,

12   could we have a comfort break before the openings so that I can

13   --

14             THE COURT:  Yeah, I'll wait.

15             MR. MESSING:  Because I rushed here, rushed here to

16   be here for the Court at 8:30 as requested.

17             THE COURT:  No.

18             MR. MESSING:  I did not bring my entire family with

19   me, which I think is in the best interest of this Court as

20   well.

21             THE COURT:  Okay, I appreciate it.  I will take a

22   break before we begin to open.  I don't want you to be

23   stressing out doing your hour-long opening.

24             But I want to confirm the stipulations.  Are the

25   stipulations written?  We had a stipulation that was read.  I

1    think you read one.

2              MR. MESSING:  It was -- it's an exhibit.  I don't

3    know the number.  You're talking about the stipulation to the

4    3rd Circuit order?

5              THE COURT:  Right.

6              MR. MESSING:  Yes.

7              THE COURT:  To 3rd Circuit order.

8              MR. MESSING:  Right, it was.  And as the Court

9    pointed out, there was -- there's testimony from Mr. Webb that

10   it could take up to nine months.

11             There's testimony from Mr. Dennis that he was told

12   he'd have to wait two years or more.  But that's the

13   stipulation.

14             THE COURT:  Right.

15             MR. MESSING:  These orders always -- Your Honor

16   knows, these orders --

17             THE COURT:  You could argue.

18             MR. MESSING:  -- always say that.

19             THE COURT:  Yeah, but you could argue --

20             MR. MESSING:  Never happens.

21             THE COURT:  Well, you could argue the facts.

22             MR. MESSING:  Right.

23             THE COURT:  As you understand them from the evidence.

24             MR. MESSING:  Exactly.

25             THE COURT:  I think that's fair.  The order said 90

1  days.  And at least a murder trial at least it takes 9 months

2  at the earliest.  These cases take a long time.

3          MR. MESSING:  Yeah.

4          THE COURT:  I think common sense, you could make

5  those arguments because I think you have some reasonable basis

6  to make them that he was told that it will take a lot longer.

7          But the -- so the two stipulations are -- there were

8  two stipulations.

9          MR. MESSING:  Was there --

10          THE COURT:  It was that one and there was the other

11  one is I did -- I guess the detective acted on the

12  (indiscernible) but I have that in the charge.  Was there

13  another stipulation?

14          MR. BROWNLIE:  There's a possibility of stipulation

15  with respect to the last three witnesses for the Defense, but

16  we never reached an agreement.

17          THE COURT:  Oh, you never reached it.  So I just

18  remind the jury that that was --

19          MR. MESSING:  Okay, we had offered a very generous

20  stipulation.  It was declined.

21          THE COURT:  Yeah.

22          MR. MESSING:  So that's it.  That's all we have.

23          THE COURT:  All right.  So I will just remind the

24  jury that there was stipulation that was read by Mr. Messing

25  concerning the remand order.

1          MR. MESSING:  Fine.

2          THE COURT:  The remand order.

3          MR. MESSING:  Yeah.

4          THE COURT:  Okay?

5          MR. SANTARONE:  That's it.

6          MR. MESSING:  Yeah.

7          MR. SANTARONE:  Your Honor, I would just like to put

8   on the record an objection to any time pass past 90 days.  Mr.

9   Webb testified that that's how long it takes for a criminal

10  trial first conviction -- first degree murder case to go to

11  trial.  I  mean there -- and the investigation.  That wasn't in

12  cases remanded from federal court.  He said he never

13  experienced that.  The order says 90 days or he's released.

14          MR. MESSING:  Your Honor?

15          MR. SANTARONE:  To make that argument that he's --

16          THE COURT:  Mr. Santarone, no case -- no first degree

17  murder case that is remanded could be tried in 90 days.

18          MR. SANTARONE:  Under federal order?

19          THE COURT:  I haven't seen it or heard it at all.

20  All they could do is grant the habeas.  And what I see a lot is

21  that the district prosecutor decide not to grant a new trial

22  and withdraw the case to dismiss the charges.

23          Mr. Webb said that a regular murder case at best is

24  nine months.

25          MR. BROWNLIE:  From the day of investigation, Your

1    Honor.  That was the testimony.

2              THE COURT:  Right, well, I don't think that was

3    clear.  It takes 9 months.  I think he could argue -- I think

4    he could argue reasonable inferences from that.  I'm not going

5    to cabin him to the 90 days.

6              But especially since the Plaintiff said that he was

7    told that his choice is to sit around and wait for two or three

8    years or take a *nolo contendere* plea.

9              MR. SANTARONE:  It -- that --

10             THE COURT:  I think he could argue those facts.

11             MR. SANTARONE:  Your Honor, that's pure -- no

12   attorney came in who represented and said that.

13             MR. MESSING:  That's what he said.  That's what he

14   said.

15             THE COURT:  That's what was said.

16             MR. MESSING:  It's in evidence.

17             THE COURT:  It was not objected to.

18             MR. SANTARONE:  It's hearsay.

19             MR. BROWNLIE:  It's hearsay.

20             THE COURT:  You didn't object to it.  He got -- it's

21   in evidence.  That's his state of mind as to why he acted the

22   way he did.  It explains why he took the plea.  I'm going to

23   permit it.  I think it's fair game.

24             With that, anything else?

25             MR. MESSING:  No.

1          MR. SANTARONE:  Not from the Defense, Your Honor.

2          THE COURT:  All right.  Mr. Messing, you need time?

3    Don't take too long.

4          MR. MESSING:  I'll do my best.

5          THE COURT:  All right.

6          MR. MESSING:  I'll be right back.

7          THE COURT:  I think we're ready.  We need anything

8    else placed on the record, Carlos?

9          THE CLERK:  (Indiscernible.)

10         THE COURT:  All right, let me put my notebooks away.

11   This is horrible.

12       (The Judge confers with the Clerk)

13         THE COURT:  By the way, counsel, I'm going to give

14   the entirety of the charge to the jury.  They will have the

15   entirety of the charge.  You don't have an objection to that,

16   right?

17         MR. SANTARONE:  Not at all.

18         MR. BROWNLIE:  No, of course not.

19         THE COURT:  I think it's helpful.  So let me know

20   when you're ready.

21         MR. MESSING:  Oh, I'm ready.

22         THE COURT:  Okay.

23         MR. BROWNLIE:  Ready?

24         MR. MESSING:  Yeah.

25         THE COURT:  All right.

1          (The Judge confers with the Clerk)

2              THE COURT:  Please rise.

3          (Jury enters courtroom)

4              THE COURT:  Okay.  Okay, you may be seated.  We have

5    to wait a second.  My deputy has to get something from one of

6    the jurors, but you're ready to listen to the closing arguments

7    this morning?

8              Okay, okay, counsel, you ready?  Attorney Messing?

9              MR. MESSING:  Yes.

10             THE COURT:  You may begin whenever you're ready.

11             MR. MESSING:  Thank you.

12             THE COURT:  You're welcome.

13         **CLOSING ARGUMENT BY PLAINTIFF'S ATTORNEY**

14             MR. MESSING:  Counsel, good morning.  We come into

15   this place, this federal courtroom, when we seek to vindicate

16   the violation of fundamental constitutional rights, not just

17   for Jimmy Dennis, but for all of us.  This is where we go.

18   This is the place.

19             And that's why you were selected.  You made it clear

20   that you would be fair, that you would be partial -- impartial,

21   that you would keep an open mind.

22             We didn't come here to put law enforcement on trial,

23   to attack the Philadelphia Police Department, District

24   Attorney's Office, or the courts.

25             We came here because 32 years ago, there was a

1    miscarriage of justice not motivated by evil, not by pure

2    malice, not by a sense that we're going to get an innocent guy.

3    We get that.  And I think that's clear.

4              But it was a time in some ways not unlike what we

5    face today, where police are confronted with a nightmare.

6    Again, it was young people being robbed of jewelry, novelty

7    clothing items.

8              There was enormous pressure on the police to solve

9    these cases, to close these cases, to make arrests.  And so,

10   they go out and they find some eyewitnesses.  And --

11             THE COURT:  Excuse me, Mr. Messing, can you use the

12   microphone?

13             MR. MESSING:  Sure.

14             THE COURT:  Because we can't hear --

15             MR. MESSING:  I apologize.

16             THE COURT:  -- they cannot hear you.

17             MR. MESSING:  Just who, the defense lawyers?

18             THE COURT:  Yes.

19             MR. SANTARONE:  I'm sorry, I can't.

20             MR. MESSING:  Okay.

21             THE COURT:  So you could stretch, Mr. Messing,

22   stretch the microphone towards you.  You could pull it, yeah.

23   And stay little bit --

24             MR. MESSING:  How's that?

25             THE COURT:  Give a little bit room.

1          MR. MESSING:  Is that better?  Okay.

2          THE COURT:  Okay.

3          MR. MESSING:  So at its core, one of the fundamental

4   issues in this case is kind of the anatomy, not just of a

5   miscarriage of justice, but the anatomy of misidentifications,

6   a serious problem.

7          When a crime takes place, when a traumatic event

8   takes place, it takes place very, very quickly.  I think Mr.

9   Bertha, when asked how long he was able to see the face of this

10  killer, he said a second, one second.

11         Now when a crime like this takes place, especially

12  this kind of sudden awful thing where a young girl is just

13  gunned down senselessly, the focus is on a lot of different

14  things that's going on.

15         This is a crowded transportation hub.  There's a lot

16  going on there.  People see her, they see her friend, they see

17  these two robbers, a murderer.  They see that there's a silver

18  gun.  They see a lot of different things.  So, you know, the

19  ability to observe, to describe, to recall is a very, very,

20  very shaky proposition.

21         Now that's not to say that all identification

22  testimony is bad.  That's not so.  People, given the

23  opportunity to observe and describe, are able to recall, are

24  able to recount, but often that's not what happens.

25              And here, it clearly isn't what happened.  They get

1    nine eyewitnesses.  Four of them, including the gentleman that

2    came to Court, weren't even able to describe the height and

3    weight, but those that did varied.  One was 5'7" and then it

4    went up to 5'11".

5           What you do know is when they were finally -- these

6    four people shown a photo array, they had Mr. Dennis' picture

7    here, number one.

8           Look, I'm not suggesting that that in and of itself

9    is a violation of federal law, but when you think about the

10   identification testimony in this case, what you should be

11   thinking about is the element of suggestiveness of, you know,

12   people who had a second or two seconds to observe this horrible

13   scene with their focus on many different places, the clothing,

14   the gun, the face or faces.

15          Anything that happens that might influence their

16   ability to make an identification, a positive identification is

17   critical.

18          Now bear in mind, when they were shown these photos,

19   not a single one of them said, yeah, I'm sure that's the guy.

20   That's him.  Never forget that face.  Etched in my memory.

21          Looks like him.  Might be him.  That's a far cry from

22   a positive identification.

23          And the problem with that and use your common sense

24   and life experiences after that, they go to Court or they go to

25   a line-up, are they identifying James Dennis because he's the

1  person they saw commit the crime?  Or is he now a familiar face

2  to him because he was in the number one prominent position in

3  that photo array?  That's the problem.  And that's human

4  nature.

5          And no one's suggesting that people came in here,

6  these eyewitness -- Mr. Bertha, you heard his testimony.  He

7  had an extremely limited opportunity to see these robber's and

8  murderer's face.  One second, his words.

9          Mr. Cameron couldn't describe height or weight.  And

10  what we learned is that the victim in this case, Chedell

11  Williams, was unusually tall.  She was 5'10", which is tall,

12  quite tall for a woman.  So you have to judge everything with

13  that.

14          And if, you know, you -- as the judge said, you have

15  eyes.  You can see.  You could see about how tall I am.  You've

16  seen me standing next to James Dennis.  Is there any way in the

17  world that someone would look at James Dennis and describe him

18  as 5'9", 5'10", 5'11"?

19          I mean, I'll get to more of that later, but this sets

20  in motion a sequence of events that led not to only to a

21  miscarriage, an anatomy of a misidentification, but the anatomy

22  of a miscarriage of justice.  And that's why you're here.  And

23  that's why you were chosen.

24          And before I go any further, I want to thank you.

25  You've sat here.  I've seen you listen.  I've seen you take

1    notes.  You've taken this very seriously.

2            This is the enforcement of our Constitution.  And

3    there's probably no greater responsibility that we as citizens

4    have to enforce the Constitution.  And that's what you're here

5    for.

6            And you know, as important as the job of the lawyers

7    and law enforcement of the Court, who will instruct you as to

8    the governing legal principles, you are the finders of the

9    facts, only you.  You make the decision here as to whether or

10   not the Plaintiff has tipped the scales of justice.

11           This isn't a criminal case where we have to prove our

12   case beyond a reasonable doubt.  All we need to do is tip the

13   scales ever so slightly.  It's called a preponderance of the

14   evidence and the judge is going to explain this to you later.

15           By the way, anything that I say or that the other

16   Defense attorneys say about the law in this case, you do not

17   have to listen to us.  The law comes from Judge Sanchez.

18   That's the source of the governing legal principles in this

19   case.  Not me, not any of the Defense lawyers.

20           So the case moves through the criminal justice system

21   and Mr. Dennis is convicted of first degree murder and

22   sentenced to death.

23           And that begins his horrible journey through the

24   prison system into solitary confinement on death row for 25 and

25   a half years.

1          When he -- when the United States Court of Appeals

2    granted a new trial and sent it back, you know, they issued an

3    order sending it back to state court, tried within 90 days.

4          You know, Mr. Webb, who I'll talk about in a minute,

5    I think made it clear first degree murder case that's 25 years

6    old, it doesn't get put together and tried within 90 days or 9

7    months.

8          Jimmy Dennis was given a horrible, horrible choice

9    when he came back.  He had asserted his innocence from the

10   first day he went in to talk to the police, through the trial,

11   through 25 and a half years on death row, he never gave up.  He

12   kept going in a way I'm not sure there are many people that

13   could do that, that could survive that in a box for 25 and a

14   half years and yet not giving up, pushing, seeking to vindicate

15   his rights.

16         But he was given this Hobson's choice in 2016 when

17   the 3rd Circuit remanded it back.  You want a new trial, you're

18   going to have to sit two years, maybe more.

19         Or you take a deal.  You don't admit your guilt.  You

20   assert your innocence, but you have to enter a no contest plea.

21   And the judge will explain what that means to you.

22         And you get a sentence of 12 and a half to 25 years.

23   He already served more than that.  Who wouldn't take that

24   choice?  Which one of us would not take that choice?  It is an

25   impossible offer to refuse.

1          But a no contest plea, as the Court will explain to

2    you, is not evidence of guilt.  It is not an admission of

3    guilt.  It is not evidence that can be used to impeach your

4    credibility as a witness.

5          It does not prevent you as James Dennis has from

6    asserting your innocence.  But it is a conviction under the law

7    of third degree murder and robbery and the fact that you

8    receive a time served sentence.  That's a reality.

9          But the judge will instruct you.  And bear in mind

10   Jimmy Dennis has asserted his innocence of this crime for 32

11   years.  He has never given up.

12         And he holds his faith in you to never give up that

13   hope of someday being vindicated, of someday realizing that

14   there are citizens who will understand what he went through and

15   what the consequences have been.

16         I want to talk a little bit about the testimony.  And

17   I want to start because witnesses come to the stand, sometimes

18   they have an interest in the case.

19         The Defendant detectives have an interest in this

20   case.  Jimmy Dennis has an interest in this case.  Some of his

21   friends and family who testified, they have an interest in this

22   case.

23         But there were a number of witnesses who had no dog

24   in the game, no reason to come and testify for one side or the

25   other.

1            I mean, they may have felt guilt or shame.  You know,

2    for example, Charles Thompson (phonetic).  Here's a guy who

3    knew Jimmy Dennis.  It's clear from Mr. Dennis' testimony that

4    they had problems, personal problems with each other.

5            Thompson had joined the band Sensation.  At one

6    point, he was late, he didn't show.  Jimmy would discipline him

7    for that because he was the leader of the band.  He was the

8    lead singer.

9            And then, he gets arrested for what sounds like an

10   awful crime, assaulting his -- a pregnant girlfriend.  And he's

11   in detention.

12           Now whether they knew about this because they were

13   already focusing on Jimmy and knew about the band and all of

14   that and brought him up because they wanted to talk to him and

15   put the squeeze on him or whether he went up there to cut a

16   deal, a deal was cut.  I mean, he went up there and he made it

17   clear.

18           And we know from the evidence that it was

19   Jastrzembski and Santiago who told him you could get

20   implicated.  You could be in even bigger trouble than you're

21   already in.  You need to cooperate.  You need to tell us this.

22   You need to tell us that.  And ultimately he did.  And he

23   testified at trial that he saw Jimmy that day with a gun, the

24   day of this murder.

25           He came in here now 30-plus years later.  No ax to

1   grind.  No indication he has any kind of relationship or has

2   ever spoken since then to Jimmy Dennis or anybody connected to

3   Jimmy Dennis.

4           And he told you what happened.  Was he motivated by

5   guilt or remorse?  Probably.  He sat on this for a long time.

6   He knew because that was critical evidence in this case.

7           I mean, this is a case they go into, they know they

8   have very shaky identification evidence.  That they're not

9   going to win this case based on shaky identification evidence.

10  People who couldn't pick out -- make a positive ID of the

11  photo.  They knew they needed more.

12          And that's, you know, I mean, that's legitimate

13  police work to need more.  They want more evidence.  That's

14  what officers do and that's what they should do.

15          What they shouldn't do is coerce a witness into

16  falsely implicating an accused in a criminal case, in any

17  criminal case, let alone a capital First Amendment, capital

18  first degree murder case.

19          That's fabrication of evidence.  You are making it

20  up.  You are having a witness say something that is simply not

21  true.  That is by definition the fabrication of evidence.

22          They ignore more likely suspects.  You know, Zahra

23  Howard testified, later denied, but testified that based on a

24  very brief observance of this robber and killer, she was able

25  to make an identification, even though she couldn't pick out

1    and make a positive identification with this photograph.

2           The next day, she goes to talk to the older aunts,

3    who are no longer with us, of the victim of Chedell Williams.

4    And she says to them, well, I knew these guys.  They were from

5    Olney High School.

6           Jimmy Dennis didn't go to Olney High School, but the

7    boys she named did go to Olney High School.

8           A car had been following us for a week.  Kim and

9    Quinton (phonetic) were there.  None of these things were ever

10   investigated.  I mean, how do you not investigate that?  How do

11   you not go out and talk to them, bring them in, see if you can

12   get a photo identification of any of them?

13          How do you ignore that kind of evidence from the

14   mouth of the victims that Chedell Williams' two aunts, how do

15   you just throw that aside?

16          Instead, what you hear is detective, former Detective

17   Jastrzembski saying, well, you know, Steffan (phonetic) told us

18   that he heard from Vernon (phonetic), that he heard from Steven

19   (phonetic), that he heard from Shawn (phonetic), that he heard

20   from -- that Jimmy did it.  They never testified.  They never

21   testified.  They were thugs.  They lied.

22          This is the kind of unsubstantiated rumor, hearsay

23   opinion hearsay opinion hearsay, that you're being asked to

24   accept as a legitimate police investigation.  I wouldn't want

25   to be on the receiving end of that kind of police

1   investigation.

2         Without Charles Thompson saying that he saw Jimmy

3   with a gun that day, based on the very weak identification,

4   there is a reasonable likelihood, which as the judge will tell

5   you is the standard in this case, that that would have been a

6   very different verdict back in 1992.

7         And then critically, Latanya (phonetic) Caison.

8   Again, no ax to grind.  She knew Jimmy from the neighborhood.

9   Her nephew was friends with him.

10        She had no reason to come in here and lie except what

11  was done to her and then what she in turn did to Jimmy

12  unwittingly, unknowingly.

13        They come to her house not the day that Jimmy Dennis

14  tells them I couldn't have done it.  At the time this murder

15  took place, I was on a bus in another part of the city.

16        And what do they do?  They go to see her two months

17  later.  Remember that day?  Of course she remembers that day.

18  Everybody remembers that day.  It was on the news.  I was

19  Action News.  This poor girl shot to death for hoop earrings or

20  some kind of earrings.  It was horrible.  Everybody remembered

21  that day.

22        Did you see Jimmy that day?  Yes.  What time?  Well,

23  she made it clear, couldn't remember the time.  She said, well,

24  let me go get the receipt.  I have a receipt because I know I

25  saw him within an hour of when I picked up my welfare check.  I

1    picked up my welfare check.  I ran a couple of errands.  I

2    ordered fish.  They cleaned the fish.  I went to the pharmacy.

3    I picked up or dropped off a prescription.  Whatever it took,

4    it took under an hour.

5           She chose these two detectives, Jastrzembski and

6    Santiago.  We know it was them.  The receipt, they deny it, but

7    they say they took this, which is available as this case and

8    told you if you go into the welfare office, there's a stack of

9    these.  They're just notices of when checks are available.

10          There's no time stamp on this.  There was no way for

11   her to refresh her memory and figure out what time it was that

12   she picked up a welfare check, but she did have a receipt.  And

13   that receipt said 1303.

14          Now a lot of people will look at that and you saw it,

15   it's small writing 3:03.  And that's what she judged her time.

16   Did they say anything to her?

17          No.  They didn't say anything to her, because they

18   felt that Jimmy Dennis was their guy and they wanted to make

19   sure they had a case against him.

20          And so, that alibi, rock solid alibi, was destroyed.

21   You commit a crime and you know where you were and you have

22   evidence to prove it.  And that piece of evidence is then taken

23   by them and never shows up.

24          It's not in this homicide file.  It's not in the

25   activity sheets.  It's gone.  It's gone because they took it.

1    And it wasn't until years later when Michael Schwartz

2    (phonetic), the lawyer you heard from, said it was something

3    weird about this.  He wanted to look into it.  He was diligent.

4    He got it and you saw when he got it, 1303.

5            And when she looked at it on the stand, and she I

6    thought, and it's up to you, no ax to grind, no dog in the

7    game, she told you exactly what happened.  I looked at it.  I

8    don't know military time.  They do.

9            I thought it was 3.  If she had read it correctly, if

10   she had been told that's not 3:03, that's 1:03, she would have

11   said as she told you just last week, well, wait a minute if I

12   saw him at 103, I saw him on the bus within an hour.  That's

13   shortly before 2.

14           The murder took place in another part of the city at

15   1:54 p.m.  That is as good an alibi as you're going to get,

16   except deliberate concealment of evidence, one of the other

17   counts in this case, a constitutional violation.  A violation

18   of Mr. Dennis' right to a fair trial and to due process of law,

19   rights that each of us is entitled to.

20           Another witness with no dog in the game, George

21   Ritchie, this guy, he's living in Florida.  He's tracked down

22   years later.

23           And you heard what he had to say.  He didn't know

24   anybody in this case.  He was little irritated the way he was

25   treated, but he doesn't know anybody in this case.  He has no

1  bias, no interest.

2        He was shown the photo array.  And we know, look, I

3  there may be some suggestion, well, maybe some other unknown

4  detective took the photo array from Officer Santiago and showed

5  it.

6        We know from Jastrzembski and Santiago that it was

7  Santiago that was showing the photos.  Jastrzembski was with

8  him a couple of times.  No one else did it.  It was them.

9  Ritchie couldn't remember their names.  He thought one of them

10  was kind of a light-skinned black person.

11        What's important here is he was shown the photos and

12  he said, no, this killer's not in any of these photos.  And

13  they got irritated at him.  Look again.  He says, no, I'm

14  telling you, it's not one of these guys.

15        He was the guy where you saw the statements of all

16  the witnesses, the initial statements, he was the one guy who

17  said I am -- I got a really good look at this guy.  I am

18  absolutely sure that I could pick him out, that I could

19  identify him if I saw him again.

20        And he was the one that says huh-unh.  That's not the

21  guy.  And then, when you saw Jimmy Dennis at a court hearing

22  where he came some years later, and he saw him in person, he

23  said that's not him.  He's way too short.

24        Of course he's way too short.  He didn't get the

25  description.  He's not the guy.  George Ritchie resisted the

1    pressure to make an identification and then came in here 30

2    plus years later and told you what really happened.

3            Most interesting I thought of the witnesses that had

4    no bias and interest at all was the former head of the Homicide

5    Unit of the Philadelphia District Attorney's Office David Webb.

6    Straight shooter.  By the book kind of guy.

7            And he described the procedures that they follow, he

8    and Roger King.  He made it clear, first of all, a juvenile

9    gets shot in the head.  It's an intentional murder.  Everybody

10   in the homicide system, the homicide unit, the police

11   department, the homicide unit of the District Attorney's

12   Office, everybody knows that first degree murder.

13           So, you know, them getting up here and say, oh, no, I

14   thought it second degree.  This is an effort to get out of

15   liability in this case by saying, well, I had nothing to do

16   with that.

17           You arrest somebody for shooting somebody, a

18   juvenile, in the head at point blank range and killing them

19   almost instantly, that is first degree murder.  So don't be

20   sidetracked.  Don't be fooled.  That's clear.

21           He also, Mr. Webb, made it clear that he and Roger

22   King, who blame is being somehow shifted on and is not here to

23   defend himself, if he knew that a critical witness like Charles

24   Thompson had been coerced into saying that he saw Jimmy Dennis

25   with a gun on the day of the murder, he would have turned that

1    over to the Defense.  And that would have turned the trial

2    around.

3            If he knew that the detectives had deep sixed a

4    document that corroborated the alibi, the precise alibi of a

5    Defendant, he and Mr. King would have turned that over to the

6    Defense.  It would have turned the case around.  There wouldn't

7    have been a case.

8            I mean, in real life, if the police find, if

9    detectives find from the witness himself, from the suspect

10   himself look I got an alibi, I was in another part of the city

11   on the bus, I saw this woman from the neighborhood, Latanya

12   Caison, what is the first thing a detective does?  I mean, what

13   would anybody do?  You go and you see, oh, my God, do I have

14   the right guy or the wrong guy?  Let's see if this alibi checks

15   out.

16           You go and you see her that day.  And she says, yeah,

17   I remember that.  I even have a receipt of exactly when I

18   picked up the check.  Here.  You do that that day.

19           Days go by.  Weeks go by.  Two months go by before

20   they see her.  And then, what do they do?  They take the

21   receipt and it never appears anywhere.

22           Mr. Webb said if he knew of evidence that an

23   important witness had lied, he would have told the Defense.  If

24   the District Attorney's Office had been told about what the

25   aunt said about their conversation with Zahra Howard, that

1    would have changed the ballgame.  It would have turned it

2    around.  Another deliberate concealment and deception of

3    evidence.

4         A lieutenant intentionally trashed the evidence?  I

5    mean, this was clothing evidence that they seized from the

6    house of Jimmy Dennis' father, clothing evidence that could

7    have been tested.

8         Is there blood stains, blood spatter?  Is there

9    gunpowder residue on the sleeve from having fired a gun?  All

10   of that could have been tested.  And they're claiming that

11   a -- some lieutenant destroyed it.  I'll get to that in a

12   minute.

13        If a -- again Mr. Webb, if they knew that there was

14   evidence that was withheld of other more likely suspects, that

15   would have also been turned over to the Defense.  That would

16   have changed the game.

17        Each of these alone or cumulatively radically altered

18   the outcome of this case.  It's just not a -- it's not even a

19   likely probability.  The case probably wouldn't have gone to

20   trial.  We had an alibi.  We have -- there were other

21   witnesses.

22        The Defense would have found out about it.  They

23   would have sat down with the Roger King and Mr. Webb and said,

24   wait a minute, what are we doing here?  We've got an innocent

25   guy.  None of that happened because evidence was fabricated and

1   evidence was concealed.

2         So you have all of these independent witnesses that

3   are telling you the truth.  And then, we get to witnesses that

4   do have a bias and do have an interest in the outcome of this

5   case.

6         Jastrzembski originally tells a court that, oh, the

7   evidence was inadvertently thrown out by the cleaners.  But

8   then, he admits later and you heard it and you heard his words

9   he covered for Lieutenant Quinn (phonetic) he says, Lieutenant

10  Quinn who's also now deceased can't come in to defend himself.

11  He covered for him.  He lied under oath, quote, maybe.  His

12  credibility is central.

13        Lying under oath has a name in the law.  It's called

14  perjury.  If you lie under oath, even to protect a co-worker or

15  a friend, that's a lie.

16        And I don't like saying it.  I take == sorry, I take

17  no pleasure in saying it.  But if you lie to cover up and cover

18  up is an important operative word in this case, then that

19  testimony is simply not worthy of belief.

20        Once he said the activity sheets are not shared, you

21  heard that.  Then he said, oh, no, we give them over to the

22  D.A.

23        Well, another witness, who has absolutely no ax to

24  grind was the last witness you heard from, Detective Maahs,

25  who's on the homicide unit back in the early 1990s when all of

1    this happened.

2           I said sometimes the activity sheets are shown to the
3    D.A., sometimes they're not.  Right.  Sometimes they're given
4    over, sometimes they're not, right?  That's out of his mouth.
5    No one had talked to him about this.

6           So you look at the homicide file here.  And because I
7    think Jastrzembski and Santiago admitted there's a lot of
8    duplicates in there.  The search warrants appear three or four
9    times.  The arrest warrant appears three or four times.
10   There's radio tape transcriptions that appear.  You take those
11   away, there's very little left.

12          The activity sheets, on the other hand, are the heart
13   of the investigation.  They're the ones that have all this
14   information.

15          If they had been turned over to the District
16   Attorney's Office, then you and I wouldn't be sitting in this
17   courtroom today because none of this would have happened.  And
18   you heard that from David Webb, not just me.

19          They execute three search warrants.  The first
20   warrant, the girlfriend, then mom, then finally exasperated the
21   dad.  They don't spend a huge amount of time there, less than
22   an hour.

23          How do you search a whole apartment for a tiny little
24   pair of hoop earrings in less than an hour?  Come on.  I mean,
25   they know they weren't there.  They couldn't be there because

1    Jimmy had nothing to do with it.

2           And they found some clothing and you saw what they

3    were a pair of red pants, not a red jogging suit.  I mean,

4    Jimmy said he didn't own a red jogging suit.  His father -- I

5    mean, seriously I mean, maybe when he was young like Mark Allen

6    when he was a kid maybe he had a red or black jogging suit back

7    then.  I don't know, but there was none found in any of the

8    three places that he was staying.

9           There were no white hightops.  There was no black

10   jacket with stripes down the side.  You heard George Ritchie.

11   None of that was found.

12          And this wasn't somebody who was going around hiding

13   and destroying evidence.  As soon as he heard the rumors that

14   he was a suspect, he went to the police station, but no one

15   wanted to see him back then.

16          And then a few weeks later, he gets arrested.  He

17   asserts his innocence.  He tells them about his alibi.

18          Jastrzembski should have told Latanya Caison what

19   1303 was.  That would have been the correct thing to do, not

20   just legally, but morally.  And he didn't because if he had, we

21   wouldn't be sitting here.

22          We do know the days after they charged Jimmy with

23   first degree murder, Jimmy gets picked up for a robbery that

24   took place before, weeks before.

25          Look, I can't do anything about that robbery.  It was

1     a long time ago, but Jimmy and I put our faith in you to use

2     your common sense.

3              That just happened, just suddenly happened?  Does

4     that make any sense that charged with first degree murder and

5     suddenly they find another robbery?  And you get that?  And you

6     get convicted of first degree murder and robbery?

7              And on the robbery, bear in mind, you got a sentence

8     of a minimum of six --

9              MR. SANTARONE:  Objection, Your Honor.

10              THE COURT:  State your ground?

11              MR. MESSING:  It's in evidence.

12              MR. SANTARONE:  Your Honor, this is a conviction that

13     he cannot challenge.

14              THE COURT:  Okay.

15              MR. MESSING:  I'm not challenging it.  I can't

16     challenge it.

17              MR. SANTARONE:  Yes.

18              THE COURT:  The objection is sustained.  Move on.

19              MR. MESSING:  All right, no one's challenging that.

20     I can't.  It's been 30 years.  But you heard what happened.

21     Jimmy said he got a sentence of a minimum of six years and a

22     longer maximum sentence of 30.

23              Bear that in mind.  They knew Jimmy Dennis Had

24     counsel by the time they arrested him.  They got a call from a

25     lawyer named Lee Mandel.

1        They made contact with Lee Mandel before they

2   questioned Jimmy?  No, of course, no harm no foul I suppose

3   because all Jimmy did was assert his innocence over and over

4   again.

5        They took a paper from Caison, but now they're saying

6   it's just that pink slip, which is available in every DPW

7   office.  No time stamp on it.  Use your common sense.  How did

8   that happen?

9        Defendant Santiago's testimony, while short, it

10  basically parallels what Jastrzembski told you.  They didn't

11  have enough time.  There was a search for earrings.  Lieutenant

12  Quinn orders key evidence trashed, thereby eliminating any

13  opportunity for forensic evidence that would exonerate Jimmy

14  Dennis.

15       There's nothing in the homicide file or even in the

16  activity sheets about showing photograph to George Ritchie,

17  about George Ritchie saying not that the guy, about the other

18  eyewitness Overstreet, who goes to the line-up and says doesn't

19  take out Jimmy Dennis.

20       They treat the fact that Chedell Williams was 5'10"

21  as completely irrelevant when they know it's directly relevant

22  because people were describing the shooter as being about as

23  tall.

24       How is that not relevant when Jimmy Dennis is a half

25  a foot shorter?  I mean, it almost defies logic that something

1    like that could happen.  Never cut a deal with Charles

2    Thompson.  We don't coerce him.

3         Jastrzembski and Santiago both told you the same

4    thing.  We have never leaned on a witness or a suspect.  We

5    have never tried to cut a deal.  I mean, no homicide detective

6    has ever done that.

7         Look if you believe that, there's not much I can do

8    about it, but use your common sense, your life experience, your

9    collective knowledge from a lifetime on this planet as to

10   whether during interrogations detectives ever try to lean on a

11   witness or cut a deal, leniency, favor, treatment.

12        Charles Thompson's aggravated assault case

13   disappeared a few months later after he testified.  Is that

14   because the complainant didn't show up in court or something

15   else?  Use your common sense.

16        An aggravated assault on a pregnant woman disappears.

17   Latanya Caison, why would she do this?  Why would she come in

18   now and tell you this if it wasn't true?

19        And where is Zahra Howard?  The thing she told

20   Chedell Williams' aunts just set off a red light, a red flag of

21   the other people responsible who went to Olney High School.

22   Jimmy Dennis never went there.  Who followed them in a car for

23   a week.

24        And Chedell Williams, the same earrings that had been

25   stolen from her by this killer, were also stolen a week before.

1    I mean, is that a coincidence or is that something far more

2    sinister?

3            And they're recovered from somebody named Pep, who

4    was never interviewed, whose photograph is never shown to any

5    of the eyewitnesses.  It just defies logic.

6            So the questions you have to answer them among others

7    is why would Lieutenant Quinn have intentionally trashed

8    critical evidence in a first degree murder case?

9            Why would Roger King, who is known as one of the top

10   homicide prosecutors in this city for many years, conceal

11   evidence?  Why would he have done that?

12           Why would George Ritchie, who was asked by Mr.

13   Pomager interestingly enough you threw it back out on

14   cross-examination when no one had brought that up on direct,

15   and then it turns out that he said yes.  In fact, that's

16   exactly what happened.  I wonder where that information came

17   from?

18           If Jastrzembski and Santiago had never seen Ritchie,

19   how did they know that ask?  Santiago showed the photos

20   sometimes with, sometimes without Jastrzembski.

21           That house is a four or five minute drive from Fern

22   Rock, so what?  He wasn't there at the time of the murder.

23   That is what we call smoke and mirrors.  It's misleading.  It's

24   designed to suggest to you, well, he was right at the murder

25   scene.  But we know from Latanya Caison he was nowhere near the

1    murder scene.  We know that now.  And they knew it then.

2          Michael Schwartz, he didn't know the rumors about

3    Abbottsford.  Why?  Because he never saw the activity sheets.

4    They weren't disclosed for a very, very long time, hidden away

5    from everybody, including David Webb and Roger King.

6          That's what leads to miscarriages of justice.  They

7    can't dump their mistakes, their errors of judgment, and their

8    very shoddy investigative techniques on a district attorney who

9    was not here to defend himself and who we know from his -- from

10   the mouth of the man who ran the homicide unit in the District

11   Attorney's Office none of that would ever have happened.  Not a

12   single piece of that evidence would have not been turned over

13   and would not have changed the course of this case.

14         That is, in essence, the evidence that you have heard

15   on the issue of the fabrication and the concealment of

16   evidence.

17         We only have to tip the scales by a preponderance of

18   the evidence.  What's clear now is we've gone way beyond that.

19   I mean, now we have several discrete items of evidence that had

20   they been disclosed, had the District Attorney's Office known

21   about it, had a jury known about it, not only would have been

22   reasonably like to have resulted in different verdict, it would

23   have been overwhelming likely to have resulted in a different

24   verdict.  And that's what you have.

25         So when you get to the verdict sheet, as the

1    jury -- as the judge will tell you, you're going to be asked a

2    series of questions about Mr. Dennis' claim, the deprivation of

3    liberty without due process of law and a fair trial under the

4    14th Amendment.

5        You find by preponderance of the evidence that

6    Defendant Frank Jastrzembski denied Plaintiff James Dennis his

7    constitutional right to due process and a fair trial by

8    fabricating evidence, then by concealing, deliberate deception.

9        Same for Santiago.  Same for engaging in a conspiracy

10   to deprive Mr. Dennis of his constitutional rights.

11       And what you're going to here from the judge is an

12   instruction that makes clear that a conspiracy to violate civil

13   rights doesn't mean that two people sat down and hatched in so

14   many words a specific plan.

15       Yeah, we're going to get this innocent guy.  That's

16   not what happens.  It's certainly not what happened here.

17       By their actions, they form an agreement.  They both

18   do the same thing.  They fabricate evidence whether or conceal

19   evidence whether it's the DPW receipt that turned Latanya

20   Caison from a rock solid alibi into a prosecution witness at

21   trial unwittingly, to Charles Thompson who was coerced into

22   falsely implicating James Dennis with the incredibly damaging

23   evidence that he saw him with a gun.

24       The clothing that could have exonerated Jimmy if it

25   had been subjected to forensic testing or if it had been

1    presented fairly at a trial, trashed not by a senior official

2    in the homicide unit, who just goes about trashing evidence,

3    because it disappeared.

4         Other more likely suspects.  The impeachment of Zahra

5    Howard, if she had bothered to show up, with evidence that she

6    told completely different story the very next day to Chedell

7    Williams family, all of that on this verdict slip all we have

8    to do is prove any of these things by preponderance of the

9    evidence.  And we have.  And your answer should be yes.

10        Unhesitatingly, unequivocally, there can be no doubt

11   now.  And then, you're going to be asked about damages.  How do

12   you compensate somebody for spending 25 and a half years in a

13   concrete box more than 22 hours a day?  Little human contact

14   and when it is, it's on other side of a protective screen,

15   shower two or three times a week, food slid under the door?

16   How do you even survive that?  How does anybody survive it and

17   keep fighting?  It's an extraordinary thing.  The impact is

18   profound.

19        Now you heard two mental health experts.  You heard

20   Dr. Brand (phonetic), who has been for 30 years studying

21   trauma.  That is her specialty.  Her CV is as long as most

22   books I've read.

23        She told you.  She was straightforward.  She laid out

24   her findings.  She conducted extensive psychological testing.

25   She eliminated any sign of faking.

1        She was a straight arrow.  And she told you this was

2   very, very severe, as severe as it gets case of post-traumatic

3   stress disorder of depression, anxiety, other things that

4   you've heard about that you know that I don't need to repeat

5   now.

6        They're life altering, utterly life altering.  And

7   understandably 25 and a half years of box.  I would imagine

8   that is pretty common.  You heard from Mark Bookman, who look

9   he's a defense attorney.  He comes -- he does come in here with

10  that bias.  He's opposed to the death penalty.

11       But he also told you as an expert what that -- what

12  it's like and what the differences between serving a sentence

13  in a box or in the general population, where you could have a

14  life for however long you had to serve, you have a life.  You

15  have relationships.  You move.  You go outside.  You play

16  basketball.  You do things.  You come out harmed, hurt,

17  damaged, but nothing like death row, nothing like solitary

18  confinement.

19       Or you could listen to Dr. Joy, who was very jovial.

20  And you know, had this theory about narcissism.  It's up to you

21  whether you want to believe Dr. Brand, Mr. Bookman, or Dr. Joy,

22  who I mean, you saw Jimmy Dennis on the stand.  You've seen

23  Jimmy Dennis now for almost two weeks.

24       I mean, to suggest to you that this is a bubbly

25  flirtatious happy-go-lucky guy is, well, let's just say it

1 strains credibility.

2      And you know, she is not a trauma expert. Sure, she

3 works for V.A. Hospital. That's important work. I applaud her

4 for it. She wrote articles have Snow White, Cinderella, and

5 things like that. Dr. Brand is a very serious mental health

6 professional.

7      And you heard from Courtney Gwen Jackson (phonetic),

8 Tony Marr (phonetic), Frank Jones. I wanted you to hear from

9 people who told you what Jimmy Dennis was like before and what

10 he's like now.

11      The word I think agoraphobic is the word that Dr.

12 Brand used. He rarely goes out. He's afraid of his shadow.

13 His relationships have been shattered.

14      Courtney is a remarkable woman. They've this on and

15 off again relationship. And she has tried to keep it going,

16 but look what they did to him? Look what they did to this man?

17      I understand that they thought, they thought they had

18 the right guy, but they didn't. And they didn't use what they

19 had to share with the District Attorney and with the Defense

20 and with the Court and with the jury what we now know.

21      And the result of this has been beyond description.

22 This is why we come to this room. This is why we come to this

23 place. This is it.

24      This is where you seek ultimate vindication because

25 if we can't count on our fellow citizens to correct a horrible

1   injustice like this, if we can't count on our courts for Jimmy

2   and for all of us, to do what's right, what's just, what's

3   fair, then what do we have?  What's left?  We have nothing like

4   Jimmy had nothing.

5         The judgment that was imposed in 1992 was wrong.  The

6   sentence was wrong.  Today is judgment day.  Today is the day

7   that you impose the right judgment.

8         The damages here, the compensatory damages for all

9   he's been through for a life unled, for a life taken away from

10  him, punitive damages that send a message not just to these two

11  retired detectives because they're not doing police work

12  anymore, but to all police officers or any police officers out

13  there who are willing to do this kind of thing, you do it and

14  there are consequences.

15        That's what you're here for, the consequences.

16  Justice, fairness.

17        I'll have a chance after you hear from the Defendant

18  if necessary to respond to anything they may bring up.

19        And we thank you.  And we thank you and Jimmy and his

20  family and his friends thank you for what you're doing here.

21  Nothing, nothing could be more important.

22        THE COURT:  Attorney Santarone?

23        MR. SANTARONE:  Thank you, Your Honor.

24        It's easy to stand here and (indiscernible) life that

25  who raised their hands to both uphold the law and present

1    tears.  The only tears, the person who deserves tears is

2    Chedell Williams, who was gunned down in October of 1991.

3              Mr. Dennis stands convicted of the murder of Chedell

4    Williams.  That's a fact that you're required to accept under

5    the law.

6              Part of the oath that you took as a juror was that

7    we're going to accept the law as given to us by the judge.  And

8    you're going to hear the judge give you that instruction.  He

9    stands convicted.  Third degree murder and numerous other

10   crimes.

11             THE COURT:  Speak into the microphone.  Make sure

12   your voice gets picked up.

13             MR. SANTARONE:  The decision to charge James Dennis

14   with first degree murder was not the detectives.  And to seek

15   the death penalty was not the homicide detectives.

16             The difference between third degree murder and first

17   degree murder is the intent to kill, the specific intent to

18   kill.  That's what makes it first degree murder.  The specific

19   intent that's in the murderer's mind, the murderer does.

20             Pointing a gun at someone and pulling the trigger is

21   intentional.  It's an intentional act.  It's intent to kill.

22             The allegations against Detective Santiago and

23   Detective Jastrzembski are a fabrication of evidence and

24   concealment of evidence.  One, they're not true.  We're going

25   to go through those.

1           And two, clearly, none of those, none of those

2     allegations go to the element of intent, which is what you have

3     to look at.

4           And Mr. Messing's tried to confuse that and danced

5     around that issue, but that's the issue for you to decide.  Do

6     any of these allegations go to the issue of intent and maybe

7     not?

8           The case was based on the intent to kill and the

9     eyewitnesses who saw this.  That's the case that David Webb

10    approved for first degree murder.  And that's the case that

11    Roger King took to trial.

12          A judge and a jury and judges heard their testimony,

13    looked at them, judged their credibility, and made decisions.

14    They saw Zahra Howard talk about seeing her best friend

15    murdered in front of her.

16          Mr. Howard is -- Mrs. Howard has lived that nightmare

17    for years.  She said people representing James Dennis show up

18    at her house, talk to her children.  No wonder witnesses don't

19    want to cooperate.  No wonder witnesses recant.

20          At a hearing in December 22nd, 2008, she testified

21    that she's been visited many, many times by somebody

22    representing James Dennis.  That's 17 years later.  She's still

23    living with that.

24          She testified under oath at that hearing in December

25    of 2008 that she never knew the shooter from Olney High School,

1    exactly what she was asked in the first police interview.

2           If you look at Exhibit 3, question 3, at the bottom

3    of page 3, she's asked that exact question.  Did you know him

4    from school?  I'm sorry, Exhibit -- page 3.  No, I'm sorry last

5    question bottom.  And then, if you go over to page 4, she's

6    specifically asked at school?  She says no.

7           A jury heard Thomas Bertha testify he looked at the

8    murderer in the face and at James Dennis, an arrogant James

9    Dennis pointed the gun at him as he ran past.

10          Thomas Bertha, contrary to what was said, made a

11   positive identification right away at the photo ID.

12          And a brave James Cameron, you saw him come in here

13   despite his current health conditions.  You saw him come here

14   and testify.  His testimony was strong and his testimony was

15   positive.  He knew what he saw.  He was positive that James

16   Dennis was the person that murdered Chedell Williams.

17          He was close enough to get to this young lady as she

18   was falling.  He put his jacket under her head.  As you'll hear

19   the law, the burden of proof is on the Plaintiff and they have

20   not come close to meeting that burden.

21          The burden to show that any of these allegations

22   against Detective Jastrzembski or Santiago were true and that

23   somehow that would change the first degree murder conviction to

24   a third degree murder conviction.

25          Chedell Williams died on October 22nd, 1991, a young

1    life taken at the Fern Rock Train Station.  Exhibit 51 is the

2    flash information that came out.  Suspect is 5'7", 150 pounds

3    and a very thorough description of the car is given.

4           What happens then?  The crime scene unit is there.

5    Witnesses are transported to 8th and Race.  There's an

6    anonymous call.

7           Within two days, James Massey (phonetic), Exhibit 88,

8    an individual who worked at the Pepsi Cola Bottling Company,

9    hears within days that James Dennis, Derek Stalworth (phonetic)

10   and Rodney Johns (phonetic) are involved.

11          The next day, he overhears other people saying here's

12   Charles Birch (phonetic) and he hears Steven Beanie (phonetic)

13   saying the same thing.

14          Mr. Massey goes to the 39th police district to say,

15   hey, you know, I know something about this murder.  These

16   aren't thugs.  Where's evidence of that?

17          He goes there and then he gives a statement.  He says

18   what he heard.  But what he does say is even if I'm hearing

19   this story about this murder, I know these three guys are stick

20   up guys.  Everyone in Abbottsford knows them.

21          He's passing this information along, but he knows

22   they're stick up guys.  Interviews follow and it's clear that

23   this is no secret that these three are involved.  As James

24   Dennis himself said the neighborhood knows.

25          We went through a list of both male and females who

1    he said were spreading rumors that he and his associates were

2    involved in the murder of Chedell Williams.

3         He testified he has no grudges, no personal issues

4    with any of these people who are making these allegations.

5         He explained they were jealous of him.  That's the

6    reason they did it, because they're jealous.

7         They weren't jealous of Rodney Johns.  They weren't

8    jealous of Derek Stalworth.  They were jealous of him.

9         And that issue of that explanation fits in with what

10   Dr. Michelle Joy found when she interview the narcissism.

11        The statements of the residents of Abbottsford were

12   shown lead to this photo spread we put together.  The photo

13   spread showing the witnesses who either immediately focus on

14   James Dennis or in Thomas Bertha's case says, yes, that's

15   definitely him.

16        They're shown a series of three sets of photographs.

17   Each set has eight photographs in them.  In the other two sets,

18   there's somebody also in the number one position.  They all

19   only say it looks like James Dennis and they identify him.

20        That's enough for the District Attorney, for David

21   Webb to say after meeting with the detectives, we saw the

22   activity sheets where the meetings are taking place.  That's

23   enough for him to say that's enough for probable cause to issue

24   an arrest warrant.

25        The arrest warrant is issued.  And on November 22nd,

1    1991, James Dennis is arrested the next day.  Other leads are

2    investigated.  We talked about the Frazier (phonetic) thing.

3    Mr. Messing didn't mention that, but the Frazier thing was

4    exhaustively investigated.

5         They picked up Frazier after he talks to Rich Peffel

6    (phonetic) of Montgomery county detectives.  They bring him

7    down.  They drive him around.  He's picking out addresses.  And

8    oh, yeah, this is where they live.  This is where they head

9    out.

10        They take statements of people that live in this

11   house.  None of it's true.  The description of the car doesn't

12   match.  It's just a fantasy he's made up.

13        The two detectives who testified under oath that the

14   entire homicide file, all those statements were in a box were

15   brought to Roger King.

16        Whether or not Roger King thought this far-fetched

17   fantasy story isn't even Brady evidence deserving of being

18   produced because it's clearly not true is something we'll never

19   know, but it was presented.  And it was in his possession.

20        Roger King was a task master, who completely -- was

21   completely involved in this cases, holding meetings, giving

22   detectives assignments.

23        King and others didn't want to be surprised at

24   trials.  And detectives knew that.  They wouldn't withhold

25   evidence, and then, have somebody walking into court during a

1    trial and tell them something or testify to something they

2    didn't know about.  He knew his case inside out.  He had all

3    the information.

4                Once James Dennis is arrested on November 23rd, 1991,

5    the case belonged to District Attorney's Office.  And after

6    he's already arrested is when he gives the name Tammy Caison.

7    And it's spelled incorrectly C-I-S-O-N.  They don't know who

8    this is.

9                Caison's information, now this is -- he's alleging

10   this was his alibi.  Caison's information was certainly

11   available to his criminal attorney, but we don't know if he

12   ever sent an investigator out to talk to her like we don't

13   get -- we don't find that out.

14               We don't know Lee Mandel did send investigators out

15   to talk to the other witnesses, wouldn't he immediately say I'm

16   going to be find this alibi witness and see what she has to

17   say.  That didn't happen.  So that tells you something as to

18   what she was still saying at the time.

19               There's a line-up where he's identified by three

20   witnesses who are seeing him standing next to others

21   similar -- similar looking people.  They all identify James

22   Dennis at that line-up.

23               Now they see him standing with others in a line-up.

24   Height's difficult to judge.  That's why they had those markers

25   at 7-11 when you exit so people come and judge they need to

1    judge somebody's height.

2         Even people who knew James Dennis, knew him well,

3    James Massey said he was 5'8".  He's known him from Abbottsford

4    Project.

5         At a preliminary hearing on December 22nd, 1991, we

6    look at Exhibit 170, page 1, and then we go to page 4.  We'll

7    say that they're the people that testified at the preliminary

8    hearing that bound this case over for a criminal trial.

9         The detectives don't testify.  It's the witnesses who

10   testify.  That's what the case is about.  They are the strength

11   of Roger King's case on first degree murder.

12        Interesting, let's look at what James Dennis' own

13   witnesses had to say.  Exhibit 186, page 92 and 93, Mark Nelson

14   who testified in this Court about his good friend Jimmy Dennis.

15        He's asked on a day what was Jimmy Dennis wearing?

16   He says probably sweat pants, a red sweatsuit, and probably a

17   black or probably a black sweater suit.  That's his friend

18   testifying as to what Dennis is wearing on an occasion, not

19   when they were 12 years old.  That's what he said he was

20   wearing, a red sweatsuit.

21        James Dennis testified, if we look at Exhibit 218,

22   page 177, line 8, Jimmy Dennis testified he never owned a red

23   sweatsuit.

24        Also his friend Mr. Nelson Mark Allen, Mark Nelson,

25   he goes by both, testified that Rodney and Derek were friends

1   with James Dennis, but then Nelson didn't hang around with

2   them.

3           In this courtroom then, Nelson tried to say, well,

4   maybe it's not the same Derek and Rodney who were from

5   Abbottsford Project, which is -- really would be quite a

6   coincidence.

7           Look at Exhibit 31, page 5 of the documents.  And

8   it's page 5 of the document, page 3 of the actual statement.

9   This is James Dennis' statement.  He said Derek and Rodney came

10  to Helen's house on 31st Street.

11          So Derek and Rodney know where James Dennis lives

12  with his girlfriend on 31st Street, which isn't near

13  Abbottsford.

14          Remember, the statements that were taken from

15  representatives -- people at Abbottsford were, they're always

16  together, the three of them are always together.

17          Look at page Exhibit 218, the deposition that was

18  taken of James Dennis, page 80, line 7.  Okay, how well did you

19  know Rodney and Derek?  Not well.

20          Okay, did you hang out with Rodney and Derek in 1991

21  very often?  I didn't hang out with them at all.

22          We know that's not true.  He testified at trial and

23  he testified at his deposition that he was constantly beat up,

24  that every day, he was subject to attack.  It didn't matter

25  what prison he was in across Pennsylvania how many times he was

1  attacked, how many times he was beaten.

2        Well, Mr. Messing didn't mention that allegation in

3  his opening because his own expert Mark Bookman came and said

4  that couldn't happen.  That doesn't happen.

5        The records in prison do not support this at all.

6  Severe beatings get in prison records.  Medical records show

7  things.  Prisoners are disciplined.  Injuries are treated.

8  None of that's in the record.  And Mr. Bookman said it couldn't

9  happen.

10        What did James Dennis say was that if he had been in

11  general population as opposed to solitary, that he would have

12  been attacked again because of the nature of his crime, whether

13  first degree, second degree, or third degree murder.

14        Exhibit 218, page 233, line 11, if you had been in

15  the general population for third degree murder of a 16-year old

16  girl, you would have still been beaten up and attacked by

17  guards and plaintiffs and then I said guards and prisoners?

18  His answer, yes.

19        If he'd been in general population, he would have

20  been at a far greater risk.

21        We heard about the two death warrants that were

22  signed, but never saw them.  And Mark Bookman agreed that no

23  one in Pennsylvania has been executed over 60 years unless they

24  withdrew all opposition to it.

25        I don't think anyone could say that these detectives

1    are responsible for what conditions may or may not exist, how

2    bad the food is, how bad the air is.  Anything else in the

3    Commonwealth of Pennsylvania state correctional institutions, t

4    that's not their responsibility.

5         If you look at Exhibit 251, there was a psychiatric

6    exam in prison.  Look at education, what Mr. Dennis said was

7    dropped out of school after 11th grade to hang out with his

8    friends who were selling drugs.

9         If you look at work, currently unemployed for two

10   months.  He worked as a short order cook for six months before

11   that.  Held several similar jobs.

12        Patient has been a singer in a group that began as a

13   choir 10 years ago.  He makes some money from this group, but

14   was looking for employment.

15        He of course denies he ever said that.  This is

16   history given, a medical history, history given during medical

17   examination.

18        Charles Thompson before he recanted, he said he saw

19   Jimmy Dennis with a gun on the night of the murder and he

20   testified to that under oath.

21        He said he was threatened by the detectives, but he

22   also said when I told Roger King I wanted to recant, that Roger

23   King threatened him, that Roger King was intimidated.

24        Well, now --

25        MR. MESSING:  Objection.  That's not in evidence.

1           THE COURT:  Members of the jury, you ought to

2   recollect what was said and what was not said during the course

3   of the trial.  I leave it up to you.

4           You may continue.

5           MR. SANTARONE:  Thank you, Your Honor.

6           When James Dennis testified at the criminal trial, at

7   that point, Charles Thompson is testifying against him.  So

8   he's got to explain why Thompson is saying these things.

9   What's his testimony Thompson's going to give?

10          So he talks about how they fought constantly.  They

11  were enemies.  They weren't -- they even had a physical fight

12  one time.  He needs to come up with a reason for Charles

13  Thompson saying he had a gun.

14          And the righteous Mr. Dennis says I threw him out of

15  the band because of this assault involving this pregnant

16  girlfriend.

17          More interesting, Charles Thompson didn't know that.

18  That didn't happen.  Charles Thompson said he wasn't thrown out

19  of the group for that.

20          (Indiscernible) says the affidavit that was obtained

21  for Charles Thompson where it's claimed that he went to the

22  Pennsylvania Supreme Court to recant his statement.

23          Charles Thompson said that never happened.  I don't

24  know where that came from.  This is part of the group that is

25  working for James Dennis.  Where did that affidavit come from?

1   He testified that never happened.

2            The testimony of James Dennis, we look at Exhibit

3   178, line 79, page 79, line 21.  He says I thought -- I told

4   detectives I thought I seen her talking about Tammy Caisson.

5            Contrary to what Ms. Caison said, your memory does

6   not get better as you get older.  33 years ago she testified

7   under oath.

8            Page 175, Exhibit 175, page 138, line 6, she goes

9   over what she did that day.  I went inside the 312 Center,

10  picked up my assistance check.  Went and got my daughters

11  prescription filled.  Dropped that off.  I went and got some

12  fish, ordered some fish.  I went like two other stores, went

13  back to get the prescription.  And then, I picked up my fish

14  and I went home.

15           Page 138, line 17, while on the K bus, did you see

16  James Dennis?  No, I didn't.  That was her testimony under oath

17  33 years ago.

18           If you look at Exhibit 36, the statement she gave to

19  detectives, page 3, the first question, I saw him when I got

20  off the bus.  I was walking up my side of the street.  He was

21  walking up the other.

22           She never said she saw him on the bus or in back of

23  the bus.  She saw him on the other side of Henry Avenue.  Henry

24  Avenue's a multilane east west avenue in Philadelphia.

25           Going back to the top of page 2, tell me about that

1    day?  She gives the same testimony that she gave about what she

2    did.  She went to the 312 Center to get her check.  Then

3    dropped off her prescription.  At trial, she said specifically

4    her daughter's prescription.  Then, to the fish store.

5            At trial she said two other stores.  Then went back

6    to pick up my prescription.  Ask yourself how long in 1991 did

7    it take to fill a prescription when the -- it would have to be

8    typed out?  Then went back to the fish story.

9            Think about the testimony James Dennis said his

10   father drove him everywhere or his friends picked him up.  On

11   this day, he took the bus.  If you remember the question asked

12   by Mr. Pomager, he didn't even know what a bus transfer was.

13   How did he end up on the other side of Henry Avenue from Ms.

14   Caison?

15           Either Rodney Johns and Derek Stalworth dropped him

16   off because they're not going to drive that car.  The

17   description of it's known.  They're not going to drive that car

18   back to the project.

19           You remember, the car was never found despite the

20   city-wide bulletin that was put out and announced three times

21   an hour about looking for this very identifiable car.

22           Was he on the bus?  I would say no, but the scene of

23   the Fern Rock Station where the shooting occurs like four

24   minutes from his father's house, although Mr. Dennis claims he

25   didn't know what the subway was.

1              Look how close it is.  If we look at Exhibit 263,

2        it's four minutes.  On page 178, line 70 -- Exhibit 178, page

3        77, lines 17 to 21, he's asked if he was on the bus how long

4        did it take to get from your father's house to Old York Road?

5        From Old York Road to Henry and Midvale?  Maybe 20, 25 minutes

6        at the most.

7              Detective Santiago at the direction of Roger King

8        drove another route from Fern Rock to Abbottsford in a car.

9        And it was 14 minutes.

10             There is time for James Dennis, Stalworth, and Johns

11       to have committed this crime and for Mr. Dennis to have shot

12       and killed Chedell Williams and still gotten back to

13       Abbottsford.

14             He doesn't have any interest in this case is what Mr.

15       Messing said.  Ms. Caison said people in Abbottsford are like

16       family.  She testified that what she knew truthfully on January

17       11th, 1992 and at the criminal trial, but somewhere along the

18       line, someone put another story in her head that she's now

19       accepting.

20             Her scripted answer to every question was I don't

21       read military time, the detectives took the receipt.  She said

22       that regardless of the question that was asked.

23             At the criminal trial in 1992, she was shown Exhibit

24       247.  That was shown to her at the criminal trial.  She never

25       said, no, I gave them something else.  She said I gave

1    them -- what I gave them was pink.

2           Never said there was another piece of paper.  Never

3    referred to or said she was relying on anything in deciding

4    that time she was basing on when she thought she got out of

5    work.

6           Not once in the years until years afterward did she

7    ever say to any investigator, to the Court, or when testifying

8    at any time or the District Attorney that she gave them

9    anything else.

10          Roger King would have met with these witnesses.  And

11   I can only assume that Lee Mandel would have his investigator

12   talk to the alibi witness.

13          In this courtroom, she said she gave detectives a

14   white piece of paper because the copies she's been shown by the

15   attorneys over the years of this receipt is white, because it's

16   a photocopy.

17          She's also shown another one, shown a notarized

18   affidavit that was simply not true.  She has no recollection

19   ever having seen that typed.  She doesn't where it was typed.

20   She doesn't know where it was notarized yet has all these

21   allegations in it.

22          She was paid cash at the 312 Center.  It's like if

23   you present a check to a bank and you're not making a deposit,

24   you get back your cash.  You don't necessarily get a receipt

25          If she got a receipt, if she got a receipt for cash,

1    why would she keep it 10 weeks?  If you look at Exhibit 247

2    again, the dates that are on there are November 8th, November

3    22nd, December 8th, and December 20th.  They're the dates she's

4    supposed to pick up her checks.

5         It makes sense that she would still have that because

6    she'd just been there December 20th to pick up her last check.

7    It's far more likely that she had to schedule a payment since

8    she'd gone there at the end of December.

9         And the detectives testified as she's -- as they're

10   leaving she gives them that.  They wouldn't hide the receipt

11   from Roger King.  They never got that receipt.

12        We heard twice about these affidavits that were put

13   together by somebody representing James Dennis.  Nothing about

14   who put these together.

15        But what we hear is Ms. Caison didn't know anything

16   about it.  Never said detectives went to her workplace.  She

17   said she wasn't present again when it was typed and notarized.

18        We'll look closer at that one when we talk about

19   Charles Thompson.  Interestingly, no one else has testified

20   that they ever saw James Dennis at Abbottsford Project before

21   4:00 p.m. on October 22nd, 1991.

22        He's talked about what he did when he got off the

23   bus.  Lawrence Murryweather (phonetic), Willis Merritt

24   (phonetic) went to their house.  Their families were there.

25   Joey Bishop (phonetic), the uncle, anyone from the band who say

1    they saw them before then.

2          And that's not limited to what I'm saying was ever

3    said in this courtroom.  That's any testimony ever has been

4    presented that anybody ever said they saw before 4 o'clock.

5    Where are all his friends coming up saying, oh, yeah, he was at

6    our house.  He was with my family.

7          Michael Schwartz, his attorney, described Caison as

8    the only witness with no stake in the game.  First of all, it's

9    not a game.

10         What was Zahra Howard's stake in the game?  Seeing

11   her best friend murdered in front of her?  What was James

12   Cameron's stake in the game when he's eight feet away and got

13   there as this young woman was falling and her life was draining

14   out of her?

15         What was Thomas Bertha's stake in the game when he's

16   looking at James Dennis and Dennis raises the gun up and points

17   at him.

18         It's easy to make allegations years later, accuse

19   detectives of lying, concealing evidence, fabrication of

20   evidence when all else fails.

21         Michael Schwartz testified that he took the case over

22   from a couple of attorneys who apparently passed this file

23   around before the big law firm from Washington as Mr. Dennis

24   said got involved.

25         You heard no testimony that anything was not turned

1    over to Lee Mandel.  The file was in poor condition, but by the

2    time it worked its way to Mr. Mandel -- through Mr. Mandel, the

3    first attorney who had it, the female attorney who had it then

4    it gets to Mr. Schwartz.

5            There's no basis to contradict the detective's

6    testimony of Santiago and Jastrzembski that their policy was to

7    give the entire file to the District Attorney's Office.

8            They had nothing to do with production of evidence.

9    They had nothing to do with deciding what witnesses will call.

10   They had nothing to do with assigning of degree of murder.

11   They weren't even present at the trial.  They'd be sequestered.

12           David Webb, the assigned, said that they would go

13   through every piece of paper.  Schwartz not only handled the

14   immediate case hearing after the trial, but he also handled the

15   post-conviction relief act hearing.

16           In that filing, as we talked about with Mr. Schwartz,

17   he blames Lee Mandel for ineffective assistance of counsel.

18   Then he claims prosecutorial misconduct on the part of Roger

19   King.

20           Which brings to the testimony of James Dennis, that

21   he only hire -- his testimony was he only hired Lee Mandel

22   after he was arrested.  Look at Exhibit 74, Number 5.  23 days.

23           MR. MESSING:  I'm seeing --

24           MR. SANTARONE:  I'm sorry, number 6 I think it's at

25   the bottom.

1          MR. MESSING:  That's November 30.  The homicide

2     division was contacted by Lee Mandel attorney at law stating

3     that he represented Jimmy Dennis.

4          Well, what's interesting is Mr. Dennis testifies I

5     never hired Lee Mandel.  I didn't have an attorney till I was

6     arrested but Mr. Messing's here arguing, oh, they questioned

7     him without contacting his attorney.  They're -- he's throwing

8     things up.  You can't have it both ways.

9          George Ritchie, the big law firm from Washington

10     comes down to Florida to talk to Mr. Ritchie.  And they fly him

11     up in 2008, put him in a hotel.  He's a big deal now.

12          Clearly, he had some attitude with the police from

13     the very beginning.  Mr. Reinhold (phonetic) was -- Detective

14     Reinhold was threatening him.  He's a witness.  They don't know

15     anything about this crime.  They're trying to gather

16     information.  They're not threatening any witnesses.

17          He claims he told the police that he saw one of the

18     suspects throw something as they were running, but it was

19     ignored.

20          This is ridiculous.  The police are there.  The crime

21     scene unit is there to gather evidence.  They're not going to

22     ignore a claim when somebody says oh, I saw somebody throw

23     something away.

24          He said of the suspects one of them had ankle length

25     leather coat.  No one has ever said that.  He said the shooter

1   was wearing sunglasses.  No one ever said that.

2         He said they were driving a 55 Chevy Malibu.  He was

3   so certain of that.  That car would have been 37 years old in

4   1991.  It would have antique license plates.

5         He said he was shown books the next day or the day

6   after that.  That would have been either October 23rd or

7   October 24th.  The photo arrays weren't even put together by

8   that time.

9         Regardless of that, he said some detectives showed

10  him something.  One of whom was black.  He was very clear.  He

11  was talking about a black detective whispering to the other

12  detective who showed him his photo array, showed him photo

13  arrays.

14        This really shoots his credibility.  From his

15  testimony, I'm looking at a photo I'm looking at a photo of a

16  different guy.

17        When I flip it over, it's the same guy who's on the

18  first page.  He's not recognizing these are different young

19  African American males.  He has no credibility.

20        He's under a car working at the time.  He doesn't

21  even hear the gunshot.  And then now years later, he's going to

22  inject himself into this.

23        The clothing, the lost clothing was not an issue that

24  was unknown.  It was known at the time of trial.  In fact, Mr.

25  Schwartz included in his claims of ineffective assistance of

1    counsel a claim that Lee Mandel should have done a better job

2    at cross-examining about the missing clothing.

3          The clothing was never claimed to be identical, only

4    similar.  The detectives didn't fabricate evidence or conceal

5    evidence.

6          The similar clothing was not a red sweatsuit like Mr.

7    Nelson said he'd seen Jimmy Dennis Wearing.  It wasn't hightop

8    white sneakers.

9          The explanation given was a mistake.  They were

10   cleaning out.  They told everybody you got every a day to get

11   all your evidence out of here.  Get these bags off the top of

12   these locker -- off the top of these filing cabinets.

13         Detective Strep (phonetic), who's off that day, he

14   comes in.  The cleaners threw it out.  He never lied as Mr.

15   Messing's alleged.  And we went through that in his testimony.

16         It was the same story, told the cleaners threw it

17   out.  The explanation given was a mistake.  But to find

18   liability in a civil rights case, negligence or mistake or a

19   less than perfect investigation, that's not sufficient.  That's

20   not -- that doesn't meet the Plaintiff's burden of proof.

21         Mr. Messing wants it both ways.  He wants to say the

22   clothing did not match the description that was given, but at

23   the same time criticize Detective Jastrzembski for not having

24   forensic exams done with the clothing.

25         Corby Johnson (phonetic), she knew when they were

1    very young not after he left school to hang out with his

2    friends or sell drugs.  She didn't know about his relationship

3    with Helen Everett, didn't know he was living with Helen

4    Everett.  But Rodney and Derek did.  They knew exactly where he

5    was living.

6            Frank Jastrzembski accused of being a liar.  He was

7    asked question, well, at the scene, did you recover a shell

8    casing?  It was revolver.  There are no shell casings in

9    revolvers.  It doesn't eject.  The shell casings stays in the

10   revolver.

11           They only recovered similar clothing, not the same

12   clothing.  So detective, who's going to fabricate something

13   will fabricate, oh, I only found similar clothing that doesn't

14   really match the description but not say oh, I found a red

15   sweatsuit, I found high top white sneakers.

16           They didn't find a gun or the earrings.  James Dennis

17   Knew the police were looking for him.  The searches were a

18   month later.

19           Remember, he knew from the time Rodney and Derek came

20   to Helens' house to tell him.  He had an attorney call Homicide

21   to see if there was a warrant for his arrest.  Again, although

22   James Dennis testified he never hired an attorney till after he

23   was arrested.

24           Dr. Brand, Dr. Brand goes to Plaintiff's credibility

25   and her advocacy.  She admits that she was not told Mr. Dennis

1    was tried and convicted of robbing and shooting another victim.

2    She admitted her assessment could have been different if she

3    had that that additional information.

4         It may have changed her valuation?  Of course it

5    would changed it.  He was in a choir and he liked to sing.  And

6    it was an opportunity to sing, but there was another side of

7    James Dennis that she didn't see and wasn't told about.

8         He told Dr. Brand his plea was because he was going

9    to spend another two or three years in prison.  That's

10   absolutely not true.

11        The order from the federal court was he either be

12   re-tried in 90 days or released.  When detective -- when David

13   Webb testified he said, yeah, a first degree homicide case

14   takes 9 months to get to trial.

15        That's taking the investigation, that's everything

16   else.  He'd never been involved in a case where there was a

17   remand, let alone a remand from a federal court making a demand

18   as to what has to happen.

19        He was going to be tried again in 90 days.  And he

20   took this deal.  Why?  Because these three eyewitnesses were

21   still there.  These three eyewitnesses whose testimony you saw

22   James Cameron, you heard the other testimony, they were going

23   to come in again and make the identifications that had

24   consistently made over the years numerous times under vigorous

25   cross-examination that James Dennis was a person who shot and

1    killed Chedell Williams.

2         Dr. Michelle Joy works at the VA Hospital working

3    with people who have post-traumatic stress disorder from

4    combat.

5         She talked about the narcissism that he's had his

6    whole life which helped him in prison.  She also said that he's

7    test told her he regularly goes out with friends to eat, goes

8    their houses, travel to New York.  He's not the somber,

9    depressed individual that was portrayed here or portrayed to

10   Dr. Brand.

11        Once probable cause exists, David Webb, based on

12   those eyewitness statements, decided that was probable cause.

13   Once probable cause exists, homicide detectives have to move on

14   to the murder or murders that happened that day, happened that

15   week, interviewing witnesses, looking for evidence, testifying

16   in court.

17        The already charged and arrested criminal Defendants

18   an alibi witness that's given that day when they're -- after

19   they're arrested isn't a priority.  Because the person has been

20   arrested, probable cause exists.  That's for his Defense

21   attorney to investigate his alibi witnesses.

22        You saw Manny Santiago testify.  He would never

23   withhold evidence from the District Attorney's Office.  The

24   entire file was turned over to the D.A.'s Office including the

25   activity sheets.

1          At that point, well, at all points, the District

2    Attorney's Office and the homicide detectives are not equals.

3    The homicide detectives -- the D.A.'s Office is the boss.

4    They're calling the shots.  It's their investigation at that

5    point.

6          In Roger King's case, he directed them what to do,

7    who to interview, what witnesses to find, who meet with.  Roger

8    King met with witnesses before they testified regularly.

9          What did those witnesses tell him when he interviewed

10   them?  The detectives never had Tammy Caison's name until after

11   the arrest.  And then they went out likely at Roger King's

12   request after the line-up after the preliminary hearing in prep

13   for trial.

14         The only information they received was her statement

15   that she gave and the under oath testimony that she gave in

16   1992, which is identical to the statement.

17         Roger King sent them out because they didn't want any

18   surprises coming up at trial.  They wanted to interview these

19   witnesses.  And no surprise they come up because it wasn't

20   true.

21         You're going to hear the judge's instructions and

22   you're going to see the verdict sheet.  The incidents that they

23   have raised of the fabrication of evidence, the concealment of

24   evidence one, not true.  Or they're simply an oversight and

25   something wasn't done.

1          There's no right to a perfect investigation.  This

2     case turns on the three eyewitnesses who identified Chedell

3     Williams' killer as James Dennis.

4          Those issues that have been raised by Mr. Messing

5     were raised over the years, don't go that element of intent.

6     For that reason and the reason that these detectives did

7     everything proper.  They did not violate James Dennis'

8     constitutional rights.  They did not violate their oath.  They

9     didn't come in and lie.  We'd ask you to find in favor of the

10    detectives (indiscernible).

11          THE COURT:  You want to be brief?

12          MR. MESSING:  Yes, briefly, Your Honor.  Thank you.

13          THE COURT:  Okay.  All right.

14          MR. MESSING:  I did not come up here to discuss the

15    particular facts, show you some evidence.  I talked about some

16    facts.

17          And the reason I did is because you are the finders

18    of the fact.  You are the ones, your memory, the notes that you

19    took, your collective discussions, you are the fact finders.

20    The judge is the giver of the law.  You are the fact finders,

21    so don't be misled.

22          Would you bring up Exhibit 16, please?

23          We were told that, well, George Ritchie couldn't have

24    been shown photographs within a couple of days because the

25    photo arrays haven't even put been put together.

1          October 25th, 1991, the photo array showing Zahra

2     Howard.

3          Exhibit 17, please?

4          October 25th, the photo array showing to James

5     Cameron.

6          And number 18, please?

7          The photo array shown to Thomas Bertha, one second

8     looks like the guy.

9          You are the judgers of the facts.  Only you.  Not

10    anything I said and certainly not anything that was woven by an

11    experienced defense attorney.

12          What really sticks in my (indiscernible) is that they

13    continued to try to put this on a district attorney Roger King,

14    who isn't here to defend himself because David Webb made it

15    abundantly clear to you that none of that could have happened,

16    that if Roger King knew about all of this evidence, then we

17    wouldn't be sitting here today.

18          These activity sheets, we turn everything over.  You

19    heard Detective Maahs.  He had no involvement in any of that.

20    He wasn't here when Jastrzembski and Santiago testifies.  He

21    made it clear, well, sometimes we turn over some, sometimes we

22    don't.

23          I mean, that was the practice back then.  I get that.

24    That doesn't make it right.  That doesn't mean that you can

25    withhold evidence.  That doesn't mean that you conceal

1    evidence.  And it doesn't mean that you can make up or

2    fabricate evidence.

3           The decisions to charge first degree murder, that all

4    up to the district attorney.  You heard Mr. Webb.  This was a

5    first degree murder case.  The Defendant, they were experienced

6    homicide detectives.

7           What do you think thought was going to happen?  It's

8    a first degree murder case, it's a capital murder case.

9           Don't be tricked, don't be misled, don't be fooled.

10   The issue is endemic.  I'm dancing around intent.  That is not

11   the issue.

12          The issue is whether evidence was fabricated,

13   concealed.  That's the issue before you.  The Constitution is

14   the issue before you.

15          Why Jimmy Dennis made that decision in 2016 to take

16   this deal for time served, no contest?  He'd asserted his

17   innocence.

18          Listen to the judge.  Listen carefully to what the

19   judge tells you.  A plea of *nolo contendere* is not evidence

20   that that person is guilty.

21          A plea of *nolo contendere* --

22          THE COURT:  Let's not repeat what was said on your

23   first part of the argument.  This is rebuttal, okay?

24          MR. MESSING:  Okay.  Listen to what the judge is now

25   saying.  Not me, not anybody else in the courtroom.  Re-tried

1   within 90 days.  That's right, a 25-year old murder conviction

2   comes back and it's going to be brought to trial within 90

3   days.

4           You heard from Jimmy Dennis, what he was told.  I

5   mean, use your common sense.  That could not have -- it

6   wouldn't happen.  It never happens.

7           That's just the order for the 3rd Circuit granting

8   habeas relief and saying dispose of this case quickly.  This

9   man has been in jail for a really long time (indiscernible).

10          Why didn't Zahra come into (indiscernible)?

11          MR. SANTARONE:  Objection, Your Honor.

12          MR. BROWNLIE:  Objection.

13          THE COURT:  State your ground?

14          MR. SANTARONE:  Your Honor, there was a Court order

15  as to why she wasn't here.

16          THE COURT:  Okay.

17          MR. MESSING:  Yeah, she had a court order that she

18  didn't come in.

19          THE COURT:  She testified through her prior testimony

20  as if she was present in Court.  So.

21          MR. MESSING:  I am not standing here.  I have never

22  suggested for a moment that Mr. Bertha, Mr. Cameron are lying

23  to you.  That's not the issue in this case.

24          The issue in this case is human nature of what

25  happens when you're put through a process where you can't give

1    a detailed description, where you don't have a real opportunity

2    and ability to observe and describe and recall, where you can't

3    positively identify a photo, but you're then shown the person,

4    the Court, or a line-up.

5           The issue is human nature, what happens to us, what

6    do we see in our mind's eye.  What becomes reality to us?

7    Memory can play very strange tricks on all of us.  We're

8    humans.  You may have read about this.  You may have heard of

9    this.  This is nothing new.

10          I'm not saying they're lying.  They believe it.  They

11   saw a traumatic horrible event.  And they were then put through

12   a process where they were led to believe this must be the guy.

13   I've got to help.

14          None of them knew what was going on.  None of them

15   knew about the alibi.  None of them knew about witnesses who

16   were coerced into lying.  None of them knew about other

17   suspects, more likely suspects that were completely ignored.

18          No one knew what Zahra Howard had said to the

19   victim's aunts the next day.  All of you hear is Mr.

20   Jastrzembski and Santiago talking about what Massey said to

21   Veeney or Shornby (phonetic) or Steven --

22          MR. SANTARONE:  Objection, Your Honor.

23          MR. MESSING:  That's all you hear.

24          THE COURT:  Excuse me.  State your ground?

25          MR. SANTARONE:  This is the same argument he's made

1  in his closing.

2          THE COURT:  All right, I think --

3          MR. MESSING:  Well, this is regarding their argument.

4          THE COURT:  Very well, but you're repeating your

5  first point of the argument.

6          MR. MESSING:  I apologize.

7          THE COURT:  Okay.

8          MR. MESSING:  And the interesting this is this

9  Frazier business, which they talk about, we never brought up.

10  It was just another example of information they received that

11  you decide, was it adequately investigated?  Was this guy that

12  was named ever investigated?  Was his photograph ever shown to

13  eyewitnesses?  Did they turn -- did he have an alibi?

14          And what did they do?  They go after the credibility

15  of Latanya Caison, of George Ritchie, Thompson, people who came

16  in here with no reason to lie.  No connection to James Dennis.

17  They just come in here and start pointing fingers at the people

18  who have no ax to grind.

19          Others too.  Jastrzembski, Santiago, and Jimmy and

20  his family, they have an interest.  Of course they have an

21  interest.  They have a vital interest.

22          But these witnesses do not.  32 years ago, there was

23  a rush to judgment.

24          MR. BROWNLIE:  Objection.

25          THE COURT:  That's sustained.

1          MR. MESSING:  You now have to decide based upon the

2     facts, based on the law that the judge will provide you.  You

3     need to decide that it's time for justice, for truth.  That is

4     your responsibility.  Don't rush, take your time.

5          Particularly and not just to through the liability

6     for fabrication and concealment deliberate deception, but what

7     kinds of damages could possibly compensate Jimmy Dennis for 25

8     and a half years in a concrete box?  That's what you have to

9     decide.

10         And it is an awesome and critical responsibility.

11    And Jimmy Dennis and I and the Court put our faith in you.

12         THE COURT:  Okay.  Okay, members of the jury, now you

13    heard, we've been at it almost two hours.  I'm going to give

14    you a 10-minute break.  I'm ready to give you my instructions.

15         My instruction are about 62, 63 pages.  So it's going

16    to be close to an hour.  So I want you to take a break.  Follow

17    my instructions not to talk among yourselves, with anyone else.

18         In a few minutes, in an hour, in another hour, you

19    will have the case.  And then, you will be free to speak to

20    each other about what you heard.

21         So have a good break.  We'll resume at 11.  And I

22    will give you my charge.

23         THE CLERK:  All rise.

24       (Jury exits courtroom)

25         MR. BROWNLIE:  Your Honor --

1            THE COURT:  Yes.

2            MR. BROWNLIE:  -- if I may just briefly, I don't know

3   if this copy of the verdict sheet you read from this morning is

4   the exact copy that's going to go to the jury, but there's a

5   discrepancy between the thickness of the line on the yes

6   question and the no question.  It looks like the yes is a

7   little emphasized with respect to the thickness of the line.

8   Just add to be consistent.

9            MR. MESSING:  I.

10           THE COURT:  That's fine.

11           MR. MESSING:  I leave it up to the Court to determine

12   thickness of lines.

13           THE COURT:  Yeah, or the font, all right.  We'll make

14   sure that it's -- could you -- Carlos, could we -- yeah, we

15   make sure that.

16           MR. MESSING:  10 minutes, is that the?

17           THE COURT:  Yeah, 10 minutes.  11 o'clock we resume.

18       (The Clerk confers with the Judge)

19           THE COURT:  Okay, that's fine.

20       (Recess taken at 10:53 a.m., recommencing at 11:09 a.m.)

21           THE CLERK:  All rise.

22       (Jury enters courtroom)

23           THE COURT:  Members of the jury, you may be seated.

24   Members of the jury, I'm now going to give you the law that you

25   must apply to the facts as you find them.  Please don't stress

1      out.  Don't take notes.

2            I'm going to give you the entirety of the charge.

3      You will each one will have the entirety of the charge, along

4      with the verdict slip to help you during your deliberations.

5      So you don't have to take any notes since you will have all the

6      instructions in the jury room.

7            So, members of the jury, these instructions are

8      divided into three parts.  The first part of the instruction

9      will address how you, the jurors, are to consider the evidence

10     that was presented to you in this case.

11           The second part of the instruction will review the

12     specific rules of law as to the claims that you must apply to

13     the facts as you find them.  And I will give you a copy of the

14     instructions so you will have them available while you're

15     deliberating.

16           And then, the last part of the instructions will be

17     for you review how you will conduct your deliberations and how

18     you will go about returning your verdict in this case.

19           So now I'm going to proceed to instruct you, part 1,

20     which deals with how to consider the evidence.  And you already

21     heard some of this before, so it's a little bit of repetition.

22           Members of the jury, you have now seen and heard all

23     the evidence and the arguments of the attorneys in this case.

24     I will now instruct you on the law.

25           You have two duties as a jury.  The first duty is to

1    decide the facts from the evidence in this case.  That is your

2    job and must be performed in accordance with the instruction

3    that I provide to you.

4           Your second duty is to apply the law that I give you

5    to the facts.  You must follow these instructions even if you

6    disagree with them.  Each of the instruction is important and

7    you must follow all of them.

8           Perform these duties fairly and impartially.  Do not

9    allow sympathy, prejudice, fear, or public opinion to influence

10   you in any way.

11          Nothing I say now and nothing that I have said or

12   done during the trial is meant to indicate to you any opinion

13   my on part about what the facts are or about what your verdict

14   should be.

15          Whatever your verdict, it will have to be unanimous.

16   All of you will have to agree on it or there will be no

17   verdict.

18          In the jury room, you will discuss the case among

19   yourselves, but ultimately, each of you will have to make up

20   his or her own mind.  And this is a responsibility that each of

21   you has and that you cannot avoid.

22          During your deliberations, you must not communicate

23   with or provide any information to anyone by any means about

24   this case.

25          You may not use any electronic device or media such

1    as the telephone, a cell phone, a smartphone, an iPhone or a

2    computer, the Internet, any Internet service, any text or

3    instant messaging service, any Internet chatroom, blog, or

4    websites such as Facebook, Instagram, LinkedIn, YouTube or

5    twitter to communicate to anyone any information about this

6    case, or this type of case, or the parties in this case or

7    conduct any research about this case until I have accepted your

8    verdict.

9          In other words, you cannot talk to anyone on the

10    phone, correspond with anyone or electronically communicate

11    with anyone about this case.

12          You can only discuss this case in the jury room with

13    your other fellow jurors during your deliberations.  You may

14    not use these electronic means to investigate or to communicate

15    about the case because it is important that you decide this

16    case based solely on the evidence that was presented to you in

17    this courtroom.

18          You are only permitted to discuss the case with your

19    fellow jurors during the deliberations because they have seen

20    and heard the same evidence you have.

21          In our judicial system, it is important that you are

22    not influenced by anything or anyone outside of the courtroom.

23          Remember, members of the jury, during my preliminary

24    instructions, I talked to you little bit about the evidence to

25    give you a heads up.

1    The evidence from which you could find the facts will

2    consist of the testimony of all the witnesses, the documents

3    and other things that were received as exhibits in evidence,

4    and any facts that are stipulated that is formally agreed to by

5    the parties.

6    During my preliminary instructions, I told you that

7    there are a number of things that are not evidence.  Statement

8    and arguments and questions of the lawyers for the parties in

9    this case are not evidence.  Questions that I might have asked

10   are not evidence.  Objections by lawyers and any testimony I

11   struck or told you to disregard.

12   And anything that you might have seen or heard about

13   the case from any source outside the courtroom is not evidence

14   that you can consider.

15   You must make your decision based only on the

16   evidence that you have seen and heard in this courtroom.  Do

17   not allow rumors, suspicions, or anything else that you might

18   have seen or heard outside of the Court influence your decision

19   in any way.

20   You should use your common sense in weighing the

21   evidence, consider it in light of your everyday experience with

22   people and events and give it whatever you weight you believe

23   it deserve to receive.

24   If your experience tells you that certain evidence

25   reasonably leads to a conclusion, you are free to reach that

1  conclusion.

2          Now members of the jury, there are rules that control

3  what can be received in evidence.  So when a lawyer asks the

4  question or offer an exhibit into evidence, and a lawyer on the

5  other side thinks that it is not permitted under the Federal

6  Rules of Evidence, that lawyer may have objected.  This simply

7  means that a lawyer requested that I make a decision on a

8  particular rule of evidence.

9          You should not be influenced by the fact that an

10  objection was made.  Objections to questions are not evidence.

11  Lawyers have an obligation to their clients to make objections

12  when they believe that evidence being offered is improper under

13  the Rules of Evidence.

14          You should not be influenced by the objection or by

15  the rulings on the objections.  If the objection was sustained,

16  ignore the question.  If it was overruled, treat the answer

17  like any other.

18          If you're instructed that some item of evidence is

19  received for the limited -- for a limited purpose only, you

20  must follow that instruction.

21          Also members of the jury, certain testimony or other

22  evidence may have been struck from the record and you are

23  instructed to disregard that evidence.

24          Do not consider any testimony or evidence that was

25  struck or excluded.  Do not speculate about what the witness

1    might have said or what the exhibit might have shown.

2           And although the lawyers may have called to your

3    attention to certain facts or factual conclusions that they

4    thought were important, what the lawyers said is not evidence

5    and it is not binding upon you.

6           It is your recollection and interpretation of the

7    evidence that controls your decisions in this case.  Also, do

8    not assume from anything that I might have done or said during

9    the course of the trial that I have any opinion about any of

10   the issues in this case or about what your verdict should be.

11          Remember, I talked to you about the fact that there

12   are two types of evidence that you may use in reaching your

13   verdict.

14          One type of evidence is called direct evidence.  An

15   example of direct evidence is evidence when a witness testifies

16   about something that the witness knows from his own senses,

17   something that the witness saw, something that the witness

18   felt, something that the witness heard, something that the

19   witness did.

20          If a witness testified that he saw it raining

21   outside, and you believe him, that will be direct evidence that

22   it was raining outside.  Another form of evidence is an

23   exhibit -- is an exhibit where the fact to be proved is in

24   existence or current condition.

25          The other type of evidence is circumstantial

1 | evidence.  Circumstantial evidence is proof of one or more

2 | facts from which you could find another fact at issue.

3 | If someone right now was to walk into this courtroom

4 | wearing a raincoat covered with drops of water and carrying a

5 | wet umbrella, that will be circumstantial evidence from which

6 | you could conclude that it was raining outside.

7 | You should consider both kinds of evidence that were

8 | presented to you.  The law makes no distinction between the

9 | weight that you should give to either direct or circumstantial

10 | evidence.  You are to decide how much weight to give any of the

11 | evidence in this case.

12 | Earlier in my preliminary instructions, I told you

13 | that statements made by counsel are not evidence and are not

14 | binding upon you.  And there are exceptions to this.

15 | Stipulations are one of those exceptions.

16 | When the Plaintiff and the Defense stipulate, that is

17 | when they agreed that a certain fact is true, their stipulation

18 | is evidence of that fact, you should regard that stipulated

19 | fact or agreement as an established agreed-upon fact as proven

20 | in this case.

21 | And there are two stipulations that were presented to

22 | you in this case.  First, there was a stipulation read by the

23 | Plaintiff, a lawyer, concerning the 3rd Circuit remand order.

24 | And then, there is a stipulation that both Detectives

25 | Jastrzembski and Santiago were acting under color of state law

1    and those you could take as established proof in this case.

2         As I stated in my preliminary instructions at the

3    beginning of the trial, in deciding what the facts are or what

4    happened, you may have to decide what testimony to believe and

5    what testimony you do not believe.

6         And remember that you are the sole judges of the

7    credibility of the witnesses.  And by credibility, we mean

8    whether a witness is worthy of your belief.  You may believe

9    everything a witness said, or only part of it, or none of it.

10        In deciding the questions of credibility, remember to

11   use your commonsense, your good judgment, and your experience.

12   In deciding what to believe, you may consider a number of

13   factors including the following.

14        The opportunity and ability of the witness to see or

15   hear or know about the things the witness testified to, the

16   quality of the witness' understanding and memory, the witness

17   manner while testifying, whether the witness has an interest in

18   the outcome of the case or any motive, bias, or prejudice,

19   whether the witness is contradicted by anything the witness

20   said or wrote before trial or by other evidence.

21        How reasonable the witness' testimony is when

22   considered in light of the other evidence that you believe and

23   any other factors that bear on whether the witness is

24   believable.

25        Remember that inconsistencies or discrepancies in a

1    witness' testimony or between the testimony of different

2    witnesses may or may not cause you to disbelieve a witness'

3    testimony.

4          Two people or more witnessing an event may simply see

5    or hear what happened differently.  A mistaken recollection

6    like failure to recollect is a common human experience.

7          In weighing the effect of inconsistencies, you should

8    also consider whether or not it was about a matter of

9    importance or an insignificant detail.

10          You should also consider whether the inconsistent

11   (sic) was an innocent or intentional.  You are not required to

12   accept the testimony even if the testimony was not contradicted

13   and the witness was not impeached.  You may decide that the

14   witness is not worthy of your belief because of the witness

15   bearing and demeanor or because of the inherent improbability

16   of the testimony or for all the reasons that are sufficient to

17   you.

18          Members of the jury, after you make your own judgment

19   about whether to believe a witness' testimony, you can then

20   attach to that witness' testimony the importance of the weight

21   that you think that testimony deserves to receive.

22          In weighing -- the weight of the evidence to prove a

23   fact does not necessarily depend on the number of witnesses who

24   testify or the quantity of evidence that was presented, what is

25   more important that numbers or quantity is how believable the

1  witnesses were, how much weight you think their testimony

2  deserve to receive.

3         Remember, members of the jury, this is a civil case.

4  The standard of proof in a civil case is different than the

5  standard of proof in a criminal case where we require proof

6  beyond a reasonable doubt.

7         Here, Mr. Dennis has the burden of proving his case

8  by what we call the preponderance of the evidence.  That means

9  Mr. Dennis has to prove to you in light of all the evidence

10  that what he claims is more likely so than not so.

11         To say it differently, if you were to put the

12  evidence favorable to Mr. Dennis and the evidence favorable to

13  the Defendants on opposite sides of the scales, Mr. Dennis will

14  have to make the scales tip somewhat on his side.

15         Did Mr. Dennis fails to meet this burden, the verdict

16  must be for the Defendants Mr. Santiago and Frank Jastrzembski.

17  If you find after considering all the evidence that a claim of

18  fact is more likely so than not so, then the claim of fact has

19  been proved by a preponderance of the evidence.

20         In determining whether any fact has been proved by a

21  preponderance of the evidence in this case, you may unless

22  otherwise instructed consider the testimony of all witnesses

23  regardless of who may have called them and all exhibits

24  received in evidence regardless of who may have produced them.

25         You may have heard the term truth beyond a reasonable

1    doubt.  That is a stricter standard of proof and it applies

2    only to criminal cases.

3          So, members of the jury, I'm going to instruct you do

4    not apply in civil cases such as this one that standard.

5    That's only for criminal cases, not as civil cases.  And you

6    should put that out of your mind.

7          You heard evidence that Mr. Dennis was previously

8    convicted of a crime punishable by more than one year in

9    prison.

10         You may consider this evidence along with other

11   current evidence in deciding whether or not to -- whether or

12   not to accept his testimony and how much to give his testimony,

13   members of the jury.

14         In this case, if you recall, there were a number of

15   trial depositions that were played to you and there were a

16   number of other notes of testimony that were recorded,

17   statements of witnesses and presented to you.  The witness was

18   placed under oath and swore to take -- to tell the truth.  The

19   lawyers for each party may have asked questions.  A court

20   reporter was present, recorded the questions and answers.

21         Those trial depositions and notes to testimony are

22   entitled to the same consideration and are to be judged insofar

23   as possible in the same way as if the witness has -- had been

24   present to testify here in Court.

25         The trial depositions of George Ritchie, if you

1   recall, and Dr. Bethany Brand were presented to you by video.

2   The 1992 trial testimony of Thomas Bertha was also read to you.

3           And again, the testimony of witnesses is entitled to

4   the same considerations and as if the witnesses have been

5   presented to you and Zahra Howard as well if you recall.

6           Members of the jury, you have heard testimony

7   concerning opinions from Dr. Bethany Brand, Dr. Michelle Joy,

8   and Mr. Mark Bookman.

9           In weighing these opinions, you may consider the

10   witness' qualifications, the reasons for their opinions, and

11   the reliability of the information supporting those opinions as

12   well as the factors I have previously mentioned for weighing

13   the testimony of any other witness.

14           The opinion of these witnesses should receive

15   whatever weight and credit, if any, you think appropriate given

16   all the other evidence in this case.

17           In deciding whether to accept or rely upon the

18   opinion of Dr. Bethany Brand, Dr. Michelle Joy, or Mark

19   Bookman, you may consider any bias that the witness may have

20   including any bias that may arise from the evidence that the

21   witness has been or will be paid for reviewing this case and

22   testifying or from evidence that the witness testifies

23   regularly and makes large portion of their income from

24   testifying.

25           So that concludes my first part of the instructions,

1    members of the jury.  Now I'm going to turn to the law

2    explaining the claims in this case through the applicable law

3    in this case.

4          And Mr. Dennis is suing under §1983, a civil rights

5    law passed by Congress that provides a mechanism by which one

6    can vindicate constitutional rights infringed by officials

7    acting under color of state law.

8          As I have said in the first part of these

9    instructions, this is a civil case.  Mr. Dennis is the party

10   who brought this lawsuit.  Defendants are the parties against

11   whom the lawsuit was filed.

12         Plaintiff has the burden of proving his case by what

13   is called a preponderance of the evidence.  That means

14   Plaintiff has to prove to you in light of all the evidence that

15   what he claims is more likely so than not so.

16         To say it differently, if you were to put the

17   evidence favorable to the Plaintiff and the evidence favorable

18   to the Defendants on opposite sides of the scales,

19   Plaintiffs -- Plaintiff will have to make the scales tip

20   somewhat on his side.

21         If the Plaintiff fails to meet this burden, the

22   verdict must be for the Defendants.  If you find after

23   considering all the evidence that a claim or fact is more

24   likely so than not so, then the claim of fact has been proved

25   by a preponderance of the evidence and the verdict must be for

1    the Plaintiff.

2         In determining whether any fact has been proved by a

3    preponderance of the evidence in this case, you may unless

4    otherwise instructed consider the testimony of all the

5    witnesses regardless of who called them and all exhibits

6    received in evidence regardless of who may have produced them.

7         You may have heard the term proof beyond a reasonable

8    doubt.  Again, I'm repeating myself, but that is a stricter

9    standard of proof and it applies only to criminal case.  It

10   does not apply in civil cases such as this one.  So again, you

11   should put that out of your mind.

12        §1983, I'm going to get into the elements of the

13   claim.  Mr. Dennis must prove both the following elements by a

14   preponderance of the evidence that Defendants Manuel Santiago

15   and Frank Jastrzembski acted on the color of state law and

16   while acting on the call of state law each Defendant deprived

17   Mr. Dennis of a federal constitutional right.

18        I will now give you more details on actions on the

19   color of state law after which I will tell you the elements Mr.

20   Dennis must prove to establish the violation of his federal

21   constitutional rights.

22        Because the Detective Defendants Manuel Santiago and

23   Frank Jastrzembski were homicide detectives of the Philadelphia

24   Police Department at the relevant time, I instruct you that

25   both Detective Santiago and Detective Jastrzembski are acting

1    under color of state law.

2         In other words, this element of Mr. Dennis claim is

3    not in dispute and you must find this element has been

4    established because the parties have stipulated that it is

5    true.

6         I have already instructed you on the first element of

7    Mr. Dennis' claim, which you must which you must find

8    established pursuant to the stipulation of the parties.

9         The second element of Mr. Dennis claim is that each

10   Defendant deprive him of federal constitutional right and did

11   so depriving of a federal constitutional right.

12        The Defendants in this case -- strike that.

13        Let me read that again.  The second element of Mr.

14   Dennis' claim is that each Defendant deprive him of a federal

15   constitutional right.

16        Mr. Dennis alleges that Defendants in this case

17   violated his 14th Amendment right to due process of law by

18   fabricating evidence, concealing evidence, and thereby

19   deliberately deceiving the Court and a conspiracy to do the

20   same.

21        I will now instruct you on conclusions of law, which

22   you must accept for purposes of this case.  And I will provide

23   you the elements that Mr. Dennis must prove in support of his

24   claims.

25        Members of the jury, in -- there are several

1    conclusions of law which you must accept as true for purposes

2    of this lawsuit.

3            After the United States Court of Appeals remanded the

4    murder charge to state court for this position, Mr. Dennis was

5    offered the choice of awaiting a new trial or entering in *nolo*

6    *contendere* or no contest plea to three degree murder and

7    related charges.  Mr. Dennis chose to enter the no contest

8    plea.

9            A *nolo contendere* or no contest plea is not

10   substantive evidence of guilt.  It cannot be used in this case

11   to impeach Mr. Dennis' credibility.  And it does not prevent

12   Mr. Dennis from asserting his innocence.

13           However, a *nolo contendere* plea does not -- does

14   result -- however, a *nolo contendere* plea does result in

15   convictions.

16           Mr. Dennis was convicted of five crimes in connection

17   with the death of Chedell Ray Williams.  You must accept that

18   Mr. Dennis is convicted of murder of the third degree, robbery,

19   carrying a firearm without a license, conspiracy to commit

20   robbery, and possession of an instrument of a crime with intent

21   to deploy criminally.

22           These 26 convictions have not been overturned and Mr.

23   Dennis remains convicted of these crimes.  To the extent your

24   resolution of factual dispute will be inconsistent with any of

25   these five convictions, you must resolve that dispute in favor

1    of the conviction.

2         And I will now instruct you and the relevant criminal

3    law so you could understand.  Mr. Dennis remains convicted of

4    carrying a firearm without a license.

5         In Pennsylvania, it is unlawful to carry a firearm

6    without a license, a lawfully issued license.  Any factual

7    determinations made by you during the deliberation must be

8    consistent with these legal conclusions.

9         To the extent you must resolve competing factual

10   scenarios and one scenario is consistent with this legal

11   conclusions and the other is not, you must resolve the factual

12   dispute in a manner that is consistent with Mr. Dennis'

13   outstanding convictions.

14        For example, if presented with competing claims that

15   Mr. Dennis did or did not possess a gun, you must resolve that

16   factual dispute in a manner that is consistent with the legal

17   conclusion that Mr. Dennis has a conviction in connection with

18   the death of Chedell Ray Williams for carrying a firearm

19   without a license.

20        Mr. Dennis remains convicted of third degree murder.

21   In Pennsylvania, a person is guilty of criminal homicide if he

22   intentionally, knowingly, recklessly, or negligently causes the

23   death of another human being.

24        If the person acts with malice in causing the death

25   of another, then the criminal homicide is classified as murder

1    of the third degree.

2         The element of third degree murder are as follows.  A

3    human being was unlawful -- has unlawfully been killed.  The

4    death was caused by the accused.  And the accused acted with

5    malice.

6         Consistent with my previous instruction, you must

7    accept as true the following legal conclusions.  Chedell Ray

8    Williams was unlawfully killed.  James Dennis caused her death

9    and he did so with malice, which is a conscious disregard for

10   an unjustified and extremely high risk that his actions might

11   cause the death or serious violation of Williams.

12        Any factual determinations made by you during the

13   deliberations must be consistent with the legal -- with these

14   legal conclusions.

15        To the extent you must resolve competing factual

16   scenarios and one scenario is consistent with these legal

17   conclusions and the other is not, you must resolve that factual

18   dispute in a manner that is consistent with Mr. Dennis

19   outstanding convictions.

20        For example, if presented with competing claims that

21   Mr. Dennis was or was not at the murder scene, you must resolve

22   the factual dispute in a manner consistent with the legal

23   conclusion that Mr. Dennis possessed a -- possesses a

24   conviction for third degree murder of Chedell Ray Williams.

25        Also, in Pennsylvania, criminal homicide constitute

1    murder of the first degree when it is committed by an

2    intentional killing.

3            The only element that distinguishes first degree

4    murder from third murder is the specific intent to kill.

5            A person causes the death of another with a specific

6    intent to kill if the person was conscious of his own purpose

7    and intended to end the life of the victim.

8            Having explained to you the legal conclusions you

9    must accept as true for purposes of this lawsuit and the

10   criminal law and support thereof, I will now instruct you on

11   the elements Mr. Dennis must prove in support of a civil rights

12   claim.

13           Plaintiff asserts that the detectives and I'm going

14   to combine them, but both detectives violated his

15   constitutional right to due process of law by fabricating

16   evidence.

17           To succeed on this claim as to Defendants,

18   Jastrzembski or Santiago, the Plaintiffs must prove the

19   following elements by a preponderance of the evidence.

20           One or both of the Defendants created or made up

21   false evidence.  This is known as fabrication.  The Defendants

22   fabricated the evidence deliberately.  This does not require

23   that the Defendant acted out of actual malice, spite, or ill

24   will, but only that the Defendant made a knowing

25   misrepresentation.

1          Three, there is a reasonable likelihood that without

2     the fabricated evidence, the Plaintiff will not have been

3     convicted of first degree murder.

4          You need not find that the Defendants believe

5     Plaintiff was innocent.  Testimony that is incorrect or simply

6     disputed should not be treated as fabricated merely because it

7     turns out to have been wrong.

8          Instead, Mr. Dennis must prove persuasive evidence

9     supporting a conclusion that the detectives Santiago and

10    Jastrzembski offer evidence in bad faith.

11         This is persuasive evidence -- this persuasive

12    evidence must show that Detective Santiago and Detective

13    Jastrzembski possess the reckless state of mind in that the

14    evidence was formulated or submitted willfully, knowingly, or

15    recklessly in reckless disregard of his truth.

16         Willfully means acting with a purpose to disobey or

17    disregard the law.  It does not require proof that Santiago and

18    Jastrzembski had any evil motive or bad purpose other than the

19    purpose to disobey or disregard the law.

20         Knowingly means acting voluntarily and intentionally

21    and not because of a mistake or accident or an innocent -- or

22    the innocent reason.

23         Reckless disregard for the truth means that Detective

24    Santiago and Detective Jastrzembski were aware of the

25    substantial unjustifiable risk of violating Mr. Dennis'

1    constitutional right to due process of law by fabricating

2    evidence or that their action will have caused the violation of

3    Mr. Dennis' constitutional right to due process of law.  And

4    Santiago and Detective Jastrzembski consciously disregarded

5    that risk.

6            The reasonable likelihood standard requires that Mr.

7    Dennis draw a meaningful connection between his particular due

8    process injury and the use of fabricated evidence against him.

9            He must demonstrate that the fabricated evidence was

10   so significant that it could have affected the outcome of the

11   criminal case.

12           The second way that the Plaintiff asserts that

13   Defendants Detectives Jastrzembski and Santiago violated his

14   constitutional right to due process of law is by concealing

15   evidence.

16           In particular, Plaintiff alleges that Defendant

17   Jastrzembski and/or Santiago deliberately concealed evidence

18   that was favorable to the Plaintiff.

19           To succeed on this claim as to Defendants

20   Jastrzembski and/or Santiago, the Plaintiff must show by a

21   preponderance of the evidence that he will not have been

22   convicted of first degree murder in the absence of the

23   deliberate deception.

24           You must prove that the evidence at issue is

25   favorable to the Plaintiff either because it was exculpatory or

1    because it was impeaching.

2           He must prove that the Defendant knew the evidence at

3    issue was favorable to Mr. Dennis.  And he must prove that the

4    Defendant concealed or suppressed the evidence.

5           And he must prove that there is a reasonable

6    likelihood that had the evidence been disclosed to the

7    Plaintiff, it could have affected the outcome of the criminal

8    proceedings.

9           Put otherwise, the concealment of this evidence

10   undermines confidence Plaintiff -- in Plaintiff conviction of

11   first degree and death sentence or cast serious doubts in the

12   integrity of the proceeding.

13          And I will define some of the terms that I have used

14   just used.  Exculpatory evidence is evidence that will tend to

15   undermine the evidence of guilt or show innocence.

16          An example of exculpatory evidence is evidence

17   tending to show that someone other than the accused committed

18   the crime.

19          Impeachment evidence is evidence that calls into

20   question the reliability or credibility of the prosecutional

21   witness.  Evidence is material if there's a reasonable

22   probability that its disclosure will have produced different

23   results.

24          This standard does not require a showing that a

25   jury -- does not require a showing that a jury more likely than

1    not will have returned a different verdict.

2           Rather the reasonable probability standard set aside

3    the likelihood with a different result is great enough to

4    undermine the confidence in the outcome of the trial.

5           Members of the jury, there's a claim here for

6    criminal civil rights conspiracy.  A conspiracy is an agreement

7    between two or more people to do something illegal.

8           To succeed on a civil rights conspiracy claim, Mr.

9    Dennis must show by a preponderance of the evidence that the

10   detectives reached an understanding to deprive him of his

11   constitutional rights.

12          Mere similarly of conduct among various persons or

13   the fact that they have associated with each other or may have

14   discussed some common aims or interests is not necessarily

15   proof of conspiracy.

16          Instead, Mr. Dennis must prove three elements that

17   his first -- his 14th Amendment right to due process was

18   violated by evidence of fabrication or deliberate deception by

19   Detective Santiago and Detective Jastrzembski reached an

20   agreement to violate Mr. Dennis' 14th Amendment right and

21   either Mr. Santiago or Ms. -- Detective Jastrzembski took

22   concerted action in furtherance of that agreement.

23          First, Mr. Dennis must succeed on either of his

24   fabricated evidence or deliberate deception claim.  If Mr.

25   Dennis does not prove that Detective Santiago or Detective

1   Jastrzembski fabricated evidence or engaged in deliberate

2   deception, then you must find for them on the civil rights

3   conspiracy claim.

4         Second, Mr. Dennis must all prove that Detective

5   Santiago and Detective Jastrzembski reached an agreement to

6   violate his 14th Amendment rights.

7         In order to find an agreement, you must find that

8   there was a jointly accepted plan and that Detective Santiago

9   and Detective Jastrzembski knew the plan's essential nature and

10  general scope.

11        A person who has no knowledge of a conspiracy but

12  also happens to act in a way which furthers some purpose of the

13  conspiracy does not there by become a conspirator.

14        However, you need not find that both Detective

15  Santiago and Detective Jastrzembski knew the exact details of

16  the plan.

17        The agreement can be either express or implied.  In

18  other words, if you infer from the sequence of events that it

19  is more likely than not that Detective Santiago and Detective

20  Jastrzembski agreed to do an act that deprived Mr. Dennis of

21  his 14th Amendment constitutional rights, then Mr. Dennis has

22  proved the assistance of the agreement.

23        And finally, Mr. Dennis must prove Mr. Santiago,

24  Detective Santiago or Detective Jastrzembski took concerted

25  action in furtherance of the agreement.

1          This requires proof either that Detective Santiago or

2    Detective Jastrzembski engaged in at least one act of in

3    furtherance of the conspiracy.  If you find in favor of

4    Detective Santiago or Detective Jastrzembski on any one of

5    these elements you must find in favor of them and the civil

6    rights conspiracy claim.

7          Members of the jury, I am now going to instruct you

8    on damages.  Just because I am instructing you on how to award

9    damages does not mean that I have any opinion on whether or not

10   Mr. Dennis is entitled to damages.

11         Mr. Dennis must show that the injury will not have an

12   affair without the Defendant's conduct.  Mr. Dennis must also

13   show that the conduct was a substantial factor in bringing

14   about the constitutional violation and that the injury was

15   either direct result or reasonable probable consequence of the

16   conduct.

17         There can be more than cause of an injury.  To find

18   the Defendants had caused Mr. Dennis' injury, you need not find

19   that Defendants' act was the nearest cause either in time or

20   space.

21         However, Mr. Dennis injury was caused -- if Mr.

22   Dennis' injury was caused by a later independent event that

23   intervened between the Defendants' act and Mr. Dennis injury,

24   the Defendants are not liable unless the injury was reasonably

25   foreseeable by the Defendants.

1          If you find Mr. Dennis' constitutional rights were

2     violated, then you must consider the issue of compensatory

3     damages.

4          Compensatory damages must not be based on speculation

5     or sympathy.  They must be based on evidence presented at trial

6     and only that evidence.

7          Mr. Dennis has the burden of proving compensatory

8     damages by a preponderance of the evidence.  Mr. Dennis claims

9     the following items of damages:  Physical harm to Mr. Dennis

10    during and after the events at issue including ill health,

11    physical pain, disability, disfigurement, discomfort, and any

12    such physical harm that Mr. Dennis is reasonably certain to

13    experience in the future.

14         In assessing such harm, you should consider the

15    nature and extent of the injury and whether the injury's

16    temporary or permanent.

17         Emotion and mental harm, after Mr. Dennis during and

18    after the events at issue including fear, humiliation, and a

19    (indiscernible) and any such emotional or mental harm that Mr.

20    Dennis reasonably be certain to experience in the future.

21         The reasonable value of the medical psychological

22    hospital nursing and similar and supplies that Mr. Dennis

23    recently needed or needs and actually obtain at needs to obtain

24    and the present value of such care and supplies that Mr. Dennis

25    is reasonably certain to need in the future.

1          The wages, salary, profits, reasonable value of the

2   work time that Mr. Dennis has lost because of his inability or

3   diminished ability to work beginning from his time of release

4   from incarceration to present and the present value of wages,

5   salaries, profits, reasonable value of working time that Mr.

6   Dennis is reasonably certain to lose in the future because of

7   his inability or diminishability of work.

8          Your consideration of these categories of

9   compensatory damages is entitled to -- is limited to those

10  injury specifically caused by Mr. Dennis' presence on death

11  row.

12         You may not award Mr. Dennis damages for any injuries

13  resulting from his valid term of incarceration from November

14  23rd, 1991 to December 22nd, 2016.

15         In other words, if the physical harm or emotional

16  mental harm or the incursion of medical expenses are

17  attributable to incarceration generally or to Mr. Dennis'

18  present in prison, then Mr. Dennis may not recover those

19  damages.

20         Any award of compensatory damages conferred by you

21  must be limited to the physical harm, emotional mental harm, or

22  the incursion of medical expenses specifically related to Mr.

23  Dennis' presence on death row and proven by a preponderance of

24  the evidence.

25         Furthermore, Mr. Dennis has a duty under the law to

1    mitigate his damages.  That means that Mr. Dennis must take

2    advantage of any reasonable opportunity that he may have or

3    that may have assisted on under the circumstances to reduce or

4    minimize the loss or damage caused by the Defendants.

5            If the Defendants persuade you by preponderance of

6    the evidence that Mr. Dennis failed to take advantage of an

7    opportunity that was reasonably available to him, then you must

8    reduce the amount of his damages by the amount that could have

9    been reasonably obtained if he had taken advantage of such an

10   opportunity.

11           In assessing damages, you must not consider attorney

12   fees or the costs of litigating this case.  Attorney fees and

13   costs if relevant at all are for the Court and not the jury to

14   determine.  Therefore, attorney fees and costs should play no

15   part in your calculation of damages.

16           Members of the jury, in addition to compensatory

17   damages, you may consider awarding Mr. Dennis punitive damages.

18   A jury may award punitive damages to punish a Defendant or to

19   deter the Defendant and other like the Defendant from

20   committing such conduct in the future.

21           However, you may not award -- strike that.

22           You may only award punitive damage if you find that

23   the Defendant acted maliciously or wantonly in violation of Mr.

24   Dennis' constitutional rights.

25           In this case, there are only two individual

1    Defendants.  You must make a separate determination whether

2    each Defendant acted maliciously or wantonly.

3            And I will provide you a definition of specific

4    terms.  A violation is malicious if it was prompted by ill will

5    or spite towards the Plaintiff.

6            A Defendant is malicious when they act consciously

7    when they have -- strike that.

8            A Defendant is malicious when they consciously decide

9    to violate federal constitutional rights of which the Defendant

10   is aware or when they consciously decide to injure the

11   Plaintiff in the manner that the Defendant knows to be

12   unlawful.

13           A conscious desire to perform the physical aspect

14   cause Plaintiff injury or to fail to undertake certain acts

15   does not by itself establish that a Defendant had a conscious

16   desire to violate rights or injure Plaintiff unlawfully.

17           A violation is wanton if the person committing the

18   violation recklessly or callously disregarded the Plaintiff

19   rights.

20           If you find by a preponderance of the evidence that a

21   Defendant acted maliciously or wantonly in violating Mr.

22   Dennis' rights, then you may award punitive damages against

23   that Defendant.

24           You possess discretion to award punitive damages that

25   is if you find that the legal requirements for punitive damages

1    are satisfied, then you may still decide not to award them.

2           In exercising your discretion over an award of

3    punitive damages, you should their purpose.  Punitive damages

4    proceed from the principle of punishment and deterrence.  They

5    are designed to punish a Defendant for malicious or wanton

6    violation of Plaintiff's rights or to deter the Defendant and

7    others like the Defendant from doing similar things in the

8    future or both.

9           In other words, you should consider the degree to

10   which the Defendant in question should be reprimanded further

11   conduct and the degree to which an award of punitive damages

12   will deter the Defendant in question or others from committing

13   similar wrongful acts in the future.

14          With respect to punishment, you should consider the

15   nature of the Defendant's actions, and the amount of harm

16   actually caused by the Defendant's act bearing in mind that

17   when considering whether to use punitive damages to punish, you

18   should only punish the Defendant in question for harming Mr.

19   Dennis and not for harm alleged to have been caused by other

20   people other than --to other people other than to Mr. Dennis.

21   Do not punish a Defendant for harming people other than Mr.

22   Dennis.

23          With respect to deterrence, you should consider

24   whether compensatory damages standing alone are sufficient to

25   deter or prevent the Defendant in question from again

1    performing any wrongful acts that they may have performed.

2           You also should weigh whether the Defendant is in a

3    position to cause the injury again and whether an award of

4    punitive damages in this case is likely to deter other persons

5    from performing wrongful acts similar to those a Defendant in

6    question may have committed.

7           Members of the jury, with regards to causation, in

8    civil in a civil rights action, the Plaintiff must demonstrate

9    that the Defendant conduct was the cause of the claimed injury.

10   Mr. Dennis must establish both causation in fact and proximate

11   causation.

12          A Defendant's conduct is an actual cause or cause in

13   fact of a Plaintiff injury only if the injury will not have

14   occurred but for the conduct.

15          Proximate cause is defined as the person's wrongful

16   conduct which is a substantial factor in bringing about harm to

17   another.

18          The word substantial is used to denote the fact that

19   the Defendant's conduct has such an effect in producing the

20   harm as to lead a reasonable person to regard it as the cause.

21          The law recognizes more than one proximate cause of

22   an injury or damage.  Many factors or things or conduct of one

23   or more persons of government entities may operate at the same

24   time, either independently or together to cause injury or

25   damage.  And in such a case, each may be a proximate cause.

1          In situations where a Defendant's conduct is not a

2   substantial factor in the commission of the constitutional

3   violation, they cannot be considered the cause of the

4   violation.

5          So members of the jury, that concludes my

6   instructions on part 1 and part 2.  I'm now going to consult

7   with the lawyers to determine if there are anything about the

8   instructions that I read to you that needs to be clarified,

9   added, or corrected.

10         And then, after I consult with them, I will come

11  back, give you my concluding remarks, and then, you will have

12  the case.

13         So with that in mind, members of the jury, I'm going

14  to talk to the lawyers before I give you my concluding remarks.

15         Counsel, is there anything you wish to bring to my

16  attention and clarify?

17         MR. MESSING:  No, sir.

18         THE COURT:  How about the Defendants?

19         MR. BROWNLIE:  One issue, Your Honor.

20         THE COURT:  All right, let me see you at sidebar.

21      (Sidebar conference)

22         THE COURT:  Carlos, do you see I -- we need to delete

23  some of the stuff?  The way I read it is right, but we had

24  language that kept the City in?

25         THE CLERK:  Yeah.

1          MR. MESSING:  You took care of it.

2          THE COURT:  I took care of it, yeah.  I have to

3    correct it.

4          MR. BROWNLIE:  Very, very minor point, Your Honor.

5          THE COURT:  If it's minor, why are you bringing it

6    up?

7          MR. BROWNLIE:  Well, because it goes to our

8    discussion earlier this morning about the verdict sheet.  So

9    when --

10         MR. MESSING:  What page?

11         MR. BROWNLIE:  Page 43.

12         THE COURT:  All right, all right.  Let me organize

13   myself because I need to highlight some of the things I need my

14   law clerk to change.  Page 41.

15         MR. BROWNLIE:  43, Your Honor.

16         THE COURT:  Okay.

17         MR. BROWNLIE:  The Court has it written correctly in

18   the instructions, but you misspoke.

19         THE COURT:  I did?

20         MR. BROWNLIE:  Yeah, so the instructions read if Mr.

21   Dennis does not prove Detective Santiago and Jastrzembski

22   fabricated evidence or engaged in deliberate deception, then

23   you must find for them under the civil conspiracy claim.

24         When Your Honor read the instructions, you said or.

25         MR. MESSING:  Well, even so, it's the same.

1            THE COURT:  Do you want me to --

2            MR. BROWNLIE:  I'm going to for the record.

3            THE COURT:  Oh.

4            MR. BROWNLIE:  It's consistent with our discussions

5     earlier this morning.

6            THE COURT:  All right, that's fine.

7            MR. BROWNLIE:  The instructions go back with the jury

8     so.

9            THE COURT:  Yeah.  So did you catch all the things we

10    need to --

11           THE CLERK:  Not everything, Your Honor.

12           THE COURT:  All right.  I sorted it out.

13           MR. BROWNLIE:  I'm just keeping track, Your Honor.

14           THE COURT:  All right.

15           MR. BROWNLIE:  We can confer.

16           THE COURT:  Because I need to edit this before it

17    goes out because I edit out while I was delivering.

18           MR. BROWNLIE:  (Indiscernible.)

19           THE COURT:  I forgot to get out.

20           MR. MESSING:  (Indiscernible).

21           THE COURT:  Yeah.  Yeah.  Well, thank you for working

22    yesterday.  He responded to our email.  You guys didn't.

23           MR. MESSING:  They --

24           MR. BROWNLIE:  We had a charging conference, Your

25    Honor.

1          UNIDENTIFIED SPEAKER:  (Indiscernible).

2       (Sidebar conference ends)

3          THE COURT:  Okay, members of the jury, so now I'm

4    going to give you my concluding remarks.  And in a few minutes,

5    you've going to have the case.

6          So let me just go over a few things about your

7    deliberations in the jury room and your possible verdict.  When

8    you retire to the jury room to deliberate, you may take with

9    you these instructions, your notes, and the exhibits.

10          About the exhibits, whatever you need, just let me

11   know if you need to take a look at some of the exhibits that

12   you already saw over the course of the trial that were admitted

13   in evidence.  Just let me know and we'll put them together for

14   you.

15          So your first job is to select one member of the jury

16   to be the presiding juror.  The presiding juror's

17   responsibility will be to preside over the deliberations of the

18   jury and speak in open court on behalf of the jury.

19          Remember, you have two main duties as jurors.  The

20   first one is to decide what the facts are from the evidence

21   that you saw and heard in the courtroom deciding what the facts

22   as -- facts are is your job, not mine, not the lawyers.  And

23   you must determine the facts in accordance with the

24   instructions that I provide to you.

25          Again, nothing I have said or done during the course

1   of the trial was meant in any way to influence your decision

2   about the facts in any way.

3          Your second duty is to take the law that I give you

4   and apply to the facts and decide if under the appropriate

5   burden of proof Mr. Dennis has established his claims.

6          It is my job to instruct you about the law and you

7   are bound by the oath that you took at the beginning of the

8   trial to follow the instructions that I give you if any of

9   personally disagree with them.

10         And this includes the instruction that I gave you

11  before and during the trial and these instructions.  All the

12  instructions are important and you can -- you should consider

13  them all together as the as a whole as the law that you must

14  follow and apply to this case.

15         Perform these duties fairly.  Do not let any bias,

16  sympathy, or prejudice that you may feel toward one side or

17  other influence your decision in any way.

18         Now that all the evidence is in and the arguments of

19  the lawyers have been completed, and once I have finished this

20  instruction, you will be free to talk about the case in the

21  jury room with the hope of reaching a unanimous verdict.

22         During the trial, you were on our schedule.  From now

23  on, we are on your schedule.  As to the length of your

24  deliberations and whether you need anything during the course

25  of the trial that we can provide to you.  So what that means is

1  you decide the length of your deliberations and we are

2  basically on your time.

3          As jurors you'll have a duty to consult with each

4  other and to deliberate with intention of reaching a verdict.

5  Each of you must decide the case for yourself but only after

6  full and impartial consideration of all the evidence with your

7  fellow jurors.

8          I ask that you listen to each other carefully.  In

9  the course of your deliberations, you should feel free to

10  re-examine your own views and to change your opinion based on

11  the evidence, but you should not give up your honest

12  convictions about what the evidence shows just because of the

13  opinion of your fellow jurors.

14          Nor should you change your mind just for the purpose

15  of obtaining enough vote for a verdict.  No one will be allowed

16  to hear your discussions in the jury room and no record will be

17  made of what you say in the jury room.

18          You should all feel free to speak your minds.  When

19  you start deliberations do not talk to my staff to me, or

20  anyone about each -- to anyone but each other about the case.

21          During your deliberations, you must not communicate

22  or provide any information to anyone by any means about this

23  case.

24          You may not use any electronic devices or media such

25  as cellphones, smart phone, computer or any kind, the Internet,

1    any Internet service, or any instant messaging service, or any

2    Internet chat room, blog, website, or social networking service

3    as Facebook, Instagram, LinkedIn, or YouTube to communicate to

4    anyone any information about this case or to conduct any

5    research about this case until I have accepted your verdict.

6           You may not use any electronic means to investigate

7    or communicate about the case because it is important that you

8    to decide this case based only on the evidence presented in his

9    courtroom.

10          Remember that information and the Internet or

11   available through social media might be wrong, incomplete, or

12   inaccurate.

13          Information that you might see on the Internet or on

14   social media has not been admitted in evidence.  And the

15   parties have not had a chance to discuss it with you.  You

16   should not seek or obtain such information and it must not

17   influence your decision in this case in any way.

18          If you have any questions or messages for me, you

19   must write them down on a piece of paper, have the presiding

20   juror sign and date them, and give them to my deputy who will

21   be near you.

22          My staff will give them to me and I will respond to

23   the message as quickly as I can.  I may have to talk to the

24   lawyers about what you have asked.  So it may take little bit

25   of time to get back to you.

1          One more thing about messages.  Never write down or

2    tell anyone how you stand on your vote.  For example do not

3    write down or tell anyone that a certain number is voting one

4    way or another.  Your vote should stay secret until you have

5    finished and I have taken your verdict.

6          Your verdict must be or must represent the considered

7    judgment of each juror.  In order for you as a jury to return a

8    verdict, each of you must agree to the verdict.  Your verdict

9    must be unanimous.

10          And finally, members of the jury, I have prepared a

11    verdict slip that after you reach a unanimous agreement, your

12    presiding juror can complete what we call the official verdict

13    form.  And you will have one copy only that says official

14    verdict.

15          Then each of you will be given a copy, but that copy

16    will say jury verdict, not official verdict.  The presiding

17    juror shall return the official verdict to the courtroom in

18    this case, so that it could be made part of the record.

19          Unless I direct you otherwise, please do not reveal

20    your answers until you have been discharged.  After you have

21    reached a verdict, you are not required to talk to anyone about

22    the case unless I order you to do so.

23          And once again, members of the jury, I want to remind

24    you that nothing about the instructions and nothing about the

25    form of the verdict is intended to suggest or convey in any way

1    or manner what I think your verdict should be.  It is your sole

2    and exclusive duty and responsibility to decide on the verdict

3    in this case.

4            So the verdict will read -- the official verdict that

5    you will have will read claim 1, Plaintiff claim of deprivation

6    of liberty without due process of law and denial of a fair

7    trial under the 14th Amendment.

8            First, it will be Defendant Frank Jastrzembski and

9    there would be two questions.  A, do you find by a

10   preponderance of the evidence that Defendant Frank Jastrzembski

11   denied Plaintiff James Dennis' constitutional right to due

12   process and fair trial by fabricating evidence, yes or no?

13           Do you find by a preponderance of the evidence that

14   Defendant Frank Jastrzembski denied Plaintiff James Dennis'

15   constitutional right to due process and a fair trial by

16   conceding evidence, yes or no?

17           And then, the next Defendant will be Defendant Manuel

18   Santiago.  Do you find by a preponderance of the evidence that

19   Defendant Manuel Santiago denied Plaintiff James Dennis'

20   constitutional right to due process and fair trial by

21   fabricating evidence, yes or no?

22           And the second question will be do you find by a

23   preponderance of the evidence that Defendant Manuel Santiago

24   denied the Plaintiff Dennis' constitutional right to due

25   process and fair trial by conceding evidence, yes or no?

1          And then, the second question deals with Plaintiff's

2     claim for civil rights conspiracy.  Do you find by a

3     preponderance of the evidence that Defendant Frank Jastrzembski

4     conspired to deprive Plaintiff James Dennis' constitutional

5     rights, yes or no?

6          Do you find by a preponderance of the evidence that

7     Defendant Manuel Santiago conspired to deprive Plaintiff James

8     of his constitutional right, yes or no?

9          If your answer is yes to one or more of the six

10    questions above as to one or more of the Defendants, proceed to

11    below questions and damages.

12         If you answer no to all of the six questions above,

13    skip the below questions on damages and have the presiding

14    juror sign and date this form as noted at the end.

15         Compensatory damages will ask you to please state the

16    total amount of compensatory damages Plaintiff James has proven

17    by a preponderance of the evidence in accordance with the

18    course instruction regarding compensatory damages.  And you are

19    to state an amount.

20         With regards to punitive damages, there are several

21    questions that you must answer.  First, you must answer whether

22    you find the Defendant Detective Jastrzembski acted maliciously

23    or wantonly in violating James Dennis' federally protected

24    rights, yes or no?

25         If your answer is yes, then you go to question 4(a).

1   State the amount of damages awarded to James Dennis.  And you

2   have to include a figure in that amount, which is a question

3   below.

4           If you find Detective -- that question reads if you

5   find that the Defendant acted -- Santiago acted maliciously or

6   wantonly in violating James Dennis' federal constitutional

7   right, yes or no?

8           If your answer is yes, then you go to 4 to the next

9   question, state the amount of punitive damages awarded to James

10  Dennis.  And you are to insert an amount.

11          Your presiding juror will then sign the verdict slip

12  and date it.  And when you have reached a unanimous agreement,

13  please let us know and I will take your verdict.

14          So, members of the jury, that concludes my

15  instruction.  I think it's approximately 12:10.  I think we

16  brought -- did we put the lunch should be available now?

17          We ordered lunch.  I don't know if it's going to be

18  there in the jury room right now.  All right, is the lunch

19  there?  All right, so we -- I don't know if the lunch is there,

20  we ordered it.  All right.  So it should be there.

21          What I suggest because we have to make accommodation

22  to one of the jurors suggest that you have lunch for 20 minutes

23  or so.

24          And then, after you have lunch, then come back

25  together and begin your deliberations after lunch.  Don't begin

1   your deliberation until you have lunch.  I think the lunch is

2   there.

3           If the lunch is not there, then you probably could

4   begin until the lunch comes.  Stop when the lunch comes.  Have

5   lunch and then resume to speak about the case when you're back

6   together because we need to make an accommodation to one of

7   you, who will be having lunch separately from the rest of the

8   jurors.  Is that clear?  That's my suggestion.

9           So with those instructions, members of the jury, I'm

10  going to ask that you go into the jury room.  If you need

11  anything in terms of exhibits, just let her know and we'll do

12  as quickly as possible.

13          I'm going to send the instructions to you and the

14  verdict slip.  It's going to take a little while, but bear with

15  me and I will deliver it to you shortly.  Yes.  Okay.  Go

16  ahead.

17       (The Judge confers with the Clerk)

18           THE COURT:  Okay.

19           UNIDENTIFIED SPEAKER:  So what is the

20  (indiscernible)?

21           THE COURT:  Yes, right.

22           UNIDENTIFIED SPEAKER:  Okay.

23           THE COURT:  Got medical issues.  So I'm going to ask

24  you to clear the courtroom because we're going to take them,

25  when it's appropriate for lunch we're going to take them

1    through here to a separate place so they could have lunch for

2    20 minutes and then resume with the jury.

3              MR. MESSING:  So my office is across the street.

4              THE COURT:  Yeah.  How long does it take you from

5    your office here?

6              MR. MESSING:  What's that?

7              THE COURT:  How long for you to get here from your

8    office?

9              MR. MESSING:  Under 10 minutes.

10             THE COURT:  Under 10 minutes?

11             MR. MESSING:  Assuming there's no long line in

12   security.  I'm literally -- I'm next to the Federal Detention

13   Center.

14             THE COURT:  Oh.

15             MR. MESSING:  I'm going to give my cellphone number.

16             MR. BROWNLIE:  Your Honor, I have --

17             THE COURT:  Yeah, give us your cell numbers.  Please

18   don't be more than 10 minutes.

19             MR. BROWNLIE:  Yes, sir.  I have those portions

20   highlighted that Your Honor changed in the instructions if

21   you'd like a copy, Your Honor.

22             THE COURT:  Oh, that would be great.  He filed -- did

23   you file it?  Okay, match with this.  And did I -- was there

24   wrong on the verdict slip all 4(c) or is that right?

25             MR. BROWNLIE:  I don't believe so.

1          THE COURT:  I didn't read it, but they have it.

2          MR. MESSING:  It's just (indiscernible).

3          MR. BROWNLIE:  Yeah.

4          THE COURT:  Yeah, I think we have --

5          THE CLERK:  Are we off the record or are we still on?

6          THE COURT:  No, we're off the record.

7       (Recess taken at 12:13 p.m., recommencing at 1:13 p.m.)

8          THE COURT:  So you saw the note?

9          MR. MESSING:  Yes.

10          THE COURT:  I don't think I tell them, but I don't

11   think it's any other concern with what happened to the City's

12   case or why the City did not give a closing statement.

13          And they should not consider that in any way in

14   focusing on the issues that have been decided, which is to

15   decide based on the evidence whether or not these two

16   detectives violated his constitutional right to a fair trial.

17          MR. MESSING:  I would -- I think the Court's right.

18   I think I would say because I don't want them to think that

19   there was a separate settlement with the City and the City paid

20   money.

21          THE COURT:  Right.

22          MR. MESSING:  So I think what the Court should say is

23   exactly what the Court said, but their focus should be on the

24   individual liability and the damages in this case.  And you

25   know, period.  And --

1          THE COURT:  You agree attorney -- I think that's

2     fair.

3          MR. SANTARONE:  Yeah, I don't -- there's no -- I

4     mean, just that they should concentrate on what's left in the

5     case, that's what Your Honor's planning on saying?

6          THE COURT:  Yes.

7          MR. SANTARONE:  That's fine.  I wasn't sure what Mr.

8     Messing was raising if there's more than that, but I think

9     that's fine.

10          THE COURT:  Well, the verdict slip is only focusing

11     on whether these two detectives --

12          MR. SANTARONE:  Yes.

13          THE COURT:  -- violated his constitutional rights.

14          MR. SANTARONE:  That's fine.  Thank you.

15          THE COURT:  I think that's all I -- is the -- yeah,

16     that's because if they did, then they're liable and if they're

17     liable, they're going to have damages.

18          MR. SANTARONE:  Okay.

19          THE COURT:  So I don't want to be too specific.

20          So I'm going to also explain did you know all the

21     power and iPhone and technology power went out of the building?

22     So we were not able to print the copies the -- we had to send

23     it upstairs to the IT Department to see --

24          MR. BROWNLIE:  Unbelievable.

25          THE COURT:  -- if they can figure out a way.  So they

1    still don't have it.  They have the verdict form, but they

2    don't have the --

3             MR. SANTARONE:  Okay.

4             THE COURT:  They don't have it.  Is there a verdict

5    form here?

6         (The Judge confers with the Clerk)

7             MR. MESSING:  Are you going to bring them out to

8    answer or you going to write?

9             THE COURT:  Yeah, I'm going to bring them out.  I'm

10   not going to write.  I think it's better that I bring them out.

11            MR. MESSING:  Okay.

12            THE COURT:  I'm also going to explain they should

13   have the charge momentarily because all the power in the

14   building went out with regards to phones, computers, and all

15   that.

16            MR. SANTARONE:  Seriously?

17            THE COURT:  Yeah.

18            MR. SANTARONE:  For how long?

19            THE COURT:  We don't know, but I think that the IT

20   has a way of helping us.

21            MR. MESSING:  The good news is that the elevators are

22   working.

23            THE COURT:  Yeah.  Are the elevators working?

24            MR. MESSING:  Yeah, that's the good news.

25            THE COURT:  Okay, fortunately, but the power and

 1   electronics all right.

 2            MR. MESSING:  This building needs to rent a --

 3            THE COURT:  All right, could you bring the jury out?

 4   We have everybody, right?

 5            MR. BROWNLIE:  Yes, Your Honor.

 6            THE COURT:  Where are the detectives?

 7            MR. SANTARONE:  They I didn't call them.  I think

 8   they went to get something to eat.

 9            MR. MESSING:  It's fine.  I waive their presence.

10            THE COURT:  All right.  You have a right to be here.

11            MR. MESSING:  Yeah, for that question, we're fine.

12            THE COURT:  All right.  Could you bring the jury in?

13        (Jury enters the courtroom)

14            THE COURT:  Yeah, we're ready, one second.

15        (The Judge confers with the Clerk)

16            THE COURT:  You can bring them now.  All right.

17        (The Judge confers with the Clerk)

18            THE CLERK:  Are you ready then, Judge?

19            THE COURT:  Yes, I am.

20            THE CLERK:  All rise.

21            THE COURT:  You may be seated.  So your presiding

22   juror poses the following question.  What happened to the

23   City's case?  Why did they not give a closing argument?

24            Members of the jury, you the jury should not be

25   concerned what happened to the City's case or why the City did

1    not give a closing statement.  Give no consideration whatsoever

2    that the City is no longer in this case.

3            Your job is to decide whether each of the detectives

4    individually or separate is -- violated Mr. Dennis'

5    constitutional right under 14th Amendment to a fair and a fair

6    trial.

7            And that is your job and your job alone.  So focus on

8    the case against the detectives, not be concerned at all with

9    the City and the City not being here, not participating in

10   closing arguments.  That's one.

11           The second thing is we have problem in the building,

12   believe it or not, the iPhones are not working in our chambers

13   and the computers are not working and we couldn't print the

14   copy of the charge for you a little bit earlier.

15           But we had to send it to get printed downstairs in

16   the IT Department.  So it'll be with you momentarily.  I think

17   I've answered your question members of the jury.  I'm going to

18   ask that you go back to the jury room and continue your

19   deliberations.

20           THE CLERK:  All rise.

21       (Jury exits courtroom)

22           THE COURT:  Okay.

23           MR. MESSING:  Thank you, Your Honor.

24           THE COURT:  Don't go too far.

25           MR. MESSING:  I'll be here for a while and then.

1          MR. BROWNLIE:  And then, yeah, thank you.

2          MR. MESSING:  But I make it back in 8 and a half

3    minutes.

4          THE COURT:  You beat them.  You're faster what is it

5    76 you beat them?

6          MR. BROWNLIE:  We were here.

7          THE COURT:  Huh?

8          MR. MESSING:  That's the way it is.  We should

9    deliberate out there.

10         (Recess taken at 1:21 p.m., recommencing at 2:09 p.m.)

11         MR. MESSING:  Oh, I didn't realize.  Do you want me

12    to get Mr. Dennis for this or?

13         THE COURT:  Yes, could you get him, please?

14         MR. MESSING:  Sure.

15         THE COURT:  But I think we need to start putting the

16    flash together.

17         THE CLERK:  I have the flash (indiscernible).

18         THE COURT:  All right.

19         THE CLERK:  There is --

20         MR. BROWNLIE:  I'll represent Your Honor, there are

21    no transcripts on the flash drive.

22         THE COURT:  All right, so we need the transcripts

23    then.

24         MR. BROWNLIE:  Okay.

25         THE CLERK:  And the Judge doesn't have the activity

1   sheet (indiscernible).

2          MR. BROWNLIE:  That is correct as well.  We spoke

3   with her.

4          THE COURT:  All right.

5          MR. MESSING:  Well, we can go through that.  The

6   immediate question is are these two things.

7          THE COURT:  Right.

8          MR. MESSING:  But the second thing is not in

9   evidence, the transcript of her 1992 testimony was never

10  introduced in evidence.  I'm not sure if even a part of it was

11  used.  Might have been a reference to it, but it's not in

12  evidence.

13         THE COURT:  I thought -- I thought she was questioned

14  about her process.

15         MR. MESSING:  She was questioned.  It was put up when

16  this is what you said you did that day?  They went through the

17  whole thing.

18         MR. BROWNLIE:  Your Honor, may I approach the

19  binders?

20         THE COURT:  Yes, you may.

21         MR. MESSING:  Your Honor, I will -- excuse me I will

22  agree that the binders contain all of the testimony from the

23  1992 trial.

24         However, her entire testimony from the 1992 trial was

25  never moved into evidence.  She was questioned about a brief

1  passage, that's it.  And I frankly don't remember what that

2  passage was, so.

3              MR. SANTARONE:  I do.

4              MR. MESSING:  I don't see how you're going to send

5  out her entire 1992 testimony because it's not in evidence.

6              THE COURT:  Okay, Attorney Santarone?

7              MR. SANTARONE:  Your Honor, I -- parts of her

8  testimony were shown to her during her direct.  I mean, during

9  her cross rather.  That was moved into evidence.

10             So if you -- I think we know what she was shown.  She

11 was shown the parts that I showed to the jury in my closing.

12             THE COURT:  All right.

13             MR. MESSING:  I don't know that, I honestly don't.

14             THE COURT:  All right, so they are asking for the

15 original interview of the detective.  Do we have that?

16             MR. MESSING:  No, we have the -- we have a copy of it

17 however.

18             THE COURT:  All right.

19             MR. MESSING:  It's not a great copy, but it's a copy.

20             MR. BROWNLIE:  We do have the original.  It's part of

21 the City's records.

22             THE COURT:  All right, so I need to either send out

23 the original interview of Caison with detective.  And then,

24 they're asking for the testimony of Tanya Caison from 1992

25 trial okay?

1             MR. MESSING:  That's not in evidence.

2             THE COURT:  All right, what was presented to them

3    from the 1992 trial under oath that she testified about because

4    I heard testimony about her trial testimony that was brought

5    out both on direct and cross?

6             MR. BROWNLIE:  I have marked for the Defense's

7    records Your Honor the Exhibit 175, Volume 3.

8             THE COURT:  175, Volume 3.

9             MR. BROWNLIE:  Denotes testimony from Mr. Dennis'

10   1992 criminal trial specifically October the 8th, 1992 were in

11   fact moved into evidence.

12            MR. MESSING:  What exhibit is this?

13            MR. BROWNLIE:  175, Volume 3.

14            MR. SANTARONE:  Your Honor, this is actually the

15   original statement.

16            THE COURT:  Okay.

17            MR. BROWNLIE:  And --

18            THE COURT:  Nancy, do you have the list of what was

19   (indiscernible) Stacy 175?

20            MR. MESSING:  I'm looking at it now.  I have -- give

21   me a moment.  This volume contains the testimony 175 of a

22   number of witnesses.  It's a full day testimony from the jury

23   trial.

24            It includes Detective Perks, Santiago, Barbara

25   Williams, James Cameron, Manuel Santiago, Frank Jastrzembski.

1    And there is testimony by Latanya Caison.  I'm looking at it

2    now.

3           This entire, I mean, this entire Exhibit 175, I don't

4    believe was ever moved in evidence.  I will agree I did not use

5    the -- although I referred to her 1992 testimony on my direct

6    examination, I don't believe that I moved any of it into

7    evidence.

8           And I think on the cross-examination, she may have

9    been asked some questions about this testimony, but I don't

10   believe the entirety of her testimony was moved into evidence.

11          MR. SANTARONE:  Your Honor, her testimony on that day

12   is it's page 135 to 153.  It's not that long.

13          THE COURT:  No.  I've marked what was used of that

14   testimony during the testimony.  And I can tell you that I

15   have -- I think that

16          Stacy, you have lock for the evidence, what was

17   admitted or not?

18          THE CLERK:  I just have 175 was admitted, but on

19   (indiscernible).

20          THE COURT:  All right, but it was admitted.  175 was

21   admitted number one.  Number two, I was following the testimony

22   and for example 136, line 17 and 18 were read into evidence.

23          MR. MESSING:  176.

24          THE COURT:  136.

25          MR. MESSING:  I didn't see that.

1          THE COURT:  17 and 18.  And from what hour to what

2   hour did you work?  10 to 2.  That was part of the record.

3   138, there was a question about then what happened?  And she

4   gave the description of her activities.

5          So line 6 to line 12 were admitted in evidence, I

6   mean, what she was questioned on.  Line 17 to 23, she was

7   questioned on.  Line --

8          MR. MESSING:  What page is this again?  I'm sorry.

9          THE COURT:  138, line 17 to 22, she was questioned

10  on.  I don't know whether -- I think it was both Plaintiff and

11  Defense questioned her on that.  139, page -- 139 line 5

12  through 7, she was questioned on.

13         143, she was questioned on cross page -- 143, line 18

14  to 23.  She was questioned 145, line 13 to 15.  And then,

15  again, 150, lines 4 through 12 she was questioned on from the

16  trial testimony.

17         And so, these were the witnesses that would testify

18  at the trial.  Some of them may have appeared here, but so

19  Attorney Santarone, those are the trial testimony that she gave

20  that was elicited in this case.

21         MR. SANTARONE:  Yeah.

22         THE COURT:  I mean, the testimony is here.  And your

23  point they are asking for the trial testimony of 1992.

24         MR. SANTARONE:  I agree with give it to them.

25         THE COURT:  Okay.

1          MR. SANTARONE:  I want to give it to them.  I mean --

2          THE COURT:  Right.  And you don't want to give it to

3    them even it was admitted as part of an exhibit because that

4    was sworn statement and it's evidence in the case, although you

5    and the Defense only highlighted those portions that you wanted

6    to make points with.

7          MR. MESSING:  Actually, I don't believe I highlighted

8    any portion to that testimony.  It is correct that they did

9    highlight some.  I wasn't taking the kind of notes that the

10   Court was taking, so I don't remember which passages they

11   discussed with the witness.

12         THE COURT:  Right.

13         MR. MESSING:  So I guess my feeling is if the Court

14   is going to send anything out, it should be only those sections

15   that were brought up by the Defense on cross-examination.  I

16   didn't bring up any of them.

17         MR. BROWNLIE:  Your Honor, may we confirm and I

18   apologize just one more time what the lines were?

19         THE COURT:  All right, this is what I was noting as

20   the witnesses were testifying from that testimony.

21         MR. BROWNLIE:  I believe it begins on 136 with line

22   17.

23         THE COURT:  Direct examination of Ms. Caison, right.

24   136, pages 7 -- lines 17 and 18.

25         MR. MESSING:  Whatever the Court has noted down, I

1    think that is what they're entitled to see.  No more.

2              THE COURT:  He's asking me first so I'm going to

3    repeat what I said.

4              MR. MESSING:  Okay.

5              THE COURT:  138, line 6 to line 12 and 138, line 17

6    to line 22.  Line 139, line 5 to line 7.  143, line 18 to line

7    23.  145, line 13 to line 15.  150, line 4 to line 12.

8              That's what I have marked let me check my other

9    notes.  I have a lot of notes.  I have one missing.  She

10   testified before judge -- expert Joy or after?  Do you

11   remember?

12             MR. BROWNLIE:  I believe.

13             MR. MESSING:  She testified before, no, yeah, before

14   Joy.

15             THE COURT:  All right, I have one of my notes

16   missing, notebooks.  Can you check in chambers?

17             Anyway, so you didn't use the whole trial testimony.

18   You just used parts of the testimony on direct and cross to

19   impeach.

20             MR. BROWNLIE:  Yes, Your Honor.

21             THE COURT:  Can we just give -- I think that's what's

22   in evidence.  The whole trial transcript was not in evidence.

23   I mean, it was admitted.

24             MR. SANTARONE:  I understand, Your Honor.  I mean, I

25   think we moved all that exhibit in but as we did, but they want

1      the testimony from the 1992 trial.  So I assume they're asking

2      for her testimony from that trial.  And that was moved into

3      evidence whether it was referred to or not.

4              MR. MESSING:  My 17 was --

5              THE COURT:  So not everything that is moved into

6      evidence goes out with the jury as you well know.  Or it's

7      heard by the jury.  The jury did not hear the entirety of the

8      testimony.

9              MR. SANTARONE:  Right.

10             THE COURT:  They heard only the relevant portions

11     that you elicited on cross to impeach her credibility.

12             This is not what I want.  I have one with notes.  And

13     I think it's in chambers.  I don't see it.

14             MR. SANTARONE:  That's --

15             THE COURT:  I have another notebook that I think had

16     the notes.  And now so many notebooks here cannot find it.

17             MR. MESSING:  So Your Honor?

18             THE COURT:  Yes.

19             MR. MESSING:  The Plaintiff's position in response to

20     this note from the jury is, one, if the Court wants to send out

21     the interview with the detective from --

22             THE COURT:  That goes out.  They want it.  It's in

23     evidence.

24             MR. MESSING:  Yeah, we --

25             THE COURT:  Repeat it -- everybody used it.

1          MR. MESSING:  Right, we have no -- obviously no

2    objection to that.

3          THE COURT:  Okay.

4          MR. MESSING:  As to the testimony from the 1992

5    trial, I think the Court has two options.  One would be to

6    simply tell them that they only heard brief excerpts and their

7    recollection of that evidence is what controls in this case.

8          The other option is to say to them you only heard

9    excerpts.  I'm going to provide those excerpts to you.  And

10   then, just give them the excerpts that the Court has identified

11   as having been used at trial because that's what's in evidence,

12   not the entire transcript of 200 pages of testimony from --

13         THE COURT:  Not the transcript.  Her testimony.

14         MR. MESSING:  Right, not her testimony.

15         THE COURT:  It's only not that much.

16         MR. MESSING:  There was no reference to anything

17   other than the passages that the Court just read.

18         THE COURT:  Oh, it's not that much.  And on the other

19   hand, it's not that much, but you asked -- that's what they

20   want to see, the testimony.

21         MR. SANTARONE:  That's what they want to see, Your

22   Honor.

23         THE COURT:  -- regarding what she said at trial

24   about -- I think they're looking for a corroboration on the

25   receipt.

1          MR. SANTARONE:  Right.

2          THE COURT:  And it's not there because --

3          MR. SANTARONE:  Right.

4          THE COURT:  -- your position is that it needs --

5          MR. SANTARONE:  Right.

6          THE COURT:  -- she didn't say it.

7          MR. SANTARONE:  We can do it.  I guess we're just

8   going to have redact this then.

9          THE COURT:  Well, redact it.  Can we do that?

10          MR. MESSING:  Well, it's yeah, I mean, it's going to

11   take.

12          MR. BROWNLIE:  It'll take a couple minutes, but

13   I -- if.

14          THE COURT:  Well, if you take --

15          MR. BROWNLIE:  We'll have to have -- well, no, I'll

16   put on the USB redacted, Your Honor.

17          THE COURT:  All right, put it on the redacted page,

18   but I think I gave you the pages that --

19          MR. MESSING:  Yes, we have it highlighted.

20          MR. BROWNLIE:  I have it highlighted, Your Honor.

21   That's why I asked for it to be read.

22          THE COURT:  And you know, 174, 175.

23          MR. MESSING:  174 is not.

24          THE COURT:  No, it's 175.  So I have my notes.  Let

25   me double check my notes also on her testimony.

1          MR. BROWNLIE:  In the interest of time, may I request

2   a USB?

3          THE COURT:  Do we have it?  Start putting it -- I'm

4   going to let you use the trial testimony that was the parts of

5   the excerpt that was referred to during the course of the trial

6   about what she said in 1992.

7          MR. MESSING:  That's fine, Your Honor.

8          THE COURT:  In response to the questions about the

9   receipt and about providing an alibi.

10          MR. MESSING:  So I just for the sake of clarity,

11   Josh, just for the sake of clarity, what the judge has

12   enumerated is starting page 138, lines 6 to 12 and lines 17 to

13   22.

14          MR. BROWNLIE:  I'm sorry, begins on 136, line 17.

15          MR. MESSING:  I'm sorry did you say 136, Your Honor?

16          THE COURT:  Yes.

17          MR. MESSING:  Where was that?

18          MR. BROWNLIE:  So maybe I can refer back to the notes

19   since this copy is Your Honor.

20          THE COURT:  Right, go ahead.

21          MR. BROWNLIE:  So 136, lines 17 and 18, 138 lines 6

22   to 12, line 17 to 22.

23          THE COURT:  Got it

24          MR. MESSING:  Right.

25          MR. BROWNLIE:  139, lines 5 to 7.

```
1              MR. MESSING:  Right.

2              MR. BROWNLIE:  143, line 18 to 20 -- is it 22 or 23?

3              THE COURT:  23.

4              MR. MESSING:  23.

5              MR. BROWNLIE:  23.  145, 13 to 15.  150, 4 to 12.

6   And I believe that's it, Your Honor.

7              THE COURT:  Yeah.

8              MR. MESSING:  That is what I have, too.

9              THE COURT:  Before let me go check my notes because I

10  took notes of everybody's testimony.  And Detective Santiago

11  was your last witness, right?

12             MR. MESSING:  Yes.

13             THE COURT:  So this --

14        (Pause)

15             THE COURT:  She testified earlier.  Latanya, okay,

16  here it is.

17        (Pause)

18             THE COURT:  Very well, you have those -- can you

19  transcribe that or could you maybe it available and have.

20             MR. MESSING:  Yes.

21             THE COURT:  Attorney -- I heard I have a summary of

22  my notes from her testimony so.

23             MR. MESSING:  Impressed that the Court writes down

24  the page in line so.  That's --

25             THE COURT:  Yeah.  I have to pay attention, don't I?
```

1          MR. MESSING:  Apparently, yes.

2          THE COURT:  Right.

3          MR. MESSING:  The only thing I would ask is that the

4    jury be told that as they requested, they're being provided a

5    copy of the interview, which I think is exhibit what is it 38?

6    Is that right?

7          MR. BROWNLIE:  I'm redacting.

8          MR. MESSING:  Right, it's.

9          MR. BROWNLIE:  Do you have that list?

10         MR. MESSING:  I don't remember.  Oh, wait I have it.

11   It's Exhibit 36 --

12         MR. BROWNLIE:  36.

13         MR. MESSING:  -- is interview with Latanya Caison on

14   January 11th, 1992.  And then, to advise the jury that the

15   entirety of the 1992 testimony is not in evidence.

16         However, they will be provided with excerpts that

17   were referred to in the examination of Ms. Caison and are part

18   of the record in this case.

19         THE COURT:  All right, I'll do that.  So do we have

20   and we'll have to bring them out.  We have the -- let me

21   have --

22         MR. SANTARONE:  This is actually the original.

23         THE COURT:  Say that again?

24         MR. SANTARONE:  This is the original.

25         THE COURT:  All right.

1        MR. MESSING:  Well.

2        THE COURT:  Okay.  Where's the date here.  Okay, got

3  it.  All right, bring the jury in.

4     (The Judge confers with the Clerk)

5        THE COURT:  This is C-36, right?

6        MR. MESSING:  Yeah, 36 is that right, gentlemen?

7        MR. SANTARONE:  Yes, 36.

8        MR. MESSING:  Yes.

9        THE COURT:  Okay, yes, it is.

10     (Jury enters courtroom)

11        THE COURT:  You may be seated.  So members of the

12  jury, your presiding juror posed the following question.

13  Transcripts original into with Tanny Caison with detective and

14  testimony of Tanya Caison from 1992 trial.

15        So we're going to provide you with exhibit -- the

16  original of Exhibit 36, which was the interview of Ms. Latanya

17  Caison, Tanny, in the case in I think the date of the interview

18  was --

19        MR. MESSING:  January 11th.

20        THE COURT:  -- January 11, 1992 at 11:00 a.m.  So you

21  will have that for your review.

22        In terms of the testimony of Caison or Tanya Caison

23  from 1992 trial, the entirety of the trial testimony that she

24  gave is not in evidence.  It was mentioned during the

25  examination.

1          I'm going to give you portions of the testimony that

2     she was questioned on about the 1992 trial when she gave

3     testimony under oath at that trial.

4          So we will provide you with the experts -- with the

5     excerpts the portions of the testimony that were introduced in

6     this case.  I think that answers your question.  If it doesn't,

7     write me another note and let me know.

8          But we'll make that available electronically.  So you

9     have in the jury room a monitor and a dedicated laptop.  So you

10    could retrieve those exhibits or that portion of the testimony.

11    We're going to put it on flash.  And you could retrieve it.  So

12    bear with us.

13         I'm going to ask that you go back to the jury room

14    and continue with deliberations.  All right?

15              THE CLERK:  All rise.

16         (Jury exits courtroom)

17              THE COURT:  We need that back, okay.  Is it done?

18              MR. MESSING:  Yes.

19              MR. BROWNLIE:  I -- two minutes and I'll be done.

20              THE COURT:  All right.

21              MR. MESSING:  This is the only thing on flash drive.

22         (Counsel confer)

23              THE COURT:  All right, but at least give them this.

24    They could take the statement.  They will get the flash to them

25    in a few minutes.  Yeah.

1          MR. MESSING:  Mr. Brownlie's been kind enough to put

2     those excerpts on the flash drive, however, they're -- I think

3     all of your exhibits were on the flash drive including exhibits

4     that we haven't discussed as to whether they could go out.

5          THE COURT:  I know, that's why I think I mentioned

6     this way back.  Take a look at my protocol, because at the end

7     of the trial, I want you to have available a list of exhibits

8     that were admitted in the case to go out to the jury.  That's

9     why you need to consult and make sure that you take a look at

10    each other exhibits.

11         So this is why we are now adjusting and doing

12    something a little bit different.  Normally, I send everything

13    out.

14         MR. MESSING:  Right.

15         THE COURT:  So that we don't have to go back and

16    forth with the jury and they have it available.

17         Now I do understand that because there were no

18    redactions to the activity log and there's a lot of stuff that

19    it's not relevant and may be prejudicial, that you have

20    concerns.

21         But at least to the rest of the exhibits, please tell

22    me that are we going to go through the same exercise if they

23    ask for some other exhibit that is in evidence?

24         MR. MESSING:  I suggest what we do, Your Honor, is to

25    send they've already got the transcript or the copy of the 1992

1    interview.

2              THE COURT:  Okay.

3              MR. MESSING:  I suggest we give them the flash drive

4    just with the excerpts.  And then, when that's sent out I will

5    go through --

6              THE COURT:  Okay.

7              MR. MESSING:  -- all the exhibits to see if there are

8    any things we have -- anything we have to bring to the Court's

9    attention.

10             THE COURT:  All right, fair enough.  So as soon as

11   he's done, take a look at it.  And then, I'll send it out.

12             MR. MESSING:  Okay.

13             MR. BROWNLIE:  Your Honor can I just --

14             THE COURT:  But the flash has to be empty.  It

15   doesn't have any other exhibits other than that transcript,

16   right?

17             MR. BROWNLIE:  I will pull them off, but they will be

18   in one -- the flash drive will only have this exhibit on it.

19             THE COURT:  Right.

20             MR. MESSING:  And then I'll -- once that's out, I'll

21   sit down with them.

22             THE COURT:  Yeah, you could give them that.  Okay,

23   thanks.

24             MR. BROWNLIE:  Your Honor, can I just confirm page

25   145?  I have marked line.

1           THE COURT:  Lines 13 -- well.

2           MR. MESSING:  13 and 15.

3           THE COURT:  No, it starts -- I'm sorry, the question

4 is were you responsible for cleaning that entire building or

5 just some portion of it?

6           And then, the answer is the first floor and the

7 Social Security office.  So you will basically go in, start

8 your job, do your cleaning and your floor, and then the

9 offices, and then you were finished, you left?

10           Answer, I do.  Yeah.

11           MR. BROWNLIE:  So line 16 is included?

12           THE COURT:  Yes, line 16 is included.

13           MR. BROWNLIE:  Okay thank you I thought so.

14           MR. MESSING:  That's fine.

15           THE COURT:  Yeah, yeah.  That's their answer, yeah.

16 Okay?

17           MR. BROWNLIE:  Thank you, Your Honor.

18           MR. MESSING:  Thank you for your technical know-how

19 in doing that because I couldn't.

20           THE COURT:  I'm lucky I don't have the transcript.

21           MR. MESSING:  I hesitate to say this, but I'm

22 impressed.

23           MR. BROWNLIE:  Sure, Your Honor.

24           THE COURT:  All right, thanks.  Okay.

25           MR. MESSING:  Don't put any pictures that you wish to

1    send around on that flash drive, please.

2              MR. BROWNLIE:  I will not, Mr. Messing.

3         (The Judge confers with the Clerk)

4              THE COURT:  One for now.  We're working on getting

5    the flash with the other stuff ready.

6              MR. MESSING:  We're going to go through it.

7              THE COURT:  Right.

8              MR. MESSING:  And we work all this out.

9              THE COURT:  We'll make it available as soon as we

10   can.  They're going to give you the flash with the 92 portions

11   of the trial testimony that was used including the examination

12   of the witness in a few minutes.

13             MR. BROWNLIE:  I'm nearly finished.

14             THE CLERK:  That's fine.

15        (Counsel confer)

16        (Pause)

17             THE COURT:  Your one minute is up.

18             MR. BROWNLIE:  Nearly finished, Your Honor.

19             MR. MESSING:  Keep the pressure up, Your Honor, make

20   him move faster.

21             MR. BROWNLIE:  Mr. Messing wants to come over and

22   just take a look.

23             MR. MESSING:  Thank you.  Did just do all the lines

24   the judge said?

25             MR. BROWNLIE:  Yes.

1          MR. MESSING:  That's fine.  I agree.  I'll take your

2    word for that.  Don't put any funny business in there.

3          MR. BROWNLIE:  No funny business.

4        (Pause)

5          MR. MESSING:  He's almost done.

6          MR. BROWNLIE:  I'm just double checking, Your Honor.

7          THE COURT:  Appreciate that.

8        (The judge confers with the clerk)

9          MR. MESSING:  He's just double checking.  Very

10   thorough.

11         THE COURT:  Appreciate that.  That's the one thing I

12   learned as a lawyer trust, but verify.  Stacy know that.

13         MR. SANTARONE:  What's the question?

14         MR. MESSING:  What's the exhibit number for this?

15         MR. BROWNLIE:  175.

16         THE COURT:  175.  I have it right here.  175.

17       (Pause)

18         MR. BROWNLIE:  Okay, Your Honor.

19         THE COURT:  All right, give it to my deputy.

20         MR. MESSING:  And we're going to through the rest of

21   the exhibits now.

22         THE COURT:  Appreciate that.  Thank you very much.

23         MR. MESSING:  It's the least we could do.

24         THE COURT:  So that we could agree to send them out,

25   that way we don't have to be back and forth.

```
1              (Counsel confer)
2                   THE COURT:  Do you have an extra just in case?
3                   MR. BROWNLIE:  I'm afraid I only have one, Your
4      Honor.
5                   THE CLERK:  That's the same.
6                   THE COURT:  Do we have an extra in chambers?
7                   MR. MESSING:  If you have an extra flash drive we can
8      do that?
9                   THE CLERK:  No.
10                  THE COURT:  We don't?
11                  THE CLERK:  No.
12                  MR. BROWNLIE:  We had -- we originally had all of the
13     admitted exhibits.
14                  THE COURT:  Yeah, I know what happened.
15             (The Judge confers with the Clerk)
16                  MR. MESSING:  Okay.
17                  THE COURT:  We'll have the flashlight -- the flash
18     back to you in a flash.  All right --
19             (Counsel confer)
20                  THE COURT:  All right, stay here.  Don't go too far.
21             (Counsel confer about exhibits)
22             (Recess taken at 2:52 p.m., recommencing at 4:02 p.m.)
23                  MR. MESSING:  What do we have now?
24                  THE COURT:  You know, this is an old building, Mr.
25     Messing.  And your client want to be here or are you okay?
```

1          MR. MESSING:  I don't know.  Let me see how

2    significant this one is.

3          THE COURT:  Well, you see it?

4          MR. MESSING:  They want --

5          THE COURT:  They want --

6          MR. MESSING:  -- mistrial.

7          THE COURT:  Detective Jastrzembski -- I think how do

8    you pronounce his name?

9          MR. MESSING:  May I make a suggestion?  I think you

10   need to stop trying to say it.

11         THE COURT:  Yeah, I think I need to.  I think I

12   changed it.

13         MR. BROWNLIE:  There was one point where you had it

14   pretty well.

15         MR. MESSING:  No, no, never happened.

16         THE COURT:  Oh, Jastrzembski, yeah.

17         MR. SANTARONE:  Jastrzembski.

18         THE COURT:  Yeah, Jastrzembski.

19         MR. MESSING:  I have it.

20         THE COURT:  No, I think I want to stop.

21         MR. MESSING:  Just stop, stop.

22         THE COURT:  Detective J.

23         MR. MESSING:  Whatever anything but hearing you say

24   that again.  I'm begging you.

25         THE COURT:  All right, I will not say that.

 1          MR. MESSING:  I don't know what to say.  I mean, you

 2  don't have the notes of testimony of this trial I assume?

 3          THE COURT:  No, I don't.  And --

 4          MR. MESSING:  Well.

 5          THE COURT:  And I don't think -- I think it was a

 6  long --

 7          MR. BROWNLIE:  It was long.

 8          THE COURT:  Testimony.  It was like a full day

 9  almost.

10          MR. SANTARONE:  Yeah.

11          THE COURT:  So the answer is, no, they have to do the

12  best to remember collectively what the testimony was.

13          MR. MESSING:  Exactly.

14          THE COURT:  And so, do you want me to just answer the

15  note or?

16          MR. BROWNLIE:  Just answer the note.

17          MR. MESSING:  I would answer the note something like

18  the notes of testimony are not yet available.  The jury must

19  rely on their own recollection of the evidence that was

20  presented at this trial.

21          THE COURT:  Yeah, I think that's fair.  You agree?

22          MR. SANTARONE:  That's fine, Your Honor.

23          THE COURT:  All right, I'm going to make that.  See

24  if I get a pen that works here.  Okay.

25          MR. MESSING:  May I ask as I'm getting questions from

1    home, as to how late you intend to keep them today, Judge?

2              THE COURT:  Well, I told them they -- I'll check to

3    around 5 o'clock to see.

4              MR. MESSING:  You mean bring them out kind of thing

5    or check?

6              THE COURT:  No, I just ask with my staff.

7              MR. MESSING:  Okay.  And with the Court's permission,

8    I'm putting my jacket back on.

9              THE COURT:  You may.

10             MR. MESSING:  Unfortunately it doesn't have a down

11   lining.  And I've consulted with counsel for all parties and we

12   are agreement that the Court is not to pronounce the name of

13   the Defendant ever again.

14        (Counsel confer)

15             THE COURT:  This is what I have said.  The answer to

16   your question the first question is, no, we do not have the

17   notes of testimony available yet.  You must rely on your

18   collective recollection of the witness' testimony.

19             MR. SANTARONE:  That's fine, Your Honor.

20             THE COURT:  All right, let's send it back.  And we'll

21   see, hang around here.

22             MR. MESSING:  Hang around?

23             THE COURT:  Yeah, don't go too far?

24             MR. MESSING:  Do have a heavy cat in the back

25   perhaps?

1          THE COURT:  Do you want my coat?  Yes.

2          MR. BROWNLIE:  Your Honor?

3          THE COURT:  I'm afraid to ask, but maybe I should ask

4     any way.  Was there any money on the table?

5          MR. MESSING:  No.  A few years ago there was.

6          THE COURT:  All right.

7          MR. MESSING:  But not recently so.

8          THE COURT:  I have always asked at every stage of the

9     game whether the parties are interested in talking settlement,

10    but I got the feeling that nobody here was interested in that.

11         UNIDENTIFIED SPEAKER:  I had come back for this

12    particular comment.

13         THE COURT:  Yeah.  But is there any -- let's not

14    speak so loudly any interest in I don't have to take the

15    verdict.  I could take it and seal it, you know that, right?

16         MR. MESSING:  It's up to the City.

17         THE COURT:  All right.

18         MR. MESSING:  I made a demand, I reduced the demand.

19    They've never made.

20         UNIDENTIFIED SPEAKER:  So technically, Your Honor,

21    this is no longer party.

22         THE COURT:  All right, go ahead.

23         MR. MESSING:  The City indemnifies all of these guys.

24         THE COURT:  Yeah.

25         MR. MESSING:  That's up to them.  If they don't want

1    to do it, they don't want to do it.  I can't.

2              THE COURT:  All right.

3              MR. MESSING:  And she's very nice, compared to some

4    of their other lawyers so.

5         (Colloquy between the Judge and counsel, not transcribed)

6              THE COURT:  Anyway, let's see, they'll be around back

7    around 5 or 6.

8              MR. MESSING:  All right, so you're going to say

9    something to them a little before 5?

10             THE COURT:  I'll try to -- I'll ask my staff to check

11   in, you know, how long do they plan, can we get them anything

12   if they're planning to stay late, because we need to --

13             MR. MESSING:  If they want to come back tomorrow.

14             THE COURT:  If they want to come back tomorrow,

15   that's fine.

16             MR. MESSING:  Okay.

17             THE COURT:  I told them I'm on their time.

18             MR. MESSING:  Okay.

19             THE COURT:  All right?

20             MR. MESSING:  I'll be around.  I'm going to leave my

21   coat here.

22        (Colloquy between the Judge and counsel, not transcribed)

23        (Extended pause)

24             MR. MESSING:  Are you bringing the jury yet?

25             THE COURT:  Yeah, I'm bringing the jury in because

1    I -- they are done for the day and they're going to come back

2    tomorrow.

3              MR. MESSING:  All right, let me bring Mr. Dennis in.

4              THE COURT:  Yeah, so bring them in.

5              MR. MESSING:  I'll be right back.

6              THE COURT:  And I just got to read those instructions

7    because --

8              MR. MESSING:  That's fine.

9              THE CLERK:  You want me to read those instructions?

10   I know them by heart.

11             THE COURT:  Yeah, I know.

12        (The Judge confers with the Clerk)

13        (Pause)

14             THE COURT:  Okay.

15             MR. MESSING:  Yes, we're ready.

16             THE COURT:  She knows.  Text her and let her know

17   that you could bring the jury in.  She was lining them up.

18   Bring them in.

19        (Jury enters courtroom)

20             THE COURT:  You may be seated.  Members of the jury,

21   I understand that you want to recess for the day and come back

22   tomorrow morning to continue with the deliberations.  I want to

23   again repeat some of the instructions that I have been given

24   you throughout the trial.

25             The only time that you could discuss the case with a

1    view of reaching a unanimous verdict is when you are all

2    together in the jury room.  So, overnight, you cannot talk to

3    anyone about this case or confer with your other fellow jurors

4    about this case.  That would be inappropriate.

5         And you cannot supplement your knowledge about any of

6    the issues that have been presented to you from any source

7    outside of the courtroom as I have been saying repeatedly

8    throughout the trial.

9         Do not talk with anyone, listen to others talk about

10   the case until the trial has been ended, I have accepted your

11   verdict and I have discharged you from responsibilities with

12   this case.

13        Also, do not discuss this case outside of the

14   courtroom or at home, including your family and friends.

15   Remember what I have been repeatedly saying, tell your family

16   that the judge instructed you not to talk to them about the

17   case, because somebody else's ideas or conversation can

18   influence you and you should not be influenced by anything

19   other than the evidence that was presented to you from the

20   witness' mouth and the exhibits that were admitted in evidence.

21        Do not use your computer, your cellular phone, or

22   other electronic devices or (indiscernible) technology while in

23   the courtroom or during your deliberations or over the recess.

24        You certainly could use them during your

25   deliberations or during recess for personal uses, but again,

1    remember what I have been saying repeatedly do not use these

2    electronic devices to obtain or disclose the information about

3    this case to anyone.

4              You may not communicate with anyone about the case on

5    your cellphone through email, iPhone, text messaging, or on

6    Twitter through any blog or website, through any Internet

7    chatroom or by way of any other social networking websites,

8    including Facebook, Twitter, MySpace, LinkedIn, and YouTube.

9              You may not use any similar technology of social

10   media even if I have not specifically mentioned it in my

11   instructions.

12             Again, remember, the information you already have it,

13   you already have it, you cannot conduct any research or make an

14   independent investigation of your own about any matters

15   relating to this case, this type of case, any other parties in

16   this case.

17             That means, for example, that you cannot visit the

18   scene where the murder occurred, conduct any experiments,

19   consult reference work to dictionaries, or research or search

20   the Internet, websites or blogs for additional information, or

21   use a computer, cellular phone, or other electronic devices or

22   tools of technology or any other method to obtain information

23   about this case, this type of case, any other parties in this

24   case, or anything else connected with this case.

25             Do not try to find any information from any source

1    outside the confines of this courtroom, where we presented you

2    all the evidence you heard the arguments of the lawyers and I

3    gave you the charge of the Court.

4          And remember, you must decide this case only on that

5    evidence that was presented to you in this courtroom, not from

6    anything outside of this courtroom at my instructions about the

7    law, which you have in your possession.  It will be improper

8    for you to try to supplement your knowledge from any source

9    outside of the courtroom.

10         Please, you have each a pad with -- leave them

11   overnight.  We will distribute them to you again in the morning

12   when you come back to deliberate.

13         And you could begin your deliberations as soon as all

14   six of you are together.  No sooner, no later.  All six must be

15   in the jury room at the same time.

16         And I told you that I was on your time from now on,

17   but I'm assuming that you're going to be here tomorrow at 9:00

18   a.m. to continue with the deliberations.  So be here.  When all

19   of you are here, then you could begin your deliberations.

20         Members of the jury, with those instructions, again,

21   remember follow, could you do that?  And with that, have a nice

22   evening and I will see you here promptly tomorrow at 9 to

23   resume your deliberations in this case.  So have a nice

24   evening.

25         THE CLERK:  All rise.

1           (Jury exits courtroom)

2               THE COURT:  I'm going to ask that everyone remain in

3   the courtroom for a few minutes until the jury exits.

4               MR. MESSING:  Sure, yeah.

5               THE COURT:  I'll see you tomorrow.  You don't have to

6   be here, just be accessible.

7               MR. MESSING:  I'll be in my office across the street.

8               THE COURT:  All right.

9               MR. MESSING:  I made it in 8 and a half.  I could try

10  to cut it a little, but 8 and a half is pretty good for an old

11  guy, 8 and half minutes.

12              THE COURT:  Oh, all right.  So I'm not getting your

13  sense of humor, but --

14              MR. MESSING:  Most people don't.

15              THE COURT:  Okay.

16              MR. MESSING:  But you know what?

17              THE COURT:  So --

18              MR. MESSING:  You can't please everyone.

19              THE COURT:  So you don't have to come in.  You have

20  to be available within 10 minutes of a call, because they're

21  going to come in and they're going to begin deliberations at 9

22  o'clock.  And we'll see where you are by the end of the day,

23  all right?  Thank you very much.

24              MR. MESSING:  Good afternoon.

25              THE COURT:  But may I see the lawyers in chambers for

165

1    five minutes?

2              MR. MESSING:  The lawyers?

3              THE COURT:  Yes.

4              MR. MESSING:  That's me.

5              THE COURT:  I assume you are.

6              MR. MESSING:  Yeah, no.

7              THE COURT:  Looks to me -- are you in a hurry to get

8    out of here?

9              MR. MESSING:  I'm always in a hurry.

10             THE COURT:  All right.

11             MR. MESSING:  Happy to chat.

12             THE COURT:  Yeah, yeah.  Thanks.

13             MR. MESSING:  Chambers or over here?

14             THE COURT:  Yeah, chambers.

15          (Proceedings concluded at 4:52 p.m.)

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4              I, Chris Hwang, court approved transcriber, certify

5     that the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9

10

11              /s/ *Chris Hwang*

12     _____        May 8, 2024

13     Chris Hwang                      Date

14     Court Reporter

15

16

17

18

19

20

21

22

23

24

25